## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FOAMEX INTERNATIONAL INC. | ) | Bankr. Case No. 05-12685 (KG) |
| | ) | |
| Reorganized Debtor. | ) | |

-----------------------------------------------------------------x

| | | |
|---|---|---|
| | ) | |
| THE BANK OF NEW YORK, AS INDENTURE TRUSTEE, | ) | Civil Action No. 07-00212 (JJF) |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOAMEX INTERNATIONAL INC. | ) | |
| | ) | |
| Appellee. | ) | |

-----------------------------------------------------------------x

## OPENING BRIEF OF APPELLANT
## THE BANK OF NEW YORK, AS INDENTURE TRUSTEE

**POTTER ANDERSON & CORROON LLP**
Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConaill (No. 4734)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

**DECHERT LLP**
Glenn E. Siegel
Ross L. Hirsch
Davin J. Hall
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for The Bank of New York, as Indenture Trustee*

Dated:  June 25, 2007
           Wilmington, Delaware

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

ISSUE PRESENTED ON APPEAL.......................................................................3

STANDARD OF REVIEW.....................................................................................3

STATEMENT OF THE CASE................................................................................ 3

SUMMARY OF ARGUMENT .............................................................................. 5

STATEMENT OF THE FACTS ............................................................................ 6

I.      THE 2005 NOTES INDENTURE ............................................................... 6

        A.      Compounding Under the 2005 Notes Indenture ......................... 6

        B.      Post-Maturity Obligations............................................................ 7

III.    TREATMENT OF THE 2005 NOTES UNDER THE PLAN.............................. 8

ARGUMENT ......................................................................................................... 9

I.      NEW YORK LAW GOVERNS THE NOTEHOLDERS' RIGHTS
        UNDER THE INDENTURE ........................................................................ 9

II.     UNDER NEW YORK LAW, THE 2005 NOTES INDENTURE
        PROVIDES FOR POST-MATURITY COMPOUND INTEREST. .................. 10

        A.      Under New York, Interest Accrues After the Maturity Date in the
                Manner Provided for in the Debt Instrument if the Document
                States that such Interest Shall Accrue until the Debt "Is Paid" .............. 10

        B.      The 2005 Notes Indenture Provides that Interest Shall Accrue on
                the Dates and in the Manner Provided for in the 2005 Notes Until
                Principal Is Paid ........................................................................... 12

        C.      The Bankruptcy Court Erred.................................................... 14

                1. Reliance on Non-New York Law was Erroneous............................... 14

                2. "Express" Does Not Mean Contained in One Provision .................... 15

III.    BECAUSE THE 2005 NOTES INDENTURE EXPRESSLY PROVIDES
        FOR POST-MATURITY COMPOUND INTEREST AND THE
        HOLDERS OF THE 2005 NOTES WERE TO BE LEFT UNIMPAIRED
        UNDER THE SOLVENT DEBTORS' PLAN, THE BANKRUPTCY
        CODE REQUIRES THE PAYMENT OF POST-MATURITY INTEREST...... 17

CONCLUSION................................................................................................ 19

## TABLE OF AUTHORITIES

### STATUTES

11 U.S.C. § 1124....................................................................................4, 8-9

NY GBL § 5-527 .......................................................................................12

### CASES

Astoria Fed. Sav. and Loan Ass'n v. Rambalakos,
    372 N.Y.S.2d 689 (1975)..............................................................10, 14

Bank Leumi Trust Co. of New York v. Sanford Ross Management, Ltd.,
    101 A.D.2d 759 (N.Y. 1984)………………………………………...............10, 14

Berkery v. C.I.R.,
    192 B.R. 835 (E.D. Pa. 1996) ...........................................................3

Citibank, N.A. v. Liebowitz, 110 A.D.2d 615 (N.Y. 1985)…………………………....10, 14

First Business Credit Co. v. Grayboyes (In re Grayboyes), 2006 U.S. Dist. LEXIS
    6671 (E.D. Pa. 2006)....................................................................15

In re Best Payphones, Inc.,
    2003 Bankr. LEXIS 180 (Bankr. S.D.N.Y. 2003) ......................................10, 15

In re Brannon,
    476 F.3d 170 (3d Cir. 2007)..............................................................9

In re Combustion Engineering, Inc.,
    391 F.3d 190 (3d Cir. 2004)..............................................................18

In re Continental Airlines, Inc.,
    149 B.R. 76 (D. Del. 1993)..............................................................3

Debentures Protective Comm. of Continental Investment Corp. v. Continental
Investment Corp.,
    679 F.2d 264 (1st Cir. 1982)............................................................17

In re Dilts, 143 B.R. 644 (Bankr. W.D. Pa. 1992).......................................14

In re Dow Corning Corp.,
    244 B.R. 678 (E.D. Mich. 1999)........................................................17

In re Dow Corning Corp.,
    456 F.3d 668 (6th Cir. 2006) ...............................................................................17

In re Dunes Casino Hotel,
    63 B.R. 939 (D. N.J. 1986) ....................................................................................3

Elliott Assocs., L.P. v. The Republic of Peru,
    194 F.R.D. 116 (S.D.N.Y. 2000) ..........................................................................12

Empire Trust Co. v. Equitable Office Bldg. Corp.,
    167 F.2d 346 (2d Cir. 1948)..........................................................................11, 12

European American Bank v. Peddlers Pond Holding Corp.,
    185 A.D.2d 805 (N.Y. 1992) .........................................................................10, 14

In re Four Three Oh, Inc.,
    256 F.3d 107 (3d Cir. 2001)...................................................................................3

Interface Group-Nevada v. Trans World Airlines, Inc. (In re Trans World
    Airlines, Inc.),
    145 F.3d 124 (3d Cir. 1998)..................................................................................9

Leverso v. South Trust Bank,
    18 F.3d 1527 (11th Cir. 1994) ..............................................................................9

Nobleman v. American Sav. Bank,
    508 U.S. 324 (1993)..............................................................................................9

O'Brien v. Young,
    95 N.Y. 428 (1884) ...................................................................................10, 11, 14

Photopaint Techs., LLC v. Smartlens Corp.,
    335 F.3d 152 (2d Cir. 2003)...................................................................................3

In re Realty Assocs. Securities Corp.,163 F.2d 387 (2d Cir. 1947).....................................11, 16

Slutsky v. Blooming Grove Inn, Inc.,
    147 A.D.2d 208 (N.Y. 1989) .........................................................................10, 14

Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.),
    324 F.3d 197 (3d Cir. 2003)................................................................................18

Stull v. Joseph Feld, Inc.,
    309 N.Y.S.2d 985 (1970) ..............................................................................10, 14

Weiss v. Northwest Broadcasting Inc.,
    140 F.Supp.2d 336 (D. Del. 2001) ...................................................................................9

## OTHER

N.Y. Jur. 2d. Interest and Usury § 23 ..............................................................................10

## PRELIMINARY STATEMENT

In this appeal, The Bank of New York ("BNY"), as indenture trustee under a certain indenture, dated as of December 23, 1997 (the "2005 Notes Indenture")[1] asks this Court to reverse the March 23, 2007 order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), because that decision is wrong as a matter of law. The single issue upon which the Bankruptcy Court ruled was whether the 2005 Notes Indenture required the Debtors to pay post-maturity interest on overdue installments of interest (or "compound interest") to BNY because of the Debtors' payment default. This issue is determined by the 2005 Notes Indenture, which is governed by New York law. There are no factual issues in dispute.

The Debtors were required to pay post-maturity compound interest because the holders of the 2005 Notes were left unimpaired under the Debtors' confirmed Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan")[2]. Since their claims were unimpaired, the Debtors were required to leave unaltered the legal, equitable, and contractual rights of the holders. Because the terms of the 2005 Notes Indenture require the payment of post-maturity compound interest, the Debtors should have paid such compound interest. Under the Plan, however, the Debtors only paid post-maturity simple interest.

---

[1]    Pursuant to the 2005 Notes Indenture, Foamex L.P. and Foamex Capital Corporation, two of the above-captioned reorganized debtors (collectively, the "Debtors"), issued 13-1/2% senior subordinated notes due 2005 (the "2005 Notes").

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Prior to the hearing to consider the confirmation of the Plan, BNY advised the Debtors that it would object to the confirmation since the holders of the 2005 Notes would be impaired if they did not receive compound interest. In order to avoid litigation over this objection at the confirmation hearing, the Debtors and BNY agreed that the Debtors would pay what was finally determined to be the appropriate amount owed to the holders under the 2005 Notes.

Following briefing and oral argument, the Bankruptcy Court ruled from the bench. Notably, in rendering its decision, the Bankruptcy Court did not disagree with BNY's reading of the Indenture to require payment of compound interest upon default, nor did the Bankruptcy Court suggest an alternative reading of the various provisions of the Indenture cited by BNY. Rather, the Bankruptcy Court indicated that the Indenture did not "expressly" provide for post-maturity compound interest, because it was required to read various provisions of the Indenture together to arrive at the position advocated by BNY.

A correct ruling would be in accordance with the Bankruptcy Code and the Debtors' Plan. The Debtors are solvent, and the Plan required payment in full, including all applicable interest on all allowed pre-petition general unsecured claims. Payment to BNY of post-maturity interest is thus mandated by the Plan and merely permits BNY to receive the treatment it should have received with respect to its claim – to simply be made whole, as were all other pre-petition creditors.

2

## ISSUE PRESENTED ON APPEAL

Whether the Bankruptcy Court erred in concluding that the claims of the holders of the 2005 Notes were unimpaired even though the holders did not receive the post-maturity compound interest provided for in the 2005 Notes Indenture and as required by New York law.

## STANDARD OF REVIEW

For cases originating in bankruptcy court, this Court occupies the first level of appellate review. Thus, "it is settled law" that the district court's "role is to apply a clearly erroneous standard to findings of fact, while applying a de novo standard of review to questions of law." Berkery v. C.I.R., 192 B.R. 835, 837 (E.D. Pa. 1996); see also In re Four Three Oh, Inc., 256 F.3d 107, 112 (3d Cir. 2001); In re Continental Airlines, Inc., 149 B.R. 76, 84 (D. Del. 1993). Matters of contract construction are questions of law and subject to plenary review. See Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003); In re Dunes Casino Hotel, 63 B.R. 939, 944 (D. N.J. 1986).

## STATEMENT OF THE CASE

On September 19, 2005, the Debtors filed voluntary petitions for relief in the Bankruptcy Court, pursuant to Chapter 11 of the United States Bankruptcy Code. (Disclosure Statement, App. at A32.)[3] BNY participated in the Debtors' cases on behalf of the holders of the 2005 Notes.

On November 27, 2006, the Debtors filed their Plan. (Disclosure Statement, App. at A33.) The Plan provided that the claims of the holders of the 2005 Notes would be left

---

[3]    Citations to the Appendix to the Opening Brief of The Bank of New York, as Indentured Trustee, filed herewith are abbreviated "App. A___".

unimpaired. (Plan Art. IV.D.2, App. at A44.)  Accordingly, pursuant to section 1124(1) of the Bankruptcy Code, the Debtors were required to leave unaltered the legal, equitable, and contractual rights of the holders and of BNY.

Notwithstanding that requirement, in the Plan, the Debtors provided that the holders would be paid principal and simple interest at the default rate on the Plan's Effective Date.  The Plan failed to account for the payment of interest on missed interest payments that came due after the maturity date, as required by the plain terms of the 2005 Notes Indenture.

Because this issue was discrete and did not need to delay confirmation of the Plan, and in order to avoid litigation over this objection at the confirmation hearing, the Debtors and BNY agreed that BNY's objection could be resolved post-confirmation. With the express reservation of BNY's rights on this issue, the Bankruptcy Court confirmed the Plan.  Thereafter, the Debtors paid BNY (i) the full amount of principal due, (ii) a certain missed August 2005 interest payment, and (iii) simple interest on both. The Debtors did not pay interest on their missed interest payments which came due in 2006, as promised by the 2005 Notes Indenture.

Following briefing and oral argument, the Bankruptcy Court (in a bench ruling) concluded that the 2005 Notes Indenture did not "expressly" provide for post-maturity interest. (Transcript of Omnibus Hearing (the "Transcript"), Case No. 05-12685 (KG) (Bankr. D. Del. Mar. 21, 2007), App. at A73).  The Bankruptcy Court entered its order denying BNY's request on March 23, 2007.  On April 2, 2007, BNY timely filed its notice of appeal.  This is BNY's opening brief in support thereof.

## SUMMARY OF ARGUMENT

1.      The Bankruptcy Court erred when it concluded that there was no express provision in the 2005 Notes Indenture for post-maturity compound interest. Under New York law, which governs the 2005 Notes Indenture,[4] if a debt instrument provides for interest to accrue on the "unpaid" balance, or until principal is no longer "outstanding" or has been paid, then interest continues to accrue in the manner set forth in the debt instrument after the stated maturity date and until the outstanding principal is in fact paid.

2.      Pursuant to the 2005 Notes Indenture, the failure to pay principal on the stated maturity date triggered application of a default rate. More importantly, the 2005 Notes Indenture expressly provides that this default interest continues to "accrue" until the notes are no longer outstanding and the principal has been paid. Indeed, under the 2005 Notes Indenture, interest accrues semi-annually and is payable on stated interest payment dates. When interest payments are not made, default interest accrues on the overdue installments of interest. Because the principal amount of the 2005 Notes was not paid until February 12, 2007 (the date the Plan was substantially consummated), rather than the stated maturity date of August 15, 2005, the Debtors are required to make additional payments of installment interest after the maturity date, as well as pay interest on such overdue installments of interest. However, the Debtors have only paid default interest on principal and the August 15, 2005 missed interest payment and, as such, have not paid the claims of the holders in full. Accordingly, because the Plan was to leave the claims of the holders unimpaired, and the Debtors have a valid contractual obligation to

---

[4]      See 2005 Notes Indenture § 13.8, App. at A15 ("The internal laws of the State of New York, without regard to conflicts of laws principles thereof, shall govern and be used to construe th[e] Indenture, the Notes and the Note Guarantees.").

pay post-maturity compound interest, this Court should order payment of such interest to the holders of the 2005 Notes.

## STATEMENT OF THE FACTS

### I.    The 2005 Notes Indenture

    *A.    Compounding Under the 2005 Notes Indenture*

Under the 2005 Notes Indenture, the Debtors were required to pay principal and interest on the dates and in the manner provided in the 2005 Notes. (2005 Notes Indenture § 4.1, App. at A09.) The 2005 Notes required that principal be paid on August 15, 2005. (2005 Notes, App. at A16.) In addition, the Debtors were to pay interest "semi-annually in arrears on February 15 and August 15 . . . (each an "Interest Payment Date")." (2005 Notes, App. at A22.) The Debtors did not make the required principal or interest payment due on August 15, 2005, and therefore, the Debtors were in default of the 2005 Notes Indenture prior to the Petition Date. (Disclosure Statement, App. at A36.)

This failure to pay both principal due and payable upon maturity and the August 15, 2005 interest payment constituted an "Event of Default" under the 2005 Notes Indenture,[5] which triggered a default rate of interest (of 14.5%) on outstanding principal and missed interest payments.[6]

---

[5]    2005 Notes Indenture § 6.1(a), (b), App. at A10 ("An event of default occurs if . . . (a) the Issuers default for 30 days in the payment when due of interest . . . [or] the Issuers default in payment when due of the principal . . . on the Notes.").

[6]    2005 Notes Indenture § 4.1, App. at A09 ("The Issuers shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest . . . at the same rate to the extent lawful"); see also id. § 2.12, App. at A08 ("If the Issuers or the Subsidiary Guarantors default in a payment of interest on the Notes, they shall pay the defaulted interest in any

In addition to default interest, the 2005 Notes Indenture provides for the payment of compound interest. Specifically, the 2005 Notes require the Debtors to:

> pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest at the [default] rate.

(2005 Notes § 1, App. at A22); see also (2005 Notes Indenture § 4.1, App. at A09 (same)). Thus, the 2005 Notes Indenture expressly stipulates that compound interest (i.e., interest-on-interest) accrues on the 2005 Notes.

B.    *Post-Maturity Obligations*

The obligation to pay installments of interest (and default interest on those missed installments) on account of the 2005 Notes continues after the stated maturity date. This obligation is expressly stated in a number of provisions of the 2005 Notes Indenture. For example, section 8.1 of the 2005 Notes Indenture unequivocally provides that *"the Issuers' [payment] obligations in section 4.1 . . . shall survive until the Notes are no longer outstanding."* (2005 Notes Indenture § 8.1, App. at A13-A14) (emphasis added). In addition, section 2.8 of the 2005 Notes Indenture (entitled "Outstanding Notes") makes it clear that a note ceases to be outstanding and accrue interest only when the principal is paid under section 4.1:

> If the principal amount of any Note is considered paid under Section 4.1 hereof, it ceases to be outstanding and interest on it ceases to accrue.

(2005 Notes Indenture § 2.8 ¶ 3, App. at A07); see also (id., ¶ 4) (*"[i]f the Paying Agent . . . holds, on a redemption date or maturity date, money sufficient to pay Notes payable on*

---

> lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.1").

*that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.*") (emphasis added).[7]  Because the Debtors did not pay the principal amount on the stated maturity date, the 2005 Notes were outstanding on that date.  Therefore, the 2005 Notes required continued semi-annual interest payments, and continued to accrue default interest, and interest on interest (or compound interest).

## II.    Treatment of the 2005 Notes under the Plan

On February 1, 2007, the Bankruptcy Court entered an order confirming the Plan. Under the Plan, the claims of the holders of the 2005 Notes were to be left *unimpaired* within the meaning of section 1124 of the Bankruptcy Code.  See (Plan, Art. IV.D.2, App. at A44.)  These claims were classified as Class 4 Claims under the Plan and were deemed Allowed (as defined in the Plan) in the aggregate amount of (i) the outstanding principal, (ii) the August 15, 2005 interest payment, and (iii) accrued default rate simple interest on principal and the August 15, 2005 interest payment from the stated maturity date through the Petition Date. (Plan, Art. IV.D.1, App. at A43.)  On February 12, 2007, the holders were paid this Allowed claim, plus certain "Post-Petition Interest."  See (Plan, Article IV.D.1, App. at A43.)

"Post-Petition Interest" was defined as "accrued and unpaid interest pursuant to the 2005 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the default rate provided for in the 2005 Senior Subordinated Notes Indenture." (Plan, App. at A40-A41.)  As such, the Debtors paid only post-maturity

---

[7]      It should also be noted that the 2005 Notes provide a date certain for the commencement of interest payments (February 15, 1998), but no certain termination date.  (2005 Notes § 1, App. at A22.)

*simple* interest at the default rate on the Plan's Effective Date (ignoring the Interest

Payment Dates), even though the holders of the 2005 Notes were to be left unimpaired.

The Bankruptcy Court subsequently upheld this payment as all that the Debtors were

required to make pursuant to section 1124 of the Bankruptcy Code.

## ARGUMENT

The Plan provides that the rights of the holders of the 2005 Notes are to be

unimpaired.  Since they were to be left unimpaired, and the 2005 Notes Indenture and the

2005 Notes require compounding of unpaid interest until the 2005 Notes are paid, the

Debtors are required to pay compound interest to the holders of the 2005 Notes.

## I.    New York Law Governs the Noteholders' Rights Under the Indenture

The 2005 Notes Indenture and the 2005 Notes provide that New York law

governs the rights of the parties to the 2005 Notes Indenture and the holders of the 2005

Notes.  2005 Notes Indenture § 13.8.

This provision is enforceable in bankruptcy, <u>Leverso v. South Trust Bank</u>, 18 F.3d

1527, 1531 (11th Cir. 1994) ("[b]ondholders' rights are a matter of contract, governed by

the trust indenture and general principles of contract law."), and courts within the Third

Circuit will enforce a contract's choice of law provision.  <u>See, e.g.</u>, <u>Interface Group-

Nevada v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)</u>, 145 F.3d 124,

134 (3d Cir. 1998); <u>Weiss v. Northwest Broadcasting Inc.</u>, 140 F.Supp.2d 336, 342 (D.

Del. 2001).  <u>See generally</u> <u>Nobleman v. American Sav. Bank</u>, 508 U.S. 324, 329 (1993)

("Congress has 'left the determination of property rights in the assets of a bankrupt's

estate to state law,' since such '[p]roperty interests are created and defined by state

law.'") (quoting in part <u>Butner v. United States</u>, 440 U.S. 48, 54 (1979)); <u>accord</u> <u>In re

Brannon</u>, 476 F.3d 170, 176 (3d Cir. 2007) (stating that Courts within the Third Circuit

will "turn to state law for the 'determination of property rights in the assets of a bankrupt's estate.'").

## II. Under New York Law, the 2005 Notes Indenture Expressly Provides for Post-Maturity Compound Interest. [8]

### A. Under New York Law, Interest Accrues After the Maturity Date in the Manner Provided for in the Debt Instrument if the Document States that such Interest Shall Accrue until the Debt "Is Paid"

Under New York law, if a debt instrument provides for interest to accrue in a particular manner until the principal amount of the debt is paid, such interest will accrue in the same manner regardless of the instrument's stated maturity date. See, e.g., O'Brien v. Young, 95 N.Y. 428, 430 (1884) (use of the phrase "until the principal shall be paid" was dispositive); accord European American Bank v. Peddlers Pond Holding Corp., 185 A.D.2d 805, 805 (N.Y. 1992) (noting that the foregoing principle is "well established"); Slutsky v. Blooming Grove Inn, Inc., 147 A.D.2d 208 (N.Y. 1989) (same); Citibank, N.A. v. Liebowitz, 110 A.D.2d 615 (N.Y. 1985); Bank Leumi Trust Co. of New York v. Sanford Ross Management, Ltd., 101 A.D.2d 759 (N.Y. 1984); Astoria Fed. Sav. and Loan Ass'n v. Rambalakos, 372 N.Y.S.2d 689 (1975); Stull v. Joseph Feld, Inc., 309 N.Y.S.2d 985 (1970); see also 72 N.Y. Jur. 2d. Interest and Usury § 23 (noting that the use of similar language means that the maturity date will be disregarded); In re Best Payphones, Inc., 2003 Bankr. Lexis 180, at *19, Case No. 01-15472 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2003) (attached as Exhibit A) (concluding that the only reasonable

---

[8] It should be noted that the Debtors agree that they were obligated to pay compound interest pre-maturity and indeed did so for their 9-7/8% notes due 2007 (which are virtually identical to, and rank *pari passu* with, the 2005 Notes) under the Plan. This created the odd result that claims of the holders of notes which had not yet matured were treated better than the claims of holders of notes which had matured, even though the interest provisions of the matured instrument were to apply post-maturity. See Plan, Article I.A.

interpretation of a document was that certain interest provisions continued to govern until the payment of principal) (citing O'Brien, 95 N.Y. at 428).

Accordingly, under New York law, if an indenture provides for the accrual of interest until the principal "is paid," such language is sufficient to constitute a stipulation between the contracting parties that interest accrues in the manner provided for in the indenture after the stated maturity date. For example, in In re Realty Assocs. Securities Corp., the Court of Appeals for the Second Circuit considered an appeal by a *debtor* who argued that the contract rate of interest (rather than the statutory rate of interest) should have been paid on its matured but unpaid bonds upon its exit from bankruptcy. 163 F.2d 387, 389-90 (2d Cir. 1947). After (i) cross-referencing a number of sections in the indenture (particularly, that the default rate of interest applied after an event of default, and nonpayment at maturity being one such event) and (ii) considering that "it is common ground that under the New York decisions interest continues [in the manner provided for in the specific contract] . . . if the contract provides for payment of interest 'until the principal shall be paid,'" the Court held that the bondholders were entitled to post-maturity interest in accordance with the terms of their indenture. Id. at 390-92 (citing O'Brien, 95 N.Y. at 430).

Similarly, in Empire Trust Co. v. Equitable Office Bldg. Corp., 167 F.2d 346 (2d Cir. 1948), the debtor's plan of reorganization provided for the payment of certain debentures in full with interest to the date of consummation of the plan. Id. at 347. The issue in the case was whether the debenture holders were entitled to interest at the contract rate or the statutory rate for interest that accrued after an accelerated maturity date. Id. The court held that, because the debenture contained a provision to pay interest

on principal "until such principal shall be paid," contractual interest continued to accrue. Moreover, the Court also "construed" a clause in the debenture to be an equivalent of a covenant to pay interest on matured coupons of interest, [9] but because such a compounding provision was void under New York law at the time Empire Trust was decided, the Court could not enforce it. Id. at 348-49. Payment of compound interest, however, is now clearly authorized under current New York law and the 2005 Notes Indenture expressly provides for compounding in section 4.1 of the indenture, section 1 of the Note, and as set forth below. See NY GBL § 5-527 ("A loan or other agreement providing for compound interest shall be enforceable notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed). See generally Elliott Assocs., L.P. v. The Republic of Peru, 194 F.R.D. 116, 119 (S.D.N.Y. 2000) (ordering the payment of post-maturity compound interest pursuant to New York law).

B.    The 2005 Notes Indenture Provides that Interest Shall Accrue on the Dates and in the Manner Provided for in the 2005 Notes Until Principal Is Paid

The 2005 Notes Indenture provides for interest to accrue in the manner provided for in the 2005 Notes after the maturity date and until principal is paid, and the obligation to pay installments of interest (and default interest on those missed installments) on account of the 2005 Notes continues after the stated maturity date.

---

[9]    The court looked to the terms of the indenture for this obligation, because the interest coupon itself was silent about post-maturity interest. Id. at 348-49 ("[W]e think the . . . clause should be construed as equivalent to a covenant to pay interest at 5% per annum on overdue coupons."). This suggests that an obligation to pay post-maturity compound interest need not be contained in one provision in order for a court to conclude that it exists.

This obligation is stated in a number of provisions in the 2005 Notes Indenture. Specifically, section 8.1 of the 2005 Notes Indenture provides that "*the Issuers' [payment] obligations in section 4.1 . . . shall survive until the Notes are no longer outstanding.*" (2005 Notes Indenture, App. at A14) (emphasis added). Notably, there is no mention of the "maturity" date.

In addition, section 2.8 of the 2005 Notes Indenture (entitled "Outstanding Notes") states that interest continues to accrue in the manner provided for in the 2005 Notes until principal is paid. (2005 Notes Indenture § 2.8, ¶ 3, App. at A07) ("*If the principal amount of any Note is considered paid under Section 4.1 hereof, it ceases to be outstanding and interest on it ceases to accrue.*" (emphasis added)); see also (id., ¶ 4) ("*[i]f the Paying Agent . . . holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.*" (emphasis added)). Again, there is no mention of the "maturity" date being the termination date.

Thus, the 2005 Notes Indenture provides that interest continues to accrue on the 2005 Notes, on the dates and in the manner provided for in the notes, *until principal is paid.* See (2005 Notes Indenture §§ 2.8, 4.1, 8.1, App. at A07, A09, A13-14.) Pursuant to the 2005 Notes, interest accrues semi-annually, and if it is not paid on the applicable Interest Payment Date, default interest accrues on the missed interest payments. Sections 2.8 and 8.1 mandate that interest accrues in this manner until principal is paid, and the Debtors were obligated to make interest payments on February 15, 2006, and August 15, 2006 (at the default rate). They did not, thereby causing default interest to accrue on these overdue installments of interest.

Since the 2005 Notes Indenture states that interest shall cease to accrue only if the principal is paid, and interest accrues at a default rate compounded semi-annually, see discussion supra pp. 10-12, under New York law, the Debtors are required to pay post-maturity compound interest at the default interest rate, rather than just simple interest.

C.    The Bankruptcy Court Erred

1.    *Reliance on Non-New York Law was Erroneous*

The Bankruptcy Court was apparently persuaded by the Debtors' argument that it was not "enough to state . . . that the indenture survives until the notes are no longer outstanding." (Transcript, App. at A58, A62, A71.)  As indicated above, however, the Bankruptcy Court erred in relying on a body of case law that contradicts the law of New York or was otherwise patently inapplicable.  For example, in In re Dilts, the bankruptcy court based a denial of payment of post-maturity contractual interest on the observation that, "[u]nder Pennsylvania law, 'until paid' relates only to the maturity date." 143 B.R. 644, 647 (Bankr. W.D. Pa. 1992).  As indicated above, the New York courts do not follow that principle of law, and the use of the phrase "until paid" does in fact constitute an express stipulation between the parties that interest shall continue to accrue in the manner provided for in the debt instrument after the maturity date or until the debtor's obligations are no longer outstanding.  See, e.g., O'Brien v. Young, 95 N.Y. 428, 430 (1884) European American Bank v. Peddlers Pond Holding Corp., 185 A.D.2d 805, 805 (N.Y. 1992); Slutsky v. Blooming Grove Inn, Inc., 147 A.D.2d 208 (N.Y. 1989); Citibank, N.A. v. Liebowitz, 110 A.D.2d 615 (N.Y. 1985); Bank Leumi Trust Co. of New York v. Sanford Ross Management, Ltd., 101 A.D.2d 759 (N.Y. 1984); Astoria Fed. Sav. and Loan Ass'n v. Rambalakos, 372 N.Y.S.2d 689 (1975); Stull v. Joseph Feld, Inc., 309

14

N.Y.S.2d 985 (1970); In re Best Payphones, Inc., 2003 Bankr. Lexis 180, at *19, Case

No. 01-15472 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2003).

Likewise, in First Business Credit Co. v. Grayboyes (In re Grayboyes), a decision

that was also based on Pennsylvania law, the district court affirmed the bankruptcy

court's determination that only simple interest was to accrue on a debt instrument

because the "loan documents fail[ed] to specify that interest should be calculated

according to a compound interest formula." 2006 U.S. Dist. LEXIS 6671, at *34 (E.D.

Pa. 2006) (attached as Exhibit B). Even if this case was binding precedent (which it is

not, since it is based on Pennsylvania law), it is readily distinguishable, because the 2005

Notes Indenture clearly requires the payment of compound interest. See (2005 Notes

Indenture §§ 2.12, 4.1, 8.1, App. at A08, A09, A13-14); see also (2005 Notes § 1, App. at

A22).

### 2.    *"Express" Does Not Mean Contained in One Provision*

Although the Bankruptcy Court noted that it understood BNY's argument, found

it to be "skillful" and "well made," and did not challenge its interpretation of the

indenture provisions, it was ultimately not persuaded by it, because (in its opinion) there

was no "express" provision for compound interest. See (Transcript, App. at A73.) The

Court seemed to imply that such a provision needed to be made in one sentence or

perhaps required a separate single paragraph on post-maturity interest. See (Transcript at

A71 ("[T]he Court emphasi[zes] the word express.").) Although under New York law a

debt instrument just needs to provide that interest shall accrue until principal is paid (in

order for contractual interest to continue on past the maturity date), sections 2.8 and 8.1

of the 2005 Notes Indenture do in fact contain express statements that the interest provisions of the 2005 Notes extend beyond their maturity.

Moreover, simply because a handful of sections of the 2005 Notes Indenture need to be cross-referenced in order to fully state the Debtors' obligation to pay post-maturity compound interest does not render the obligation "implied."[10]  For something to be "express," it just has to be clearly stated; "express" is not synonymous with "succinct" or "terse."  Certainly, it cannot be suggested that courts interpreting New York law would not cross reference particular provisions in an indenture to determine whether a debtor would be contractually obligated to provide post-maturity interest.  See, e.g., Realty Assocs., 163 at 390 ("[A]fter an 'event of default' (nonpayment at maturity being specified as one such event) [certain interest] shall be applied to the payment of principal and interest then owing.").  In any event, the key point under New York law is that because the 2005 Notes were not considered to be "paid" until the Effective Date, interest continued to accrue in the manner and on the dates provided for in the notes.  See (2005 Notes Indenture §§ 2.8, 2.12, 4.1, 8.1, App. at A07-A08, A09, A13-A14.)

Additionally, although the obligation to pay post-maturity compound interest does arise from a number of sections, that does not mean the obligation is implied or inferred -- sections 2.8 and 8.1 clearly state that interest continues to accrue until the notes are paid, section 4.1 states that interest accrues in the manner and on the dates provided for in

---

[10]    In fact, this is exactly how the Debtors themselves reasoned that they needed to pay post-maturity *simple* interest under the Plan, since section 6.1 of the 2005 Notes Indenture identifies what constitutes an event of default, and section 2.12 and 4.1 tell the Debtors what rate of default interest they had to pay.  Indeed, at no point have the Debtors pointed to a provision in the 2005 Notes Indenture that supports their argument that their obligation to pay interest on the Interest Payment Dates ceases to exist after the maturity date, especially when principal was still outstanding.

the notes, and section 1 of the notes states that interest is due twice a year and that default interest accrues on the missed interest payments. Thus, it is quite clear that the Debtors are required to pay post-maturity compound interest.

III.     **Because the 2005 Notes Indenture Expressly Provides for Post-Maturity Compound Interest and the Holders of the 2005 Notes were to be Left Unimpaired under the Solvent Debtors' Plan, the Bankruptcy Code Requires the Payment of Post-Maturity Interest.**

Because (i) the 2005 Notes Indenture provides for post-maturity compound interest, (ii) the holders of the 2005 Notes were to be left unimpaired under the Plan, and (iii) the Debtors are solvent, this Court must reverse the Bankruptcy Court and order that the Debtors pay post-maturity compound interest at the default rate. When dealing with issues similar to those presented to this Court, the United States Court of Appeals for the Sixth Circuit held that "[w]here the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, providing for interest on unpaid installments of interest, the bankruptcy court will enforce the contractual provision with respect to both instalments [sic] due before and . . . after the petition was filed. . . . This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to his advantage." In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006) (quoting In re Dow Corning Corp., 244 B.R. 678, 695 (E.D. Mich. 1999)); accord Debentures Protective Comm. of Continental Investment Corp. v. Continental Investment Corp., 679 F.2d 264, 269 (1st Cir. 1982) (stating that a bankruptcy court should enforce a contractual provision for interest on unpaid installments of interest in the pre and post-petition periods in the case of a solvent debtor). Because there is indeed

17

a valid contractual provision for post-maturity and post-petition interest, the Debtors (and, by implication, their equityholders) should not be able to reap a windfall by not paying due and outstanding default interest-on-interest.

Furthermore, because the Plan was to leave the holders of the 2005 Notes unimpaired, they must be paid in full. See In re Combustion Engineering, Inc., 391 F.3d 190, 216 (3d Cir. 2004); Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.), 324 F.3d 197, 202 (3d Cir. 2003). In order to be paid in full, they must be given everything that is owed to them under their indenture (i.e., post-maturity compound interest). Since the 2005 Notes Indenture contains an express provision for post-maturity compound interest, which is valid under New York state law, and the Debtors are solvent and have obligated themselves to pay the 2005 Notes in full (under the Plan), this Court must therefore require the Debtors to give the holders of the 2005 Notes the benefit of their bargain by ordering the payment of such interest.

## CONCLUSION

WHEREFORE, BNY respectfully requests that the Court enter an order (i) reversing the Order from which BNY appealed, (ii) concluding that the 2005 Notes Indenture requires the payment of post-maturity compound interest at the default interest rate provided therein, (iii) requiring that the Debtors pay such interest to the holders of the 2005 Notes, and (iv) granting such further relief as the Court may deem just and proper.

Dated: June 25, 2007

POTTER ANDERSON & CORROON LLP

Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConaill (No. 4734)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

-and-

DECHERT LLP
Glenn E. Siegel
Ross L. Hirsch
Davin J. Hall
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

Counsel for The Bank of New York, as Indenture Trustee

Pac#803724

19

# EXHIBIT A

LEXSEE 2003 BANKR. LEXIS 180

**In re: BEST PAYPHONES, INC., Debtor.**

**Chapter 11, Case no. 01-15472(SMB)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 Bankr. LEXIS 180*

**March 10, 2003, Decided**

**NOTICE:**    [*1] NOT FOR PUBLICATION

**PRIOR HISTORY:** *In re Best Payphones, Inc., 2002 Bankr. LEXIS 1412 (Bankr. S.D.N.Y., Dec. 11, 2002)*

**DISPOSITION:**    Motion for reconsideration denied.

**COUNSEL:** Fran M. Jacobs, Esq., Of Counsel, DUANE MORRIS LLP, New York, New York, for Manhattan Telecommunications Corporation.

MAYNE MILLER, ESQ., New York, New York, for Debtor.

**JUDGES:** STUART M. BERNSTEIN, Chief United States Bankruptcy Judge.

**OPINION BY:** STUART M. BERNSTEIN

**OPINION**

MEMORANDUM DECISION DENYING MO-TION TO RECONSIDER ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT MADE BY MANHATTAN TELECOMMUNICATIONS CORPORATION

STUART M. BERNSTEIN

Chief United States Bankruptcy Judge

On December 11, 2002, I granted in part and denied in part the motion by Manhattan Telecommunications Corporation ("MetTel") for partial summary judgment overruling the debtor's objection to MetTel's proof of claim. In re Best Payphones, Inc., 2002 Bankr. LEXIS 1412, Case no. 01-15472, 2002 WL 31767796 (the "De-cision"). On December 30, 2002, the Court entered an order (the "Order")(ECF Doc. # 224) reflecting disposi-tion of the motion.

The debtor, Best Payphones, Inc. ("Best"), has moved for reconsideration of certain parts [*2] of the underlying decision pursuant to *FED. R. BANKR. P. 9024, FED R. CIV. P. 60* and *11 U.S.C. § 502(j)*. For the reasons that follow, the motion is denied.

**DISCUSSION**

**A. The Standards Governing the Motion**

Initially, the parties disagree over the standards that govern Best's motion. The Federal Rules of Civil Proce-dure do not mention motions for reconsideration. *Broadway v. Norris, 193 F.3d 987, 989 (8th Cir. 1999)*; 12 JAMES WM. MOORE, *MOORE'S FEDERAL PRACTICE § 59.30[7]*, at 59-112 (3rd ed. 2002)("MOORE"). Nevertheless, courts have generally held that regardless of the title, a motion filed within ten days of the entry of judgment is treated as a motion to alter or amend the judgment under *FED. R. CIV. P. 59(e)* [1], while one filed more than ten days after the entry of judgment is treated as a motion seeking relief from the judgment under *FED. R. CIV. P. 60(b)* [2]. 12 *MOORE § 59.30[7]*, at 59-112 to 59-114. The same "timing" rules apply to motions to reconsider the allowance or disal-lowance of claims under *11 U.S.C. § 502(j)* [3] and *FED. R. BANKR. P. 3008*. [4] *In re Aguilar, 861 F.2d 873, 875-75 (5th Cir. 1988)*. [*3]

1 *Rule 59(e)* states:

Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.

2 *Rule 60(b)* states in relevant part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under *Rule 59(b)*; (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment ....

Bankruptcy *Rule 9024* generally makes *Rule 60(b)* applicable to bankruptcy proceedings with exceptions or modifications that are not relevant.

[*4]

3 *Section 502(j)* states in relevant part:

A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case ....

4 *Rule 3008* states:

A party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate. The court after a hearing on notice shall enter an appropriate order.

The foregoing rules only apply, however, to final orders, judgments or proceedings. See Cancel v. Mazzuca, 2002 U.S. Dist. LEXIS 15201, No. 01 Civ. 3129 (NRB), 2002 WL 1891395, at *3 (S.D.N.Y. Aug. 15, 2002)(*Rule 60(b)*); *Broadway v. Norris, 193 F.3d 987, 989 (8th Cir. 1999)*(*Rule 59(e)*) [5]; *In re New Concept Hous., Inc., 951 F.2d 932, 935 (8th Cir. 1991)*(Bankruptcy Rule 3008); *In re Shook, 278 B.R. 815, 828 n.13 (B.A.P. 9th Cir. 2002)*(same); see generally 12 *MOORE § 60.23*, at 60-75 to 60-77 (*Rule 60(b)*); 9 ALAN N. RESNICK & HENRY J. SOMMER, *COLLIER ON BANKRUPTCY P 3008.01[3]*, at 3008-4 to 3008-5 (15TH ed. rev. 2002)(*Rule* [*5] *3008*)("COLLIER"). Here, the Order partially granted and partially denied summary judgment allowing Met-Tel's proof of claim, and was, therefore, not final. See *United States v. 228 Acres of Land & Dwelling, 916 F.2d 808, 810-11 (2d Cir. 1990)*; Cancel v. Mazzuca,2002 U.S. Dist. LEXIS 15201, No. 01 Civ. 3129 (NRB), 2002 WL 1891395, at *3 (S.D.N.Y. Aug. 15, 2002). As a result, these rules do not govern Best's motion.

5     Contrasting *Rule 59(e)* with *Rule 60(b)*, Broadway v. Norris stated that *Rule 60(b)* applied to non-final orders. *193 F.3d at 989*. This conclusion is not supported by the language of *Rule 60(b)* or the cases or commentators that have addressed the question.

A court may nevertheless reconsider its interlocutory orders pursuant to its inherent authority, *United States v. LoRusso, 695 F.2d 45, 53 (2d Cir. 1982)*, cert. denied, *460 U.S. 1070 (1983)*, or under FED. R. CIV. P. 54(b). The latter rule provides, in this regard, that an interlocutory order [*6] that has been not certified as a final judgment "is subject to revision at any time before the entry of [final] judgment." The court should, however, cautiously exercise this authority. Complete disposition of discrete issues and claims is often essential to effective case management. 10 *MOORE § 54.25[4]*, at 54-87. If a court is forced to revisit earlier interlocutory rulings, "much of the advantage in making the early rulings would be lost." Id.

Consequently, a court need not revisit an uncertified interlocutory order unless doing so would be consistent with the doctrine of law of the case. *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 2003 U.S. App. LEXIS 3293, No. 01-9432, 2003 WL 402156, at *13 (2d Cir. Feb. 20, 2003)*; 10 *MOORE § 54.25[4]*, at 54-87; see *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)*. Thus, reconsideration of non-final orders is "subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Official Committee of Unsecured Creditors of Color Tile, Inc., 2003 U.S. App.*

LEXIS 3293, 2003 WL 402156, at *13 **[*7]** (quoting *Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964).* "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d at 1255* (quoting 18 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 4478, at 790); accord *Official Committee of Unsecured Creditors of Color Tile, Inc., 2003 U.S. App. LEXIS 3293, 2003 WL 402156, at *13-14.*

Finally, *Local Bankruptcy Rule 9023-1(a)* amplifies the standards for reconsideration. *BANKR. S.D.N.Y.R. 9023-1(a)* states:

> A motion for reargument shall be served within 10 days after the entry of the Court's determination of the original motion and, unless the Court orders otherwise, shall be made returnable within the same amount of time as required for the original motion. The motion shall set forth concisely the matters or controlling decisions which counsel believes the Court has not considered. No oral argument shall be heard unless the Court grants the motion and specifically orders that the matter be reargued **[*8]** orally.

Under this rule, the moving party must show that the court overlooked controlling decisions or factual matters "that might materially have influenced its earlier decision." *Anglo-American Ins. Group v. Calfed, Inc., 940 F. Supp. 554, 557 (S.D.N.Y. 1996)*(quoting *Morser v. AT & T Information Sys., 715 F. Supp. 516, 517 (S.D.N.Y. 1989)); accord Farkas v. Ellis, 783 F. Supp. 830, 832-33 (S.D.N.Y.),* aff'd *979 F.2d 845 (2d Cir. 1992).* The rule permitting reargument must be narrowly construed to avoid repetitive arguments on issues that the court has already fully considered. *Farkas v. Ellis, 783 F. Supp. at 832.* Further, and subject to the rules governing newly discovered evidence, the parties cannot advance new facts or arguments, and may not submit affidavits or new material. See *Pereira v. Aetna Cas. & Sur. Co. (In re Payroll Express Corp.), 216 B.R. 713, 716 (S.D.N.Y. 1997).*

B. Grounds for Reconsideration

1. The Chaite Declaration

Best formerly purchased dial tone services from the North American Telecommunications Corporation,

("Natelco"), switched to MetTel, **[*9]** and then switched back to Natelco. During the second Natelco period, Natelco filed a chapter 11 bankruptcy, and entered into an agreement to sell its assets, including its customer accounts, to MetTel.

Michael Chaite, Best's president, submitted a declaration in the Natelco bankruptcy in opposition to the proposed sale of Natelco's assets to MetTel. He stated under the penalty of perjury that "there were no billing disputes with Natelco as there had been with MetTel." [6] Decision 2002 Bankr. LEXIS 1412 [WL], at *3. I concluded that Chaite could not defeat summary judgment by contradicting his earlier declaration through a new affidavit claiming Best had disputed Natelco's bills. Decision 2002 Bankr. LEXIS 1412 [WL], at *9. Best has asked for reconsideration, contending that the statement in his earlier declaration was qualified, and did not contradict his testimony in opposition to MetTel's summary judgment motion.

> 6    Although the Decision correctly quoted the declaration, it incorrectly paraphrased it, referring to the absence of "billing disputes between the Debtor and MetTel." Decision at *8. As noted, the declaration discussed the absence of billing disputes between Best and Natelco.

**[*10]** Best's attempt to qualify or limit the thrust of Chaite's declaration testimony was considered and rejected. Decision 2002 Bankr. LEXIS 1412 [WL], at *9 n.11. The current motion merely rehashes Best's earlier opposition. It fails, however, to identify anything that was overlooked, or point to a clear error or a manifest injustice.

2. Natelco's Waiver

Although never mentioned in its original claim objection, Best eventually contended that Natelco had waived its claims under the Natelco Agreement # 1. Chaite attested to an agreement -- he never identified the individuals who made it -- under which Natelco agreed to "forgive" the charges that could not be documented, and accept 50% on those that could. (Reply to Declaration of David Aronow Deemed Motion for Summary Judgment on Debtor's Objection to Mettel's Proofs of Claim, dated Oct. 11, 2002, at P 20)(ECF Doc. # 158.) Chaite stated that this agreement was memorialized in a letter (which Best never produced) and confirmed in an e-mail. (See id. PP 20-21.) I considered two e-mails produced by Best during oral argument, and concluded that they failed to raise a triable issue regarding the issue of waiver. [7] See Decision 2002 Bankr. LEXIS 1412 [WL], at *8.

7  As MetTel has noted, I rejected the waiver argument as a matter of law for additional reasons.

[*11]  Best has asked me to reconsider its waiver argument, and has offered two additional declarations in further support. The Declaration of Michael Chaite in Support of Application For an Order Granting Reconsideration of Order Disposing Of Motion for Summary Judgment and Allowing Claim of MetTel in Part, dated Jan. 9, 2003, (ECF Doc. # 230), mainly repeats the statements in the Chaite declaration submitted in opposition to the motion for summary judgment. Chaite again mentions a waiver agreement, using the passive voice ("an agreement was reached"), without identifying the individuals who made the agreement. (Id. P 2.) He also refers to the memorialization of the agreement, and offers an explanation of the circumstances under which the agreement arose. (Id.)

Best is essentially asking me to reach a different conclusion based on the same evidence I previously considered. To the extent that Chaite's new declaration amplifies or supplements the evidence regarding the "execution" of the waiver agreement, it does not meet the criteria for "new evidence." Where reconsideration is sought based on new evidence, the motion should be judged under *FED. R. CIV. P. 60(b)(2).* [8] [*12]  *Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112, 114 (S.D.N.Y. 2001); Morin v. Turpin, 809 F. Supp. 1081, 1086 (S.D.N.Y. 1993).* The movant must satisfy five requirements: (1) the newly discovered evidence must concern facts that existed at the time of the earlier proceeding, (2) the movant must have been "justifiably ignorant of them despite due diligence," (3) the evidence must be admissible, (4) the new evidence must be sufficiently important to probably change the outcome and (5) the evidence must not be merely cumulative or impeaching. *United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001); Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112, 114 (S.D.N.Y. 2001).* Chaite obviously could have included this information in his declaration opposing summary judgment. Hence, it is not "new."

8  *FED. R. CIV. P. 60(b)(2)* allows a court to grant relief from an earlier order based upon "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under *Rule 59(b)*."

[*13]  The Declaration of Charles H. Ryans, Jr., Esq. in Support of Reconsideration, dated Jan. 9, 2003 ("Ryans Declaration")(ECF Doc. # 231), is apparently offered to rebut the notion that the waiver defense was "newly minted," see Decision at *7, and as "further evidence of the existence of the agreement at the time that the Debtor returned to NATelco." (Application for an

Order Granting Reconsideration of Order Disposing of Motion for Summary Judgment and Allowing Claim of MetTel in Part, dated Jan. 9, 2003, ("Reconsideration Motion"), at P 20)(ECF Doc. # 230.) Ryans represented Best in state court litigation brought by MetTel. According to Ryans, the president of MetTel, David Aronow, advised him that MetTel had recently discovered an additional debt of $ 32,000.00 that had arisen under the Natelco Agreement # 1, and had been assigned to MetTel as part of the Natelco bankruptcy sale. (Ryans Declaration P b.) When Ryans informed Chaite, Chaite told him that the matter had already been resolved, and "from conversations with Mr. Chaite, my understanding was that NATelco never sent correctly itemized invoices to the Debtor for the disputed amount and that [*14]  the matter was resolved between Mr. Chaite and NATelCo prior to MetTel taking over NATelCo's accounts." (Id. PP b, c.)

The Ryans Declaration does not provide "new evidence" of a waiver agreement because it is inadmissible -- Ryans lacked personal knowledge of the agreement. In any event, the information in the Ryans Declaration could have been submitted in opposition to the summary judgment motion. Best concedes that it had this information earlier, but maintains that did not submit it because Ryans was unwilling to cooperate until the plan of reorganization was confirmed. (See Debtor's Memorandum of Law on Reconsideration or Order Disposing of Motion for Summary Judgment on Debtor's Objection to Proof of Claim by MetTel, dated Jan. 9, 2003 ("Best Memorandum"), at 9)(ECF Doc. # 232.) Best could have taken Ryans' deposition.

The other purpose of the Ryans Declaration, to offer non-hearsay evidence of Chaite's prior consistent statement of a waiver agreement, [9] misconstrues the Decision. I did not reject the waiver argument based on an assessment of Chaite's credibility. I rejected it as a matter of law because (1) Best did not raise it in its objection to [*15]  MetTel's claim, [10] (2) Best did not raise it as an affirmative defense in the state court litigation, and therefore, arguably waived it, [11] (3) Best failed to produce the written agreement Chaite said existed and (4) the exchange of e-mails failed to support the existence of a waiver. Decision 2002 Bankr. LEXIS 1412 [WL], at *7-8.

9  Under *FED. R. EVID. 801(d)(1)*, a statement is not hearsay if "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive ...."

10   The omission was intentional. According to Mayne Miller, Esq., Best's lawyer, Chaite discussed the waiver agreement with him when Miller was preparing the claim objection. Miller "suggested that it would be better to defer inserting it as another defense to the Claim until some documentation were [sic] available." (Reconsideration Motion P 21.)

11   Ryans filed the answer on behalf of Best in that lawsuit. His current declaration fails to explain why he didn't assert the affirmative defense of waiver if Chaite had told him about it. Hence, although Best recently invoked "excusable neglect" to ameliorate the earlier pleading omission, (see Debtor's Supplemental Memorandum of Law on Reconsideration of Order Disposing of Motion for Summary Judgment on Debtor's Objection to Proof of Claim by MetTel, dated Feb. 28, 2003 ("Best Supplemental Memorandum"), at 6)(ECF Doc. # 252), Ryans has neglected to offer any excuse.

In fact, the defenses he did assert were inconsistent with the existence of a waiver. The Fifth Affirmative Defense (P 35) alleged that Natelco had received a $ 45,000.00 deposit, and "failed to apply [the deposit] to any outstanding balances that may have been due to NATELCO by Defendant, if any, when plaintiff allegedly purchased the assets of NATELCO." The Seventh Affirmative Defense (P 37) contended that MetTel failed to apply a 20% discount to "any outstanding balances that may have been due to NATELCO by Defendant ... which was given automatically to all NATELCO subscribers by Plaintiff when Plaintiff allegedly purchased the assets of NATELCO." Referring to the debt under the Natelco Agreement # 1, the Eighth Affirmative Defense (P 38) asserted that "Best never received an itemized invoice from NATELCO for $ 32,344.121." (Debtor's Objection to Proofs of Claim of Manhattan Telecommunications Corporation, dated July 31, 2002, Ex. D)(ECF Doc. # 88.)

[*16]  3. Pre-Judgment Interest

The Natelco Agreement # 2 provided that interest on unpaid invoiced amounts would accrue at the rate of 1.5% per month, or 18% per annum. The Decision allowed certain portions due under the Natelco Agreement # 2, and each side submitted a proposed order and a letter brief regarding the appropriate interest rate. MetTel argued that I should award the contract rate while Best pushed for the 9% statutory rate. I resolved the dispute in

MetTel's favor. I did not write an opinion, but the Order reflected my conclusion that MetTel was right and Best was wrong.

In its current motion, Best makes the same two arguments that it made in its letter brief. First, the use of the contract rate is limited to foreclosure actions and cases involving promissory notes. Second, the contract rate does not apply to the period after the contract has expired. (Best Memorandum 9-10.)

I implicitly rejected both arguments when I signed the Order, and I explicitly reject them now. A litigant may recover pre-judgment interest in an action based on breach of contract. *N.Y.C.P.L.R. 5001, 5002* (McKinney 1992). Under *C.P.L.R. 5004*, the prevailing interest rate is fixed at [*17] nine percent per annum, except where otherwise provided by statute. The parties may nevertheless agree to a different pre-judgment interest rate, 10 JACK B. WEINSTEIN, HAROLD L. KORN & ARTHUR R. MILLER, *NEW YORK CIVIL PRACTICE P 5004.01a*, at 50-74 (2002), and if they do, the contract rate, rather than the C.P.L.R. rate, will apply. *Nuera Communications, Inc. v. Telron Communications USA, Inc., 2002 U.S. Dist. LEXIS 26249, No. 00 Civ. 9167 (RMB)(FM), 2002 WL 31778796, at *3 (S.D.N.Y. Nov. 15, 2002)(Report and Recommendation of Maas, M.J.); Citibank, N.A. v. Liebowitz, 110 A.D.2d 615, 487 N.Y.S.2d 368 (N.Y. App. Div. 1985); Schwall v. Bergstol, 97 A.D.2d 540, 468 N.Y.S.2d 47, 47 (N.Y. App. Div. 1983); Secular v. Royal Athletic Surfacing Co., 66 A.D.2d 761, 411 N.Y.S.2d 615, 616 (N.Y. App. Div. 1978).*

Under Natelco Agreement # 2, Best and Natelco agreed that "if any invoice is not paid when due, ... interest shall accrue on the invoiced amount a monthly rate of one and one half (1.5%) percent ... beginning on the date payment was due ...." (Payphone Services Agreement, dated Dec. 8, 2000, at P 4(c). [12] While Best has cited foreclosure and promissory [*18] note cases in which the courts used the contract rate to compute pre-judgment interest, this doesn't mean, as Best suggests, that the contract rate only applies in such cases. Rather, the case law reflects that the contract rate is used to compute pre-judgment interest in all types of contract actions. See, e.g., *Nuera Communications, Inc. v. Telron Communications USA, Inc., 2002 U.S. Dist. LEXIS 26249, 2002 WL 31778796* (action to recover balance due for sale of telecommunications equipment); *Morse/Diesel v. Trinity Indus., Inc., 875 F. Supp. 165 (S.D.N.Y. 1994)*(action by general contractor against subcontractor and performance bond surety); *Archer Mgmt. Servs., Inc. v. Pennie & Edmonds, 287 A.D.2d 343, 731 N.Y.S.2d 177 (N.Y. App. Div. 2001)*(action by in-house mail room service against law firm for unpaid invoices); *Morningside Fuel Corp. v. Lanius, 244 A.D.2d*

*198, 664 N.Y.S.2d 30 (N.Y. App. Div. 1997)*(action to recover balance due on fuel oil deliveries and services); *Secular v. Royal Athletic Surfacing Co., 66 A.D.2d 761, 411 N.Y.S.2d 615 (N.Y. App. Div. 1978)*(action for goods sold and delivered); Frank v. Superior Indus. Sys., Inc., 2002 N.Y. Misc. LEXIS 1721, No. 2001-954 S C, 2002 WL 31962640 (N.Y. App. T. Sept. 25, 2002)) **[*19]** (same); *Williamson & Co. v. Colby Engraving & Rubber Plate Corp., 98 Misc. 2d 134, 413 N.Y.S.2d 580 (N.Y. Sup. Ct. 1979)*(same).

> 12  A copy of the Payphone Services Agreement is attached as exhibit C to the Declaration in Support of Objection of Manhattan Telecommunications Corp., dated Sept. 9, 2002 (ECF Doc. # 122).

In addition, Best is incorrect when it argues that the statutory rate superseded the contract rate after Best defaulted or the Natelco Agreement # 2 terminated. The only reasonable reading of that agreement is that Best had to pay interest at 18% per annum on unpaid invoices until those unpaid invoices were paid. In such circumstances, "the contract rate governs until payment of the principal, or until the contract is merged in a judgment." *O'Brien v. Young, 95 N.Y. 428, 430, 95 N.Y. (N.Y.S.) 428 (1884).*

### 4. Discovery

Best also contends that it needed discovery to meet MetTel's motion, made an adequate request for discovery, and **[*20]** I ignored or denied that request. After Best served its claim objection and MetTel replied, I advised the parties that I planned to treat MetTel's response as a motion for partial summary judgment. [13] Decision 2002 Bankr. LEXIS 1412 [WL], at *4. I fixed a schedule for supplemental submissions in consultation with the parties, including a deadline for the submission of opposition papers by Best. Best never stated that it needed discovery despite the fact that it had already received and presumably reviewed MetTel's papers.

> 13  As an aside, Best continues to question the application of the summary judgment procedures to this contested matter. (See Best Supplemental Memorandum 6-7.) *FED R. BANKR. P. 9014* expressly makes *FED. R. BANKR. P. 7056* -- and hence, *FED. R. CIV. P. 56* -- applicable to contested matters.

If the non-moving party needs discovery to respond, he may request it under *FED. R. CIV. P. 56(f).* [14] His request must show, by affidavit:

> 1) the nature of the uncompleted discovery, i.e., what facts are sought **[*21]** and how they are to be obtained; and
>
> 2) how those facts are reasonably expected to create a genuine issue of material fact; and
>
> 3) what efforts the affiant has made to obtain those facts; and
>
> 4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse Corp. v. Esprit de Corp., 769 F.2d 919, 926 (2d Cir. 1985)*; accord *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy, 891 F.2d 414, 422 (2d Cir. 1989)*; Bragg v. Emmis Broad. Corp., 1998 U.S. Dist. LEXIS 16290, o. 95 Civ. 10310 (DAB), 1998 WL 730339, at *5 (S.D.N.Y. Oct. 19, 1998).

> 14  *Rule 56(f)* states:
>
> > Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Best concedes **[*22]** it had to satisfy this procedure. (See Best Memorandum 11.) Initially, it contended it did, but failed to identify the location of the complying request. (See id. ("The Debtor ... did submit such an affidavit and indicated that it was entitled to the information ....").) After MetTel challenged Best's assertion, Best directed me to the "Preliminary Reply to the Aronow declaration" as satisfying the requirements of *Rule 56(f).* (Debtor's Reply Memorandum of Law on Reconsideration or Order Disposing of Motion for Summary Judgment on Debtor's Objection to Proof of Claim by MetTel, dated Feb. 6, 2003, at 6.) I assume this referred to the Preliminary Reply to Declaration of David Aronow Opposing Debtor's Objection to Proofs of Claim Filed by Manhattan Telecommunications Corporation, dated Sept. 11, 2002 ("Preliminary Reply")(ECF Doc. # 158), a nineteen-page submission whose final paragraph (the forty-seventh) summarized Best's opposition:

Although additional time is needed to prepare a complete reply to the tardy opposition to the Debtor's Objection to Met-Tel's Proofs of Claim, the Court can, even without granting additional time, reject the Creditor's opposition, [*23] either for untimeliness or inadequacy, and reduce the MetTel claim according to the request in the Debtor's original Objection, subject to any revision upon receipt of a determination of the pending appeal before the Appellate Division.

Thus, the "Preliminary Reply" argued that I should deny MetTel's motion and sustain Best's claim objection based on the existing record. It did not ask for discovery or indicate that discovery was necessary. In addition, Best's opposition memorandum did not raise the need for discovery. As a result, Best failed to show that I overlooked its compliance with *FED. R. CIV. P. 56(f)*, and accordingly, it is not entitled to reconsideration.

5. The Telephone Tariff

According to Best, every Competitive Local Exchange Carrier ("CLEC") such as Natelco and MetTel must file a tariff setting forth its rates. The tariff allegedly provided -- Best has still not provided a copy -- that a bill becomes final and binding if the customer fails to object to the bill within three months, unless the CLEC has records indicating that the bill was incorrect. (Reconsideration Motion P 23.) In addition, the CLEC must keep its customer records for six years. [*24] (Id. P 24.) Best protests that I should not have granted summary judgment in favor of MetTel on an "account stated" theory because I did not consider the tariff, (id. P 25), and because Best asserted that MetTel had records evidencing its objections to the bills. (Best Memorandum 6-7.)

Although Best maintained that it had objected to Natelco's bills, it was unable to provide either evidence of a written objection or written evidence confirming an oral objection. Lacking written proof of its own objections, Best's opposition to the summary judgment motion nevertheless speculated that MetTel had such proof in light of the tariff's document retention requirements. (Preliminary Reply P 5.) David Aronow of MetTel responded that "MetTel has no record that Debtor ever objected to any of its bills." (Reply Declaration [of David Aronow] in Support of Motion for Summary Judgment, dated Oct. 18, 2002, at P 6)(ECF Doc. # 167.) This left Chaite's alleged oral objections which I deemed insufficient because Chaite failed to "relate when and to whom the oral protests were made, and specify the substance of the conversations." Decision at *7, 9.

Best's reconsideration [*25] motion makes this argument more explicitly: in light of the tariff's document retention requirements, MetTel must have records of Best's complaints, these records would defeat the account stated theory, and consequently, summary judgment was, therefore, inappropriate. But nothing has changed since the motion for summary judgment. Best should but doesn't have any records of its own complaints, Chaite cannot state of his own personal knowledge that MetTel has them, and Aronow has denied the MetTel has them. Thus, Best failed to raise an issue of fact regarding the existence of records of complaint, there still isn't an issue of fact, and there is no basis to reconsider the prior conclusion that Best failed to raise a triable issue to defeat an "account stated" claim.

Based upon the foregoing, Best's motion for reconsideration is denied. Settle order on notice.

Dated: March 10, 2003

/s/ *Stuart M. Bernstein*

Chief United States Bankruptcy Judge

# EXHIBIT B

LEXSEE 2006 US DIST LEXIS 6671

**IN THE MATTER OF MARY ANN GRAYBOYES, Debtor. FIRST BUSINESS CREDIT CO., Appellant, v. MARY ANN GRABOYES, Appellee.**

**CHAPTER 13, Bkrtcy, No. 02-33530-KJC, CIVIL ACTION No. 05-1780**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 6671*

**February 22, 2006, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *In re Graboyes, 2007 U.S. App. LEXIS 3536 (3d Cir. Pa., Feb. 14, 2007)*

**COUNSEL:** [*1] For FIRST BUSINESS CREDIT COMPANY, Appellant: JEANNE D. BONNEY, JOHN J. KORESKO, KORESKO & ASSOCIATES, P.C., BRIDGEPORT, PA.

For MARY ANN GRABOYES, Debtor-in-Prossess: STEVEN B. MIROW, PHILADELPHIA, PA.

WILLIAM C. MILLER, Trustee, Pro se, PHILADELPHIA, PA.

**JUDGES:** LEGROME D. DAVIS, J.

**OPINION BY:** Legrome D. Davis

**OPINION**

**MEMORANDUM OPINION**

J. Davis

Presently before the Court is an appeal from a March 11, 2005 Order entered by the Honorable Kevin J. Carey, United States Bankruptcy Judge, sustaining the objection of appellee Mary Ann Graboyes ("debtor") to the claim of appellant First Business Credit Company ("FBCC") against the bankruptcy estate. For the following reasons, this Court affirms the judgment of the bankruptcy court.

**I. Factual and Procedural History**

The parties concede the accuracy of the bankruptcy court's recitation of the factual and procedural history of this litigation in its March 11, 2005 opinion. This Court briefly summarizes this factual predicate.

In 1992, debtor and her husband, Seymour Graboyes ("debtor's husband"), sought tax advice from attorney John Koresko ("Koresko") to resolve the tax debt of debtor's husband in connection with [*2] his ownership of a bar. (See March 11, 2005 Order, at 2). Koresko demanded a $ 5,000 retainer for his representation of debtor and her husband. (Id.).

To finance the retainer, debtor and her husband sought and obtained a loan from FBCC, a for-profit lender with Koresko's brother serving as its sole officer and director. (Id., at 2, 2 n.4). On February 25, 1992, debtor and her husband executed a mortgage note ("note") in favor of FBCC in the amount of $ 10,000 or "so much of said principal sum as shall have been advanced," with an interest rate of 18.36%, to be repaid in monthly installments of $ 200 for 23 months. (See Note, attached as Ex. 11). The principal balance, accrued interest, and other costs identified in the note were due after two years. (Id.).

To secure the note, debtor and her husband also executed a mortgage (the "mortgage") granting FBCC a lien against a single condominium unit in a condominium complex at 316 Glen Lane, Elkins Park, Pennsylvania (the "property"). (See Mortgage, attached as Ex. 11). The mortgage was recorded on February 27, 1992 with the Recorder of Deeds Office for Montgomery County, Pennsylvania. (Id.; March 11, 2005 Opinion, [*3] at 3).

On February 28, 1992, debtor and her husband filed a voluntary chapter 13 bankruptcy petition in the bankruptcy court of the Eastern District of Pennsylvania (the "1992 bankruptcy action"). (Id., at 3). The schedules for the bankruptcy petition listed FBCC as a secured creditor with a secured claim in the amount of $ 5,000, the amount loaned by FBCC to debtor and her husband for

retention of Koresko's legal services. (Id.). This secured claim was consistent with Koresko's signed statement in the bankruptcy litigation, averring that he had been paid a $ 5,000 retainer for legal services rendered in connection with the bankruptcy case. (Id.).

The 1992 bankruptcy action was dismissed on March 18, 1993. (Id., at 3). On May 14, 1993, the chapter 13 trustee sent Koresko a check in the amount of $ 3,237, a refund for payments made by debtor and her husband to the chapter 13 trustee (the "refund"). (Id.). On May 20, 1993, Koresko sent to debtor's husband an invoice for legal services, indicating payment of the original retainer, and a check in the amount of $ 1,500. (Id., at 3-4). Koresko subtracted $ 1,626.75 from the refund, labeling this fee an "advance [*4] against second mortgage." (Id., at 4).

Debtor and her husband never made any payments on the note. (Id., at 4). Nor did FBCC make any demand on debtor or her husband for payment of the note. (Id.). On September 23, 2002, debtor filed a voluntary chapter 13 bankruptcy petition in the bankruptcy court for the Eastern District of Pennsylvania. (See Bankruptcy Docket Sheet, attached as Ex. 4, at Doc. No. 1). On January 30, 2003, FBCC filed a proof of claim in the debtor's bankruptcy case in the amount of $ 49,130.78, plus interest and attorney fees. (See January 30, 2003 Proof of Secured Claim, attached as Ex. 16; June 22, 2004 Order, attached as Ex. 15, at 4). On March 24, 2003, FBCC filed an amended proof of claim in the amount of $ 61,553.03. (Id.). This figure, as of March 24, 2003, reflected the amount of principal ($ 6,500) and interest ($ 33,225.97) under the note ($ 39,725.97), and the attorney's fees FBCC incurred in connection with debtor's bankruptcy court proceedings ($ 23,990). (See March 24, 2003 Proof of Secured Claim, attached as Ex. 16; June 22, 2004 Order, at 5).

On February 24, 2003, the debtor, while in bankruptcy, initiated an adversary [*5] proceeding against FBCC by filing a complaint to determine the validity, priority, and scope of the lien held by FBCC against the property. (See Adversary Proceeding Docket Sheet, attached as Ex. 5, at Doc. No. 1). On June 22, 2004, Judge Carey ruled in plaintiff's adversary proceeding that FBCC was a secured creditor of debtor's estate, based upon FBCC's lien on debtor's property. (See June 22, 2004 Order). However, in making this finding, Judge Carey noted that debtor did not "specifically contest the amount of the claim," and, therefore, the June 22, 2004 Order made "no ruling concerning the amount or appropriateness of the interest, fees, or any other charges which may be included in FBCC's proof of claim." (Id., at 9 n.11). [1]

1 During the bankruptcy court litigation, FBCC filed a confessed judgment action against debtor's husband in the Court of Common Pleas for Montgomery County, Pennsylvania. (See FBCC's Post-Hearing Response to Debtor's Objection, attached as Ex. 6, at 1). A confessed judgment was entered against debtor's husband on September 11, 2003. (Id.).

[*6] On October 8, 2004, debtor filed an objection to FBCC's proof of claim. (See Debtor's Objection, attached as Ex. 14). The parties submitted briefs in support of their respective positions. (See Briefing Schedule, attached as Ex. 12; Parties' Submissions, attached as Ex. 8-11). On November 23, 2004, Judge Carey held a hearing on the claim objection. (See Transcript of November 23, 2004 Hearing, attached as Ex. 7). The parties also submitted post-hearing responses. (See FBCC Post-Hearing Response, attached as Ex. 6).

On March 11, 2004, Judge Carey issued an opinion finding that the amount of FBCC's secured claim was $ 6,626.00 plus simple interest. (See March 11, 2004 Opinion, attached as Ex. 2, at 11). Judge Carey reasoned that debtor could assert violations of Pennsylvania's usury law, 41 P.S. §§ 101 et seq. ("Act 6"), as a recoupment defense to FBCC's proof of claim, despite the inability to assert these violations as an affirmative cause of action because of the expiration of the applicable statute of limitations. (Id., at 4 n.9). Judge Carey then reasoned that FBCC was not entitled to recover on its claim either interest in [*7] excess of 10% or attorney's fees incurred in connection with bankruptcy court proceedings involving debtor and her husband, as the recovery of these charges pursuant to the terms of the note violated Act 6. (Id., at 4-10). Accordingly, Judge Carey entered an Order (the "March 11, 2005 Order") limiting FBCC's secured claim to the principal balance of the note, including the $ 5,000 advance for Koresko's retainer fee and the $ 1,626.75 advance against the mortgage that was deducted from debtor's refund, and simple interest on this principal balance at a lawful rate of 10% per year. (Id.).

On March 21, 2005, FBCC filed a notice of appeal of the March 11, 2005 Order. (See Notice of Appeal, attached as Ex. 1). FBCC filed a brief in support of its appeal on May 3, 2005 (Doc. No. 3). On May 18, 2005, debtor filed a brief in opposition to the appeal (Doc. No. 4). FBCC submitted a reply brief on June 10, 2005. (Doc. No. 7).

## II. Discussion

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 158(a). In applying the appropriate standard of review, this Court reviews the bankruptcy court's legal determinations de novo, its factual findings [*8] for

clear error, and its exercise of discretion for an abuse thereof. See, e.g., *In re Rashid, 210 F.3d 201, 205 (3d Cir. 2000)*.

FBCC alleges an array of errors in the bankruptcy court's procedural and substantive conclusions concerning debtor's Act 6 recoupment defense to FBCC's proof of claim. In particular, FBCC claims that the bankruptcy court erred not only in procedurally permitting FBCC to assert Act 6 violations as a recoupment defense to FBCC's proof of claim, but also in finding that the loan transaction meets the substantive requirements of Act 6, thereby triggering Act 6's consumer-based limitations both on the charging of interest and on the recovery of attorney's fees in connection with residential mortgage loan transactions.

## A. Procedural Availability of Act 6 as Recoupment Defense

FBCC offers three reasons why the bankruptcy court erred in finding that, despite the expiration of the statute of limitations, debtor may utilize Act 6 as a recoupment defense to FBCC's proof of claim. (See FBCC's Br., at 7-20). First, FBCC claims that the factual circumstances of this litigation preclude the availability of Act 6 as a recoupment defense. [*9] (Id., at 7-15). Second, FBCC claims that debtor is judicially estopped from using Act 6 to contest FBCC's proof of claim. (Id., at 16-19). Third, FBCC contends that the doctrine of collateral estoppel precludes FBCC from arguing the applicability of Act 6 to the note and mortgage. (Id., at 19-20).

## 1. Recoupment Defense

FBCC argues that the bankruptcy court erred in holding that debtor may avail herself of Act 6's residential mortgagee protections as a recoupment defense despite the expiration of the statute of limitations. (See FBCC's Br., at 7-15). FBCC reasons that debtor may not raise Act 6 violations as a recoupment claim under the factual circumstances of this litigation, where debtor's recoupment claim would void FBCC's underlying obligation and where debtor is using her recoupment claim affirmatively, prior to a judgment or enforcement action against debtor. (Id.).

This Court disagrees. Under Pennsylvania law, which governs the validity of plaintiff's Act 6 recoupment defense, a defendant may raise violations of state law through a recoupment defense, although these violations could not be asserted affirmatively as a counterclaim due to the expiration [*10] of the statute of limitations. See, e.g., *Mellon Bank v. Pasqualis-Politi, 800 F. Supp. 1297, 1301 (W.D. Pa. 1992)*. There are several requirements to the applicability of the equitable doctrine of recoupment under Pennsylvania law. First, recoup-

ment must be asserted defensively, as a reactive strategy to reduce the value of another party's particular claim, rather than offensively, as an independent cause of action. See, e.g., *Bull v. U.S., 295 U.S. 247, 262, 79 L. Ed. 1421, 55 S. Ct. 695, 81 Ct. Cl. 974, 1935 C.B. 310 (1935)* ("recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded"); *Commonwealth v. Berks County, 364 Pa. 447, 72 A.2d 129, 130 (Pa. 1950)* (adopting Bull Court's definition of "recoupment"); c.f. *Algrant v. Evergreen Valley Nurseries Ltd. P'ship, 126 F.3d 178, 184 (3d Cir. 1997)* (prohibiting plaintiff under federal common law from using doctrine of recoupment in declaratory judgment action to circumvent statute of limitations and to void notes allegedly procured through fraud in violation of federal Securities Exchange Act and state securities [*11] laws, as recoupment is "defensive claim which can only be asserted in response to an independent action instituted by another party"). Second, Pennsylvania law requires that the legal predicate for the recoupment defense (i.e., the violation of state law) arise out of the same transaction from which plaintiff's claim springs. *Pasqualis-Politi, 800 F. Supp. at 1301* (describing and applying Pennsylvania's "mutuality requirement"); see also *Berks County, 72 A.2d at 130* (recoupment defense available to adverse party so long as party's claims "have grown out of the transaction which gave rise" to plaintiff's suit). Third, as a defense, the amount of the recoupment is limited to the value of the plaintiff's claim. See, e.g., *Commonwealth v. Orsatti, Inc., 448 Pa. 72, 292 A.2d 313, 316 (Pa. 1972)* (recoupment right does not entitle defendant asserting recoupment defense to excess of amount over plaintiff's claim); *Edwards v. Pa. Dep't of Pub. Welfare, 34 Pa. Commw. 622, 384 A.2d 293, 296 (Pa. Commw. Ct. 1978)* (recoupment defense "is limited to such amounts as the state [plaintiff] has claimed against the defendant"). [*12] [2]

> [2] This analysis is similar to the treatment of recoupment under federal common law. Both the Third Circuit and the Pennsylvania Supreme Court have declared that, pursuant to federal common law, a party may raise statutory consumer credit violations through a recoupment defense, although these violations could not be asserted affirmatively as a counterclaim due to the expiration of the statute of limitations. See, e.g., *Silverman v. Eastrich Multiple Investor Fund, 51 F.3d 28, 32 (3d Cir. 1995)* (permitting loan guarantor to raise ECOA claim in declaratory judgment action in federal court as defense to confession of judgment entered against her in state court, despite expiration of statute of limitation period); *Household Consumer Discount Co. v. Vespaziani, 490 Pa. 209, 415 A.2d 689, 693-96*

*(Pa. 1980)* (permitting borrowers to raise TILA violations as recoupment defense). Neither party argues that a conflict of law exists between the treatment of the recoupment doctrine under Pennsylvania law and its treatment under federal common law.

[*13] Bankruptcy courts in the Third Circuit have uniformly determined that a proof of claim constitutes an action to collect a debt, and, therefore, that a debtor may raise transgressions of consumer credit statutes defensively as an objection to a proof of claim. See, e.g., *Crisomia v. Parkway Mortg., Inc. (In re Crisomia), 2002 Bankr. LEXIS 1112, 2002 WL 31202722, at *4 (Bankr. E.D. Pa. 2002)* (noting that "courts have found that a debtor may raise TILA violations defensively in an objection to a proof of claim filed defensively in an objection to a proof of claim filed more than a year from the asserted TILA violation as a matter of recoupment or set-off"); *In re Soto, 221 B.R. 343, 359 (Bankr. E.D. Pa. 1998)* (debtor may assert TILA violations as a recoupment defense to bank's proof of claim for debt owned in connection with secured loan); see also *In re e.Spire Communs., Inc. , 293 B.R. 639, 648-649 (Bankr. D. Del. 2003)* (recoupment available as defense to proof of claim under Maryland law). [3] More importantly, at least one bankruptcy court has determined that Pennsylvania law permits Act 6 to be used as a recoupment defense to reduce a creditor's bankruptcy claim, pending satisfaction of [*14] the mutuality requirement. See, e.g., *In re Kenderdine, 118 B.R. 258, 264 (Bankr. E.D. Pa. 1990)* (rejecting defendant's defense that debtor's damages claim under Act 6 may not be asserted as recoupment defense under Pennsylvania law after expiration of limitation period).

> [3] Although many of these bankruptcy court decisions applied federal common law, this Court has uncovered no case law to suggest that Pennsylvania law does not characterize a creditor's proof of claim as an adversary action to which a debtor may raise a recoupment defense. Nor has FBCC identified any such decision.

Applying Pennsylvania law, this Court affirms the bankruptcy court's conclusion that the debtor may raise violations of Act 6 as a recoupment defense to a creditor's proof of claim. (See March 11, 2005 Opinion, at 4-5 n.9). All of the requirements of the recoupment defense under Pennsylvania law are met. See 2 Standard Pennsylvania Practice 2d § 13:221 ("The defense of recoupment arises out of [*15] the same transaction as the plaintiff's claim, survives as long as the cause of action upon the claim exists, and is a doctrine of an intrinsically defensive nature founded upon an equitable reason, inhering in the same transaction, and constituting an al-

leged reason why the plaintiff's claim in equity and in good conscience should be reduced."). First, debtor has asserted FBCC's alleged violations of Act 6 defensively, in direct response to FBCC's proof of claim, which is considered an affirmative cause of action to collect a debt, and in indirect response to FBCC's confessed judgment against debtor's husband on the note in the Pennsylvania Court of Common Pleas for Montgomery County. See, e.g., *In re Crisomia, 2002 Bankr. LEXIS 1112, 2002 WL 31202722, at *4-6* (permitting debtor to assert TILA non-disclosure claims defensively, as a method to offset any proof of claim lodged by creditor). Second, the alleged Act 6 violations, the factual predicate for debtor's recoupment defense, are inherent in the execution of the note and mortgage, the very transaction that forms FBCC's proof of claim. See, *Pasqualis-Politi, 800 F. Supp. at 1301; Kline v. Blue Shield of Pa., 383 Pa. Super. 347, 556 A.2d 1365, 1370 (Pa. Super. Ct. 1989)* [*16] (party may assert recoupment defense to breach of contract action when defense arises out of same contractual transaction as plaintiff's claim). Third, debtor does not seek damages in excess of FBCC's proof of claim, but, instead, seeks to limit the interest and attorney's fees elements of FBCC's proof of claim to that amount which FBCC is legally permitted to collect on a residential mortgage loan under Act 6.

## 2. Judicial Estoppel

FBCC argues that the bankruptcy court erred by failing to apply the doctrine of judicial estoppel to preclude debtor from asserting Act 6 violations, based upon debtor's prior inconsistent statements on the applicability of Act 6. (See FBCC's Br., at 16-19). In particular, FBCC argues that the debtor initially identified the debt as commercial in its 1992 Chapter 13 schedules, but now "reclassifies" the debt as a "non-commercial residential mortgage" subject to Act 6. (Id.).

FBCC has introduced no evidence to suggest that the bankruptcy court erred in finding that the claim objection is not barred by judicial estoppel. FBCC fails to adduce documentation in the record suggesting that debtor took an inconsistent position, whether in this case [*17] or in the 1992 bankruptcy action, regarding the application of Act 6 to the instant loan transaction. See, e.g., *Marra v. Marra, 2003 PA Super 321, 831 A.2d 1183, 1187 (Pa. Super. Ct. 2003)* (denying judicial estoppel argument when litigant takes no inconsistent statements). [4] Furthermore, as the bankruptcy court indicated, there is no inconsistency in classifying a transaction as a business loan, but in then seeking the protections of Act 6 because the loan is secured by a "residential mortgage" within the meaning of that statute. (See Opinion, at 8 n.14). Absent any affirmative evidence to the contrary, this Court re-

fuses to disturb the bankruptcy court's finding on this issue.

> 4  Pennsylvania law, rather than federal common law, determines whether debtor is judicially estopped from raising violations of Act 6 as a recoupment defense. See, e.g., *Linan Faye Constr. Co., Inc. v. Housing Auth. of City of Camden, 49 F.3d 915, 933 (3d Cir. 1995)* (looking to New Jersey law to determine whether defendant is judicially estopped from refusing to pay compensation in connection with plaintiff's state law claims).

### [*18] 3. Collateral Estoppel

FBCC further argues that the bankruptcy court erred in concluding that debtor was not collaterally estopped from raising FBCC's alleged Act 6 violations as a recoupment defense. (See FBCC's Br., at 19). FBCC argues that principles of collateral estoppel preclude debtor from re-litigating the applicability of Act 6 to the note and mortgage because the debtor failed to raise the alleged Act 6 violations in response to the confessed judgment action against debtor's husband in the Court of Common Pleas for Montgomery County. (Id.).

Under Pennsylvania law, the doctrine of collateral estoppel precludes re-litigation of an issue when: (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the claim is asserted was a party or in privity with a party in the prior case; (4) the party or person in privy with the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment. See, e.g., *Office of Disciplinary Counsel v. Kiesewetter, 585 Pa. 477, 889 A.2d 47, 50-51 (Pa. 2005).* [*19]

Again, this Court affirms the bankruptcy court's decision for the very reason expressed in the bankruptcy court's opinion: that a state court confessed judgment on a residential mortgage subject to the protections of Act 6, standing alone, does not constitute a "final adjudication" on the merits of a particular issue. (See March 11, 2005 Opinion, at 6 n.13). This conclusion becomes palpable after analyzing the treatment of confessed judgments under Act 6.

*Section 407* of Act 6 does not permit a plaintiff to execute a confessed judgment on "residential real property" until the plaintiff files, prosecutes, and obtains a judgment in a separate civil action in which the parties enjoy all the rights they retain in other proceedings. *41 P.S. § 407(a).* The court in which this post-confessed

judgment action is brought then has the power to change or modify the confessed judgment prior to enforcement. Id. As one court has stated, "while not eliminating confessed judgments, *section 407* [of Act 6] essentially renders them a nullity in all instances in which the section applies." *In re Olick, 221 B.R. 146, 151 (Bankr. E.D. Pa. 1998).*

The procedural [*20] nuances of Act 6 preclude a finding of finality as to a confessed judgment on a residential mortgage, or as to any issues raised during the proceedings to obtain the initial confessed judgment. Indeed, pursuant to *§ 407*, a confessed judgment on residential real property, the type of property at issue in this litigation, [5] cannot serve as a final adjudication on the merits of a particular issue because this issue may be re-litigated anew in a separate legal proceeding, where the parties are free to raise all available claims and defenses. See, e.g., *In re Olick, 221 B.R. at 151-152* (holding that doctrine of merger, a rule of *res judicata* that merges all plaintiff's claims into plaintiff's judgment at end of legal proceeding, does not apply to confessed judgments on residential property subject to *§ 407* of Act 6 because such judgments are not final within meaning of *res judicata* doctrine); 22 Standard Pa. Practice 2d § 121:87 (2005) ("A confessed judgment against residential property is not a final judgment in the usual sense because its enforceability will be determined by the results of a subsequent proceeding in which the parties are free to litigate [*21] the matter anew, raising all possible claims or defenses."). Nor has FBCC indicated that, following the procedures of *§ 407*, it filed a separate civil action against debtor's husband and obtained a judgment enforcing the confessed judgment. See, e.g., *Romah v. Romah, 411 Pa. Super. 12, 600 A.2d 978, 978 n.1 (Pa. Super. Ct. 1991)* (suggesting that *res judicata* effect not given to confessed judgments subject to *§ 407* of Act 6, unless procedural requirements of *§ 407* have been satisfied). Accordingly, the bankruptcy court correctly denied FBCC's collateral estoppel argument concerning the unavailability of Act 6.

> 5  Act 6 defines "residential real property" as "real property located within this Commonwealth containing not more than two residential units or on which not more than two residential units are to be constructed and includes a residential condominium unit." *41 P.S. § 101.* The property subject to the mortgage consists of a single residential unit in a condominium complex, thereby meeting this definition.

### [*22] B. Substantive Applicability of Act 6

FBCC challenges the bankruptcy court's substantive conclusions that the transaction at issue falls within the

substantive purview of Act 6, thereby triggering Act 6's interest ceiling and its limitation on recoverable attorney's fees. (See FBCC's Br., at 6-7, 15-16, 20-22). FBCC makes the following arguments: (i) that the loan is not secured by a "residential mortgage" within the meaning of Act 6; (ii) that the loan exceeded the business loan threshold and therefore does not implicate Act 6's interest ceiling; and (iii) that FBCC complied with the procedural and substantive requirements of Act 6's provisions pertaining to the recovery of attorney's fees. (Id.).

### 1. Residential Mortgage

FBCC challenges the bankruptcy court's determination that the loan is secured by a "residential mortgage," and therefore falls within the scope of Act 6. (See FBCC's Br., at 6-7, 15). Specifically, FBCC argues that the loan does not meet the definition of "residential mortgage" because the purpose behind the loan was to pay the debt of a business enterprise and because the principal amount of the loan exceeded $ 50,000, once unpaid interest [*23] is combined with principal under the terms of loan. (Id.).

This Court rejects FBCC's arguments. *Section 101* of Act 6 defines "residential mortgage" in the following manner:

> an obligation to pay a sum of money in an original bona fide principal amount of fifty thousand dollars ($ 50,000) or less, evidenced by a security document and secured by a lien upon real property located within the Commonwealth containing two or fewer residential units or on which two or fewer residential units are to be constructed and shall include such an obligation on a residential condominium unit.

*41 P.S. § 101*. Under *§ 101*, the definition of "residential mortgage" contains three primary elements: (i) a monetary requirement that the secured loan include a principal of $ 50,000 or less; (ii) a documentation requirement that the borrower execute a document granting the lender a lien upon real property located within the Commonwealth; and (iii) a physical requirement that the property subject to the lien contains two or fewer residential units. Id. [6]

> 6 FBCC does not challenge debtor's satisfaction of the second component of this definition, conceding that debtor executed a mortgage granting FBCC a lien on the property in exchange for the loan. (See Mortgage, attached as Ex. 11).

**[*24] a. Physical Requirement**

The bankruptcy court correctly held that the physical component element of the definition of residential mortgage in Act 6 is contingent upon the composition of the property securing the loan, rather than upon the purpose for which the lendee borrowed the money secured by this property. (See March 11, 2005 Opinion, at 6). This conclusion comports with the plain language of the statute and with Pennsylvania case law interpreting this statute. See *41 P.S. § 301* ("residential mortgage" covers transaction secured by property covering "two or fewer residential units"); *General Electric Credit Corp. v. Slawek, 269 Pa. Super. 171, 409 A.2d 420, 422 (Pa. Super. Ct. 1979)* (mortgagee's lien on residential property constitutes "residential mortgage," although mortgagor used loan transaction to finance purchase of sailboat rather than for improvement of residential property). Nor does FBCC cite any case law interpreting the definition of "residential mortgage" according to the purpose of the loan. [7] Accordingly, because the property consisted of one residential unit of a condominium complex, the Court affirms [*25] the bankruptcy court's determination that the note and mortgage were secured by real property within Act 6's definition of "residential mortgage." (See March 11, 2005 Opinion, at 3; FBCC Br., at 5).

> 7 FBCC's reliance on *In re DiPietro, 135 B.R. 773, 778 (Bankr. E.D. Pa. 1992)*, is misplaced. In re DiPietro stands for the proposition that the definition of "business loan" for purposes of *§ 301(f)(v)* of Act 6 requires consideration of the purpose for which the funds are being utilized, as prescribed by the regulations promulgated by Pennsylvania's Secretary of Banking. *Id. at 778*; see 10 Pa. Code § 7.2 (defining "business loans" as "extensions of credit where the funds are to be utilized in a business enterprise," where the borrower performs the managerial decision-making of the enterprise, and where the borrower signs an affidavit setting forth the intended use of the proceeds). The bankruptcy court's construction of "business loan" in In re DiPietro, according to the factors prescribed by the accompanying regulations to Act 6, is simply irrelevant to the definition of "residential mortgage" under *§ 101* of Act 6.

**[*26] b. Monetary Requirement**

The bankruptcy court also correctly held that the note and mortgage satisfied the monetary element of the definition of "residential mortgage." (See March 11, 2005 Opinion, at 5). Initially, this Court agrees with the bankruptcy court's determination that the principal amount of a loan must be measured at the time of the consummation of the transaction, rather than at subsequent dates, such as after the accrual of interest on un-

paid balances. This methodology comports with the statutory definition of "residential mortgage," which specifies the "*original* bona fide principal amount" of the mortgage, rather than successive re-calculations of principal, as the controlling factor in determining qualification for the protections of Act 6. *41 P.S. § 101* (emphasis added); *Slawek, 409 A.2d at 423 n.5* (measuring $ 50,000 threshold for applicability of Act 6 at time of execution of note, prior to accumulation of interest after defaults on principal amount, and differentiating principal and finance charges/additional costs in loan of $ 65,849.78). Furthermore, making the definition of "residential mortgage" contingent [*27] upon the timeliness or untimeliness of a mortgagor's payments generates unpredictability as to those rights that demand reification at the outset of the loan transaction and that must remain fixed and knowable throughout the loan relationship, such as the applicable interest rate in loan transactions, the appropriate procedure for foreclosing on residential mortgage loans in default, and the availability of a debtor's right to cure a default. This unpredictability, in turn, carries the potential both to remove usurious loans from the protections of Act 6 and to deter borrowers from seeking residential mortgage loans, thereby undermining the chief purposes behind Act 6. See, e.g., *In re Schwartz, 68 B.R. 376, 382 (E.D. Bankr. 1986)* (finding that "Act 6 was passed at a time when Pennsylvania faced a crisis due to the unavailability of residential mortgage loans" and liberally construing Act 6 in favor of homeowners); *Smith v. Mitchell, 420 Pa. Super. 137, 616 A.2d 17, 20 (Pa. Super. Ct. 1992)* (purpose of Act 6 is to protect the citizenry of Pennsylvania by setting forth with clarity the legal rate of interest in loan transactions secured by residential [*28] property); *Beckett v. Laux, 395 Pa. Super. 563, 577 A.2d 1341, 1343 (Pa. Super. Ct. 1990)* (chief function of Act 6 is to offer "homeowners with 'residential mortgages' a measure of protection from overly zealous 'residential mortgage lenders'"). In other words, the rolling applicability of Act 6 to a particular loan transaction belies the effectiveness of many of Act 6's pro-borrower provisions, many of which not only provide a defense to foreclosure proceedings, but also seek to avoid usurious transactions and ultimate foreclosure proceedings by prohibiting parties from "entering" into or "contracting" for residential mortgages that charge in excess of prescribed maximum interest rates. *41 P.S. § 301(b)* (setting maximum interest rate for residential mortgages "entered into or contracted for"); id. *§ 501* (borrower not required to pay contracted for interest rate in excess of that prescribed by Act 6).

Using the "original" principal amount-and not subsequent modifications of this amount after payment or non-payment -- as the sole gauge for evaluating whether a debt qualifies as a "residential mortgage," it is clear that debtor's note [*29] and mortgage satisfy this mone-

tary requirement. For instance, the note defines the "principal sum" as "$ 10,000" or "so much of said principal sum as shall have been advanced," which, in this case, consisted of $ 6,626.00. (See Note, attached as Ex. 11). Moreover, both the note and mortgage uniformly distinguish between the outstanding "principal balance" and all remaining charges, including interest and fees. (Id.; Mortgage, attached as Ex. 11). Accordingly, this Court affirms the bankruptcy court's conclusion that the "original bona fide principal amount" of the loan did not exceed $ 50,000. [8]

> 8    Even if this Court measured the principal amount of the loan after the accrual of interest, rather than at the original moment of the transaction's consummation, the loan would still satisfy this monetary requirement, as the note never expressly stipulated that original principal and unpaid interest would merge into a new principal balance at a given point in time.

## 2. Maximum Lawful Rate of Interest

[*30] FBCC argues that even if Act 6 applies, the bankruptcy court erred in finding that the loan at issue is subject to the maximum lawful rate of interest, as prescribed by *41 P.S. § 301*. (See FBCC's Br., at 20). FBCC further argues that the bankruptcy court erred by denying FBCC compound interest on the debt, reasoning that the bankruptcy court failed to acknowledge the parties' contractual arrangement to apply a compound interest formula, as opposed to a simple interest formula, to the unpaid balance of the loan. (Id.).

### a. Business Loan Exception

*Section 301* imposes a interest ceiling on applicable residential mortgage transactions:

> The maximum lawful rate of interest for residential mortgages, as defined in this act, entered into or contracted for during any calendar month shall be equal to the Monthly Index of Long Term United States Government Bond Yields for the second preceding calendar month plus an additional two and one-half per cent per annum rounded off to the nearest quarter of one per cent per annum.

*41 P.S. § 301.* The Secretary of Banking is required to determine and publish this rate in [*31] the Pennsylvania Bulletin, which, at the time of the execution of the note and mortgage, was 10% per year. *41 P.S. § 301(b)-(c).* [9] Importantly, however, *§ 301* specifically exempts from this interest ceiling all "business loans the principal

amount of which is in excess of ten thousand dollars." *Id.* § 301(f)(v).

> 9   The bankruptcy court applied this 10 interest rate. (See March 11, 2005 Opinion, at 8). Neither party disputes the validity of this interest rate to residential mortgages at the time of the execution of the note and mortgage in February 1992.

This Court affirms the bankruptcy court's determination that the loan at issue is subject to the interest ceiling of *§ 301*. It is clear, as the bankruptcy court found, that the loan was used to pay off a business debt, and therefore constitutes a "business loan" within the meaning of *§ 301*. It is also clear that the "principal amount" of the loan was not in "excess" of $ 10,000 at the consummation of the transaction, the [*32] time at which the "principal amount" must be measured. [10] Consequently, because the loan falls under the aegis of *§ 301*, as the bankruptcy court correctly held, the maximum lawful rate of interest is 10% and debtor need not pay the excess interest. *41 P.S. § 501* (borrower need not pay amount of excess interest over maximum interest rate prescribed by Act 6); *Mulcahy v. Loftus, 439 Pa. 111, 267 A.2d 872, 873 (Pa. Super. Ct. 1970)* (provision of note that charges usurious interest rate in violation of Act 6 is voidable, although note itself not void). [11]

> 10   The same reasons which require measurement of principal at the time of a transaction's consummation for purposes of determining whether a loan agreement meets the definition of a "residential mortgage" under *§ 101* also support determining a loan's "principal" for purposes of the business loan exception to *§ 301* at the time the loan agreement is executed.

> 11   Assuming *arguendo* that it was premature to characterize the instant loan as a "business loan" within the meaning of *§ 301* at the time of its execution, debtor's note and mortgage would still fail to meet the business loan exception. Indeed, because there is no express statement in the mortgage or note providing that interest merges with principal to determine a new principal amount, the principal amount of the loan, independent of interest, never exceeded $ 10,000 at any point.

### [*33] b. Type of Interest

This Court also affirms the bankruptcy court's determination that compound interest is inappropriate because the note and mortgage fail to delineate the manner in which interest is to be computed. (See March 11, 2005 Opinion, at 8).

Compound interest denotes "interest paid on both the principal and the previously accumulated interest," while simple interest refers to "interest paid on the principal only and not on accumulated interest." Black's Law Dictionary 816-817 (7th ed. 1999). Pennsylvania law disfavors compound interest, unless the parties contractually agree to the payment of compound interest or a statute expressly authorizes it. See, e.g., *Fairmont Holdings v. Blumenfeld Holdings Corp., 1990 U.S. Dist. LEXIS 120, 1990 WL 892, at *3 (E.D. Pa. Jan 3, 1990)* (applying simple interest rate to principal balance when agreement does not specific between compound interest or simple interest, as Pennsylvania law favors simple interest on debt); *Powell v. Ret. Bd. of Allegheny County, 431 Pa. 396, 246 A.2d 110, 115 (Pa. 1968)* (requiring district court on remand to compute amount of award based upon simple interest because Commonwealth [*34] "frowns upon compound interest and as such will only permit compound interest on a debt when the parties have provided for it by agreement or a statute expressly authorizes it"); *Moyer v. Berks County Bd. of Assessment Appeals, 803 A.2d 833, 843 (Pa. Commw. Ct. 2002)* (same).

The loan documents fail to specify that interest should be calculated according to a compound interest formula. For instance, the note stipulates that interest "shall accrue on the outstanding principal balance hereof at the rate of 18.36% per annum." (See Note, at PC). It does not indicate whether unpaid interest blends with the principal balance to formulate the "outstanding principal balance," or whether the yearly interest rate of 18.36% applies solely to the original outstanding principal balance. Nor does the mortgage expressly indicate whether interest accrues on both principal and previously accumulated interest. Consequently, because the note is silent on the methodology for calculating interest, this Court affirms the bankruptcy court's conclusion that FBCC's proof of claim must be limited to simple interest on debtor's principal balance.

### 3. Maximum Amount of Attorney's Fees

[*35]   FBCC contends that the bankruptcy court impermissibly modified both the mortgage and note by denying FBCC the recovery of attorney's fees in connection with the loan. (See FBCC's Br., at 20-22). FBCC challenges the bankruptcy court's reasons for denying FBCC the recovery of attorney's fees: that FBCC never provided notice for the recovery of these fees in accordance with *§ 403*; and that *§ 407* of Act 6 prohibits FBCC from recovering such fees as part of a contested bankruptcy proceeding. (Id.).

The allowance of attorney's fees in a proof of claim is governed by *§ 506(b)* of the bankruptcy code. This section provides that:

to the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section [pertaining to trustee's ability to recover costs of preserving or disposing of such property], is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement which such claim arose.

*11 U.S.C. § 506(b)*. Courts interpreting *§ 506(b)* impose a four-prong [*36] test for the recovery of attorney's fees as part of a proof of claim, requiring the fee to be: (i) allowable under the terms of *§ 506(b)*; (ii) provided for in the parties' agreement; (iii) reasonable; and (iv) allowable under state law. *In re Olick, 221 B.R. at 152-153*.

Act 6 is the applicable state law. *Section 406 of Act 6* states that "no residential mortgage lender shall contract for or receive attorney's fees from a residential mortgage debtor," subject to three exceptions. See *41 P.S. § 406*. These three exceptions include: (i) reasonable attorneys fees included in actual settlement costs; (ii) reasonable attorney's fees incurred by a residential mortgage lender upon commencement of foreclosure or other legal action with respect to a residential mortgage; and (iii) reasonable attorney's fees incurred prior to commencement of foreclosure or other legal action, but not in excess of fifty dollars. Id. *§ 406(1)-(3)*. In addition, a residential mortgage lender must provide thirty days notice prior to commencing a legal action to foreclose on a residential mortgage obligation. See *41 P.S. § 403(a)*. This [*37] notice must comply with the procedural requirements of *§ 403(b)-(c)*. Id.

### a. Notice

This Court affirms the bankruptcy court's finding that FBCC never provided notice in accordance with *§ 403* of Act 6, a prerequisite for the recovery of attorney's fees in connection with the commencement of "other legal action" within the meaning of *§ 406(2)*. (See March 11, 2005 Opinion, at 10). Although FBCC suggests that it provided thirty days advance notice to debtor and her husband of the confessed judgment action in the Montgomery County Court of Common Pleas, FBCC fails to identify the location of this evidence in the appellate record. Nor does FBCC identify evidence in the record to demonstrate technical compliance with the conditions of *§ 403(b)-(c)*. See, e.g., *Flores v. Shapiro & Kreisman, 246 F. Supp. 2d 427, 431 (E.D. Pa. 2001)* (noting that no legal expenses may be charged prior to sending thirty day notice and that Act 6 contemplates that "a lender will

not receive full reimbursement for legal expenses incurred").

### b. Other Legal Action

This Court also affirms the bankruptcy court's conclusion that *§ 406(2)* of Act 6 prohibits FBCC from [*38] collecting attorney's fees in connection with this bankruptcy court litigation. (See March 11, 2005 Order, at 10).

Bankruptcy courts in the Third Circuit have consistently declared that the phrase "other legal action" in *§ 406(2)* only refers to "the different forms of legal action under state law which a mortgage lender may utilize to enforce its rights against the mortgagor." *In re Detone, 262 B.R. 359, 362 (Bankr. E.D. Pa. 2001)*; *In re Schwartz, 68 B.R. at 382-384* (reviewing legislative history and holding that "other legal action" in *§ 406(2)* refers not to creditor's relief from automatic stay in debtor's bankruptcy matter, even though relief from stay is prerequisite to commence foreclosure proceedings under state law against debtor, but to "different forms of legal action under state law which a mortgagee may employ to enforce its rights against the mortgagor"). Federal bankruptcy court proceedings, such as those in which a mortgagee seeks relief from a stay or those involving proof of claim litigation, fail to constitute "other legal action" within the meaning of *§ 406(2)*, thereby preventing a residential mortgage lender from charging [*39] debtors the full amount of attorney's fees incurred, regardless of the terms of the note and mortgage. See, e.g., *In re Olick, 221 B.R. at 154* (creditor may not obtain attorney's fees under *§ 406(2)* of Act 6 in connection with bankruptcy court litigation to collect debt, as "Act 6 prevents the collection of attorney's fees in bankruptcy court litigation"); *In re Vitelli, 93 B.R. 889, 897 (Bankr. E.D. Pa. 1989)* (mortgagee may not recover post-petition attorney's fees in connection with filing and defending proof of claim in bankruptcy litigation, as phrase "other legal action" in *§ 406(2)* "refers only to legal proceedings to enforce a mortgage obligation in the manner of a foreclosure action, and not to a matter filed to attempt to advance the mortgagee's position in bankruptcy court").

This Court adopts this prevailing interpretation of "other legal action" in *§ 406(2)*, concluding that Act 6 precludes a mortgagee/creditor from recovering attorney's fees incurred in bankruptcy court litigation against a mortgagor/debtor. The Court further notes that FBCC provides no case law to the contrary. Nor does FBCC present references to the legislative [*40] history of Act 6 to demonstrate that bankruptcy court litigation between a mortgagor/debtor and mortgagee/creditor was intended to be included within the definition of "other legal action" in *§ 406(2)* of Act 6. In fact, FBCC offers no legal support for its contention. Finally, FBCC's attempts to

distinguish the aforementioned holdings interpreting *§ 406(2)* as applying only when a mortgage holder unnecessarily attempts to generate significant legal fees through spurious claims in bankruptcy court prove otiose, ignoring the statutory interpretation upon which these decisions are based.

### c. Conclusion

In summary, because a residential mortgage lender can neither recover attorney's fees without providing "notice" in accordance with *§ 403* nor recover attorney's fees under *§ 406(2)* in connection with federal bankruptcy court proceedings, those provisions in the note and mortgage, to the extent they allow for the recovery of such fees, are unenforceable. See *41 P.S. § 408* (provisions of Act 6 may not be waived by any oral or written agreement).

### III. Conclusion

For the preceding reasons, this Court affirms the March 11, 2005 Order of the **[*41]** bankruptcy court

limiting FBCC's proof of claim according to the terms of Act 6. An appropriate Order follows.

### ORDER

AND NOW, this 22nd day of February 2005, upon consideration of appellant's brief in support of its appeal to reverse in part the bankruptcy court's March 11, 2005 Order (Doc. No. 3), appellee's response in opposition (Doc. No. 4), and appellant's reply brief thereto (Doc. No. 7), it is hereby ORDERED as follows:

1. Appellant's appeal is DENIED in its entirety.

2. The March 11, 2005 Order of the bankruptcy court is AFFIRMED.

3. The Clerk of Court is directed to close this action for statistical purposes.

BY THE COURT:

/S/ Legrome D. Davis, J.

## CERTIFICATE OF SERVICE

I, Laurie Selber Silverstein, certify that I am not less than 18 years of age and that on this 25th day of June, 2007, I caused a true and correct copy of the within **Opening Brief of Appellant the Bank of New York, As Indenture Trustee** to be served upon the parties below in the matter indicated:

**APPELLEES**:

**BY HAND DELIVERY**
Pauline K. Morgan
Joseph M. Barry
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19899

**BY EMAIL/AND FIRST CLASS MAIL**
Alan W. Kornberg
Brian S. Herman
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York  10019

Under penalty of perjury, I declare the foregoing to be true and correct.

Laurie Selber Silverstein

Pac#803793