**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FOAMEX INTERNATIONAL INC. | ) | Bankr. Case No. 05-12685 (KG) |
| | ) | |
| Reorganized Debtor. | ) | |

-------------------------------------------------------------x

| | | |
|---|---|---|
| | ) | |
| THE BANK OF NEW YORK, AS INDENTURE TRUSTEE, | ) | Civil Action No. 07-00212 (JJF) |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOAMEX INTERNATIONAL INC. | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

-------------------------------------------------------------x

**APPENDIX TO THE OPENING BRIEF OF APPELLANT**
**THE BANK OF NEW YORK, AS INDENTURE TRUSTEE**

**POTTER ANDERSON & CORROON LLP**
Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConaill (No. 4734)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

**DECHERT LLP**
Glenn E. Siegel
Ross L. Hirsch
Davin J. Hall
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for The Bank of New York, as Indenture Trustee*

Dated:  June 25, 2007
      Wilmington, Delaware

# TABLE OF CONTENTS

Page

Excerpts from Indenture dated as of December 23, 1997 ...................................... A01-A15

13 ½% Senior Subordinated Notes Due 2005 ....................................................... A16-A30

Excerpts from Second Amended Disclosure Statement for
Debtors' Second Amended Joint Plan of Reorganization
Under Chapter 11 of the Bankruptcy Code............................................................. A31-A37

Excerpts from Debtors' Second Amended Joint Plan of
Reorganization Under Chapter 11 of the Bankruptcy Code .................................. A38-A44

Transcript of Omnibus Hearing, Case. No. 05-12685 (KG)
(Bankr. D. Del. Mar. 21, 2007)............................................................................. A45-A74

---

FOAMEX L.P.

FOAMEX CAPITAL CORPORATION

GENERAL FELT INDUSTRIES, INC.

FOAMEX FIBERS, INC.

FOAMEX LLC

CRAIN HOLDINGS CORP.

------------------

$98,000,000

13 1/2% SENIOR SUBORDINATED NOTES DUE 2005

------------------

INDENTURE

Dated as of December 23, 1997
------------------

------------------

THE BANK OF NEW YORK

------------------

Trustee

---

CROSS-REFERENCE TABLE*

| Trust Act | Indenture Section | Indenture Section |
|---|---|---|
| 310 | (a)(1) | 7.10 |
| | (a)(2) | 7.10 |
| | (a)(3) | N.A. |
| | (a)(4) | N.A. |
| | (a)(5) | 7.10 |
| | (b) | 7.10 |
| | (c) | N.A. |
| 311 | (a) | 7.11 |
| | (b) | 7.11 |
| | (c) | N.A. |
| 312 | (a) | 2.5 |
| | (b) | 11.3 |
| | (c) | 11.3 |
| 313 | (a) | 7.6 |
| | (b)(1) | 10.3 |
| | (b)(2) | 7.7 |
| | (c) | 7.6; 11.2 |
| | (d) | 7.6 |
| 314 | (a) | 4.3; 11.2 |
| | (b) | 10.2 |
| | (c)(1) | 11.4 |
| | (c)(2) | 11.4 |
| | (c)(3) | N.A. |
| | (d) | 10.3, 10.4, 10.5 |
| | (e) | 11.5 |
| | (f) | N.A. |
| 315 | (a) | 7.1 |
| | (b) | 7.5,11.2 |
| | (c) | 7.1 |
| | (d) | 7.1 |
| | (e) | 6.11 |
| 316 | (a)(last sentence) | 2.9 |
| | (a)(1)(A) | 6.5 |
| | (a)(1)(B) | 6.4 |
| | (a)(2) | N.A. |
| | (b) | 6.7 |
| | (c) | 2.12 |
| 317 | (a)(1) | 6.8 |
| | (a)(2) | 6.9 |
| | (b) | 2.4 |
| 318 | (a) | 11.1 |
| | (b) | N.A. |
| | (c) | 11.1 |

N.A. means not applicable.

*This Cross-Reference Table is not part of the Indenture.

(i)

TABLE OF CONTENTS

Page
----

ARTICLE 1. DEFINITIONS AND INCORPORATION BY REFERENCE......................1
    SECTION 1.1. DEFINITIONS.............................................1
    SECTION 1.2. OTHER DEFINITIONS......................................17
    SECTION 1.3. INCORPORATION BY REFERENCE OF TRUST INDENTURE ACT......17
    SECTION 1.4. RULES OF CONSTRUCTION.................................18

ARTICLE 2. THE NOTES.....................................................18
    SECTION 2.1. FORM AND DATING.......................................18
    SECTION 2.2. EXECUTION AND AUTHENTICATION..........................18
    SECTION 2.3. REGISTRAR AND PAYING AGENT............................19
    SECTION 2.4. PAYING AGENT TO HOLD MONEY IN TRUST...................19
    SECTION 2.5. HOLDER LISTS..........................................20
    SECTION 2.6. TRANSFER AND EXCHANGE.................................20
    SECTION 2.7. REPLACEMENT NOTES.....................................26
    SECTION 2.8. OUTSTANDING NOTES.....................................26
    SECTION 2.9. TREASURY NOTES........................................26
    SECTION 2.10. TEMPORARY NOTES......................................27
    SECTION 2.11. CANCELLATION.........................................27
    SECTION 2.12. DEFAULTED INTEREST...................................27
    SECTION 2.13. CUSIP NUMBERS........................................27

ARTICLE 3. REDEMPTION AND PREPAYMENT.....................................27
    SECTION 3.1. NOTICES TO TRUSTEE....................................28
    SECTION 3.2. SELECTION OF NOTES TO BE REDEEMED.....................28
    SECTION 3.3. NOTICE OF REDEMPTION..................................28
    SECTION 3.4. EFFECT OF NOTICE OF REDEMPTION........................29
    SECTION 3.5. DEPOSIT OF REDEMPTION PRICE...........................29
    SECTION 3.6. NOTES REDEEMED IN PART................................29
    SECTION 3.7. OPTIONAL REDEMPTION...................................30
    SECTION 3.8. MANDATORY REDEMPTION..................................30
    SECTION 3.9. OFFER TO PURCHASE BY APPLICATION OF EXCESS PROCEEDS....30

ARTICLE 4. COVENANTS.....................................................32
    SECTION 4.1. PAYMENT OF NOTES......................................32
    SECTION 4.2. MAINTENANCE OF OFFICE OR AGENCY.......................32
    SECTION 4.3. REPORTS...............................................33
    SECTION 4.4. COMPLIANCE CERTIFICATE................................33
    SECTION 4.5. TAXES.................................................34
    SECTION 4.6. STAY, EXTENSION AND USURY LAWS........................34
    SECTION 4.7. RESTRICTED PAYMENTS...................................34
    SECTION 4.8. DIVIDEND AND OTHER PAYMENT RESTRICTIONS AFFECTING
                 SUBSIDIARIES..........................................37
    SECTION 4.9. INCURRENCE OF INDEBTEDNESS AND ISSUANCE OF
                 PREFERRED STOCK.......................................37
    SECTION 4.10. ASSET SALES..........................................40
    SECTION 4.11. TRANSACTIONS WITH AFFILIATES.........................41

A03

SECTION 4.12. LIENS..............................................................42
SECTION 4.13. LINE OF BUSINESS...................................................42
SECTION 4.14. CORPORATE EXISTENCE................................................42
SECTION 4.15. OFFER TO REPURCHASE UPON CHANGE OF CONTROL.................42
SECTION 4.16. ANTI-LAYERING......................................................43
SECTION 4.17. SALE AND LEASEBACK TRANSACTIONS.............................43
SECTION 4.18. LIMITATION ON ISSUANCES AND SALES OF CAPITAL STOCK OF
              RESTRICTED SUBSIDIARIES..................................43
SECTION 4.19. PAYMENTS FOR CONSENT...............................................44
SECTION 4.20. ADDITIONAL GUARANTEES.............................................44

ARTICLE 5. SUCCESSORS.............................................................44
SECTION 5.1. MERGER, CONSOLIDATION, OR SALE OF ASSETS...................44
SECTION 5.2. SUCCESSOR CORPORATION SUBSTITUTED.........................45

ARTICLE 6. DEFAULTS AND REMEDIES.................................................45
SECTION 6.1. EVENTS OF DEFAULT..................................................45
SECTION 6.2. ACCELERATION.......................................................47
SECTION 6.3. OTHER REMEDIES.....................................................47
SECTION 6.4. WAIVER OF PAST DEFAULTS............................................48
SECTION 6.5. CONTROL BY MAJORITY................................................48
SECTION 6.6. LIMITATION ON SUITS................................................48
SECTION 6.7. RIGHTS OF HOLDERS OF NOTES TO RECEIVE PAYMENT.............49
SECTION 6.8. COLLECTION SUIT BY TRUSTEE.........................................49
SECTION 6.9. TRUSTEE MAY FILE PROOFS OF CLAIM...........................49
SECTION 6.10. PRIORITIES.........................................................49
SECTION 6.11. UNDERTAKING FOR COSTS.............................................50

ARTICLE 7. TRUSTEE...............................................................50
SECTION 7.1. DUTIES OF TRUSTEE..................................................50
SECTION 7.2. RIGHTS OF TRUSTEE..................................................51
SECTION 7.3. INDIVIDUAL RIGHTS OF TRUSTEE.......................................52
SECTION 7.4. TRUSTEE'S DISCLAIMER...............................................52
SECTION 7.5. NOTICE OF DEFAULTS.................................................52
SECTION 7.6. REPORTS BY TRUSTEE TO HOLDERS OF THE NOTES.................52
SECTION 7.7. COMPENSATION AND INDEMNITY.........................................53
SECTION 7.8. REPLACEMENT OF TRUSTEE.............................................54
SECTION 7.9. SUCCESSOR TRUSTEE BY MERGER, ETC...........................55
SECTION 7.10. ELIGIBILITY; DISQUALIFICATION.....................................55
SECTION 7.11. PREFERENTIAL COLLECTION OF CLAIMS AGAINST ISSUERS.........55
SECTION 7.12. TRUSTEE'S APPLICATION FOR INSTRUCTIONS FROM THE ISSUERS...55

ARTICLE 8. DISCHARGE OF INDENTURE................................................55
SECTION 8.1. TERMINATION OF ISSUERS' OBLIGATIONS.......................55
SECTION 8.2. APPLICATION OF TRUST MONEY.........................................56
SECTION 8.3. REPAYMENT TO ISSUERS...............................................57
SECTION 8.4. REINSTATEMENT......................................................57

ARTICLE 9. AMENDMENT, SUPPLEMENT AND WAIVER................................57
    SECTION 9.1. WITHOUT CONSENT OF HOLDERS OF NOTES.......................57
    SECTION 9.2. WITH CONSENT OF HOLDERS OF NOTES..........................58
    SECTION 9.3. COMPLIANCE WITH TRUST INDENTURE ACT.......................59
    SECTION 9.4. REVOCATION AND EFFECT OF CONSENTS.........................59
    SECTION 9.5. NOTATION ON OR EXCHANGE OF NOTES..........................59
    SECTION 9.6. TRUSTEE TO SIGN AMENDMENTS, ETC...........................60

ARTICLE 10. SUBORDINATION.................................................60
    SECTION 10.1. AGREEMENT TO SUBORDINATE.................................60
    SECTION 10.2. LIQUIDATION; DISSOLUTION; BANKRUPTCY.....................60
    SECTION 10.3. DEFAULT ON DESIGNATED SENIOR DEBT........................60
    SECTION 10.4. ACCELERATION OF NOTES....................................61
    SECTION 10.5. WHEN DISTRIBUTION MUST BE PAID OVER......................61
    SECTION 10.6. NOTICE BY THE ISSUERS....................................62
    SECTION 10.7. SUBROGATION..............................................62
    SECTION 10.8. RELATIVE RIGHTS..........................................62
    SECTION 10.9. SUBORDINATION MAY NOT BE IMPAIRED BY THE ISSUERS.........62
    SECTION 10.10. DISTRIBUTION OR NOTICE TO REPRESENTATIVE................63
    SECTION 10.11. RIGHTS OF TRUSTEE AND PAYING AGENT......................63
    SECTION 10.12. AUTHORIZATION TO EFFECT SUBORDINATION...................64
    SECTION 10.13. AMENDMENTS..............................................64

ARTICLE 11. GUARANTEE OF NOTES...........................................64
    SECTION 11.1. NOTE GUARANTEE...........................................64
    SECTION 11.2. EXECUTION AND DELIVERY OF NOTE GUARANTEE.................65
    SECTION 11.3. SUBSIDIARY GUARANTORS MAY CONSOLIDATE, ETC., ON
                  CERTAIN TERMS...........................................65
    SECTION 11.4. RELEASES FOLLOWING SALE OF ASSETS, MERGER, SALE OF
                  CAPITAL STOCK ETC.......................................66
    SECTION 11.5. ADDITIONAL SUBSIDIARY GUARANTORS.........................67
    SECTION 11.6. LIMITATION ON SUBSIDIARY GUARANTOR LIABILITY.............67
    SECTION 11.7. "TRUSTEE" TO INCLUDE PAYING AGENT.......................67

ARTICLE 12. SUBORDINATION OF NOTE GUARANTEE..............................67
    SECTION 12.1. AGREEMENT TO SUBORDINATE.................................68
    SECTION 12.2. LIQUIDATION; DISSOLUTION; BANKRUPTCY.....................68
    SECTION 12.3. DEFAULT ON DESIGNATED SENIOR DEBT........................68
    SECTION 12.4. ACCELERATION OF NOTES....................................69
    SECTION 12.5. WHEN DISTRIBUTION MUST BE PAID OVER......................69
    SECTION 12.6. NOTICE BY SUBSIDIARY GUARANTOR...........................69
    SECTION 12.7. SUBROGATION..............................................69
    SECTION 12.8. RELATIVE RIGHTS..........................................70
    SECTION 12.9. SUBORDINATION MAY NOT BE IMPAIRED BY
                  SUBSIDIARY GUARANTOR....................................70
    SECTION 12.10. DISTRIBUTION OR NOTICE TO REPRESENTATIVE................71
    SECTION 12.11. RIGHTS OF TRUSTEE AND PAYING AGENT......................71
    SECTION 12.12. AUTHORIZATION TO EFFECT SUBORDINATION...................71
    SECTION 12.13. AMENDMENTS..............................................72

A05

ARTICLE 13. MISCELLANEOUS.................................................72
    SECTION 13.1. TRUST INDENTURE ACT CONTROLS............................72
    SECTION 13.2. NOTICES.................................................72
    SECTION 13.3. COMMUNICATION BY HOLDERS OF NOTES WITH OTHER
                  HOLDERS OF NOTES.......................................73
    SECTION 13.4. CERTIFICATE AND OPINION AS TO CONDITIONS PRECEDENT.......73
    SECTION 13.5. STATEMENTS REQUIRED IN CERTIFICATE OR OPINION............74
    SECTION 13.6. RULES BY TRUSTEE AND AGENTS.............................74
    SECTION 13.7. NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS, EMPLOYEES
                  AND STOCKHOLDERS.......................................74
    SECTION 13.8. GOVERNING LAW..........................................74
    SECTION 13.9. NO ADVERSE INTERPRETATION OF OTHER AGREEMENTS............74
    SECTION 13.10. SUCCESSORS.............................................74
    SECTION 13.11. SEVERABILITY...........................................75
    SECTION 13.12. COUNTERPART ORIGINALS..................................75
    SECTION 13.13. TABLE OF CONTENTS, HEADINGS, ETC.......................75

ARTICLE 14. CRAIN HOLDINGS CORP. AS INTERMEDIATE OBLIGOR...................75
    SECTION 14.1. INTERMEDIATE OBLIGOR....................................75
    SECTION 14.2. MERGER, CONSOLIDATION, OR SALE OF ASSETS................75
    SECTION 14.3. EFFECTIVENESS OF CERTAIN PROVISIONS......................76
    SECTION 14.4. RELEASES FOLLOWING CRAIN ACQUISITION TRANSACTIONS........76
    SECTION 14.5. NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS,
                  EMPLOYEES AND STOCKHOLDERS.............................76

## EXHIBITS

Exhibit A        FORM OF NOTE
Exhibit B        CERTIFICATE OF TRANSFEROR
Exhibit C        FORM OF SUBSIDIARY GUARANTEE
Exhibit D        FORM OF SUPPLEMENTAL INDENTURE

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depository Participants or beneficial owners of interests in any Global Security) other than to require delivery of such certificates and other documentation or evidence as are expressly required by and to do so when expressly required by terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.7.  REPLACEMENT NOTES.

If any mutilated Note is surrendered to the Trustee, or the Issuers and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Issuers shall issue and the Trustee, upon the written order of the Issuers signed by an Officer of each Issuer, shall authenticate a replacement Note if the Trustee's requirements are met. An indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Issuers to protect the Issuers, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Issuers may charge for their expenses in replacing a Note.

Every replacement Note is an additional obligation of the Issuers and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

SECTION 2.8.  OUTSTANDING NOTES.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section as not outstanding. Except as set forth in Section 2.9 hereof, a Note does not cease to be outstanding because any Issuer or Subsidiary Guarantor or an Affiliate of any Issuer or Subsidiary Guarantor holds the Note.

If a Note is replaced pursuant to Section 2.7 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser.

If the principal amount of any Note is considered paid under Section 4.1 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuers, a Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

SECTION 2.9.  TREASURY NOTES.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by any Issuer or Subsidiary Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with any Issuer or Subsidiary Guarantor, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such

26

direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned shall be so disregarded.

SECTION 2.10.  TEMPORARY NOTES.

Until Definitive Notes are ready for delivery, the Issuers may prepare and the Trustee shall authenticate temporary Notes upon a written order of the Issuers signed by an Officer of each Issuer. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuers consider appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuers shall prepare and the Trustee shall authenticate Definitive Notes in exchange for temporary Notes.

Holders of temporary Notes shall be entitled to all of the benefits of this Indenture.

SECTION 2.11.  CANCELLATION.

The Issuers at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall return cancelled Notes to one of the Issuers. The Issuers may not issue new Notes to replace Notes that they have paid or that have been delivered to the Trustee for cancellation.

SECTION 2.12.  DEFAULTED INTEREST.

If the Issuers or the Subsidiary Guarantors default in a payment of interest on the Notes, they shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.1 hereof. The Issuers shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Issuers shall fix or cause to be fixed each such special record date and payment date, provided that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Issuers (or, upon the written request of the Issuers, the Trustee in the name and at the expense of the Issuers) shall mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

SECTION 2.13.  CUSIP NUMBERS.

The Issuers in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be effected by any defect in or omission of such numbers. The Issuers will promptly notify the Trustee of any change in the "CUSIP" numbers.

A08

lawful, (i) accept for payment, on a pro rata basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Purchase Offer, or if less than the Offer Amount has been tendered, all Notes tendered, (ii) deliver or cause the Paying Agent or Depository, as the case may be, to deliver to the Trustee Notes so accepted and (iii) deliver to the Trustee an Officers' Certificate stating that such Notes or portions thereof were accepted for payment by the Issuers in accordance with the terms of this Section 3.9. The Issuers, the Depository or the Paying Agent, as the case may be, shall promptly (but in any case not later than three Business Days after the Purchase Date) mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Issuers for purchase, plus any accrued and unpaid interest and Liquidated Damages, if any, thereon, and the Issuers shall promptly issue a new Note, and the Trustee, shall authenticate and mail or deliver such new Note, to such Holder, equal in principal amount to any unpurchased portion of such Holder's Notes surrendered. Any Note not so accepted shall be promptly mailed or delivered by the Issuers to the Holder thereof. The Issuers shall publicly announce in a newspaper of general circulation or in a press release provided to a nationally recognized financial wire service the results of the Purchase Offer on the Purchase Date.

Other than as specifically provided in this Section 3. 9, any purchase pursuant to this Section 3.9 shall be made pursuant to the provisions of Sections 3.2 through 3.6 hereof.

ARTICLE 4.
COVENANTS

SECTION 4.1.  PAYMENT OF NOTES.

The Issuers shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Issuers or a Subsidiary thereof, holds as of 10:00 a.m. Eastern Time on the due date money deposited by the Issuers in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due. The Issuers shall pay all Liquidated Damages, if any, in the same manner on the dates and in the amounts set forth in the Registration Rights Agreement.

The Issuers shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Liquidated Damages (without regard to any applicable grace period) at the same rate to the extent lawful.

SECTION 4.2.  MAINTENANCE OF OFFICE OR AGENCY.

The Issuers shall maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuers in respect of the Notes and this Indenture may be served. The Issuers shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuers shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

32

transfer, lease, conveyance or other disposition shall have been made is organized and existing under the laws of the United States, any state thereof or the District of Columbia, provided that FCC may not consolidate or merge with or into any entity other than a corporation satisfying such requirements for so long as Foamex remains a partnership; (ii) the entity or Person formed by or surviving any such consolidation or merger (if other than such Issuer) or the entity or Person to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made assumes all the obligations of such Issuer under the Notes and this Indenture pursuant to a supplemental indenture in a form reasonably satisfactory to the Trustee; (iii) immediately after such transaction no Default or Event of Default exists; and (iv) except in the case of a merger of an Issuer with or into one of its Wholly Owned Restricted Subsidiaries, the Issuer or the entity or Person formed by or surviving any such consolidation or merger (if other than the Issuer), or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made (A) shall have Consolidated Net Worth immediately after the transaction equal to or greater than the Consolidated Net Worth of such Issuer immediately preceding the transaction and (B) shall, at the time of such transaction and after giving pro forma effect thereto as if such transaction had occurred at the beginning of the applicable four-quarter period, be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of Section 4.9 hereof. In the case of a sale, assignment, lease, transfer, conveyance or other disposition of all or substantially all of the assets of an Issuer, upon the assumption provided for in clause (ii) above, such Issuer shall be discharged from all further liability and obligation under this Indenture.

SECTION 5.2.  SUCCESSOR CORPORATION SUBSTITUTED.

        Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Issuers in accordance with Section 5.1 hereof, the successor corporation formed by such consolidation or into or with which the Issuers is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Indenture referring to such "Issuer" shall refer instead to the successor entity and not to such Issuer), and may exercise every right and power of such Issuer under this Indenture with the same effect as if such successor Person had been named as an Issuer herein; provided, however, that the predecessor Issuer shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a sale of all or substantially all of the Issuer's assets as provided in the last sentence of Section 5.1 hereof.

ARTICLE 6.
DEFAULTS AND REMEDIES

SECTION 6.1.  EVENTS OF DEFAULT.

        An "Event of Default" occurs if:

        (a) the Issuers default for 30 days in the payment when due of interest on, or Liquidated Damages with respect to, the Notes (whether or not prohibited by the subordination provisions of this Indenture);

        (b) the Issuers default in payment when due of the principal of or premium, if any, on the Notes (whether or not prohibited by the subordination provisions of this Indenture);

45

A10

(c) the Issuers fail to comply with Section 4.15, or to consummate a mandatory Asset Sale Offer pursuant to Section 4.10 or to comply with Article 5;

(d) the Issuers fail for 60 days after notice to comply with any of their other agreements in this Indenture or the Notes;

(e) the Issuers default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Issuers or any of their respective Restricted Subsidiaries (or the payment of which is Guaranteed by the Issuers or any of their respective Restricted Subsidiaries) whether such Indebtedness or Guarantee now exists, or is created after the date of this Indenture, which default (a) is caused by a failure to pay principal of, interest or premium, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "Payment Default") or (b) results in the acceleration of such Indebtedness prior to its Stated Maturity and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the Stated Maturity of which has been so accelerated, aggregates $20.0 million or more;

(f) the Issuers or any of their respective Restricted Subsidiaries fail to pay final judgments aggregating in excess of $10.0 million, which judgments are not paid, discharged or stayed for a period of 60 days after entry thereof;

(g) the Issuers or any of their respective Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary pursuant to or within the meaning of Bankruptcy Law:

(i) commences a voluntary case,

(ii) consents to the entry of an order for relief against it in an involuntary case,

(iii) consents to the appointment of a custodian of it or for all or substantially all of its property,

(iv) makes a general assignment for the benefit of its creditors, or

(v) generally is not paying its debts as they become due; or

(h) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i) is for relief against the Issuers or any of its Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary in an involuntary case;

(ii) appoints a custodian of the Issuers or any of their respective Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary or for all or substantially all of the property of the Issuers or any of their Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary; or

46

A11

(iii) orders the liquidation of the Issuers or any of their respective Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days.

SECTION 6.2.  ACCELERATION.

If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately; provided, however, that if any Indebtedness or Obligation is outstanding pursuant to the Credit Facility, upon a declaration of acceleration by the holders of the Notes or the Trustee, all principal and interest under this Indenture shall be due and payable upon the earlier of (x) the day which is five Business Days after the provision to the Issuers, the Credit Agent and the Trustee of such written notice of acceleration or (y) the date of acceleration of any Indebtedness under the Credit Facility; and provided, further, that in the event of an acceleration based upon an Event of Default set forth in clause (e) above, such declaration of acceleration shall be automatically annulled if the holders of Indebtedness which is the subject of such failure to pay at maturity or acceleration have rescinded their declaration of acceleration in respect of such Indebtedness or such failure to pay at maturity shall have been cured or waived within 30 days thereof and no other Event of Default has occurred during such 30-day period which has not been cured, paid or waived. Notwithstanding the foregoing, in the case of an Event of Default as described in (g) and (h) of Section 6.1 hereof all outstanding Notes will become due and payable without further action or notice. Holders of the Notes may not enforce this Indenture or the Notes except as provided in this Indenture. Subject to certain limitations, Holders of a majority in principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default or Event of Default (except a Default or Event of Default relating to the payment of principal or interest) if it determines that withholding notice is in their interest.

If an Event of Default occurs on or after August 15, 2000 by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Issuers with the intention of avoiding payment of the premium that the Issuers would have had to pay if the Issuers then had elected to redeem the Notes pursuant to Section 3.7 hereof, then, upon acceleration of the Notes, an equivalent premium shall also become and be immediately due and payable, to the extent permitted by law, anything in this Indenture or in the Notes to the contrary notwithstanding. If an Event of Default occurs prior to August 15, 2000 by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Issuers with the intention of avoiding the prohibition on redemption of the Notes prior to such date, then, upon acceleration of the Notes, an additional premium shall also become and be immediately due and payable in an amount, for each of the years beginning on August 15 of the years set forth below, as set forth below (expressed as percentages of principal amount to the date of payment that would otherwise be due but for the provisions of this sentence):

| Year | Percentage |
| ---- | ---------- |
| 1997 | 111.8125%  |
| 1998 | 110.1250%  |
| 1999 | 108.4375%  |

47

A12

in Section 7.7 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.8, the Issuers' obligations under Section 7.7 hereof shall continue for the benefit of the retiring Trustee.

SECTION 7.9.   SUCCESSOR TRUSTEE BY MERGER, ETC.

        If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

SECTION 7.10.   ELIGIBILITY; DISQUALIFICATION.

        There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition.

        This Indenture shall always have a Trustee who satisfies the requirements of TIA ss. 310(a)(1), (2) and (5). The Trustee is subject to TIA ss. 310(b).

SECTION 7.11.   PREFERENTIAL COLLECTION OF CLAIMS AGAINST ISSUERS.

        The Trustee is subject to TIA ss. 311(a), excluding any creditor relationship listed in TIA ss. 311(b). A Trustee who has resigned or been removed shall be subject to TIA ss. 311(a) to the extent indicated therein.

SECTION 7.12.   TRUSTEE'S APPLICATION FOR INSTRUCTIONS FROM THE ISSUERS.

        Any application by the Trustee for written instructions from the Issuers may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective. The Trustee shall not be liable for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any officer of the Issuers actually receives such application, unless any such officer shall have consented in writing to any earlier date) unless prior to taking any such action (or the effective date in the case of an omission), the Trustee shall have received written instructions in response to such application specifying the action to be taken or omitted.

ARTICLE 8.
DISCHARGE OF INDENTURE

SECTION 8.1.   TERMINATION OF ISSUERS' OBLIGATIONS.

        This Indenture shall cease to be of further effect (except that the Issuers' and the Subsidiary Guarantors' obligations under Section 7.7 and 8.4 and the Issuers' Trustee's and Paying Agent's obligations under Section 8.3 shall survive) when all outstanding Notes theretofore authenticated and issued have been delivered (other than destroyed, lost or stolen Notes which have been replaced or paid) to the Trustee for cancellation and the Issuers have paid all sums payable by the

55

A13

Issuers hereunder. In addition, the Issuers may terminate all of their obligations under this Indenture if:

(1) the Issuers irrevocably deposit in trust with the Trustee or at the option of the Trustee, with a trustee reasonably satisfactory to the Trustee and the Issuers under the terms of an irrevocable trust agreement in form and substance satisfactory to the Trustee, money or United States Government Obligations sufficient (as certified by an independent public accountant designated by the Issuers) to pay principal and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by them hereunder, provided that (i) the trustee of the irrevocable trust shall have been irrevocably instructed to pay such money or the proceeds of such United States Government Obligations to the Trustee and (ii) the Trustee shall have been irrevocably instructed to apply such money or the proceeds of such United States Government Obligations to the payment of said principal and interest with respect to the Notes;

(2) the Issuers and the Subsidiary Guarantors deliver to the Trustee an Officers' Certificate stating that all conditions precedent to satisfaction and discharge of this Indenture have been complied with, and an Opinion of Counsel to the same effect; and

(3) no Event of Default or event (including such deposit) which, with notice or lapse of time, or both, would become an Event of Default with respect to the Notes shall have occurred and be continuing on the date of such deposit.

Then, this Indenture shall cease to be of further effect (except as provided this paragraph), and the Trustee, on demand of the Issuers, shall execute proper instruments acknowledging confirmation of and discharge under this Indenture. The Issuers may make the deposit only if Article 10 hereof does not prohibit such payment. However, the Issuers' obligations in Section 2.3, 2.4, 2.5, 2.6, 2.7, 4.1, 7.7, 7.8, 8.3 and 8.4, and the Trustee's and Paying Agent's obligations in Section 8.3 shall survive until the Notes are no longer outstanding. Thereafter, only the Issuers', Trustee's and Paying Agents' obligations in Section 8.3 shall survive.

After such irrevocable deposit made pursuant to this Section 8.1 and satisfaction of the other conditions set forth herein, the Trustee upon request shall acknowledge in writing the discharge of the Issuers' and the Subsidiary Guarantors' obligations under this Indenture except for those surviving obligations specified above.

In order to have money available on a payment date to pay principal or interest on the Notes, the United States Government Obligations shall be payable as to principal or interest at least one Business Day before such payment date in such amounts as will provide the necessary money. United States Government Obligations shall not be callable at the issuer's options.

The Issuers shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the United States Government Obligations deposited pursuant to this Section 8.1 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of outstanding Notes.

SECTION 8.2.  APPLICATION OF TRUST MONEY.

(a) The Trustee or a trustee satisfactory to the Trustee and the Issuers shall hold in trust money or United States Government Obligations deposited with it pursuant to Section 8.1. It shall apply the deposited money and the money from United States Government Obligations through

56

(b) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.5 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

SECTION 13.5.  STATEMENTS REQUIRED IN CERTIFICATE OR OPINION.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA ss. 314(a)(4)) shall comply with the provisions of TIA ss. 314(e) and shall include:

(a) a statement that the Person making such certificate or opinion has read such covenant or condition;

(b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

SECTION 13.6.  RULES BY TRUSTEE AND AGENTS.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

SECTION 13.7.  NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS,
              EMPLOYEES AND STOCKHOLDERS.

No director, officer, employee, partner, incorporator or stockholder of the Issuers or any of their Restricted Subsidiaries, as such, shall have any liability for any obligations of the Issuers or any Subsidiary Guarantor under the Notes, this Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.8.  GOVERNING LAW.

THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THEREOF, SHALL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE, THE NOTES AND THE NOTE GUARANTEES.

SECTION 13.9.  NO ADVERSE INTERPRETATION OF OTHER AGREEMENTS.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuers or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

74

(Face of Senior Subordinated Note for QIBs)
13 1/2% Senior Subordinated Notes due 2005

No. 1  $_____
CUSIP NO. 344126AH0

FOAMEX L.P. and
FOAMEX CAPITAL CORPORATION

promise to pay to Cede & Co. or registered assigns, the principal sum of
_____ Dollars on August 15, 2005.

Interest Payment Dates:  February 15 and August 15

Record Dates:  January 30 and July 30

FOAMEX L.P.
By its Managing General Partner FMXI, Inc.

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

FOAMEX CAPITAL CORPORATION

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

A-2

A16

This is one of the Senior
Subordinated Notes referred to in
the within-mentioned Indenture:

Dated:    _____

The Bank of New York,
as Trustee

By:_____
    (Authorized Signatory)

A-3

A17

EXHIBIT A-1

A-4

(Face of Senior Subordinated Note for IAIs)
13 1/2% Senior Subordinated Notes due 2005

No. 1 $_____
     CUSIP NO.

     FOAMEX L.P. and
     FOAMEX CAPITAL CORPORATION

promise to pay to Cede & Co. or registered assigns, the principal sum of
_____ Dollars on August 15, 2005.

Interest Payment Dates:  February 15 and August 15

Record Dates:  January 30 and July 30

FOAMEX L.P.
By its Managing General Partner FMXI, Inc.

By:_____
     Name:
     Title:

By:_____
     Name:
     Title:

FOAMEX CAPITAL CORPORATION

By:_____
     Name:
     Title:

By:_____
     Name:
     Title:

A-5

This is one of the Senior
Subordinated Notes referred to in
the within-mentioned Indenture:

Dated: _____

The Bank of New York,
as Trustee

By:_____
      (Authorized Signatory)

A-6

(Back of Senior Subordinated Note)
13 1/2% Series Senior Subordinated Notes due 2005

[Unless and until it is exchanged in whole or in part for Senior Subordinated Notes in definitive form, this Senior Subordinated Note may not be transferred except as a whole by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository. Unless this certificate is presented by an authorized representative of The Depository Trust Company (55 Water Street, New York, New York) ("DTC"), to the issuer or its agent for registration of transfer, exchange or payment, and any certificate issued is registered in the name of Cede & Co. or such other name as may be requested by an authorized representative of DTC (and any payment is made to Cede & Co. or such other entity as may be requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL in as much as the registered owner hereof, Cede & Co., has an interest herein.]1/

[THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUERS THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1) (a) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (b) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (c) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 904 OF THE SECURITIES ACT, (d) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501(a)(1), (2), (3) or (7) OF THE SECURITIES ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR") THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF SECURITIES LESS THAN $100,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUERS THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR (e) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUERS SO REQUESTS), (2) TO THE ISSUERS OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN (A) ABOVE.]2/

---

1    This paragraph should be included only if the Note is issued in global form.

2    This paragraph should be removed upon the exchange of Senior Subordinated Notes for New Senior Subordinated Notes in the Exchange Offer or upon the registration of the Senior Subordinated Notes pursuant to the terms of the Registration Rights Agreement.

A-7

A21

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1. INTEREST. Foamex L.P., a Delaware limited partnership and Foamex Capital Corporation, a Delaware corporation, or their respective successors (each an "Issuer" and together, the "Issuers"), promise to pay interest on the principal amount of this Note at the rate of 13 1/2% per annum and shall pay the Liquidated Damages, if any, payable pursuant to Section 5 of the Registration Rights Agreement referred to below. The Issuers will pay interest and Liquidated Damages, if any, in United States dollars (except as otherwise provided herein) semi-annually in arrears on February 15 and August 15, commencing on February 15, 1998, or if any such day is not a Business Day, on the next succeeding Business Day (each an "Interest Payment Date"). Interest on the Notes shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided that if there is no existing Default or Event of Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date, except in the case of the original issuance of Notes, in which case interest shall accrue from the date of authentication. The Issuers shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Liquidated Damages (without regard to any applicable grace period) at the same rate to the extent lawful.

2. METHOD OF PAYMENT. The Issuers will pay interest on the Notes (except defaulted interest) and Liquidated Damages, if any, to the Persons who are registered Holders of Notes at the close of business on the January 30 or July 30 next preceding the Interest Payment Date, even if such Notes are cancelled after such record date and on or before such Interest Payment Date, except as provided in Section 2.13 of the Indenture with respect to defaulted interest. The Notes shall be payable as to principal, premium, if any, interest and Liquidated Damages, if any, at the office or agency of the Issuers maintained for such purpose within or without the City and State of New York, or, at the option of the Issuers, payment of interest and Liquidated Damages, if any, may be made by check mailed to the Holders at their addresses set forth in the register of Holders; provided that payment by wire transfer of immediately available funds shall be required with respect to principal of, and interest, premium and Liquidated Damages, if any, on, all Global Notes and all other Notes the Holders of which shall have provided written wire transfer instructions to the Issuers or the Paying Agent. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

3. PAYING AGENT AND REGISTRAR. Initially, The Bank of New York, the Trustee under the Indenture, shall act as Paying Agent and Registrar. The Issuers may change any Paying Agent or Registrar without notice to any Holder. The Issuers or any of its Subsidiaries may act in any such capacity.

4. INDENTURE. The Issuers issued the Notes under an Indenture dated as of December 23, 1997 ("Indenture") among the Issuers, the Subsidiary Guarantors, Crain Holdings Corp. and the Trustee. The terms of the Notes include those stated in the Indenture and those made a part of the Indenture by reference to the Trust Indenture Act of 1939, as

A-8

A22

amended (15 U.S. Code ss.ss. 77aaa-77bbbb) (the "TIA"). The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. The Notes are general unsecured Obligations of the Issuers limited to $98,000,000 in aggregate principal amount, plus amounts, if any, sufficient to pay premium, if any, interest or Liquidated Damages, if any, on outstanding Notes as set forth in Paragraph 2 hereof.

5. OPTIONAL REDEMPTION. The Notes shall not be redeemable at the Issuers' option prior to August 15, 2000. Thereafter, the Notes shall be redeemable at the option of the Issuers, in whole or in part, at any time upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest and Liquidated Damages, if any, thereon, to the applicable redemption date, if redeemed during the twelve-month period beginning on August 15 of the years set forth below:

| Year | Percentage |
| --- | --- |
| 2000......................................... | 106.7500% |
| 2001......................................... | 105.0625% |
| 2002......................................... | 103.3750% |
| 2003......................................... | 101.6875% |
| 2004 and thereafter.......................... | 100.0000% |

6. MANDATORY REDEMPTION. Except as set forth in paragraph 7 below, the Issuers shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

7. NOTICE OF REDEMPTION. Notice of redemption shall be mailed at least 30 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its registered address. Notes in denominations larger than $1,000 may be redeemed in part but only in whole multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed. On and after the redemption date, interest and Liquidated Damages, if any, ceases to accrue on the Notes or portions thereof called for redemption.

8. SUBORDINATION. The Notes are subordinated to Senior Debt, which is all Indebtedness and other Obligations specified below payable directly or indirectly by Foamex or FCC, or any of their respective Restricted Subsidiaries whether outstanding on the date of the Indenture or thereafter created, incurred or assumed by Foamex or FCC or any of their respective Restricted Subsidiaries: (i) the principal of, interest on and all other Obligations related to the Credit Facility (including without limitation all loans, letters of credit and other extensions of credit under the Credit Facility, and all expenses, fees, reimbursements, indemnities and other amounts owing pursuant to the Credit Facility); (ii) amounts payable in respect of any Hedging Obligations; (iii) all Indebtedness not prohibited by Section 4.9 of the Indenture that is not expressly pari passu with or subordinated to the Senior Subordinated Notes, and (iv) all permitted renewals, extensions, refundings or refinancings thereof. All Post-Petition Interest on Senior Debt shall constitute Senior Debt. Notwithstanding anything to the contrary in the foregoing, Senior Debt will not include (i) Indebtedness of either of the Issuers or any of their respective Restricted Subsidiaries to any other Restricted Subsidiaries which is not a Subsidiary Guarantor, (ii) Indebtedness of FCC to Foamex, (iii) any Indebtedness which by the express terms of the agreement or instrument creating, evidencing or governing the same is junior or subordinate in right of payment to any item of Senior

A-9

Debt, (iv) any trade payable arising from the purchase of goods or materials or for services obtained in the ordinary course of business, or (v) Indebtedness incurred in violation of the Indenture. To the extent provided in the Indenture, Senior Debt must be paid before the Notes may be paid. The Issuers agree and each Holder of Notes by accepting a Note consents and agrees to the subordination provided in the Indenture and authorizes the Trustee to give it effect.

9. REPURCHASE AT OPTION OF HOLDER.

(a) Upon the occurrence of a Change of Control, each Holder of Notes shall have the right to require the Issuers to repurchase all or any part (equal to $1,000 or an integral multiple thereof) of such Holder's Notes pursuant to the offer described below (the "Change of Control Offer") at an offer price in cash equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest and Liquidated Damages, if any, thereon to the date of purchase (the "Change of Control Payment"). Within 30 days following any Change of Control, the Issuers shall mail a notice to each Holder describing the transaction or transactions that constituted the Change of Control and offering to repurchase Notes on the date specified in such notice, which date shall be no earlier than 30 days and no later than the fifth Business Day preceding the last day of the fiscal quarter of Foamex next following the Change of Control date (the "Change of Control Payment Date"), pursuant to the procedures required by the Indenture and described in such notice.

(b) In connection with one or more Asset Sales, when the aggregate amount of Excess Proceeds exceeds $15.0 million, the Issuers shall be required to make an offer to all Holders of Notes (an "Asset Sale Offer") to purchase the maximum principal amount of Notes that may be purchased out of the Excess Proceeds, at an offer price in cash in an amount equal to 100% of the principal amount thereof plus accrued and unpaid interest and Liquidated Damages, if any, thereon to the date of purchase, in accordance with the procedures set forth in the Indenture. To the extent that the aggregate amount of Notes tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuers may use any remaining Excess Proceeds for general corporate purposes. If the aggregate principal amount of Senior Subordinated Notes surrendered by Holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Senior Subordinated Notes to be purchased on a pro rata basis; provided, however, that the Issuers shall not be obligated to purchase Senior Subordinated Notes in denominations other than integral multiples of $1,000. Upon completion of such offer to purchase, the amount of Excess Proceeds shall be reset at zero.

(c) Holders of the Notes that are the subject of an offer to purchase will receive a Change of Control Offer or Asset Sale Offer from the Issuers prior to any related purchase date and may elect to have such Notes purchased by completing the form titled "Option of Holder to Elect Purchase" appearing below.

10. DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are in registered form without coupons in initial denominations of $1,000 and integral multiples of $1,000. The transfer of the Notes may be registered and the Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuers may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuers need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, it

A-10

need not exchange or register the transfer of any Notes for a period of 15 days before the mailing of a notice of redemption of Notes or during the period between a record date and the corresponding Interest Payment Date.

11. PERSONS DEEMED OWNERS. The registered Holder of a Note may be treated as its owner for all purposes.

12. AMENDMENT, SUPPLEMENT AND WAIVER. Subject to the following paragraphs, the Indenture and the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the Notes), and, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of the Indenture or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes (including consents obtained in connection with a tender offer or exchange offer for the Notes). In addition, any amendment to Article 10 or Article 12 of the Indenture requires the consent of the Holders of at least 75% in aggregate principal amount of the Notes then outstanding if such amendment would adversely affect the rights of the Holders of the Notes.

Without the consent of any Holder of Notes, the Issuers and the Trustee may amend or supplement the Indenture or the Notes without the consent of any Holder of a Note: to cure any ambiguity, defect or inconsistency; to provide for uncertificated Notes in addition to or in place of certificated Notes; to provide for the assumption and discharge of the Issuers' and the Subsidiary Guarantors' obligations to Holders of Notes in the case of a merger or consolidation pursuant to Article 5 or Article 11 of the Indenture, as applicable; to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not adversely affect the legal rights under the Indenture of any such Holder; to comply with requirements of the Commission in order to effect or maintain the qualification of the Indenture under the TIA; or to allow any Subsidiary Guarantor to guarantee the Notes.

13. DEFAULTS AND REMEDIES. Events of Default include: (i) default for 30 days in the payment when due of interest on, or Liquidated Damages with respect to, the Notes (whether or not prohibited by the subordination provisions of the Indenture); (ii) default in payment when due of the principal of or premium, if any, on the Notes (whether or not prohibited by the subordination provisions of the Indenture); (iii) failure to comply with Section 4.15, or to consummate a mandatory Offer to purchase pursuant to Section 4.10 or to comply with Article 5; (iv) failure for 60 days after notice to comply with any of their other agreements in the Indenture or the Senior Subordinated Notes; (v) default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Issuers or any of their respective Restricted Subsidiaries (or the payment of which is Guaranteed by the Issuers or any of their respective Restricted Subsidiaries) whether such Indebtedness or Guarantee now exists, or is created after the date of the Indenture, which default (a) is caused by a failure to pay principal of, interest or premium, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "Payment Default") or (b) results in the acceleration of such Indebtedness prior to its Stated Maturity and, in each case, the principal amount of any such Indebtedness, together with the principal

A-11

amount of any other such Indebtedness under which there has been a Payment Default or the Stated Maturity of which has been so accelerated, aggregates $20.0 million or more; (vi) failure by the Issuers of its Restricted Subsidiaries to pay final judgments aggregating in excess of $10.0 million, which judgments are not paid, discharged or stayed for a period of 60 days after entry thereof; or (vii) certain events of bankruptcy or insolvency with respect to the Issuers or any of its their respective Restricted Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary.

14. TRUSTEE DEALINGS WITH THE ISSUERS. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuers, the Subsidiary Guarantors or their respective Affiliates, and may otherwise deal with the Issuers, the Subsidiary Guarantors or their respective Affiliates, as if it were not the Trustee.

15. NO RECOURSE AGAINST OTHERS. No director, officer, employee, partner, incorporator or stockholder of the Issuers or any of their Restricted Subsidiaries, as such, shall have any liability for any obligations of the Issuers or any Subsidiary Guarantor under the Notes, the Indenture, the Note Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

16. AUTHENTICATION. This Note shall not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

17. ABBREVIATIONS. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

18. ADDITIONAL RIGHTS OF HOLDERS OF TRANSFER RESTRICTED SECURITIES. In addition to the rights provided to Holders of the Notes under the Indenture, Holders of Transferred Restricted Securities (as defined in the Registration Rights Agreement) shall have all the rights set forth in the Registration Rights Agreement, dated as of the date hereof, among the Issuers and the Subsidiary Guarantors (the "Registration Rights Agreement").

19. CUSIP NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuers have caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to the Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

A-12

The Issuers shall furnish to any Holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement. Requests may be made to:

> Foamex L.P.
> 1000 Columbia Avenue
> Linwood, PA 19061
> Telecopy:  (610) 859-3069
> Attention:  Secretary

A-13

ASSIGNMENT FORM

To assign this Note, fill in the form below: (I) or (we) assign and transfer this Note to

(Insert assignee's soc. sec. or tax I.D. no.)

(Print or type assignee's name, address and zip code)

and irrevocably appoint
to transfer this Note on the books of the Issuers. The agent may substitute another to act for him.

Date:  _____

Your Signature:_____
(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*:

\*    Signature must be guaranteed by an eligible guarantor institution within the meaning of Securities and Exchange Commission Rule 17Ad-15 (including banks, stock brokers, savings and loan associations, national securities exchanges, registered securities associations, clearing agencies and credit unions) with membership or participation in an approved signature guarantee medallion program if this Security is to be delivered other than to and in the name of the registered holder.

A-14

A28

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuers pursuant to Section 4.10 or 4.15 of the Indenture, check the box below:

/ / Section 4.10        / / Section 4.15

If you want to elect to have only part of the Note purchased by the Issuers pursuant to Section 4.10 or Section 4.15 of the Indenture, state the amount you elect to have purchased: $_____

Date:                    Your Signature:_____
                         (Sign exactly as your name appears on the Note)

                         Tax Identification No.:

                         Signature Guarantee.*

*    Signature must be guaranteed by an eligible guarantor institution within
     the meaning of Securities and Exchange Commission Rule 17Ad-15 (including
     banks, stock brokers, savings and loan associations, national securities
     exchanges, registered securities associations, clearing agencies and credit
     unions) with membership or participation in an approved signature guarantee
     medallion program if this Security is to be delivered other than to and in
     the name of the registered holder.

A-15

A29

SCHEDULE OF EXCHANGES OF NOTES3/

The following exchanges of a part of this Global Note for other Notes have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized signatory of Trustee or Note Custodian |
|---|---|---|---|---|
| ---------------- | -------------------- | -------------------- | -------------------- | --------------- |

A-16

A30

**THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.  ACCEPTANCES AND REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) | Case No. 05-12685 (PJW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Brian S. Hermann
Justin G. Brass
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York  10019-6064
(212) 373-3000

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for the Debtors and Debtors in Possession

Dated: Wilmington, Delaware
November 27, 2006

DB02:5624651.2

A31

INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

## I.

## INTRODUCTION

On September 19, 2005 (the "Petition Date"), Foamex International Inc. ("Foamex International"), Foamex L.P., Foamex Latin America, Inc. ("Foamex Latin America"), Foamex Asia, Inc. ("Foamex Asia"), FMXI, Inc. ("FMXI"), Foamex Carpet Cushion LLC ("Foamex Carpet Cushion"), Foamex Capital Corporation ("Foamex Capital"), Foamex Mexico, Inc. ("Foamex Mexico") and Foamex Mexico II, Inc. ("Foamex Mexico II") (each a "Debtor," and collectively, the "Debtors" or "Foamex")[1] filed their petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").[2]

On December 23, 2005, the Debtors filed their proposed joint plan of reorganization, dated December 23, 2005 (the "Original Plan"), which set forth the manner in which Claims against and Equity Interests in the Debtors would be treated. Concurrently with the Original Plan, the Debtors filed a disclosure statement (the

---

[1]    In addition to the Debtors, on or about the Petition Date, Foamex Canada Inc., a wholly-owned non-debtor subsidiary of Foamex L.P., sought and obtained an interim, and later, a final, order from the Ontario Superior Court of Justice recognizing the Chapter 11 Cases as "foreign proceedings" for purposes of Section 18.6 of the *Companies' Creditors Arrangement Act* (the "Recognition Order"). The Recognition Order provides for, among other things, (a) a limited duration stay of any enforcement action or proceeding with respect to Foamex Canada Inc. and its property on the terms described therein, which has been extended through January 15, 2007, and may be further extended by order of the Ontario Superior Court of Justice, and (b) authorization allowing Foamex Canada Inc. to guarantee the Debtors' obligations arising under the DIP Credit Facilities and to grant liens on its assets as security therefor.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

064397.1001

A32

"Original Disclosure Statement") describing certain aspects of the Original Plan, the Debtors' business and related matters.

The Debtors' first amended plan and first amended disclosure statement were filed on October 23, 2006, and amend and supercede in all respects the Original Plan and Original Disclosure Statement, respectively. The Debtors filed their second amended plan (the "Plan") and this second amended disclosure statement (the "Disclosure Statement") on November 27, 2006. The Plan and this Disclosure Statement amend and supercede in all respects all previously filed versions. This Disclosure Statement describes certain aspects of the Plan, the Debtors' business and related matters.

After a careful review of Foamex's business and its prospects as a going concern, Foamex, in consultation with its legal and financial advisors, concluded that recoveries to Creditors and Equityholders would be maximized by Foamex's continued operation as a going concern under the terms of the Plan. In other words, Foamex is worth more to its Creditors and Equityholders as a going concern than upon liquidation.

To achieve such higher value, the Plan contemplates (among other things): (i) payment in full in Cash to holders of Allowed (a) Administrative Claims, (b) Priority Tax Claims, (c) DIP Financing Claims, (d) Other Priority Claims and (e) Other Secured Claims (or, at the Debtors' option, the reinstatement of such Allowed Other Secured Claim or the return of collateral securing such Allowed Other Secured Claim); (ii) if Class 3 votes to accept the Plan, then each holder of an Allowed Senior Secured Note Claim shall receive, in addition to any deemed receipt of its pro rata share of the Senior Secured Notes Adequate Protection Professional Payments, Cash in an amount equal to such holder's Allowed Senior Secured Note Base Claim plus Post-Petition Interest and such holder's pro rata share of the Senior Secured Note Premium Settlement Amount; (iii) if Class 3 votes to reject the Plan, then the Senior Secured Note Base Claim plus Post-Petition Interest shall be Allowed; however, the Senior Secured Note Premium Claim shall be Disputed; (iv) payment in full in Cash to Senior Subordinated Noteholders in an amount equal to their Senior Subordinated Notes Claims plus Post-Petition Interest; (v) payment in full in Cash to holders of Allowed General Unsecured Claims in an amount equal to their Allowed General Unsecured Claims plus Post-Petition Interest; (vi) that all Unliquidated Claims shall be determined and satisfied, to the extent required, in the ordinary course of business by the Reorganized Debtors, without the need for Court approval, including where applicable, through access to available insurance; (vii) allowing holders of Equity Interests in Surviving Debtor Subsidiaries to retain such interests; (viii) converting each share of Existing Preferred Stock in Foamex International to the extent still outstanding immediately prior to the Effective Date into 100 shares of Additional Common Stock; and (ix) the continuation (subject to dilution) of the Existing Common Stock and Other Common Equity Interests in Foamex International.

In order to achieve the results contemplated by the Plan, the Debtors need to raise a significant amount of new money. As discussed in more detail below, the Debtors have secured commitments for both debt and equity financing on favorable terms and in amounts sufficient to fund the payments required under the Plan. Such funding includes (i) debt financing in the form of Exit Facilities with combined commitments of

amount) of 10 3/4% Senior Secured Notes due April 1, 2009 (the "Senior Secured Notes"). Payment of the Senior Secured Notes was guaranteed by each of the other Debtors except Foamex International and FMXI. The Senior Secured Notes were secured by second liens on substantially the same collateral that secured the obligations under the Prepetition Bank Facility and the Prepetition Term Loans.

In addition to the three primary layers of secured debt described above, as of the Petition Date, the Debtors had approximately $7.0 million of other secured debt, including, inter alia, two industrial revenue bonds ("IRBs") with face amounts of $1.0 million and $6.0 million, respectively. The IRBs were both secured by letters of credit and liens on the facilities constructed with the funds. The issuer of the $1.0 million IRB was the Delaware County (PA) Industrial Development Authority. The proceeds of that bond issuance were originally used to construct an approximately 50,000 square foot foam bun room addition at the Debtors' Eddystone, Pennsylvania facility. The $1.0 million IRB matured on October 1, 2005 and was repaid in full. The issuer of the $6.0 million IRB was the county of Dona Ana, New Mexico. The proceeds of that bond issuance were used to fund the original construction of the Debtors' Santa Teresa, New Mexico facility, consisting of approximately 84,800 square feet of manufacturing and warehousing space and an additional 5,000 square feet of office space, and the equipment initially used at the facility. The $6.0 million IRB matures in November 2013 and, pursuant to the Plan, will be reinstated and paid according to its terms.

## 2.    Unsecured Financings

On the Petition Date, the Debtors also had outstanding two tranches of subordinated bonds. Specifically, pursuant to an indenture, dated as of June 12, 1997 (the "2007 Senior Subordinated Notes Indenture"), Foamex L.P. and Foamex Capital issued $150 million (original principal amount) of 9 7/8% Senior Subordinated Notes due June 15, 2007 (the "2007 Senior Subordinated Notes"). Separately, pursuant to an indenture, dated as of December 23, 1997 (the "2005 Senior Subordinated Notes Indenture," and, together with the 2007 Senior Subordinated Notes Indenture, collectively, the "Senior Subordinated Notes Indentures"), Foamex L.P. and Foamex Capital issued $98 million (original principal amount) of 13 1/2% Senior Subordinated Notes that matured on August 15, 2005 (the "2005 Senior Subordinated Notes," and, together with the 2007 Senior Subordinated Notes, collectively, the "Senior Subordinated Notes").[13] The 2007 Senior Subordinated Notes and the 2005 Senior Subordinated Notes are unsecured obligations of Foamex L.P. and Foamex Capital (as well as the Debtors that have guaranteed the obligations thereunder as set forth in the Senior Subordinated Notes Indentures) and are subordinated in right of payment to the Debtors' secured debt, but rank pari passu in right of payment with each other and with the Debtors' other unsecured obligations.

---

[13]   As a result of the Debtors' prior repurchases of 2005 Senior Subordinated Notes, the principal amount outstanding at maturity was $51.6 million.

-22-

Additionally, prior to the Petition Date, the Debtors' customers grew concerned about the Debtors' financial condition. Because of their concerns, a few of the Debtors' significant customers took steps to source a portion of their business elsewhere and/or suspend placing new orders with the Debtors.

Compounding the Debtors' decrease in volume was the dramatic increase over the same period in the prices of the chemicals that comprise the vast majority of the Debtors' raw material requirements – specifically, polyol, TDI and MDI. At least four primary factors contributed to these price increases: first, worldwide demand for MDI had increased dramatically which caused it to be in short supply. Second, a reduction in domestic capacity of propylene oxide, a major chemical component of polyol, resulted in a significant decrease in the supply of polyol. Third, given the Debtors' financial distress, many of the Debtors' major chemical suppliers placed strict credit limits on the Debtors' purchases which, in turn, compromised the Debtors' ability to leverage their purchasing scale to obtain more attractive pricing through volume discounts and the like. Lastly, the primary urethane chemicals used to create polyol, MDI and TDI – propylene, toluene and benzene – are each oil-based derivatives. The cost of these raw materials generally tracks the price of oil and energy costs and, consequently, the cost of these chemicals rose dramatically in the year prior to the Petition Date.

Collectively, these factors contributed to chemical price increases of more than 20% from the first to the fourth quarter of 2004, and a further increase of more than 10% in the first quarter of 2005. Although the Debtors were able to pass a portion of these cost increases on to their customers, given the highly competitive environment in which they operate, the Debtors concluded at the time that they could not pass along all such increases, particularly in certain SBUs, and, as a consequence, the Debtors saw their gross margins and operating income erode dramatically.

Finally, the problems facing the North American automotive industry together with certain product-related factors, such as the move away from SUVs in the first half of 2005, negatively impacted the Debtors' automotive business, which is their second largest revenue source. In the months leading up to the Petition Date, several Tier 1 automotive suppliers sought bankruptcy protection and others scaled back their production. In addition, many OEMs were facing their own financial difficulties.

In view of these external factors, and cognizant of the need to restructure their balance sheet, prior to the Petition Date, the Debtors initiated steps to rationalize their business by refocusing on their core competencies. Along those lines, in 2002 and 2003, the Debtors attempted to sell their carpet cushion and automotive businesses. However, based on the results of those sale processes, the Debtors decided not to proceed with either sale because the prices offered would not have allowed the Debtors to deleverage their balance sheet. In April 2005, the Debtors sold their rubber and felt carpet cushion business to Leggett & Platt, Incorporated for approximately $38.7 million. In addition, in May 2005, the Debtors combined the management of their technical and foam products SBUs to increase productivity and efficiency, enhance their market focus and improve integration and communication among their sales, marketing and manufacturing teams. Finally, in the two years prior to the Petition Date, the Debtors

-24-

ceased operating in over ten locations, closed four offices, significantly reduced SG&A spending and implemented various strategies designed to further reduce overhead expenses.

Although the Debtors benefited from these restructuring initiatives prior to the Petition Date, they proved to be insufficient. To assist the Debtors in their restructuring efforts, in May 2005, the Debtors retained Miller Buckfire & Co., LLC ("Miller Buckfire"), as their investment banker and financial advisor, to evaluate strategic alternatives designed to strengthen the Debtors' balance sheet. Almost immediately upon being engaged, Miller Buckfire worked with the Debtors to devise various restructuring alternatives that could be implemented in, or outside of, chapter 11. As part of this process, Miller Buckfire solicited various financing and restructuring proposals from the Debtors' existing stakeholders as well as from third-party financing sources and equity sponsors. The results of this process demonstrated at the time that, to provide the Debtors with sufficient liquidity to operate effectively for the long-term, any restructuring would likely require a significant reduction in Foamex's indebtedness – something that, under the circumstances, could only be achieved by means of a chapter 11 case. In view of all of these factors, on August 15, 2005, Foamex L.P. did not pay the $51.6 million principal payment due upon the maturity of the 2005 Senior Subordinated Notes and the accrued and unpaid interest.

Despite defaulting on their 2005 Senior Subordinated Notes, as part of their overall restructuring efforts, the Debtors announced on August 15, 2005, amendments to both their Prepetition Bank Facility and the Prepetition Term Loans to provide for waivers to September 30, 2005, in respect of the default resulting from the failure to repay the 2005 Senior Subordinated Notes at maturity and the interest due thereon as well as certain other covenant defaults. Such amendments also provided additional liquidity under the Prepetition Bank Facility to allow the Debtors to continue their restructuring efforts. In addition, the Debtors announced at such time that the administrative agents under the Prepetition Bank Facility and Prepetition Term Loans had committed to provide the Debtors with debtor-in-possession and chapter 11 exit financing.

After the Debtors' August 15th announcement, the Debtors and their professionals continued to negotiate with their key creditors, including an informal committee of holders of Senior Secured Notes representing at the time a majority in principal amount of the outstanding Senior Secured Notes (as constituted from time to time, the "Ad Hoc Committee of Senior Secured Noteholders") and their respective professionals concerning the terms of a consensual restructuring. Those negotiations culminated in the Debtors' agreement in principle with members of the Ad Hoc Committee of Senior Secured Noteholders on the key terms of a proposed reorganization plan. That agreement in principle was memorialized in a term sheet that was filed as part of an 8-K filing on September 22, 2005; the term sheet ultimately was embodied in the Original Plan.

DB02:5624651.2                                                                   064397.1001

A36

As described in detail in Article VII below, significant improvements in the Debtors' business postpetition beginning in the fourth quarter of 2005 have led the Debtors to abandon the Original Plan in favor of the current Plan.

## VI.

## THE CHAPTER 11 CASES

### A.    Significant "First Day" Motions

On the Petition Date and during the first few weeks of the Chapter 11 Cases, the Court entered several orders authorizing the Debtors to pay various prepetition claims. These orders were designed to ease the strain on the Debtors' relationships with customers, employees and vendors as a consequence of the chapter 11 filings. The Court entered orders authorizing the Debtors, among other things, to (i) pay prepetition compensation, benefits and reimbursable employee expenses; (ii) continue certain workers' compensation programs and insurance policies; (iii) continue certain customer practices and programs; (iv) pay certain prepetition freight and customs brokers' claims and amounts due in respect of the Debtors' foreign operations; (v) pay prepetition claims of certain critical vendors,[16] and (vi) obtain postpetition financing, repay certain prepetition secured debt, and grant first priority liens, super-priority administrative expense status and adequate protection to the Debtors' postpetition lenders.

In addition, the Debtors filed several applications seeking orders authorizing the Debtors' retention of professional advisors. Specifically, the Debtors filed applications to retain (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Young, Conaway, Stargatt & Taylor, LLP, as co-counsel, (ii) Miller Buckfire, as financial advisor, (iii) KPMG LLP, as auditors and accountants, and (iv) certain ordinary course professionals. The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

### B.    DIP Credit Facilities

To provide the Debtors with the cash and liquidity necessary to continue operating and to maintain normal vendor relations postpetition, on September 19, 2005, the Debtors sought Court approval of a $240 million debtor-in-possession revolving credit facility (including a $40 million sub-limit for letters of credit) in the form of a Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified, the "DIP Revolving Credit Facility"), dated as of September 22, 2005, with Bank of America, N.A., as administrative agent (the "DIP Revolving Credit Agent"), and the lenders party thereto (the "DIP Revolving Credit Lenders"). In addition, the Debtors sought Court approval of an $80 million debtor-in-possession term loan (as amended, restated, supplemented or otherwise modified, the "DIP Term Credit Facility,"

---

[16]    During the Chapter 11 Cases, the Debtors have paid approximately $32,477,673 to 24 critical vendors. The primary recipients of these critical vendor payments have been the Debtors' chemical and fabric suppliers.

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) | Case No. 05-12685 (PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Alan W. Kornberg
Brian S. Hermann
Justin G. Brass
Ephraim I. Diamond
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (No. 3650)
Joseph M. Barry (No. 4221)
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for the Debtors and Debtors in Possession

Dated: Wilmington, Delaware
       November 27, 2006

Foamex International Inc. ("Foamex International" or the "Company"),
Foamex L.P., Foamex Latin America, Inc., Foamex Asia, Inc., FMXI, Inc., Foamex
Carpet Cushion LLC, Foamex Capital Corporation, Foamex Mexico, Inc. and Foamex
Mexico II, Inc., the above-captioned debtors and debtors-in-possession (collectively, the
"Debtors"), hereby propose the following second amended joint plan of reorganization
under section 1121(a) of the Bankruptcy Code.

Reference is made to the Disclosure Statement accompanying this Plan,
including the exhibits thereto, for a discussion of the Debtors' history, business,
properties, results of operations, and projections for future operations and risk factors,
together with a summary and analysis of this Plan. All Claim and Interest holders
entitled to vote on this Plan are encouraged to consult the Disclosure Statement and to
read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE
DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED
THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY
THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF
THIS PLAN.

## I.

## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions.

Unless otherwise defined herein, or the context otherwise requires, the
following terms shall have the respective meanings set forth below:

| | |
|---|---|
| ***2005 Indenture Trustee*** | means The Bank of New York and any successor thereto. |
| ***2005 Senior Subordinated Notes*** | means the 13½% Senior Subordinated Notes due 2005 issued pursuant to the 2005 Senior Subordinated Notes Indenture. |
| ***2005 Senior Subordinated Notes Claims*** | means all Claims arising from the 2005 Senior Subordinated Notes Indenture on account of the 2005 Senior Subordinated Notes. |
| ***2005 Senior Subordinated Notes Indenture*** | means the Indenture (as amended, supplemented, restated or otherwise modified), dated as of December 23, 1997, by and among Foamex L.P., Foamex Capital Corporation, General Felt Industries, Inc., Foamex Fibers, Inc., Foamex LLC, Crain Holdings Corp. and The Bank of New York, as Trustee. |
| ***2007 Indenture Trustee*** | means The Bank of New York and any successor thereto. |

addenda, exhibits, schedules or other attachments, if any.

*Plan Supplement Documents*   means the documents to be included in the Plan Supplement, including those identified in Article X.K of the Plan.

*Plan Supplement*   means the supplement to the Plan containing the Plan Supplement Documents.

*Post-Effective Date Common Stock*   means, collectively, the Existing Common Stock and the Additional Common Stock on and as of the Effective Date.

*Post-Petition Interest*   means with respect to:

(a)   the Senior Secured Note Base Claims, accrued and unpaid interest (including interest on interest that is due and owing and unpaid, compounded semi-annually on the semi-annual interest payment dates) pursuant to the Senior Secured Notes Indenture from the Petition Date through the Effective Date calculated in the manner set forth, and at the default rate provided for, in section 4.01 of the Senior Secured Notes Indenture; provided, however, that if Class 3 votes to reject the Plan, then (i) the Debtors and Reorganized Debtors reserve the right to assert that any default interest paid or to be paid in respect of the Senior Secured Note Principal Claim through the Effective Date shall reduce, dollar for dollar, the amount of any Disputed Senior Secured Note Premium Claim that becomes an Allowed Claim and (ii) there shall be paid, to the extent Allowed by Final Order of the Court, interest from the date the Senior Secured Note Premium Claim is determined in such Final Order to have become due and payable through the date such Allowed Senior Secured Note Premium Claim is paid, calculated in the manner set forth, and at the default rate provided for, in section 4.01 of the Senior Secured Notes Indenture;

(b)   the 2005 Senior Subordinated Note Claims, accrued and unpaid interest pursuant to the 2005 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the default rate provided for in the 2005 Senior

14

Subordinated Notes Indenture;

(c)    the 2007 Senior Subordinated Note Claims, accrued and unpaid interest (including interest on interest that is due and owing and unpaid, compounded semi-annually on the semi-annual interest payment dates) pursuant to the 2007 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the default rate provided for in the 2007 Senior Subordinated Notes Indenture;

(d)    Other Secured Claims, interest accruing on such claims from the Petition Date through the Effective Date at the rate set forth in the contract or other applicable document giving rise to such claims (to the extent lawful) or, if the applicable instrument does not specify a rate of interest, at the Federal Judgment Rate;

(e)    Priority Tax Claims, interest accruing from the Petition Date through the Effective Date (i) with respect to federal taxes, at a fixed annual rate equal to the federal statutory rate as provided in 26 U.S.C. § 6621, and (ii) with respect to state and local taxes, at the Prime Rate of interest as in effect for the period to which the Priority Tax Claim pertains or (iii) in either case, as otherwise agreed to by the holder of such Priority Tax Claim and the Debtor and which shall be reasonably acceptable to the Significant Equityholders; and

(f)    General Unsecured Claims, interest, accruing from the Petition Date through the Effective Date at the Federal Judgment Rate; provided, however, that a holder of an Allowed General Unsecured Claim may seek payment of Post-Petition Interest at an otherwise legally required rate in accordance with the procedures set forth in Article V.D herein.

For the avoidance of doubt, except as required under applicable non-bankruptcy law, Post-Petition Interest will not be paid on the following Claims: Administrative Expense Claims, Fee Claims, Substantial Contribution Claims and Unliquidated Claims.

*Post-Petition Interest Rate*    means a notice to be filed by the holder of an Allowed

15

*Principal Claim*

| | |
|---|---|
| *Senior Secured Noteholder(s)* | means a holder(s) of Senior Secured Notes. |
| *Senior Secured Notes* | means the 10¾% Senior Secured Notes due 2009 issued pursuant to the Senior Secured Notes Indenture. |
| *Senior Secured Notes Adequate Protection Professional Payments* | means the payments of the reasonable fees and expenses made by the Debtors to (i) the professionals engaged by the Ad Hoc Committee of Senior Secured Noteholders and (ii) the Senior Secured Notes Indenture Trustee (including its outside counsel) pursuant to paragraph 13(d) of the DIP Order. |
| *Senior Secured Notes Indenture* | means the Indenture (as amended, supplemented, restated or otherwise modified) dated as of March 25, 2002, by and among Foamex L.P., Foamex Capital Corporation, the Guarantors (as defined therein) and U.S. Bank National Association, as indenture trustee. |
| *Senior Secured Notes Indenture Trustee* | means U.S. Bank National Association or any successor thereto, in its capacity as the indenture trustee under the Senior Secured Notes Indenture. |
| *Senior Secured Notes Letter of Credit* | means a letter of credit issued under the Exit Facilities for the account of the Reorganized Debtors to the escrow agent in the amount required to fund the Senior Secured Note Claims Reserve and to secure the payment, if any, of the Disputed Senior Secured Note Premium Claim, the terms of which letter of credit shall be reasonably acceptable to the Debtors, the Senior Secured Notes Indenture Trustee, the Significant Equityholders, the Exit Facilities Agent and counsel to the Ad Hoc Committee of Senior Secured Noteholders. |
| *Senior Subordinated Note Claims* | means, collectively, the 2005 Senior Subordinated Notes Claim and the 2007 Senior Subordinated Notes Claim. |
| *Senior Subordinated Noteholder(s)* | means a holder(s) of Senior Subordinated Notes. |
| *Senior Subordinated Notes* | means, collectively, (i) the 2005 Senior Subordinated Notes and (ii) the 2007 Senior Subordinated Notes. |
| *Senior Subordinated Notes Indenture Trustee* | means, collectively, the 2005 Indenture Trustee and the 2007 Indenture Trustee. |

Doc #:NY7:279598.16

(b)    *Disputed Senior Secured Note Premium Claim.*

If Class 3 votes to reject the Plan, the Senior Secured Note Premium Claim shall be Disputed. On the Initial Distribution Date, the Debtors shall establish the Senior Secured Note Claims Reserve, which shall initially be funded with Cash or the Senior Secured Notes Letter of Credit in an amount to be determined by the Court at or prior to the Confirmation Hearing.

(c)    *Distributions from the Senior Secured Note Claims Reserve.*

If Class 3 votes to reject the Plan, on the date on which the Senior Secured Note Premium Claim is Allowed by Final Order, or as soon as practicable thereafter, the full Allowed amount of the Senior Secured Note Premium Claim shall be paid in full in Cash with the Cash deposited in the Senior Secured Note Claim Reserve or from proceeds of the Senior Secured Notes Letter of Credit, as applicable. If the amount of Cash on deposit in the Senior Secured Note Claim Reserve or the proceeds of the Senior Secured Notes Letter of Credit is insufficient to make the required payments, then the Reorganized Debtors will pay Cash to the Senior Secured Note Indenture Trustee in an amount necessary to satisfy any such shortfall. Any residual amount remaining in the Senior Secured Note Claims Reserve after payment of the Allowed amount, if any, of the Senior Secured Note Premium Claim and any other required payments to be made by such Final Order or under the escrow agreement shall be returned to the Reorganized Debtors, and any unused portion of the Senior Secured Notes Letter of Credit shall not be drawn and the Senior Secured Notes Letter of Credit shall be canceled.

If Class 3 votes to reject the Plan and if the Senior Secured Note Premium Claim is disallowed by Final Order, then the amount remaining in the Senior Secured Note Claim Reserve after making any payments required to be made by such Final Order or under the escrow agreement shall be returned to the Reorganized Debtors, and the Senior Secured Notes Letter of Credit shall be canceled, as applicable, as soon as practicable following such disallowance.

3.    **Impairment and Voting.**

Class 3 is Impaired under the Plan. The holders of Senior Secured Note Claims are entitled to vote to accept or reject the Plan.

D.    **Class 4 — Senior Subordinated Note Claims.**

1.    **Allowance of Senior Subordinated Note Claims and Distributions.**

The Senior Subordinated Note Claims shall be deemed Allowed in the aggregate amount of $208,150,130.55 which includes accrued and unpaid interest (at the applicable contract rate) on such Senior Subordinated Note Claims relating to the period up to but not including the Petition Date.

30

A43

On the Initial Distribution Date, in full and final satisfaction of such Claims, each holder of an Allowed Senior Subordinated Notes Claim shall receive Cash in an amount equal to such holders' Allowed Senior Subordinated Notes Claim plus Post-Petition Interest.

### 2.    Impairment and Voting.

Class 4 is unimpaired under the Plan. The holders of Allowed Senior Subordinated Note Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### E.    Class 5 — General Unsecured Claims.

### 1.    Distributions.

On the later of the Initial Distribution Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or as soon as practicable thereafter, in full and final satisfaction of such Claim, each holder of an Allowed General Unsecured Claim will receive Cash in amount equal to such holder's Allowed General Unsecured Claim plus Post-Petition Interest. To the extent that insurance is available to satisfy an Allowed General Unsecured Claim, such Allowed General Unsecured Claim shall be paid in the ordinary course of the Reorganized Debtors' business to the extent of such insurance, without the need for Court approval, at such time as such claim becomes liquidated and the insurance proceeds of the insurance therefor become available.

### 2.    Impairment and Voting.

Class 5 is unimpaired under the Plan. Each holder of an Allowed General Unsecured Claim is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

### F.    Class 6 — Unliquidated Claims.

### 1.    Distributions.

All Unliquidated Claims shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, without need for Court approval, including, where applicable, through access to available insurance. Holders of Unliquidated Claims that are liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors shall be entitled to (and shall receive payment of) interest on such Claim solely to the extent provided for under applicable non-bankruptcy law.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                              .  Case No.  05-12685
                                    .
                                    .
  FOAMEX INTERNATIONAL, INC,        .
                                    .  824 Market Street
                                    .  Wilmington, Delaware 19801
                                    .
             Debtor.                .
                                    .  March 21, 2007
. . . . . . . . . . . . . . . . . . 11:30 a.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Reorganized Debtor:    Young Conaway Stargatt & Taylor
                               By:  PAULINE MORGAN, ESQ.
                               Brandywine Building
                               1000 West Street, 17th Fl.
                               Wilmington, DE 19801

For the Bank of New York:      DECHERT, LLP
                               By:  GLENN E. SIEGEL, ESQ.
                               30 Rockefeller Plaza
                               New York, NY 10112

Audio Operator:                Matthew J. Yovino

Proceedings recorded by electronic sound recording, transcript
Produced by transcription service

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail: jjcourt@optonline.net

(609) 586-2311   Fax No. (609) 587-359

2

1          THE COURT: Good morning everyone.  Please be seated.
2  Good morning, Ms. Morgan.
3          MS. MORGAN:  Good morning, Your Honor.  Pauline
4  Morgan from Young Conaway Stargatt & Taylor on behalf of
5  reorganized Foamex Inc.
6          THE COURT:  Welcome.
7          MS. MORGAN:  Your Honor, today's agenda is pretty
8  short today.  As indicated in our agenda filed with the Court,
9  Items number 1 and 2 are adjourned by agreement of the parties.
10 Matter 3 on the agenda is settled in principle.  Item 4, the
11 interim fee request we received an order from the Court.  We
12 thank the Court for that.
13         And that brings us to Item 5 which is the only
14 contested matter today and that is the Bank of New York's
15 request for payment of post-maturity compound interest on its
16 claim.  Parties have fully briefed the matter.  I assume that
17 Your Honor has seen all the papers.
18         THE COURT:  Fully read them and all of them, yes, so
19 we are prepared.
20         MS. MORGAN:  Thank you, Your Honor.  I don't know how
21 you would like to proceed.  I thought you might want to hear
22 from Mr. Siegel first.
23         THE COURT:  That would be fine.  I think that
24 probably is the right way to proceed.  Let me just -- we have
25 all Ms. Weller.  Ms. Weller, are you there?


J&J COURT TRANSCRIBERS, INC.

3.

```
 1          OPERATOR:  Your Honor, this is the courtroom
 2  operator.  Ms. Weller has not dialed in.
 3          THE COURT:  Okay, probably her matter has been
 4  addressed already so I'll disconnect the phone.  Thank you.
 5          OPERATOR:  Thank you, Your Honor.
 6          THE COURT:  Okay.
 7          MS. MORGAN:  We'll proceed to the podium to Mr.
 8  Siegel.
 9          THE COURT:  Thank you.  Mr. Siegel, welcome.
10          MR. SIEGEL:  Thank you, Your Honor.  It's a pleasure
11  to appear in front of you for the first time.
12          THE COURT:  It's a pleasure to have you here, thank
13  you, Mr. Siegel.
14          MR. SIEGEL:  What I thought we would start with is I
15  will not be referring to this immediately but we thought for
16  the convenience of the Court we would take indenture provisions
17  highlighted and hand them up to you so that when I refer to
18  them you can see them more easily.  We've already given a copy
19  to Ms. Morgan.  There is nothing here that isn't already in our
20  papers but we thought it would be easier.
21          THE COURT:  I'd appreciate it, thank you.  It would
22  be helpful.
23          MR. SIEGEL:  May I approach?
24          THE COURT:  Certainly, thank you, Mr. Siegel.
25          MR. SIEGEL:  Your Honor, right here before you on
```

A47

4

1  what I can best call a leftover issue from the confirmation of

2  this plan.  When the plan was proposed, much to everyone's

3  delight, this turned out to be a solvent case.  We had a few

4  moments there where we weren't so sure it was going to happen,

5  but it did.

6         And whenever you get a solvent case, you wind up

7  discussing issues that you don't typically discuss in

8  bankruptcy cases and I think this is one of them.  In the plan

9  as proposed, the debtors propose to lead the public bonds

10  unimpaired.  There were two sets of public bonds.

11         There were the 2007 bonds, so noted because they

12  became mature in 2007, and the 2005 bonds.  They were

13  classified together; however, they were treated slightly

14  different.  The 2007 bonds were to be paid principal interest,

15  default interest and interest on interest for compound.

16         The 2005 bonds were to be paid principal, interest

17  and default interest but without compounding.  The debtor's

18  position being because those bonds became mature, there was no

19  provision for compounding.  When the trustee saw this

20  difference of treatment, it advised the debtor that it could

21  not support such treatment and discussions ensued as to how we

22  would deal with this issue.

23         What we ultimately agreed was that this issue need

24  not hold up confirmation and what we all agreed was that the

25  parties would be bound by what this Court ruled as to what it

A48

5

1  would take for a creditor to be unimpaired who held these
2  notes.  Now, that has certain consequences.

3        By reaching that agreement, that meant that the
4  holders of the 2005 bonds did not have the opportunity to vote
5  on the plan.  It meant as a consequence of that, debtor was
6  able to avoid the costs of solicitation.  It also avoided the
7  possibility of having to meet the <u>Cramdown</u> (phonetic) Standard,
8  the absolutely priority ruling of fair and equitable standard.

9        But, in exchange for that the holders of the 2005
10  bonds are entitled to get all of their legal, equitable and
11  contractual rights.  That is where we are.

12        But the debtors argue is that the limit of the legal,
13  equitable and contractual rights available to the holders of
14  the 2005 bonds take you to principal interest and default
15  interest and do not take you to compounded.  Why do they make
16  that argument?  They say that is because Section 4.1 of the
17  indenture which Your Honor has in front of you, refers to
18  interest payable on -- let me just, it refers to interest
19  payable on unpaid installments of interest and that once the
20  bonds mature, there are no further installments of unpaid
21  interest due.  That is still down to its essence, that's what
22  that is arguing.

23        However, that's not what the document says.  The
24  document does not provide for termination of the accrual of
25  interest and the discontinuance of installments unless and

6

1  until the notes are paid off.  It doesn't assign any magic to
2  the maturity dates.  What the indenture focuses on is whether
3  the bonds have in fact been paid off or not.  And in this
4  instance the bonds were not paid off until the effective date
5  of the plan.

6          Now I would only note parenthetically, although we
7  have not made the argument that I believe the debtor's argument
8  taken to its extreme actually takes you in a different
9  direction.  That if there are no scheduled unpaid "installments
10 of interest" by virtue of the maturity we would think that the
11 better argument would be, in fact, that you would have daily
12 compounding.  Why?  Because once the bonds have matured, every
13 single day they own the bonds and every single day the interest
14 accrues and the argument then would be that you would have
15 compounding every single day.  But we don't go there.

16         The reason we don't go there is that we think the
17 document provides the answer to the question and we don't need
18 to go there.  What we thought would be appropriate in oral
19 argument is to simply walk you through the document to explain
20 why we think that's appropriate.

21         If Your Honor goes to Page 32 of the indenture which
22 is Section 4.1, which is where we start, there is a provision
23 referred to as Payment of Notes.  Now we're going to start at
24 the bottom rather than at the top because this is all about
25 paying interest on interest and what it says is that -- I'm

A50

7

1  just going to read selectively because some of this language

2  doesn't apply but everyone can see what it says and I'm sure if

3  I excluded something that's relevant Ms. Morgan will represent

4  that.

5          It says the issuer shall pay interest including post

6  petition interest in any proceeding under the bankruptcy law on

7  overdue principal at a rate equal to one percent annum in

8  excess of the then applicable interest rate on the notes, which

9  is the default rate which everybody agrees is applicable, it

10 shall pay interest including post petition interest in any

11 proceeding under the bankruptcy law on overdue installments of

12 interest at the same rate to the extent.

13         Now that second provision is the compound inference

14 and what the debtor says is you can't have an overdue

15 installment of interest of maturity.  Well we think that's not

16 the end of the discussion.  If you go to the first paragraph of

17 Section 4.1 it says the issuers shall pay or cause to be paid

18 the principal of premium, if any, and interest on the notes on

19 the dates and in the manner provided for in the notes.  So we

20 go to the form of note.

21         We go to the form of note and there are two parts of

22 the form of note that apply.  The first provision in the form

23 of notes that is applicable is on Page A5.  It's simply a cover

24 page and you'll see that it says interest payment dates

25 February 15 and August 15.  That's all it says.  If you go to

8

1  the more specific provision which is on Page A8 it says, and

2  again this is in Item 1 of the note, it says "issuers will pay

3  interest if any in United States dollars, semi annually in

4  arrears on February 15 and August 15 commencing on February 15,

5  1998." That's what it says. It doesn't say when it

6  terminates. It just says when it starts.

7          Okay, so that's where we start. Well then the

8  question is well when does this obligation to pay interest

9  twice a year terminate? How do we find the answer to that in

10 the indenture? Well we go to section 8.1 of the indenture

11 which is entitled, not surprisingly, Termination of

12 Obligations. So let's turn to that. That is on Page 55 and 56

13 of the indenture. Your Honor, are you able to find the page?

14         THE COURT: Yes, yes, I have it. Thank you, Mr.

15 Siegel.

16         MR. SIEGEL: Okay. On Page 55 at the beginning of

17 the section it says, This indenture shall cease to be of

18 further effect when all outstanding notes therefore

19 authenticate an issue and have been delivered to the trustee

20 for cancellation and, this is what we highlight, the issuers

21 have paid all sums payable by the -- I've lost Page 56 --

22 payable by the issuers hereunder. Then you go a little bit

23 further down, it's highlighted language on Page 56, it says

24 however the issuers obligations in Section, and I will just go

25 to 4.1 which is the interest section, shall survive until the

9

1  notes are no longer outstanding.

2        So what this says is as long as the notes are

3  outstanding, the obligations under 4.1 remain outstanding.  We

4  just went through 4.1 and we think what it says in 4.1 is that

5  you have the obligation to pay interest twice a year and when

6  you don't, if you don't pay it, there's interest on unpaid

7  interest.  So, the only piece of this that we think remains is

8  figuring out what it means to have a note that is outstanding.

9        So we go to Page 26 which is Section 2.8 which refers

10  to outstanding interest.  What that says on Page 26 is if a

11  principal amount of any note is considered paid under Section

12  4.1 hereof, that again is the applicable section, it ceases to

13  be outstanding if interest ceases to accrue.  Now this is the

14  negative, the way I read this of course if the principal on the

15  note is not paid it continues to be outstanding and interest on

16  it continues to accrue.  That would seem to me to be the

17  suggestion in this language.

18        So as we walk through this indenture, we think that

19  it is perfectly clear that interest continue to accrue post-

20  maturity twice a year and interest on interest is appropriately

21  paid.  Now, Your Honor, what the debtor argues is that this is

22  somehow disfavored and therefore it has to be really specific

23  in order for us to be entitled to this.  I would suggest a

24  couple of things.

25        First of all, the indenture is absolutely clear on

A53

10

1  interest on interest.  We are not arguing about whether the

2  indenture provides for interest on interest.  What the debtor

3  is attempting to argue is that the termination date for the

4  payment of interest on interest has to be clear.  I would

5  suggest to you that the termination date of interest on

6  interest is what it is.  That when that -- it is clear that

7  interest on interest was always intended to be due under this

8  indenture.  The question of when it terminates I actually think

9  is pretty clear.  I just walked through it.  I don't know what

10 the issuer's expectation when it entered into this indenture

11 was, but I suspect the issuer believed that it would be

12 obligated to make payments under this indenture in accordance

13 with the note until the indenture was paid in full, or excuse

14 me, til the notes were paid in ful.

15      So we don't think that argument amounts to much.  The

16 only other point that I would like to make is let's think about

17 the consequences of the argument made by the debtor.  In this

18 fully solvent estate where the -- all the creditors are

19 entitled to be paid in full and where the equity holders are

20 going to come out this thing unscathed.  If you accept the

21 debtor's argument, creditors whose claims have fully matured

22 and I don't know how you are more in default, but whose right

23 to payment has been deferred even longer, are entitled to less

24 of a recovery than creditors whose documents are exactly

25 identical but by happenstance didn't have their notes mature

11

1  until the effective date or thereafter.

2          That I think is an anomalous consequence that this

3  Court really needs to consider and we just believe that under

4  the documents it's pretty clear that interest on interest

5  continued to accrue and that the debtor's argument is simply an

6  attempt on its part to achieve some sort of windfall by a

7  hyper-technical argument that we don't think the documents

8  support.  Thank you, Your Honor.

9          THE COURT:  Just address for me, if you will, while

10 you are standing Mr. Siegel, the issue relating to the proofs

11 of claim filed.  The proof of claim was amended and it was

12 specific recovery being sought.

13         MR. SIEGEL:  I understand, Your Honor, and this is the

14 best answer I can give you for that which is that we are not

15 getting paid pursuant to our proof of claim.  Our proof of

16 claim is irrelevant here.  The proof of claim is a statement by

17 the creditor as to what its allowable claim is.  Clearly, post

18 petition interest is not an allowable claim under the

19 bankruptcy cover.  You don't get your post petition interest in

20 connection with your claim.  You basically only get it two

21 ways.

22         You either get it -- well, you get it three ways.

23 You get it either under the best interest test of Chapter 7 and

24 at least in the <u>Dow Corning</u> case Judge Spector says that is the

25 federal judgment rate.  You get it under the fair and equitable

12

1   test in a <u>Cramdown</u> situation.  You get your interest on the

2   basis that it is not fair and equitable to allow equity to

3   share until you get your full contractual rights.  Or in the

4   third instance which is the instance before us, you get it

5   because your rights are unimpaired and that's a different

6   standard and a different question than whether or not you have

7   an allowable claim.

8          The proof of claim says what it says.  I just don't

9   think it has any probative value.

10         THE COURT:  And you did cite the -- I'm trying to

11  locate the name of it but I think you referred to it as the

12  <u>Continental Investment</u> decision in which the Court discusses at

13  length in a footnote -- it's in a footnote that nonetheless

14  discusses at length the proof of claim issue.  I appreciate the

15  answer.  It was helpful.  Thank you Mr. Siegel.

16         MR. SIEGEL:  Thank you, Your Honor.

17         THE COURT:  Ms. Morgan.

18         MS. MORGAN:  Your Honor for the record again, Pauline

19  Morgan for the reorganized debtors.  Your Honor, since you have

20  read the briefs I did not plan on really going through what

21  we've already cited at length but to try to highlight some of

22  the things that we think are most important and try to reply to

23  Mr. Siegel's reply that he filed as well as his arguments

24  today.

25         THE COURT:  Exactly.

A56

13

1          MS. MORGAN:  Your Honor, we think, the debtors think
2    that what the Bank of New York is trying to do today is to read
3    into the indenture the express post-maturity date compound
4    interest provision that simply isn't there.  I would reposit,
5    Your Honor, that because it took Mr. Siegel all of these
6    provisions of this indenture to explain it to you it seems to
7    me evidence that this is not explicit.

8          Once thing that Mr. Siegel failed to highlight and
9    note and that is on A5 of what was handed up to you is the
10   maturity date.  The maturity date was August 15, 2005 which the
11   parties do not dispute.  I really think it's a strange reason
12   to assume that the provisions of the indenture and the note
13   extend past the maturity date.

14         Although there is some simplicity to the Bank of New
15   York's argument that maybe the concept should sensibly read
16   this way, well it barely reads this way in comparison of the
17   2007 notes.  It's only sensible to the Bank of New York because
18   we think it provides them a -- it provides them more than their
19   own documents provide.  The Court needs to be guided by these
20   documents and by the case law.  The case law is clear and
21   unequivocal on the point that unless the governing document
22   expressly provides the methodology for calculating post-
23   maturity interest, the contract rate no longer applies, unless
24   it says the contract rate is going to apply post-maturity, The
25   cases say you go back to the legal rate of interest.

A57

14

1        You don't apply the contract rate thereafter.  It's
2   not enough to state, as this indenture states, that the
3   indenture survives until the notes are no longer outstanding.
4   Of course it survives until the notes are no longer outstanding
5   but as the case law tells us, that does not equate to a
6   statement, an express agreement, to pay post-maturity date
7   interest at the contract rate or certainly at a compound rate.
8        THE COURT:  And you cited a number of cases holding
9   that the filing of the bankruptcy doesn't effect it's --
10       MS. MORGAN:  Extend it.
11       THE COURT:  Exactly, extend it.
12       MS. MORGAN:  That's right, Your Honor.  And we cited
13  numerous cases standing for the proposition that I mentioned to
14  you and I won't go through very many of them but one I want to
15  mention is The Dilts case of the Western District of
16  Pennsylvania.  The instrument in question there stated that the
17  contract rate of interest applied until paid which we think is
18  pretty similar to the language we have here where it says until
19  the obligations remain -- I'm sorry, until the obligations are
20  no longer outstanding.
21       But in Dilts The bankruptcy court held that the
22  language until paid does not denote an express agreement to pay
23  contract rate after maturity.  Instead, the Court held until
24  paid was until maturity.  I'm quoting from the decision, it
25  says, "The parties can by mutual consent agree to other terms

15

1   for the rate of interest after maturity, but such language must

2   clearly appear in the instrument itself."

3          That's in The Dilts decision at Page 646.  Your

4   Honor, again we just don't have that express provision here.

5   Dilts applied Pennsylvania law and we said this in our papers

6   but Pennsylvania and New York adopt a similar unfavorable view

7   of compound interest and both of those states, again, require

8   that contract language for interstate -- interest rate

9   provisions post-maturity be express.

10         And the Delaware courts view it the same way.  Judge

11  Walsh in Ace-Texas, Your Honor, not extremely relevant to the

12  issue before you but in that case Judge Walsh noted that

13  pursuant to the terms of the note he had before him from an

14  after maturity interest and unpaid principal and interest

15  accrues at the default rate.  That's at Page 721 of Judge

16  Walsh's opinion.

17         Again the case is not extremely on point.  It dealt

18  with whether for equitable reasons the default interest should

19  or should not apply but again I think it's important to note

20  that he saw in the notes before him that from and after

21  maturity there was an express provision governing the rate.

22         Your Honor, this is a $98 million indenture.  Bank of

23  New York is a sophisticated party.  It could have easily

24  drafted provisions that spelled out what interest rate applied

25  and how it was going to be calculated post-maturity.  And in

A59

16

1  preparing for today's argument and you look for some guidance

2  in the case law as what it takes to be so express and we found

3  a Ninth Circuit case and I apologize it is not cited in our

4  papers but it's called <u>Crystal Properties</u> and it's at 268 F.

5  3rd 743.   That collected a number of cases with examples of

6  what an express post-maturity date contract provision would

7  say.

8          In every one the provision is clear and uses some

9  variation of the phrase after the maturity date to spell out

10  what those obligations would be.   Again, no such express

11  provision here.   What brings us the hurdle even further for the

12  Bank of New York is that the interest it is seeking is compound

13  interest.   As discussed in our brief here, case law has

14  certainly a disdain for compound interest, so much so that

15  until 1989 it was void as against public policy in New York.

16          There is a statute, Section 5:5-27 of New York's law

17  now that does permit compound interest but again only when the

18  underlying document expressly requires it.   I'm starting to

19  repeat myself but here we don't think it does, Your Honor.

20          Now Mr. Siegel had to cobble together for Your Honor

21  various provisions of the notes and indenture which interpreted

22  together they allege provide an express obligation.   But he

23  hedges the fence a little bit and in the papers and today he

24  focuses your attention Your Honor to what is fair as comparison

25  to the 2007 notes indenture.   And again as stated in our brief,

17

1  I think it is Footnote 9, the indentures themselves say they

2  cannot be relied upon in support of another indenture and Your

3  Honor knows full well that every party's contract is different

4  and special to itself so that cannot be the basis Your Honor

5  for your decision today.

6         Your Honor, also in the reply brief filed by Bank of

7  New York they asserted that if it's not explicit, it is

8  certainly implicit.  I think that is Footnote 4 of the reply.

9  Your Honor, under New York law it must be express period.

10  Implicit is not good enough.  The cases cited in that footnote

11  Your Honor also we think are either distinguishable or not

12  particularly germane.  The case is decided under Texas,

13  Massachusetts, Minnesota and Nebraska law are simply

14  inapplicable because those states adhere to the rule that when

15  the contract rate of interest is supplied but The post-maturity

16  rate is silent, that the contract rate implies and it governs

17  post-maturity.

18         Again, that's not the view of New York, Pennsylvania,

19  Maryland, Delaware.  With respect to the New York cases cited

20  many of them suggest, as we've been arguing, that the contract

21  at issue did expressly provide The post-maturity interests.  So

22  they don't really conflict with our position but they did not

23  provide enough language I think to really provide any

24  meaningful guidance to the Court as to what the indentures in

25  those governing contracts really said.

J&J COURT TRANSCRIBERS, INC.

18

1        Bank of New York also relies on the <u>In re: Realty</u>
2  <u>Associates</u> case that is also in Footnote 4.  It's the Second
3  Circuit decision from a very long time ago which hasn't been
4  cited -- I think it's been cited once in the last 48 years and
5  not for this proposition.  But the governing document in <u>Realty</u>
6  <u>Associates</u> said that the covenant to pay interest continued
7  until duly paid.  So very much like The <u>Dilts</u> decision in The
8  Western District of Pennsylvania the language was very similar.
9        And the lower court there, the District Court, in the
10 <u>Special Master</u> like <u>Dilts</u> said that's not good enough.  That
11 simply means until maturity.  The Circuit Court disagreed but
12 not because it disagreed with that ruling of the District Court
13 in the <u>Special Master</u>.  It disagreed because it found a
14 separate express provision in the contract that dealt with
15 post-maturity interests that neither the District Court or the
16 <u>Special Master</u> focused on.
17        So again, Your Honor, we think it actually buttresses
18 the debtor's position here that you have to be explicit in the
19 document and also in that case, Your Honor, compound interest
20 was not awarded because again it was not provided for.
21        Your Honor, again, we just believe there is nothing
22 explicit or express in the indenture or The notes that provide
23 for interest following maturity and it should not -- Bank of
24 New York should not be permitted to write that in at this
25 point.

19

1    As to impairment, very briefly Your Honor, our

2 position is just that there is no impairment here. Pursuant to

3 The plan, we are paying principal and interest at The default

4 rate. We've nearly paid $12 million in default interest and we

5 will pay whatever Your Honor tell us constitutes unimpairment

6 but we believe that's what we've already done. We certainly

7 think that based on this contract that is all that Section 1124

8 requires.

9    THE COURT: The impairment argument is a little bit

10 circular I think.

11    MS. MORGAN: Well Your Honor, I do too. And the fact

12 that there -- I don't think it's fair to say they were deprived

13 of the ability to vote. Again, as Mr. Siegel pointed out, we

14 did have this disagreement. We agreed to go forward with a

15 consensual plan and have this briefed later but it was

16 certainly the debtor's intention to unimpair all creditors and

17 we believe that's what we've done.

18    THE COURT: Yes, okay. And I understood by the way

19 at the confirmation hearing that this issue had been reserved

20 and was going to be presented later.

21    MS. MORGAN: Yes. And Mr. Siegel also pointed out

22 this case didn't start out so well. We didn't think creditors

23 would be paid but the euphoria of the turnaround and the

24 promise of 100 percent recovery understandably caused people to

25 look very carefully at their documents and zealously ensure

20

1  that every penny, whether it be principal, interest, attorney

2  fees or premiums, be paid.  That's all fine and Foamex is

3  really just about finished with all of its claims in fact.  And

4  it's paying what it owes.

5       But merely because this case ended as a solvent case

6  with a solvent debtor doesn't mean we should be forced to pay

7  above and beyond what the documents require to the Bank of New

8  York or anyone else.

9       The Bank made a statement in its reply at Page 3 that

10  because the debtors have the ability to pay they should pay

11  compound interests.  Your Honor, that is again not what the law

12  provides.  It does provide that they should be unimpaired and

13  we think they are already doing that.

14       Your Honor, the Bank of New York also characterizes

15  the debtor's reading of the documents as formalistic in

16  contract to its own alleged sensible reading.  We're not

17  offended by that characterization and we think it's our job to

18  ensure that creditors are paid what they are owed but we also

19  have a job to ensure the creditors are not extracting more than

20  they are entitled to.  And respectfully in this case, Your

21  Honor, we think the Bank of New York is requesting more than it

22  is entitled to under the governing documents and we ask the

23  Court to deny the request for compound interest.

24       THE COURT:  Thank you, Ms. Morgan.  Mr. Siegel, a

25  reply.

21

1        MR. SIEGEL:  Yes, must a few things.  Let's start
2   with one thing I think everyone can agree on.  There is no law,
3   no case that anybody can point to that really can guide the
4   Court to this result.  We've all done the best we can, we've
5   looked out there and we've said we think this case is helpful,
6   we think this case is helpful but we are in a situation where
7   this is, I think, a matter of pretty much first impression.

8        Now you can decide that one thing or another is more
9   persuasive but I don't believe that you can really say that
10  there is one case to point to that can provide this Court with
11  complete guidance.  The second thing that I would mention is,
12  and I won't talk specifically about this agreement to proceed
13  and the agreement that this Court determine what it means to be
14  unimpaired.  What the consequences of that agreement are is
15  that the debtor is in a position where it gets to use the
16  impairment standard rather than The Cramdown standard.

17        Now this Court can read whatever it wants into that
18  but that's the consequence of our agreement and that was a
19  point that we wanted to make.  There is also this kind of an
20  interesting, almost Alice in Wonderland, type of an approach
21  the debtor is taking which is, well all these documents refer
22  to maturity.  They don't refer to getting paid and maturity
23  somehow means something different than getting paid.  I would
24  suggest in these various cases that we're talking about that
25  when the various parties were talking about maturity, they were

22

1  not making the distinction between maturity and getting paid.
2  But the reality was that these documents all contemplated that
3  maturity was getting paid.

4          While the debtor is suggesting that our document is
5  unclear, what the debtor is doing is it is saying our document
6  is unclear because the document needed to say that if you don't
7  pay us, interest continues to be due twice a year specifically
8  going forward.  But this document does say that there is post
9  bankruptcy interests.  It does say if you don't pay an
10 installment of interest you will have interest on it.  What the
11 document does not do is it does not say that the obligation to
12 pay interest terminates.

13         Again, I think that is a different issue than the
14 issue of whether it provides for compounding.  The document is
15 clear on the compounding.  What the debtor is saying is that
16 maturity in and of itself terminates that obligation to
17 compound and we don't see that in the document.  That's really
18 the crux of our argument and these indentures are very
19 complicated documents and the fact that we had to refer to a
20 number of different sections does not mean the document doesn't
21 say what it says.  We went and we looked through the various
22 definition provisions and actually a handful of provisions, was
23 it five provisions, and several of them are simply definitional
24 and some of them repeat each other.

25         I don't really think it's that complicated.  And just

23

1  to raise one other point, many of these case that talk about

2  interest and entitlement to interest deal with situations

3  where the Court has the difficult issue of determining how to

4  allocate scarce resources between creditors where the

5  consequence of awarding interest to one creditor, particular in

6  the secured situation, is to deprive unsecured creditors who

7  did not negotiate their agreement for a larger distribution.

8  That's not what we have here.

9       Because we have a solvent estate what we have here is

10  a situation where the issuer is simply being asked to abide by

11  the document that it signed.  There is no third party that is

12  having this document subjected to it.

13       Just to raise -- to talk about one other case the New

14  Valley case is illustrative here where, you know, congress when

15  it saw the consequences of the impairment provision about

16  paying an allowed amount of claims and how that can be used in

17  a solvent case pick that thing out of the statute because they

18  felt that it was an intolerable result in the solvent

19  situation.

20       Now, I can't tell you what congress might do if they

21  found that there was some other loophole but what I am

22  suggesting is that it is at least illustrative to see what

23  congress did in New Valley to get a sense of what congress

24  thinks impairment means and what it doesn't mean.

25       Thank you, Your Honor.

24

1        THE COURT:  Thank you, Mr. Siegel.  I was hoping to

2   rule from the bench but what I would like to do is just maybe

3   take 10 minutes.  I just want to check something and then I'll

4   be back and issue a ruling.  The arguments were excellent and

5   very helpful and I appreciate it.  It didn't make it any easier

6   for me, but at least it clarified and crystallized a few things

7   and I just want to double check something.  I'll be back in

8   about 10 minutes.  We will recess until then.

9                    (Off the record)

10       THE COURT:  You may be seated.  Thank you for your

11  patience.  When I first saw what the issues were, I thought oh

12  no, an interest case.  But it was really much more interesting,

13  it was extremely well briefed.  The arguments were excellent

14  and I do have a ruling that I'm going to -- a bench ruling on

15  the Bank of New York's request to compel payment of post-

16  maturity compound interest.  I think I will just indicate up

17  front because too often judges issue the long bench rulings and

18  I still wasn't sure what had been decided.  So let me say up

19  right up front that what I'm going to decide is to deny the

20  Bank of New York's request in this case, and because I just

21  think that the contract and indenture controls and as a result

22  not paying compound interest is not a denial of the Bank -- not

23  the Bank of New York, excuse me, the 2005 note holders

24  contractual rights.

25       As the record of the case will reflect on February 1,

1  2007 the Court confirmed debtor's second amended joint plan of

2  reorganization and the plan became effective on February 12,

3  2007.   To the credit of many constituencies, the bankruptcy

4  case was a resounding success resulting in payment in full to

5  creditors and equity holders retaining their interests subject

6  only to potential dilution from a potential recapitalization.

7          Among the creditors paid in full under the plan were

8  the holders of the 2005 13 1/2  percent, $98 million original

9  principal amount senior subordinated notes dated as of December

10  23, 1997 which we'll call the 2005 notes.  And the 2007 9 7/8

11  percent, $150 million original principal amount senior

12  subordinated notes which we'll call the 2007 notes.  Both were

13  unsecured obligations.

14          Given rise to the issue presently before the Court

15  it's request by the Bank of New York as indenture trustee for

16  the 2005 notes that the reorganized debtor be compelled to pay

17  post-maturity compound interest on the 2005 notes as part of

18  their treatment under the plan.  The payment of compound

19  interest rather than plans provision for payment of simple

20  interest on non-paid installments at the default rate would

21  result in payment to the 2005 note holders of an additional

22  approximately or in excess of I should say $800,000.

23          Under the plan, the debtors are obligated to pay the

24  2005 note holders principal interest due on maturity of

25  approximately $55 million plus simple post-maturity default

26

1  rate interests of approximately $12 million.  In support of

2  their request the 2005 notes make a number of arguments that

3  the 2007 notes with whom the 2005 notes ran peri-passive under

4  the plan are to be paid post petition interest compounded twice

5  yearly.  The indentures for both notes are virtually identical

6  and therefore it is unfair to treat the 2005 notes differently.

7       The only reason for the different treatment is that

8  the 2005 notes mature pre-petition while the 2007 notes mature

9  post-petition and that despite maturity the 2005 notes were not

10  paid as of the date of maturity.

11       The 2005 notes were impaired argues the 2005 note

12  holders because the debtors are solvent and without payment of

13  compound interest a significant right will be altered.  The

14  2005 note holders were deprived of their right to vote on the

15  plan and the case law provides that where a debt instrument

16  provides for compound interest pre-maturity, a Court should

17  require compound interest post-maturity in order to leave such

18  note holder's rights unaltered.

19       In opposition to Bank of New York's request, the

20  debtors make a number of arguments.  Neither the indenture nor

21  New York law which is applicable provide for compounded post-

22  petition interest.  The proof of claim filed by Bank of New

23  York as amended requests that debtors pay both principal due

24  and payable upon maturity and make payment of the final

25  interest payment.  There was no request in the proof of claim

A70

27

 1  to pay post-maturity compound interest.  I will add right now
 2  that the Court is satisfied with the Bank of New York's
 3  explanation as to the significance or insignificance I should
 4  say of making that request in the proof of claim.  So I've not
 5  given that factor the weight that perhaps I had originally
 6  intended it to have.

 7          The reorganized debtors also argue that there is a
 8  long line of cases that hold the following maturity of a loan
 9  that the contract rate no longer applies.  Among a number of
10  cases the debtor cite is In Re Gray Boys which is a decision
11  from the Eastern District of Pennsylvania, affirmed by the
12  Third Circuit Court of Appeals, and Wolf v. Arrow Factors
13  Corporation out of the Southern District of New York affirmed
14  by the Second Circuit Court of Appeals which supports their
15  view.

16          In conjunction with the case law debtors point out
17  the Bank of New York has filed a number of documents in the
18  case conceding the interest installment due on the majority
19  date was the final interest payment.  Again, insofar as those
20  documents are the proof of claim, I have discounted that
21  argument.

22          Reorganized debtors further argue that New York law
23  disfavors compound interest absent an express contractual or
24  statutory authority and the Court emphasis the word express.
25  Reorganized debtors further argue that the plan does not impair

A71

28

1 the treatment of the 2005 notes by paying simple interest post-
2 maturity, but rather it is the indenture instrument itself and
3 not the plan which limits payments to simple interest.
4       At the same time, the 2007 notes are entitled to
5 receive compound interest by virtue of express contract
6 language in their indenture.  Debtors also argue that the
7 filing of a bankruptcy did not extend the maturity date of the
8 2005 notes citing among a number of cases <u>Watts v. Pennsylvania</u>
9 <u>Housing Finance Co.</u> again a decision by the Third Circuit Court
10 of Appeals expressly ruling there that the termination of a
11 contract to make a loan after the commencement of a bankruptcy
12 case is not stayed by the bankruptcy filing and by implication
13 and extension the filing the bankruptcy case does not extend a
14 maturity date.
15       Further, debtors point out that a case heavily relied
16 upon in their papers by the Bank of New York the <u>In Re Ace-</u>
17 <u>Texas</u> decision which is a decision out of this Court does not
18 stand for the proposition of the Bank of New York purports that
19 it does because it did not involve compound interest but
20 specifically the issue is whether a creditor was entitled to
21 interest at the default rate versus the contract rate and Judge
22 Walsh ruled in a way favorable to the reorganized debtors here.
23       In summary, this is not a situation where post-
24 petition interest is not being paid for the 2005 note holders.
25 In fact the plan provides for payment of interest but not

29

1  compound interest.  The difficulty with Bank of New York's

2  argument is that the 2005 note holders do not have a

3  contractual right to compound interest and I will say that the

4  indenture trustee's very skillful use of their indenture, and

5  the multiple provisions in the indenture, I think illustrate

6  the lengths the Court would have to go to in arriving to a

7  conclusion that the indenture did expressly provide for

8  compound interest.  I do emphasis skillful because I understood

9  the argument, I followed it, it was extremely well made but it

10 was not persuasive for the Court.

11        In other words, I think what I'm basically concluding

12 is that the 2005 note holders have received all that they

13 bargained for, and that the debtor's solvency is successful.

14 Reorganizations do not change the contractual rights of the

15 2005 note holders nor do those factors change the obligations

16 of the debtors here.  There clearly is no express provision for

17 the 2005 note holders to receive compound interest.

18        Accordingly, the Court agrees with the debtor's

19 position that there is no support in fact or law to support the

20 Bank of New York's request.  Neither the governing document

21 which is the indenture or the governing law, New York law,

22 support the request.  Accordingly, the Court denies the Bank of

23 New York's request for compound interest.

24        I don't know if the reorganized debtor will prepare

25 an order, just a very simple order essentially saying the

30

1  reasons set forth in the Court's bench ruling I think will be

2  sufficient.

3        MS. MORGAN: We will.

4        THE COURT:  Thank you and I thank counsel.  It was

5  extremely well done and I enjoyed the case despite seeing the

6  fight over interest.  Thank you and good day everyone.

7                         * * * * *

8            C E R T I F I C A T I O N

9        I, LYNN SCHMITZ, court approved transcriber,

10 certify that the foregoing is a correct transcript from

11 the official electronic sound recording of the proceedings

12 in the above-entitled matter.

13 /s/ Lynn Schmitz

14 LYNN SCHMITZ                Date:  April 4, 2007

15 J&J COURT TRANSCRIBERS, INC.

16

17

18

19

20

21

22

23

24

25

A74

## CERTIFICATE OF SERVICE

I, Laurie Selber Silverstein, certify that I am not less than 18 years of age and that on this 25th day of June, 2007, I caused a true and correct copy of the within **Appendix to the Opening Brief of Appellant the Bank of New York, as Indenture Trustee** to be served upon the parties below in the matter indicated:

**APPELLEES**:

**BY HAND DELIVERY**
Pauline K. Morgan
Joseph M. Barry
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899

**BY EMAIL/AND FIRST CLASS MAIL**
Alan W. Kornberg
Brian S. Herman
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Under penalty of perjury, I declare the foregoing to be true and correct.

_____
Laurie Selber Silverstein

Pac#803796