IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
In re:                                    )    Chapter 11
                                          )
FOAMEX INTERNATIONAL INC.                 )    Case No. 05-12685 (KG)
                                          )
               Reorganized Debtor.        )
------------------------------------------------------------x
                                          )
BANK OF NEW YORK, AS INDENTURE            )    Civil Action No. 07-212 (JJF)
TRUSTEE,                                  )
                                          )
               Appellant,                 )
                                          )
       v.                                 )
                                          )
FOAMEX INTERNATIONAL INC., *et al.*       )
                                          )
               Appellees.                 )
                                          )
------------------------------------------------------------x

APPENDIX TO THE ANSWERING BRIEF OF APPELLEES
FOAMEX INTERNATIONAL INC., *ET AL.*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Pauline K. Morgan (Del. Bar No. 3650)
Joseph M. Barry (Del. Bar No. 4221)
Kenneth J. Enos (Del. Bar No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Appellees Foamex International Inc., *et al.*

Dated: July 10, 2007
       Wilmington, Delaware

# TABLE OF CONTENTS

**Page**

9 7/8% Senior Subordinated Notes Due 2007 (without exhibits)...........................F001-F084

Original Bank of New York Foamex L.P. Claim (without exhibits).......................F085-F090

Original Bank of New York Foamex Capital Corp. Claim (without exhibits)...…........F091-F096

Amended Original Bank of New York Foamex L.P. Claim....................….............F097-F104

Amended Bank of New York Foamex Capital Corp. Claim...............................F105-F111

Memorandum of Law of The Bank of New, as Indenture Trustee, in Support
of Entry of Order Compelling Debtors to Pay Post-Maturity Compound
Interest on their 2005 Notes in Accordance with their Confirmed
Chapter 11 Plan (without exhibits)..........................................................F112-F127

Reply Memorandum of Law of The Bank of New York, as Indenture Trustee,
to Reorganized Debtors' Memorandum of Law in Opposition to the Request
of The Bank of New York, as Indenture Trustee, for Entry of an Order
Compelling the Debtors to Pay Post-Maturity Compound Interest on the
2005 Subordinated Notes ...................................................................F128-F140

Opening Brief of Appellant, The Bank of New York, as Indenture
Trustee (without exhibits)...................................................................F141-F164

EXECUTION COPY

# FOAMEX L.P.

# FOAMEX CAPITAL CORPORATION

# GENERAL FELT INDUSTRIES, INC.

# FOAMEX FIBERS, INC.

---

$150,000,000

9⅞% SENIOR SUBORDINATED NOTES DUE 2007

---

## INDENTURE

Dated as of June 12, 1997

---

## THE BANK OF NEW YORK

Trustee

---

F001

# CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310 (a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311 (a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312 (a) | 2.05 |
| (b) | 11.03 |
| (c) | 11.03 |
| 313 (a) | 7.06 |
| (b)(1) | 10.03 |
| (b)(2) | 7.07 |
| (c) | 7.06; 11.02 |
| (d) | 7.06 |
| 314 (a) | 4.03; 11.02 |
| (b) | 10.02 |
| (c)(1) | 11.04 |
| (c)(2) | 11.04 |
| (c)(3) | N.A. |
| (d) | 10.03, 10.04, 10.05 |
| (e) | 11.05 |
| (f) | N.A. |
| 315 (a) | 7.01 |
| (b) | 7.05, 11.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316 (a)(last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12 |
| 317 (a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318 (a) | 11.01 |
| (b) | N.A. |
| (c) | 11.01 |

N.A. means not applicable.

*This Cross-Reference Table is not part of the Indenture.

## TABLE OF CONTENTS

*Page*

### ARTICLE 1
### DEFINITIONS AND INCORPORATION
### BY REFERENCE

| | | |
|---|---|---|
| Section 1.01. | Definitions | 1 |
| Section 1.02. | Other Definitions | 17 |
| Section 1.03. | Incorporation by Reference of Trust Indenture Act | 18 |
| Section 1.04. | Rules of Construction | 18 |

### ARTICLE 2
### THE NOTES

| | | |
|---|---|---|
| Section 2.01. | Form and Dating | 19 |
| Section 2.02. | Execution and Authentication | 19 |
| Section 2.03. | Registrar and Paying Agent | 20 |
| Section 2.04. | Paying Agent to Hold Money in Trust | 20 |
| Section 2.05. | Holder Lists | 20 |
| Section 2.06. | Transfer and Exchange | 20 |
| Section 2.07. | Replacement Notes | 26 |
| Section 2.08. | Outstanding Notes | 26 |
| Section 2.09. | Treasury Notes | 27 |
| Section 2.10. | Temporary Notes | 27 |
| Section 2.11. | Cancellation | 27 |
| Section 2.12. | Defaulted Interest | 27 |
| Section 2.13. | CUSIP Numbers | 28 |

### ARTICLE 3
### REDEMPTION AND PREPAYMENT

| | | |
|---|---|---|
| Section 3.01. | Notices to Trustee | 28 |
| Section 3.02. | Selection of Notes to Be Redeemed | 28 |
| Section 3.03. | Notice of Redemption | 29 |
| Section 3.04. | Effect of Notice of Redemption | 30 |
| Section 3.05. | Deposit of Redemption Price | 30 |
| Section 3.06. | Notes Redeemed in Part | 30 |
| Section 3.07. | Optional Redemption | 30 |
| Section 3.08. | Mandatory Redemption | 31 |
| Section 3.09. | Offer to Purchase by Application of Excess Proceeds | 31 |

### ARTICLE 4
### COVENANTS

| | | |
|---|---|---|
| Section 4.01. | Payment of Notes | 33 |
| Section 4.02. | Maintenance of Office or Agency | 33 |
| Section 4.03. | Reports | 34 |
| Section 4.04. | Compliance Certificate | 34 |
| Section 4.05. | Taxes | 35 |
| Section 4.06. | Stay, Extension and Usury Laws | 35 |
| Section 4.07. | Restricted Payments | 35 |
| Section 4.08. | Dividend and Other Payment Restrictions Affecting Subsidiaries | 38 |

i

Section 4.09.  Incurrence of Indebtedness and Issuance of Preferred
Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
Section 4.10.  Asset Sales . . . . . . . . . . . . . . . . . . . . . . . . . .  41
Section 4.11.  Transactions with Affiliates . . . . . . . . . . . . . . . . .  42
Section 4.12.  Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43
Section 4.13.  Line of Business . . . . . . . . . . . . . . . . . . . . . . .  43
Section 4.14.  Corporate Existence . . . . . . . . . . . . . . . . . . . . . .  43
Section 4.15.  Offer to Repurchase Upon Change of Control . . . . . . . . . .  43
Section 4.16.  Anti-layering . . . . . . . . . . . . . . . . . . . . . . . . .  44
Section 4.17.  Sale and Leaseback Transactions . . . . . . . . . . . . . . .  44
Section 4.18   Limitation on Issuances and Sales of Capital Stock of
Restricted Subsidiaries . . . . . . . . . . . . . . . . . . . .  44
Section 4.19   Payments for Consent . . . . . . . . . . . . . . . . . . . . .  45
Section 4.20   Additional Guarantees . . . . . . . . . . . . . . . . . . . . .  45

ARTICLE 5
SUCCESSORS
Section 5.01.  Merger, Consolidation, or Sale of Assets . . . . . . . . . . .  46
Section 5.02.  Successor Corporation Substituted . . . . . . . . . . . . . .  46

ARTICLE 6
DEFAULTS AND REMEDIES
Section 6.01.  Events of Default . . . . . . . . . . . . . . . . . . . . . . .  47
Section 6.02.  Acceleration . . . . . . . . . . . . . . . . . . . . . . . . . .  48
Section 6.03.  Other Remedies . . . . . . . . . . . . . . . . . . . . . . . . .  49
Section 6.04.  Waiver of Past Defaults . . . . . . . . . . . . . . . . . . . .  49
Section 6.05.  Control by Majority . . . . . . . . . . . . . . . . . . . . . .  50
Section 6.06.  Limitation on Suits . . . . . . . . . . . . . . . . . . . . . .  50
Section 6.07.  Rights of Holders of Notes to Receive Payment . . . . . . . .  50
Section 6.08.  Collection Suit by Trustee . . . . . . . . . . . . . . . . . .  50
Section 6.09.  Trustee May File Proofs of Claim . . . . . . . . . . . . . . .  51
Section 6.10.  Priorities . . . . . . . . . . . . . . . . . . . . . . . . . . .  51
Section 6.11.  Undertaking for Costs . . . . . . . . . . . . . . . . . . . . .  52

ARTICLE 7
TRUSTEE
Section 7.01.  Duties of Trustee . . . . . . . . . . . . . . . . . . . . . . .  52
Section 7.02.  Rights of Trustee . . . . . . . . . . . . . . . . . . . . . . .  53
Section 7.03.  Individual Rights of Trustee . . . . . . . . . . . . . . . . .  54
Section 7.04.  Trustee's Disclaimer . . . . . . . . . . . . . . . . . . . . .  54
Section 7.05.  Notice of Defaults . . . . . . . . . . . . . . . . . . . . . .  54
Section 7.06.  Reports by Trustee to Holders of the Notes . . . . . . . . . .  54
Section 7.07.  Compensation and Indemnity . . . . . . . . . . . . . . . . . .  54
Section 7.08.  Replacement of Trustee . . . . . . . . . . . . . . . . . . . .  55
Section 7.09.  Successor Trustee by Merger, etc . . . . . . . . . . . . . . .  56
Section 7.10.  Eligibility; Disqualification . . . . . . . . . . . . . . . . .  56
Section 7.11.  Preferential Collection of Claims Against Issuers . . . . . .  57

ii

## ARTICLE 8
### DISCHARGE OF INDENTURE

Section 8.01.    Termination of Issuers' Obligations . . . . . . . . . . . . . .    57
Section 8.02.    Application of Trust Money . . . . . . . . . . . . . . . . . . .    58
Section 8.03.    Repayment to Issuers . . . . . . . . . . . . . . . . . . . . .    58
Section 8.04.    Reinstatement . . . . . . . . . . . . . . . . . . . . . . . . .    58

## ARTICLE 9
### AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01.    Without Consent of Holders of Notes . . . . . . . . . . . .    59
Section 9.02.    With Consent of Holders of Notes . . . . . . . . . . . . . .    59
Section 9.03.    Compliance with Trust Indenture Act . . . . . . . . . . . .    61
Section 9.04.    Revocation and Effect of Consents . . . . . . . . . . . . .    61
Section 9.05.    Notation on or Exchange of Notes . . . . . . . . . . . . . .    61
Section 9.06.    Trustee to Sign Amendments, etc . . . . . . . . . . . . . .    61

## ARTICLE 10
### SUBORDINATION

Section 10.01.    Agreement to Subordinate . . . . . . . . . . . . . . . . .    62
Section 10.02.    Liquidation; Dissolution; Bankruptcy . . . . . . . . . . . .    62
Section 10.03.    Default on Designated Senior Debt . . . . . . . . . . . . .    62
Section 10.04.    Acceleration of Notes . . . . . . . . . . . . . . . . . . . .    63
Section 10.05.    When Distribution Must Be Paid Over . . . . . . . . . . .    63
Section 10.06.    Notice by the Issuers . . . . . . . . . . . . . . . . . . . .    63
Section 10.07.    Subrogation . . . . . . . . . . . . . . . . . . . . . . . . .    64
Section 10.08.    Relative Rights . . . . . . . . . . . . . . . . . . . . . . .    64
Section 10.09.    Subordination May Not Be Impaired by the Issuers . . . .    64
Section 10.10.    Distribution or Notice to Representative . . . . . . . . . .    65
Section 10.11.    Rights of Trustee and Paying Agent . . . . . . . . . . . .    65
Section 10.12.    Authorization to Effect Subordination . . . . . . . . . . .    66
Section 10.13.    Amendments . . . . . . . . . . . . . . . . . . . . . . . . .    66

## ARTICLE 11
### GUARANTEE OF NOTES

Section 11.01.    Note Guarantee . . . . . . . . . . . . . . . . . . . . . . .    66
Section 11.02.    Execution and Delivery of Note Guarantee . . . . . . . .    67
Section 11.03.    Subsidiary Guarantors May Consolidate, etc., on
                  Certain Terms . . . . . . . . . . . . . . . . . . . . . . . . .    67
Section 11.04.    Releases Following Sale of Assets, Merger, Sale of
                  Capital Stock Etc. . . . . . . . . . . . . . . . . . . . . . . .    68
Section 11.05.    Additional Subsidiary Guarantors . . . . . . . . . . . . .    69
Section 11.06.    Limitation on Subsidiary Guarantor Liability . . . . . . . .    69
Section 11.07.    "Trustee" to Include Paying Agent . . . . . . . . . . . . .    69

## ARTICLE 12
### SUBORDINATION OF NOTE GUARANTEE

Section 12.01.    Agreement to Subordinate . . . . . . . . . . . . . . . . .    70
Section 12.02.    Liquidation; Dissolution; Bankruptcy . . . . . . . . . . . .    70
Section 12.03.    Default on Designated Senior Debt . . . . . . . . . . . . .    70

Section 12.04.    Acceleration of Notes . . . . . . . . . . . . . . . . . . . . . . . . . . .    71
Section 12.05.    When Distribution Must Be Paid Over . . . . . . . . . . . . . .    71
Section 12.06.    Notice by Subsidiary Guarantor . . . . . . . . . . . . . . . . . .    71
Section 12.07.    Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    72
Section 12.08.    Relative Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    72
Section 12.09.    Subordination May Not Be Impaired by Subsidiary
                  Guarantor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    72
Section 12.10.    Distribution or Notice to Representative . . . . . . . . . . . .    73
Section 12.11.    Rights of Trustee and Paying Agent . . . . . . . . . . . . . . .    73
Section 12.12.    Authorization to Effect Subordination . . . . . . . . . . . . .    74
Section 12.13.    Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    74

ARTICLE 13.
MISCELLANEOUS

Section 13.01.    Trust Indenture Act Controls . . . . . . . . . . . . . . . . . . . .    74
Section 13.02.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    74
Section 13.03.    Communication by Holders of Notes with Other
                  Holders of Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . .    76
Section 13.04.    Certificate and Opinion as to Conditions Precedent . . . .    76
Section 13.05.    Statements Required in Certificate or Opinion . . . . . . .    76
Section 13.06.    Rules by Trustee and Agents . . . . . . . . . . . . . . . . . . . .    76
Section 13.07.    No Personal Liability of Directors, Officers, Employees
                  and Stockholders . . . . . . . . . . . . . . . . . . . . . . . . . . . .    77
Section 13.08.    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    77
Section 13.09.    No Adverse Interpretation of Other Agreements . . . . . .    77
Section 13.10.    Successors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    77
Section 13.11.    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    77
Section 13.12.    Counterpart Originals . . . . . . . . . . . . . . . . . . . . . . . . .    77
Section 13.13.    Table of Contents, Headings, etc . . . . . . . . . . . . . . . . .    77

EXHIBITS

Exhibit A        FORM OF NOTE
Exhibit B        CERTIFICATE OF TRANSFEROR
Exhibit C        FORM OF SUBSIDIARY GUARANTEE
Exhibit D        FORM OF SUPPLEMENTAL INDENTURE

F006

INDENTURE dated as of June 12, 1997 between Foamex L.P., a Delaware limited partnership ("Foamex"), Foamex Capital Corporation, a Delaware corporation ("FCC"), (each of Foamex and FCC an "Issuer" and together, the "Issuers"), General Felt Industries, Inc., a Delaware corporation ("General Felt"), Foamex Fibers, Inc. ("Foamex Fibers") and The Bank of New York, a New York banking corporation, as trustee (the "Trustee").

The Issuers, the Subsidiary Guarantors (as defined below) and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the 9⅞% Senior Subordinated Notes due 2007 (the "Senior Subordinated Notes") and the new 9⅞% Senior Subordinated Notes due 2007 (the "New Senior Subordinated Notes" and, together with the Senior Subordinated Notes, the "Notes");

## ARTICLE 1
## DEFINITIONS AND INCORPORATION
## BY REFERENCE

*Section 1.01.    Definitions.*

"*Acquired Debt*" means, with respect to any specified Person, (i) Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of such specified Person, including, without limitation, Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Subsidiary of such specified Person; and (ii) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person to the extent of the fair market value of such asset where the Indebtedness so secured is not the Indebtedness of such Person.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the voting securities of a Person shall be deemed to be control. Notwithstanding the foregoing, Donaldson, Lufkin & Jenrette Securities Corporation will not be deemed to be an Affiliate of the Issuers.

"*Agent*" means any Registrar, Paying Agent or co-registrar.

"*Asset Sale*" means (i) the sale, lease, conveyance or other disposition of any assets (excluding any sale and leaseback transaction, the granting of a Permitted Lien, and the transfer of cash and Cash Equivalents) other than sales of inventory, licensing of intellectual property or sales of services, in each case in the ordinary course of business, but including a Receivables Transaction (*provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Issuers and their Restricted Subsidiaries taken as a whole will be governed by Section 4.15 and/or Article 5 hereof and not by Section 4.10), and (ii) the issue or sale by the Issuers or any of their respective Restricted Subsidiaries of Equity Interests of any of the Issuers' Restricted Subsidiaries, in the case of either clause (i) or (ii), whether in a single transaction or a series of related transactions (a) that have a fair market value in excess of $10.0 million or (b) for Net Proceeds in excess of $10.0 million. Notwithstanding the

foregoing; (i) a transfer of assets by either of the Issuers to a Restricted Subsidiary or by a Restricted Subsidiary to either of the Issuers or to another Restricted Subsidiary, (ii) an issuance of Equity Interests by a Restricted Subsidiary to either of the Issuers or to another Restricted Subsidiary, (iii) Hedging Obligations and (iv) a Restricted Payment that is permitted by Section 4.07 will not be deemed to be Asset Sales.

"*Attributable Debt*" in respect of a sale and leaseback transaction means, at the time of determination, the present value (discounted at the rate of interest implicit in such transaction, determined in accordance with GAAP) of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction (including any period for which such lease has been extended or may, at the option of the lessor, be extended).

"*Bankruptcy Law*" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"*Beneficial Owner*" means "beneficial owner" as such terms is defined in Rule 13d-3 and Rule 13d-5 under the Exchange Act; *provided, however,* that (i) a person shall not be deemed to have beneficial ownership of securities subject to a stock purchase agreement, merger agreement, or similar agreement until the consummation of the transactions contemplated by such agreement, and (ii) for purposes of determining beneficial ownership of Voting Stock of Foamex, stockholders of Foamex International Inc. shall be deemed to beneficially own a percentage of Voting Stock of Foamex equal to their percentage beneficial ownership of Voting Stock of Foamex International Inc. multiplied by Foamex International Inc.'s beneficial ownership of Voting Stock of Foamex.

"*Board of Directors*" means the Board of Directors of the Managing General Partner, on behalf of Foamex (or Foamex, if Foamex is a corporation), FCC, or any Subsidiary Guarantor or any authorized committee of the Board of Directors.

"*Business Day*" means any day except a Saturday, Sunday or other day in the City of New York, or in the city of the principal corporate trust office of the Trustee, on which banks are authorized to close.

"*Capital Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized on a balance sheet in accordance with GAAP.

"*Capital Stock*" means (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited) and (iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Cash Equivalents*" means (i) United States dollars, (ii) securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof), (iii) time deposits and certificates of deposit, including eurodollar time deposits, of any commercial bank organized

2

in the United States having capital and surplus in excess of $100,000,000 or a commercial bank organized under the laws of any other country that is a member of the OECD having total assets in excess of $100,000,000 with a maturity date not more than one year from the date of acquisition, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (i) and (ii) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) direct obligations issued by any state of the United States of America or any political subdivision of any state or any public instrumentality thereof maturing within 90 days after the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Corporation nor Moody's Investors Service, Inc. (or, if at any time neither Standard & Poor's Corporation nor Moody's Investors Service, Inc. shall be rating such obligations, then from such other nationally recognized rating service acceptable to the Trustee), (vi) commercial paper issued by the parent corporation of any commercial bank organized in the United States having capital and surplus in excess of $100,000,000 or a commercial bank organized under the laws of any other country that is a member of the OECD having total assets in excess of $100,000,000, and commercial paper issued by others having one of the two highest ratings obtainable from either Standard & Poor's Corporation or Moody's Investors Service, Inc. (or, if at any time neither Standard & Poor's Corporation nor Moody's Investors Service, Inc. shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Trustee) and in each case maturing within one year after the date of acquisition, (vii) overnight bank deposits and bankers' acceptances at any commercial bank organized in the United States having capital and surplus in excess of $100,000,000 or a commercial bank organized under the laws of any other country that is member of the OECD having total assets in excess of $100,000,000, (viii) deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $50,000,000 or a commercial bank organized under the laws of any other country that is a member of the OECD having total assets in excess of $50,000,000 and (ix) investments in money market funds substantially all of whose assets comprise securities of the types described in clauses (i) through (viii).

"*Change of Control*" means the occurrence of any of the following: (i) the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of either of the Issuers and their respective Restricted Subsidiaries taken as a whole to any "person" (as such term is used in Section 13(d)(3) of the Exchange Act) other than the Principals or their Related Parties (as defined below), (ii) the adoption of a plan relating to the liquidation or dissolution of the Issuers, (iii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as defined above), other than the Principals and their Related Parties, becomes the Beneficial Owner of (A) more than 25% of the Voting Stock of either of the Issuers (measured by voting power rather than by number of shares) and (B) a greater percentage of the Voting Stock than the Principals and their Related Parties or (iv) the first day on which a majority of the members of the Board of Directors of either of the Issuers are not Continuing Directors.

"*Closing Date Transactions*" means the following transactions to be entered into by Foamex in connection with the issuance of the Senior Subordinated Notes: (i) the distribution to Foamex-JPS Automotive L.P. ("FJPS") and FMXI, Inc. of: (a) all of the FJPS and Foamex-JPS Capital Corporation Senior Secured Discount Debentures due 2004 purchased by Foamex on or prior to the date of this Indenture; (b) the promissory note of FJPS payable to Foamex, dated June 28, 1994 and (c) the promissory note of Foamex International Inc. payable to Foamex, dated December 8, 1995; (ii) a cash distribution to Trace Foam Company, Inc. in an amount equal to one-ninety ninth (1/99) of the

3

distribution in (i) above; (iii) the amendment of the promissory note of Trace International Holdings, Inc. payable to Foamex, dated July 7, 1996, which extends the maturity of such obligation to 2001; and (iv) the consummation of the cash tender offer pursuant to Foamex's consent solicitation statement dated May 12, 1997, as amended to the date hereof and the incurrence of borrowings under the New Credit Facility.

"*Commission*" or "*SEC*" means the Securities and Exchange Commission and any successor agency thereof.

"*Consolidated Cash Flow*" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period plus (i) an amount equal to any extraordinary loss plus any net loss realized in connection with an Asset Sale or discontinued operations (to the extent such losses were deducted in computing such Consolidated Net Income), plus (ii) provision for taxes based on income or profits of such Person and its Subsidiaries for such period (including, to the extent applicable, payments made pursuant to any tax sharing agreements), to the extent that such provision for taxes was included in computing such Consolidated Net Income, plus (iii) consolidated interest expense of such Person and its Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings (whether or not accounted for by the Issuers and their respective Subsidiaries as interest expense), and net payments (if any) pursuant to Hedging Obligations), to the extent that any such expense was deducted in computing such Consolidated Net Income, plus (iv) depreciation, amortization (including amortization of goodwill and other intangibles) and other non-cash expenses of such Person and its Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash expenses were deducted in computing such Consolidated Net Income; minus (v) non-cash items increasing such Consolidated Net Income for such period, in each case, on a consolidated basis and determined in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP (excluding, however, the effect of the Closing Date Transactions and of any other extraordinary transaction in connection with the incurrence of the Senior Subordinated Notes, and the consummation of the recapitalization of the Issuers in connection therewith); *provided* that (i) the Net Income of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions with respect to current or prior years Net Income (if not previously distributed or dividended) paid in cash to the referent Person or a Restricted Subsidiary thereof; (ii) the Net Income of any Restricted Subsidiary that is not a Subsidiary Guarantor shall be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders; (iii) the Net Income of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition shall be excluded; (iv) the cumulative effect of a change in accounting principles shall be excluded; and (v) the Net Income (but not loss) of any Unrestricted Subsidiary shall

4

be excluded, whether or not distributed to the Issuers or one of their respective Subsidiaries except as set forth in (i).

"*Consolidated Net Worth*" means, (A) with respect to any partnership, the common and preferred partnership equity of such partnership and its consolidated subsidiaries, as determined on a consolidated basis in accordance with GAAP, and (B) with respect to any other Person as of any date, the sum of (i) the consolidated equity of the common equityholders of such Person and its consolidated Subsidiaries as of such date plus (ii) the respective amounts reported on such Person's balance sheet as of such date with respect to any series of preferred equity (other than Disqualified Stock) that by its terms is not entitled to the payment of dividends unless such dividends may be declared and paid only out of net earnings in respect of the year of such declaration and payment, but only to the extent of any cash received by such Person upon issuance of such preferred stock, less (x) all write-ups (other than write-ups resulting from foreign currency translations and write-ups of tangible assets of a going concern business made within 12 months after the acquisition of such business) subsequent to the date of this Indenture in the book value of any asset owned by such Person or a consolidated Subsidiary of such Person, (y) all investments as of such date in unconsolidated Subsidiaries and in Persons that are not Subsidiaries (except, in each case, Permitted Investments), plus (z) all unamortized debt discount and expense and unamortized deferred charges as of such date, all of the foregoing determined in accordance with GAAP.

"*Continuing Directors*" means, as of any date of determination, any member of the Board of Directors of the Issuers who (i) was a member of such Board of Directors on the date of this Indenture or (ii) was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board at the time of such nomination or election.

"*Contributions*" means any loans, cash advances, capital contributions, investments or other transfers of assets for less than fair value by the Issuers or any of their respective Restricted Subsidiaries to any Subsidiary or other Affiliate of the Issuers or any of their respective Restricted Subsidiaries other than a Subsidiary Guarantor, other than loans and cash advances to officers and directors made in the ordinary course of business not to exceed $5.0 million.

"*Corporate Trust Office of the Trustee*" shall be at the address of the Trustee specified in Section 13.02 hereof or such other address as to which the Trustee may give notice to the Issuers.

"*Credit Agent*" means any of The Bank of Nova Scotia or Citicorp USA, Inc., in their respective capacity as Administrative Agents for the lenders party to the New Credit Facility, or any successor thereto or any person otherwise appointed.

"*Default*" means any event that is or with the passage of time or the giving of notice or both would be an Event of Default.

"*Designated Senior Debt*" means (i) any Indebtedness outstanding under the New Credit Facility and (ii) any other Senior Debt the principal amount of which is $25.0 million or more and that has been designated by the Issuers as Designated Senior Debt.

"*Definitive Notes*" means Notes that are in the form of the Notes attached hereto as Exhibit A, that do not include the information called for by footnotes 1 and 2 thereof.

5

"*Depository*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depository with respect to the Notes, until a successor shall have been appointed and become such pursuant to the applicable provision of this Indenture, and, thereafter, "Depository" shall mean or include such successor.

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the Holder thereof, in whole or in part, on or prior to the date that is 91 days after the date on which the Senior Subordinated Notes mature.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Existing Indebtedness*" means up to $14.1 million in aggregate principal amount of Indebtedness of the Issuers and their respective Restricted Subsidiaries (other than Indebtedness under the New Credit Facility plus Indebtedness subject to the Closing Date Transactions that is not purchased pursuant to such Transactions) in existence on the date of this Indenture, including the Great Western Note, until all such amounts are repaid.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exchange Offer*" means the offer that may be made by the Issuers pursuant to the Registration Rights Agreement to exchange New Senior Subordinated Notes for Senior Subordinated Notes.

"*Fixed Charges*" means, with respect to any Person for any period, the sum, without duplication, of (i) the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued (including, without limitation, original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net payments (if any) pursuant to Hedging Obligations, but excluding the amortization of deferred financing costs) and (ii) the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period to the extent related to Indebtedness, and (iii) any interest expense on Indebtedness of another Person (other than such Person's Restricted Subsidiaries) that is Guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries (whether or not such Guarantee or Lien is called upon), but only to the extent of the interest expense attributable to the lesser of (a) the principal amount of such Indebtedness, or (b) the fair market value of such asset and (iv) the product of (a) all dividend payments, whether or not in cash, on any series of preferred stock of such Person or any of its Restricted Subsidiaries, other than dividend payments to such Person or its Restricted Subsidiaries and dividends on Equity Interests payable solely in Equity Interests of the Issuers, times (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person and its Restricted Subsidiaries, expressed as a decimal, in each case, on a consolidated basis and in accordance with GAAP.

6

"*Fixed Charge Coverage Ratio*" means with respect to any Person for any period, the ratio of the Consolidated Cash Flow of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Issuers or any of their respective Restricted Subsidiaries incurs, assumes, Guarantees or redeems, repurchases or otherwise retires any Indebtedness (other than revolving credit borrowings) or issues preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such incurrence, assumption, Guarantee or redemption, repurchase or retirement of Indebtedness, or such issuance or redemption of preferred stock, as if the same had occurred at the beginning of the applicable four-quarter reference period. In addition, for purposes of making the computation referred to above, (i) acquisitions that have been made by the Issuers or any of their respective Restricted Subsidiaries, including through mergers or consolidations and including any related financing transactions, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date shall be deemed to have occurred on the first day of the four-quarter reference period and Consolidated Cash Flow for such reference period shall be calculated without giving effect to clause (iii) of the proviso set forth in the definition of Consolidated Net Income, and (ii) the Consolidated Cash Flow attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses disposed of prior to the Calculation Date, shall be excluded, and (iii) the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses disposed of prior to the Calculation Date, shall be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the referent Person or any of its Restricted Subsidiaries following the Calculation Date.

"*FJPS*" means Foamex-JPS Automotive L.P., a Delaware limited partnership.

"*Foamex Latin America*" means Foamex Latin America, Inc. and its direct and indirect Subsidiaries.

"*Foreign Subsidiary*" means any Subsidiary of the Issuers either (a) which is organized outside of the United States of America, (b) whose principal activities are conducted outside of the United States of America or (c) whose only material assets are Equity Interests in Subsidiaries which are Foreign Subsidiaries.

"*GAAP*" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the date of this Indenture.

"*Global Note*" means a Note that contains the paragraph referred to in footnote 1 and the additional schedule referred to in footnote 2 to the form of the Note attached hereto as Exhibit A.

"*Great Western Note*" means the subordinated promissory note incurred in connection with the acquisition of Great Western in the principal amount of $7,014,864 that bears interest at a maximum rate of 6.0% per annum payable semi-annually.

7

"*Guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness.

"*Guarantor Senior Debt*" means Senior Debt of a Subsidiary Guarantor.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under (i) interest rate or currency swap agreements, interest rate or currency cap agreements, interest rate or currency collar agreements and (ii) other agreements or arrangements designed to protect such Person against or expose such Person to fluctuations in interest rates and/or currency exchange rates.

"*Holder*" means a Person in whose name a Note is registered.

"*Indebtedness*" means, with respect to any Person, without duplication, any indebtedness of such Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof) or banker's acceptances or representing Capital Lease Obligations or the balance deferred and unpaid of the purchase price of any property, except any such balance that constitutes an accrued expense or trade payable, if and to the extent any of the foregoing indebtedness (other than letters of credit) would appear as a liability upon a balance sheet of such Person prepared in accordance with GAAP, as well as all Indebtedness of others secured by a Lien on any asset of such Person (whether or not such Indebtedness is assumed by such Person) to the extent of the fair market value of such asset where the Indebtedness so secured is not the Indebtedness of such Person and, to the extent not otherwise included, the Guarantee by such Person of any Indebtedness of any other Person. The amount of any Indebtedness outstanding as of any date shall be (i) the accreted value thereof, to the extent such Indebtedness does not require current payments of interest, and (ii) the principal amount thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness. Notwithstanding anything in this Indenture to the contrary, Hedging Obligations shall not constitute Indebtedness, except to the extent they appear on the balance sheet of Foamex.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Insolvency or Liquidation Proceedings*" means (i) any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding, relative to Foamex or FCC, or to the creditors of Foamex or FCC, as such, or to the assets of Foamex or FCC, or (ii) any liquidation, dissolution, reorganization or winding up of Foamex or FCC, whether voluntary or involuntary and involving insolvency or bankruptcy, or (iii) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of Foamex or FCC.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the forms of direct or indirect loans (including Guarantees of Indebtedness or other obligations), advances or capital contributions (excluding advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. If the Issuers or any Restricted Subsidiary of the Issuers sells or otherwise disposes of any Equity Interests of any direct or indirect

8

Restricted Subsidiary of the Issuers such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of one of the Issuers, the Issuers shall be deemed to have made an Investment on the date of any such sale or disposition equal to the fair market value of the Equity Interests of such Subsidiary not sold or disposed of in an amount determined as provided in the final paragraph of Section 4.07 hereof. A provision in an agreement relating to the purchase or sale of any of the Issuers' or their respective Restricted Subsidiaries' assets containing an "earn-out" or providing for an adjustment to the purchase or sale price based on a financial statement relating to the assets purchased or sold shall not be deemed to be an "Investment."

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in the City of New York or, at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment may be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction).

"*Liquidated Damages*" means all liquidated damages then owing pursuant to Section 5 of the Registration Rights Agreement.

"*Management Services Agreement*" means that management services agreement, by and between Foamex and Trace Foam Company, Inc. as in effect on the date of this Indenture.

"*Managing General Partner*" means FMXI, Inc., a Delaware corporation and its successors.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends, excluding, however, (i) any gain (or loss in the case of (a)), together with any related provision for taxes (including pursuant to the Tax Sharing Agreement) on such gain (or loss in the case of (a)), realized in connection with (a) any Asset Sale (including, without limitation, dispositions pursuant to sale and leaseback transactions and losses) or (b) the disposition of any securities other than Cash Equivalents by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries and (ii) any extraordinary or nonrecurring gain (or loss), together with any related provision for taxes on such extraordinary or nonrecurring gain (or loss), excluding charges related to hyper-inflationary accounting pursuant to FASB 52 and interpretations by the Commission thereof.

"*Net Proceeds*" means the aggregate cash proceeds received by the Issuers or any of their respective Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees, consent fees to facilitate such Asset Sale and sales commissions) and any

F015

relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP.

"*New Credit Facility*" means that certain New Credit Facility, to be entered into, by and among the Issuers and The Bank of Nova Scotia and Citicorp USA, Inc., as Credit Agents, providing for up to $480.0 million of borrowings, including any related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, and in each case as amended, modified, renewed, refunded, replaced or refinanced from time to time, and after the Credit Agent has acknowledged in writing that the New Credit Facility has been terminated and all then outstanding Indebtedness and obligations thereunder with respect thereto have been repaid in full in cash and discharged, any successors to or replacements of such New Credit Facility (as designated by the Board of Directors as evidenced by a resolution), as such successors or replacements may be amended, modified, renewed, refunded, replaced or refinanced from time to time.

"*Non-Recourse Debt*" means Indebtedness (i) as to which neither of the Issuers nor any of their respective Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness); (b) is directly or indirectly liable (as a guarantor or otherwise), or (c) constitutes the lender; (ii) no default which (including any rights that the holders thereof may have to take enforcement action against an Unrestricted Subsidiary) would permit (upon notice, lapse of time or both) any holder of any other Indebtedness of either of the Issuers or any of their respective Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity; and (iii) as to which the lenders, except for lenders under instruments governing Acquired Debt (a) have acknowledged that they do not have recourse to the holder of the Equity Interest of the debtor or (b) have been notified in writing that they will not have any recourse to the stock or assets of either of the Issuers or any of their respective Restricted Subsidiaries.

"*Note Custodian*" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"*Obligations*" means any principal, interest, penalties, expenses, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Offering*" means the issuance and sale of the Notes by the Issuers.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

"*Officers' Certificate*" means a certificate signed on behalf of the Issuers by two Officers of the Issuers, one of whom must be the principal executive officer, the principal financial officer or the principal accounting officer of the Issuers, that meets the requirements of Section 13.05 hereof.

F016

"*Opinion of Counsel*" means an opinion from legal counsel, who is reasonably acceptable to the Trustee, that meets the requirements of Section 13.05 hereof. The counsel may be an employee of or counsel to the Issuers, any Subsidiary of the Issuers or the Trustee.

"*Pari Passu Debt*" means any Indebtedness of the Issuers or any of their Restricted Subsidiaries which, by its terms is *pari passu* in right of payment to the Senior Subordinated Notes.

"*payment in full*" (together with any correlative phrases *e.g.*, "*paid in full*" and "*pay in full*") means (i) with respect to any Senior Debt other than Senior Debt under or in respect of the New Credit Facility, payment in full thereof or due provision for payment thereof (x) in accordance with the terms of the agreement or instrument pursuant to which such Senior Debt was issued or is governed or, (y) otherwise to the reasonable satisfaction of the holders of such Senior Debt, which shall include, in any Insolvency or Liquidation Proceeding, approval by such holders, individually or as a class, of the provision for payment thereof, and (ii) with respect to Senior Debt under or in respect of the New Credit Facility, payment in full thereof in cash or Cash Equivalents.

"*Permitted Business*" means (i) the manufacture and distribution of polyurethane and advanced polymer foam and activities related thereto, and (ii) other businesses engaged in by the Issuers and their respective Restricted Subsidiaries on the date of this Indenture; and similar lines of businesses to those engaged in by the Issuers on the date of this Indenture, including, but not limited to, the manufacture and distribution of plastics and related products.

"*Permitted Investments*" means (a) any Investment in either of the Issuers or in a Wholly Owned Restricted Subsidiary of either of the Issuers and that is engaged in a Permitted Business; (b) any Investment in Cash Equivalents; (c) any Investment by either of the Issuers or any Restricted Subsidiary of either of the Issuers in a Person, if as a result of such Investment (i) such Person becomes a Wholly Owned Restricted Subsidiary of the Issuers or such Restricted Subsidiary is engaged in a Permitted Business or (ii) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, either of the Issuers or a Restricted Subsidiary of either of the Issuers that is engaged in a Permitted Business; (d) any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made in compliance with Section 4.10 hereof; (e) any Investment to the extent made in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Issuers or a Subsidiary Guarantor; (f) other Investments in any Person having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (f) that are at the time outstanding, not to exceed the sum of (A) $15.0 million, and (B) the aggregate net cash proceeds (or non-cash proceeds when converted into cash) received by Foamex and its Restricted Subsidiaries from the sale or disposition of investments existing as of the date of this Indenture or made pursuant to this clause (f); (g) securities received in connection with any good faith settlement or Insolvency or Liquidation Proceeding; (h) Hedging Obligations entered into in the ordinary course of business in connection with the operation of the business of the Issuers and their Restricted Subsidiaries or as required by any Indebtedness issued in compliance with this Indenture; (i) prepaid expenses and loans or advances to employees and similar items in the ordinary course of business; (j) endorsements of negotiable instruments and other similar negotiable documents; (k) transactions with Affiliates as permitted under this Indenture; (l) Investments outstanding as of the date of this Indenture, (m) Investments of up to $5.0 million in Trace Global Opportunities Fund, (n) loans or advances of up to $5.0 million in Trace Holdings, and (o) Investments in, including Contributions to, Foamex Latin

11

America, Foamex Asia or one or more Foreign Subsidiaries, *provided* that the maximum amount of such Investments outstanding at any one time does not exceed $50.0 million, plus the cash dividends and distributions received by the Issuer and its Restricted Subsidiaries with respect to Investments pursuant to this clause (o).

"*Permitted Liens*" means (i) Liens securing Indebtedness under the New Credit Facility; (ii) Liens in favor of either of the Issuers or any Subsidiary Guarantor; (iii) Liens on property of a Person existing at the time such Person is merged into or consolidated with the Issuers or any Subsidiary of either of the Issuers; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with either of the Issuers; (iv) Liens on property existing at the time of acquisition thereof by the Issuers or any Subsidiary of the Issuers, *provided* that such Liens were in existence prior to the contemplation of such acquisition; (v) Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business; (vi) Liens to secure Indebtedness (including Capital Lease Obligations) permitted by clause (v) of Section 4.09 hereof covering only the assets acquired with such Indebtedness; (vii) Liens existing on the date of this Indenture; (viii) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded, *provided* that any reserve or other appropriate provision as shall be required in conformity with GAAP shall have been made therefor; (ix) Liens on assets of Unrestricted Subsidiaries that secure Non-Recourse Debt of Unrestricted Subsidiaries; (x) Liens incurred in the ordinary course of business including, without limitation, judgment and attachment liens, of the Issuers or any Subsidiary of the Issuers with respect to obligations that do not exceed $25.0 million at any one time outstanding and that are not incurred in connection with the borrowing of money or the obtaining of advances or credit (other than trade credit) in the ordinary course of business); (xi) Liens in favor of the Trustee; (xii) Liens on Receivables in connection with Receivables Transaction; (xiii) Liens incurred in connection with Permitted Refinancing Indebtedness, but only if such Liens extend to no more assets than the Liens securing the Indebtedness being refinanced; (xiv) Liens securing Senior Debt; (xv) Liens for taxes, assessments, governmental charges or claims which are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor; (xvi) statutory Liens of landlords and carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's, or other like Liens (including contractual landlords liens) arising in the ordinary course of business and with respect to amounts not yet delinquent or being contested in good faith by appropriate proceedings, if a reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor; (xvii) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (xviii) Liens incurred or deposits made to secure the performance of tenders, bids, leases, statutory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a like nature incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money); (xix) Liens to secure Indebtedness of any Restricted Subsidiary, that is a Foreign Subsidiary *provided* that such Indebtedness is used by such Restricted Subsidiary to finance operations of such Foreign Subsidiary outside the United States and Canada; (xx) easements, rights-of-way, restrictions, minor defects or irregularities in title and other similar charges or encumbrances not interfering in any material respect with the business of Foamex or any of its Subsidiaries; and (xxi) Liens arising from filing Uniform Commercial Code financing statements regarding leases (other than true leases and true consignments).

12

"*Permitted Refinancing Indebtedness*" means any Indebtedness of the Issuers or any of their respective Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Issuers or any of their respective Restricted Subsidiaries; *provided* that: (i) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount of (or accreted value, if applicable), plus prepayment premium and accrued interest on, the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus the amount of reasonable expenses incurred in connection therewith); (ii) such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded; (iii) if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Senior Subordinated Notes, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Senior Subordinated Notes on terms at least as favorable to the Holders of Senior Subordinated Notes as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded; and (iv) such Indebtedness is incurred either by one of the Issuers or by the Restricted Subsidiary which is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Post-Petition Interest*" means all interest and expenses accrued or accruing after the commencement of any Insolvency or Liquidation Proceeding in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Senior Debt, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"*Principals*" means Trace International Holdings, Inc. and Marshall S. Cogan.

"*Public Equity Offering*" means a public offering of Equity Interests (other than Disqualified Stock) of (i) Foamex or FCC; or (ii) Foamex International, Inc. to the extent the net proceeds thereof are contributed to one of the Issuers as a capital contribution, that, in each case, results in the net proceeds to either of the Issuers of at least $25.0 million.

"*Receivables*" means, with respect to any Person or entity, all of the following property and interests in property of such Person or entity, whether now existing or existing in the future or hereafter acquired or arising: (i) accounts, (ii) accounts receivable incurred in the ordinary course of business, including without limitation, all rights to payment created by or arising from sales of goods, leases of goods or the rendition of services no matter how evidenced, whether or not earned by performance, (iii) all rights to any goods or merchandise represented by any of the foregoing after creation of the foregoing, including, without limitation, returned or repossessed goods, (iv) all reserves and credit balances with respect to any such accounts receivable or account debtors, (v) all letters of credit, security, or guarantees for any of the foregoing, (vi) all insurance policies or reports relating to any of the foregoing, (vii) all collection or deposit accounts relating to any of the foregoing, (viii) all proceeds of the foregoing and (ix) all books and records relating to any of the foregoing.

13

"*Receivables Subsidiary*" means an Unrestricted Subsidiary exclusively engaged in Receivables Transactions and activities related thereto; *provided, however,* that at no time shall the Issuers and their respective Subsidiaries have more than one Receivables Subsidiary.

"*Receivables Transaction*" means (i) the sale or other disposition to a third party of Receivables or an interest therein, or (ii) the sale or other disposition of Receivables or an interest therein to a Receivables Subsidiary followed by a financing transaction in connection with such sale or disposition of such Receivables (whether such financing transaction is effected by such Receivables Subsidiary or by a third party to whom such Receivables Subsidiary sells such Receivables or interests therein); *provided* that in each of the foregoing, the Issuers or their Restricted Subsidiaries receive at least 80% of the aggregate principal amount of any Receivables financed in such transaction.

"*Registration Rights Agreement*" means the Registration Rights Agreement, dated as of June 12, 1997, by and among the Issuers, the Subsidiary Guarantors and the Initial Purchasers, as such agreement may be amended, modified or supplemented from time to time.

"*Related Party*" with respect to any Principal means (A) any controlling stockholder, 80% (or more) owned Subsidiary, or spouse or immediate family member (in the case of an individual) of such Principal or (B) any trust, corporation, partnership or other entity, the beneficiaries, the stockholders, partners, owners or Persons beneficially holding an 80% or more controlling interest of which consist of such Principal and/or such other Persons referred to in the immediately preceding clause (A) and this clause (B).

"*Reorganization Securities*" means securities distributed to the Holders of the Senior Subordinated Notes in an Insolvency or Liquidation Proceeding pursuant to a plan of reorganization, consented to by each class of the Senior Debt, but only if all of the terms and conditions of such securities (including, without limitation, term, tenor, interest, amortization, subordination, standstills, covenants and defaults), are at least as favorable (and provide the same relative benefits) to the holders of Senior Debt and to the holders of any security distributed in such Insolvency or Liquidation Proceeding on account of any such Senior Debt as the terms and conditions of the Senior Subordinated Notes and this Indenture are, and provide to the holders of Senior Debt.

"*Representative*" means the trustee, agent or representative for any Senior Debt.

"*Responsible Officer,*" when used with respect to the Trustee, means any officer within the corporate trust department of the Trustee (or any successor group of the Trustee) or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers, and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"*Securities Act*" means the Securities Act of 1933, as amended.

14

"*Senior Debt*" means all Indebtedness and other Obligations specified below payable directly or indirectly by either of the Issuers or any of their respective Restricted Subsidiaries, whether outstanding on the date of this Indenture or thereafter created, incurred or assumed by either of the Issuers or any of their respective Restricted Subsidiaries: (i) the principal of, interest on and all other Obligations related to the New Credit Facility (including without limitation all loans, letters of credit and other extensions of credit under the New Credit Facility, and all expenses, fees, reimbursements, indemnities and other amounts owing pursuant to the New Credit Facility); (ii) amounts payable in respect of any Hedging Obligations; (iii) all Indebtedness not prohibited by Section 4.09 hereof that is not expressly *pari passu* with or subordinated to the Senior Subordinated Notes, and (iv) all permitted renewals, extensions, refundings or refinancings thereof. All Post-Petition Interest on Senior Debt shall constitute Senior Debt. Notwithstanding anything to the contrary in the foregoing, Senior Debt will not include (i) Indebtedness of either of the Issuers or any of their respective Restricted Subsidiaries to any other Restricted Subsidiaries which is not a Subsidiary Guarantor, (ii) Indebtedness of FCC to Foamex, (iii) any Indebtedness which by the express terms of the agreement or instrument creating, evidencing or governing the same is junior or subordinate in right of payment to any item of Senior Debt, (iv) any trade payable arising from the purchase of goods or materials or for services obtained in the ordinary course of business, or (v) Indebtedness incurred in violation of this Indenture. To the extent any payment of Senior Debt (whether by or on behalf of the Issuers or any of their respective Restricted Subsidiaries, as proceeds or security or enforcement of any right of setoff or otherwise) is declared to be fraudulent or preferential, set aside, or required to be paid to a trustee, receiver or other similar party under any bankruptcy, insolvency, receivership or similar law, then if such payment is recovered by or paid over to, such trustee, receiver or other similar party, the Senior Debt or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred. All Senior Debt shall be and remain Senior Debt for all purposes of this Indenture, whether or not subordinated in a bankruptcy, receivership, insolvency or similar proceeding.

"*Significant Subsidiary*" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the date of this Indenture.

"*Stated Maturity*" means, with respect to any installment of interest, accreted value or principal on any series of Indebtedness, the date on which such payment of interest or principal is due or is scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest, accreted value or principal prior to the date originally scheduled for the payment or accretion thereof.

"*Subsidiary*" means, with respect to any Person, (i) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof) and (ii) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or of one or more Subsidiaries of such Person (or any combination thereof).

15

"*Subsidiary Guarantors*" means General Felt Industries, Inc., Foamex Fibers, Inc. and those Restricted Subsidiaries required to execute a Note Guarantee pursuant to Section 4.20 and any other Subsidiary that executes a Note Guarantee.

"*Tax Sharing Agreement*" means the tax sharing agreement, as of the date of this Indenture, among Foamex, Trace Foam Company, Inc., FMXI, Inc. and Foamex International Inc. as in effect on the date of this Indenture.

"*TIA*" means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb) as in effect on the date on which this Indenture is qualified under the TIA, except as provided in Section 9.03 hereof.

"*Trace Note*" means the promissory note of Trace International Holdings, Inc. dated July 7, 1996 payable to Foamex, as amended and restated as part of the Closing Date Transactions.

"*Transfer Restricted Securities*" means securities that bear or are required to bear the legend set forth in Section 2.06 hereof.

"*Trustee*" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"*United States Government Obligations*" means direct obligations of the United States of America, or any agency or instrumentality thereof the payment of which the full faith and credit of the United States of America is pledged.

"*Unrestricted Subsidiary*" means (i) any Subsidiary that is designated by the Board of Directors of either Issuer as an Unrestricted Subsidiary pursuant to a Board Resolution; but only to the extent that such Subsidiary: (a) has no Indebtedness other than Non-Recourse Debt; (b) on the date of such designation is not party to any agreement, contract, arrangement or understanding with either of the Issuers or any Restricted Subsidiary of either of the Issuers unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to such Issuer or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of such Issuer; (c) is a Person with respect to which neither of the Issuers nor any of their respective Restricted Subsidiaries has any direct or indirect obligation (x) to subscribe for additional Equity Interests or (y) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; (d) has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of either of the Issuers or any of their respective Restricted Subsidiaries; and (e) has at least one director on its board of directors that is not a director or executive officer of either of the Issuers or any of their respective Restricted Subsidiaries and has at least one executive officer that is not a director or executive officer of either of the Issuers or any of their respective Restricted Subsidiaries. Any such designation by the Board of Directors of either Issuer shall be evidenced to the Trustee by filing with the Trustee a certified copy of the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the foregoing conditions and was permitted by Section 4.07 hereof. If, at any time, any Unrestricted Subsidiary would fail to meet the foregoing requirements as an Unrestricted Subsidiary, it shall thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary shall be deemed to be incurred by a Restricted Subsidiary of such Issuer as of such date (and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.09 hereof, the Issuers shall be in default of such

16

F022

covenant). The Board of Directors of either of the Issuers may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that such designation shall be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of such Issuer of any outstanding Indebtedness of such Unrestricted Subsidiary and such designation shall only be permitted if (i) such Indebtedness is permitted under Section 4.09, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period, and (ii) no Default or Event of Default would be in existence following such designation.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment, by (ii) the then outstanding principal amount of such Indebtedness.

"*Wholly Owned Restricted Subsidiary*" of any Person means a Restricted Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Restricted Subsidiaries of such Person and one or more Wholly Owned Restricted Subsidiaries of such Person.

SECTION 1.02:    OTHER DEFINITIONS.

| Term | Defined in Section |
|---|---|
| "Affiliate Transaction" | 4.11 |
| "Asset Sale Offer" | 3.09 |
| "Change of Control Offer" | 4.15 |
| "Change of Control Payment" | 4.15 |
| "Change of Control Payment Date" | 4.15 |
| "DTC" | 2.03 |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.10 |
| "incur" | 4.09 |
| "Offer Amount" | 3.09 |
| "Offer Period" | 3.09 |
| "Paying Agent" | 2.03 |
| "Payment Default" | 6.01 |
| "Permitted Consideration" | 4.10 |
| "Permitted Debt" | 4.09 |
| "Purchase Date" | 3.09 |
| "Purchase Offer" | 3.09 |
| "Registrar" | 2.03 |
| "Restricted Payments" | 4.07 |

17

F023

SECTION 1.03.    INCORPORATION BY REFERENCE OF TRUST INDENTURE ACT.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"*indenture securities*" means the Notes;

"*indenture security Holder*" means a Holder of a Note;

"*indenture to be qualified*" means this Indenture;

"*indenture trustee*" or "*institutional trustee*" means the Trustee;

"*obligor*" on the Notes means each Issuer and Subsidiary Guarantor and any successor obligor upon the Notes.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings so assigned to them.

SECTION 1.04.    RULES OF CONSTRUCTION.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and in the plural include the singular;

(5)    provisions apply to successive events and transactions; and

(6)    references to sections of or rules under the Securities Act shall be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

18

# ARTICLE 2
## THE NOTES

SECTION 2.01.    FORM AND DATING.

The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note shall be dated the date of its authentication. The Notes shall be in denominations of $1,000 and integral multiples thereof.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Issuers, the Subsidiary Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

Notes issued in global form shall be substantially in the form of Exhibit A attached hereto (including the text referred to in footnotes 1 and 2 thereto). Notes issued in definitive form shall be substantially in the form of Exhibit A attached hereto (but without including the text referred to in footnotes 1 and 2 thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it shall represent the aggregate amount of outstanding Notes from time to time endorsed thereon and that the aggregate amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Note Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

SECTION 2.02.    EXECUTION AND AUTHENTICATION.

An executive Officer shall sign the Notes for each of the Issuers by manual or facsimile signature. If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be valid until authenticated by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee shall, upon a written order of each Issuer signed by an executive Officer thereof, authenticate Notes for original issue up to the aggregate principal amount stated in paragraph 4 of the Notes. The aggregate principal amount of Notes outstanding at any time may not exceed such amount except as provided in Section 2.07 hereof.

The Trustee may appoint an authenticating agent acceptable to the Issuers to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Issuers or an Affiliate of the Issuers.

19

### SECTION 2.03:   REGISTRAR AND PAYING AGENT.

The Issuers shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuers may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Issuers may change any Paying Agent or Registrar without notice to any Holder. The Issuers shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Issuers fail to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Issuers or any of their Subsidiaries may act as Paying Agent or Registrar.

The Issuers initially appoint The Depository Trust Company ("*DTC*") to act as Depository with respect to the Global Notes.

The Issuers initially appoint the Trustee to act as the Registrar and Paying Agent and to act as Note Custodian with respect to the Global Notes.

### SECTION 2.04.   PAYING AGENT TO HOLD MONEY IN TRUST.

The Issuers shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium or Liquidated Damages, if any, or interest on the Notes, and shall notify the Trustee of any default by the Issuers in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Issuers at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Issuers or a Subsidiary) shall have no further liability for the money. If the Issuers or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuers, the Trustee shall serve as Paying Agent for the Notes.

### SECTION 2.05.   HOLDER LISTS.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Issuers and/or the Subsidiary Guarantors shall furnish to the Trustee at least seven Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Issuers and the Subsidiary Guarantors shall otherwise comply with TIA § 312(a).

### SECTION 2.06.   TRANSFER AND EXCHANGE.

(a)   *Transfer and Exchange of Definitive Notes*. When Definitive Notes are presented by a Holder to the Registrar with a request:

F026

(x)   to register the transfer of the Definitive Notes; or

(y)   to exchange such Definitive Notes for an equal principal amount of Definitive Notes of other authorized denominations,

the Registrar shall register the transfer or make the exchange as requested if its requirements for such transactions are met; *provided, however,* that the Definitive Notes presented or surrendered for register of transfer or exchange:

(i)   shall be duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by his attorney, duly authorized in writing; and

(ii)  in the case of a Definitive Note that is a Transfer Restricted Security, such request shall be accompanied by the following additional information and documents, as applicable:

(A)  if such Transfer Restricted Security is being delivered to the Registrar by a Holder for registration in the name of such Holder, without transfer, a certification to that effect from such Holder (in substantially the form of Exhibit B hereto); or

(B)  if such Transfer Restricted Security is being transferred to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) in accordance with Rule 144A under the Securities Act or pursuant to an exemption from registration in accordance with Rule 144 or Rule 904 under the Securities Act or pursuant to an effective registration statement under the Securities Act, a certification to that effect from such Holder (in substantially the form of Exhibit B hereto); or

(C)  if such Transfer Restricted Security is being transferred in reliance on another exemption from the registration requirements of the Securities Act, a certification to that effect from such Holder (in substantially the form of Exhibit B hereto) and an Opinion of Counsel from such Holder or the transferee reasonably acceptable to the Issuers and to the Registrar to the effect that such transfer is in compliance with the Securities Act.

(b)   *Transfer of a Definitive Note for a Beneficial Interest in a Global Note.* A Definitive Note may not be exchanged for a beneficial interest in a Global Note except upon satisfaction of the requirements set forth below. Upon receipt by the Trustee of a Definitive Note, duly endorsed or accompanied by appropriate instruments of transfer, in form satisfactory to the Trustee, together with:

(i)   if such Definitive Note is a Transfer Restricted Security, a certification from the Holder thereof (in substantially the form of Exhibit B hereto) to the effect that such Definitive Note is being transferred by such Holder to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) in accordance with Rule 144A under the Securities Act; and

21

(ii) whether or not such Definitive Note is a Transfer Restricted Security, written instructions from the Holder thereof directing the Trustee to make, or to direct the Note Custodian to make, an endorsement on the Global Note to reflect an increase in the aggregate principal amount of the Notes represented by the Global Note,

in which case the Trustee shall cancel such Definitive Note in accordance with Section 2.11 hereof and cause, or direct the Note Custodian to cause, in accordance with the standing instructions and procedures existing between the Depository and the Note Custodian, the aggregate principal amount of Notes represented by the Global Note to be increased accordingly. If no Global Notes are then outstanding, the Issuers shall issue and, upon receipt of an authentication order in accordance with Section 2.02 hereof, the Trustee shall authenticate a new Global Note in the appropriate principal amount.

(c) *Transfer and Exchange of Global Notes*.  The transfer and exchange of Global Notes or beneficial interests therein shall be effected through the Depository, in accordance with this Indenture and the procedures of the Depository therefor, which shall include restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act.

(d) *Transfer of a Beneficial Interest in a Global Note for a Definitive Note*.

(i) Any Person having a beneficial interest in a Global Note may upon request exchange such beneficial interest for a Definitive Note. Upon receipt by the Trustee of written instructions or such other form of instructions as is customary for the Depository, from the Depository or its nominee on behalf of any Person having a beneficial interest in a Global Note, and, in the case of a Transfer Restricted Security, the following additional information and documents (all of which may be submitted by facsimile):

(A) if such beneficial interest is being transferred to the Person designated by the Depository as being the beneficial owner, a certification to that effect from such Person (in substantially the form of Exhibit B hereto); or

(B) if such beneficial interest is being transferred to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) in accordance with Rule 144A under the Securities Act or pursuant to an exemption from registration in accordance with Rule 144 or Rule 904 under the Securities Act or pursuant to an effective registration statement under the Securities Act, a certification to that effect from the transferor (in substantially the form of Exhibit B hereto); or

(C) if such beneficial interest is being transferred in reliance on another exemption from the registration requirements of the Securities Act, a certification to that effect from the transferor (in substantially the form of Exhibit B hereto) and an Opinion of Counsel from the transferee or transferor reasonably acceptable to the Issuers and to the Registrar to the effect that such transfer is in compliance with the Securities Act,

in which case the Trustee or the Note Custodian, at the direction of the Trustee, shall, in accordance with the standing instructions and procedures existing between the

22

Depository and the Note Custodian, cause the aggregate principal amount of Global Notes to be reduced accordingly and, following such reduction, the Issuers shall execute and, upon receipt of an authentication order in accordance with Section 2.02 hereof, the Trustee shall authenticate and make available for delivery to the transferee a Definitive Note in the appropriate principal amount.

(ii)     Definitive Notes issued in exchange for a beneficial interest in a Global Note pursuant to this Section 2.06(d) shall be registered in such names and in such authorized denominations as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee. The Trustee shall make such Definitive Notes available for delivery to the Persons in whose names such Notes are so registered.

(e)     *Restrictions on Transfer and Exchange of Global Notes*. Notwithstanding any other provision of this Indenture (other than the provisions set forth in subsection (f) of this Section 2.06), a Global Note may not be transferred as a whole except by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

(f)     *Authentication of Definitive Notes in Absence of Depository*. If at any time:

(i)     the Depository for the Notes notifies the Issuers that the Depository is unwilling or unable to continue as Depository for the Global Notes and a successor Depository for the Global Notes is not appointed by the Issuers within 90 days after delivery of such notice; or

(ii)     the Issuers, at its sole discretion, notifies the Trustee in writing that it elects to cause the issuance of Definitive Notes under this Indenture,

then the Issuers shall execute, and the Trustee shall, upon receipt of an authentication order in accordance with Section 2.02 hereof, authenticate and make available for delivery, Definitive Notes in an aggregate principal amount equal to the principal amount of the Global Notes in exchange for such Global Notes.

(g)     *Legends*.

(i)     Except as permitted by the following paragraphs (ii) and (iii), each Note certificate evidencing Global Notes and Definitive Notes (and all Notes issued in exchange therefor or substitution thereof) shall bear legends in substantially the following form:

"THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

23

THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUERS THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1) (a) INSIDE THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (b) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (c) OUTSIDE THE UNITED STATES TO A FOREIGN PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 904 UNDER THE SECURITIES ACT, (d) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a)(1), (2), (3) OR (7) OF THE SECURITIES ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR") THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF SECURITIES LESS THAN $100,000, AN OPINION OF COUNSEL THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT OR (e) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF THE ISSUERS SO REQUEST), (2) TO THE ISSUERS OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION; AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN (1) ABOVE."

(ii)  Upon any sale or transfer of a Transfer Restricted Security (including any Transfer Restricted Security represented by a Global Note) pursuant to Rule 144 under the Securities Act or pursuant to an effective registration statement under the Securities Act:

(A)  in the case of any Transfer Restricted Security that is a Definitive Note, the Registrar shall permit the Holder thereof to exchange such Transfer Restricted Security for a Definitive Note that does not bear the legend set forth in (g)(i) above and rescind any restriction on the transfer of such Transfer Restricted Security; and

(B)  in the case of any Transfer Restricted Security represented by a Global Note, such Transfer Restricted Security shall not be required to bear the legend set forth in (g)(i) above, but shall continue to be subject to the provisions of Section 2.06(c) hereof; provided, however, that with respect to any request for an exchange of a Transfer Restricted Security that is represented by a Global Note for a Definitive Note that does not bear the legend set forth in (g)(i) above, which request is made in reliance upon Rule 144, the Holder thereof shall certify in writing to the Registrar that such request is being made pursuant to Rule 144 (such certification to be substantially in the form of Exhibit B hereto).

24

(iii) Notwithstanding the foregoing, upon consummation of the Exchange Offer, the Issuers shall issue and, upon receipt of an authentication order in accordance with Section 2.02 hereof, the Trustee shall authenticate New Senior Subordinated Notes in exchange for Senior Subordinated Notes accepted for exchange in the Exchange Offer, which New Senior Subordinated Notes shall not bear the legend set forth in (g)(i) above, and the Registrar shall rescind any restriction on the transfer of such Notes, in each case unless the Holder of such Senior Subordinated Notes is either (A) a broker-dealer, (B) a Person participating in the distribution of the Senior Subordinated Notes or (C) a Person who is an affiliate (as defined in Rule 144A) of the Issuers.

(h) *Cancellation and/or Adjustment of Global Notes.* At such time as all beneficial interests in Global Notes have been exchanged for Definitive Notes, redeemed, repurchased or cancelled, all Global Notes shall be returned to or retained and cancelled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for Definitive Notes, redeemed, repurchased or cancelled, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note, by the Trustee or the Notes Custodian, at the direction of the Trustee, to reflect such reduction.

(i) *General Provisions Relating to Transfers and Exchanges.*

(a) To permit registrations of transfers and exchanges, the Issuers shall execute and the Trustee shall authenticate Definitive Notes and Global Notes at the Registrar's request.

(b) No service charge shall be made to a Holder for any registration of transfer or exchange, but the Issuers may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer solely pursuant to Sections 3.07, 4.10, 4.15 and 9.05 hereto).

(c) The Registrar shall not be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(d) All Definitive Notes and Global Notes issued upon any registration of transfer or exchange of Definitive Notes or Global Notes shall be the valid obligations of the Issuers, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Definitive Notes or Global Notes surrendered upon such registration of transfer or exchange.

(e) The Issuers shall not be required:

(A) to issue, to register the transfer of or to exchange Notes during a period beginning at the opening of business 15 days before the day of mailing of a notice of redemption of Notes under Section 3.02 hereof and ending at the close of business on the day of such mailing; or

25

F031

(B) to register the transfer of or to exchange any Note so selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C) to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

(f) Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuers may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes, and neither the Trustee, any Agent nor the Issuers shall be affected by notice to the contrary.

(g) The Trustee shall authenticate Definitive Notes and Global Notes in accordance with the provisions of Section 2.02 hereof.

Each Holder of a Note agrees to indemnify the Issuers and the Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Note in violation of any provision of this Indenture and/or applicable United States federal or state securities law.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depository Participants or beneficial owners of interests in any Global Security) other than to require delivery of such certificates and other documentation or evidence as are expressly required by and to do so when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.07.   REPLACEMENT NOTES.

If any mutilated Note is surrendered to the Trustee, or the Issuers and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Issuers shall issue and the Trustee, upon the written order of the Issuers signed by an Officer of each Issuer, shall authenticate a replacement Note if the Trustee's requirements are met. An indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Issuers to protect the Issuers, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced. The Issuers may charge for their expenses in replacing a Note.

Every replacement Note is an additional obligation of the Issuers and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

SECTION 2.08.   OUTSTANDING NOTES.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those cancelled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding

26

because any Issuer or Subsidiary Guarantor or an Affiliate of any Issuer or Subsidiary Guarantor holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a bona fide purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuers, a Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

SECTION 2.09.    TREASURY NOTES.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by any Issuer or Subsidiary Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with, any Issuer or Subsidiary Guarantor, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned shall be so disregarded.

SECTION 2.10.    TEMPORARY NOTES.

Until Definitive Notes are ready for delivery, the Issuers may prepare and the Trustee shall authenticate temporary Notes upon a written order of the Issuers signed by an Officer of each Issuer. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuers consider appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuers shall prepare and the Trustee shall authenticate Definitive Notes in exchange for temporary Notes.

Holders of temporary Notes shall be entitled to all of the benefits of this Indenture.

SECTION 2.11.    CANCELLATION.

The Issuers at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall return cancelled Notes to one of the Issuers. The Issuers may not issue new Notes to replace Notes that they have paid or that have been delivered to the Trustee for cancellation.

SECTION 2.12.    DEFAULTED INTEREST.

If the Issuers or the Subsidiary Guarantors default in a payment of interest on the Notes, they shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the

F033

defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof. The Issuers shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Issuers shall fix or cause to be fixed each such special record date and payment date, *provided* that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Issuers (or, upon the written request of the Issuers, the Trustee in the name and at the expense of the Issuers) shall mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

### SECTION 2.13    *CUSIP NUMBERS.*

The Issuers in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be effected by any defect in or omission of such numbers. The Issuers will promptly notify the Trustee of any change in the "CUSIP" numbers.

### ARTICLE 3
### REDEMPTION AND PREPAYMENT

### SECTION 3.01.    *NOTICES TO TRUSTEE.*

If the Issuers elect to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof, the Issuers shall furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officers' Certificate setting forth (i) the clause of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price.

### SECTION 3.02.    *SELECTION OF NOTES TO BE REDEEMED.*

If less than all of the Notes are to be redeemed at any time, selection of Notes for redemption will be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which the Notes are listed, or, if the Notes are not so listed, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate; *provided* that no Notes of $1,000 or less shall be redeemed in part. Notices of redemption shall be mailed by first class mail at least 30 but not more than 60 days before the redemption date to each Holder of Notes to be redeemed at its registered address. If any Note is to be redeemed in part only, the notice of redemption that relates to such Note shall state the portion of the principal amount thereof to be redeemed. A new Note in principal amount equal to the unredeemed portion thereof will be issued in the name of the Holder thereof upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption.

28

The Trustee shall promptly notify the Issuers in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof to be redeemed. Notes and portions of Notes selected shall be in amounts of $1,000 or whole multiples of $1,000, except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

SECTION 3.03.     NOTICE OF REDEMPTION.

Subject to the provisions of Section 3.09 hereof, at least 30 days but not more than 60 days before a redemption date, the Issuers shall mail or cause to be mailed, by first class mail, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address.

The notice shall identify the Notes to be redeemed (including CUSIP numbers) and shall state:

(a)   the redemption date;

(b)   the redemption price;

(c)   if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes, in principal amount equal to the unredeemed portion shall be issued upon cancellation of the original Note;

(d)   the name and address of the Paying Agent;

(e)   that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)   that, unless the Issuers default in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(g)   the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(h)   that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Issuers' request, the Trustee shall give the notice of redemption in the Issuers' name and at their expense; *provided, however,* that each Issuer shall have delivered to the Trustee, at least 45 days prior to the redemption date, an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

29

SECTION 3.04.    *EFFECT OF NOTICE OF REDEMPTION.*

Once notice of redemption is mailed in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price.

SECTION 3.05.    *DEPOSIT OF REDEMPTION PRICE.*

On or prior to the redemption date, the Issuers shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of and accrued interest on all Notes to be redeemed on that date. The Trustee or the Paying Agent shall promptly return to the Issuers any money deposited with the Trustee or the Paying Agent by the Issuers in excess of the amounts necessary to pay the redemption price of, and accrued interest on, all Notes to be redeemed.

If the Issuers comply with the provisions of the preceding paragraph, on and after the redemption date, interest shall cease to accrue on the Notes or the portions of Notes called for redemption. If a Note is redeemed on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption shall not be so paid upon surrender for redemption because of the failure of the Issuers to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

SECTION 3.06.    *NOTES REDEEMED IN PART.*

Upon surrender of a Note that is redeemed in part, the Issuers shall issue and, upon the Issuers' written request, the Trustee shall authenticate for the Holder at the expense of the Issuers a new Note equal in principal amount to the unredeemed portion of the Note surrendered.

SECTION 3.07.    *OPTIONAL REDEMPTION.*

(a) The Notes shall not be redeemable at the Issuers' option prior to June 15, 2002. Thereafter, the Notes shall be redeemable at the option of the Issuers, in whole or in part, at any time upon not less than 30 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest and Liquidated Damages, if any, thereon, to the applicable redemption date, if redeemed during the twelve-month period beginning on June 15 of the years indicated below:

| Year | Percentage |
|------|------------|
| 2002 | 104.938% |
| 2003 | 103.292 |
| 2004 | 101.646 |
| 2005 and thereafter | 100.000 |

(b) Notwithstanding the foregoing, at any time prior to June 15, 2000, the Issuers may on any one or more occasions redeem up to 35% of the initially outstanding aggregate principal amount of Notes

30

F036

at a redemption price equal to 109.875% of the principal amount thereof, plus accrued and unpaid interest and Liquidated Damages, if any, thereon to the redemption date, with the cash proceeds of one or more Public Equity Offerings; *provided* that, in each case, at least 65% of the initially outstanding aggregate principal amount of Notes remains outstanding immediately after the occurrence of such redemption; and *provided, further,* that such redemption shall occur within 45 days of the date of the closing of such Public Equity Offering.

(c) Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Section 3.01 through 3.06 hereof.

SECTION 3.08.    MANDATORY REDEMPTION.

Except as set forth under Sections 4.10 and 4.15 hereof, the Issuers shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

SECTION 3.09:    OFFER TO PURCHASE BY APPLICATION OF EXCESS PROCEEDS.

In the event that the Issuers shall be required to commence an offer to all Holders to purchase Notes (a *"Purchase Offer"*) pursuant to Section 4.10 hereof, an *"Asset Sale Offer,"* or pursuant to Section 4.15 hereof, a "Change of Control Offer," the Issuers shall follow the procedures specified below.

The Purchase Offer shall remain open for a period of 20 Business Days following its commencement (the *"Offer Period"*). No later than five Business Days after the termination of the Offer Period (the *"Purchase Date"*), the Issuers shall purchase the principal amount of Notes required to be purchased pursuant to Section 4.10 hereof, in the case of an Asset Sale Offer or 4.15 hereof, in the case of a Change of Control Offer (the *"Offer Amount"*) or, if less than the Offer Amount has been tendered, all Notes tendered in response to the Purchase Offer. Payment for any Notes so purchased shall be made in the same manner as interest payments are made.

If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest shall be paid to the Person in whose name a Note is registered at the close of business on such record date, and no additional interest shall be payable to Holders who tender Notes pursuant to the Purchase Offer.

Upon the commencement of a Purchase Offer, the Issuers shall send, by first class mail, a notice to the Trustee and each of the Holders, with a copy to the Trustee. The notice shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Purchase Offer. The Purchase Offer shall be made to all Holders. The notice, which shall govern the terms of the Purchase Offer, shall state:

(a) that the Purchase Offer is being made pursuant to this Section 3.09 and Section 4.10 or 4.15 hereof, as applicable, and the length of time the Purchase Offer shall remain open;

(b) the Offer Amount, the purchase price and the Purchase Date;

(c) that any Note not tendered or accepted for payment shall continue to accrue interest;

31

(d)  that, unless the Issuers default in making such payment, any Note accepted for payment pursuant to the Purchase Offer shall cease to accrue interest and Liquidated Damages, if any, after the Purchase Date;

(e)  that Holders electing to have a Note purchased pursuant to a Purchase Offer may only elect to have all of such Note purchased and may not elect to have only a portion of such Note purchased;

(f)  that Holders electing to have a Note purchased pursuant to any Purchase Offer shall be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note duly completed, or transfer by book-entry transfer, to the Issuers, a depository, if appointed by the Issuers, or a Paying Agent at the address specified in the notice prior to the expiration of the Offer Period;

(g)  that Holders shall be entitled to withdraw their election if the Issuers, the depository or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase, the certificate number (in the case of a Definitive Note) and a statement that such Holder is withdrawing his election to have such Note purchased;

(h)  that, if the aggregate principal amount of Notes surrendered by Holders exceeds the Offer Amount, the Issuers shall select the Notes to be purchased on a *pro rata* basis (with such adjustments as may be deemed appropriate by the Issuers so that only Notes in denominations of $1,000, or integral multiples thereof, shall be purchased); and

(i)  that Holders whose Notes were purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer).

On or before 10:00 a.m. (New York City time) on each Purchase Date, the Issuers shall irrevocably deposit with the Trustee or Paying Agent in immediately available funds the aggregate purchase price with respect to a principal amount of Notes equal to the Offer Amount (or if less the principal amount of the Notes delivered prior to the expiration of the Offer Period), together with accrued and unpaid interest and Liquidated Damages, if any, thereon, to be held for payment in accordance with the terms of this Section 3.09.  On the Purchase Date, the Issuers shall, to the extent lawful, (i) accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Purchase Offer, or if less than the Offer Amount has been tendered, all Notes tendered, (ii) deliver or cause the Paying Agent or depository, as the case may be, to deliver to the Trustee Notes so accepted and (iii) deliver to the Trustee an Officers' Certificate stating that such Notes or portions thereof were accepted for payment by the Issuers in accordance with the terms of this Section 3.09.  The Issuers, the Depository or the Paying Agent, as the case may be, shall promptly (but in any case not later than three Business Days after the Purchase Date) mail or deliver to each tendering Holder an amount equal to the purchase price of such Notes tendered by such Holder and accepted by the Issuers for purchase, plus any accrued and unpaid interest and Liquidated Damages, if any, thereon, and the Issuers shall promptly issue a new Note, and the Trustee shall authenticate and mail or deliver such new Note, to such Holder, equal in principal amount to any unpurchased portion of such Holder's Notes surrendered.  Any Note not so accepted shall be promptly mailed or delivered by the Issuers to the Holder thereof.  The Issuers shall publicly announce in a newspaper of general circulation or in a press

32

release provided to a nationally recognized financial wire service the results of the Purchase Offer on the Purchase Date.

Other than as specifically provided in this Section 3.09, any purchase pursuant to this Section 3.09 shall be made pursuant to the provisions of Sections 3.02 through 3.06 hereof.

## ARTICLE 4
## COVENANTS

SECTION 4.01.     PAYMENT OF NOTES.

The Issuers shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Issuers or a Subsidiary thereof, holds as of 10:00 a.m. Eastern Time on the due date money deposited by the Issuers in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due. The Issuers shall pay all Liquidated Damages, if any, in the same manner on the dates and in the amounts set forth in the Registration Rights Agreement.

The Issuers shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Liquidated Damages (without regard to any applicable grace period) at the same rate to the extent lawful.

SECTION 4.02.     MAINTENANCE OF OFFICE OR AGENCY.

The Issuers shall maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuers in respect of the Notes and this Indenture may be served. The Issuers shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuers shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Issuers may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Issuers of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New York for such purposes. The Issuers shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Issuers hereby designate the Corporate Trust Office of the Trustee as one such office or agency of the Issuers in accordance with Section 2.03.

F039

SECTION 4.03. *REPORTS.*

Whether or not required by the rules and regulations of the Commission, so long as any Notes are outstanding, the Issuers shall furnish to the Trustee and the Holders of Notes (i) all quarterly and annual financial information that would be required to be contained in a filing with the Commission on Forms 10-Q and 10-K if the Issuers were required to file such Forms, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" that describes the financial condition and results of operations of the Issuers and their consolidated Subsidiaries and, with respect to the annual information only, a report thereon by Foamex's certified independent accountants and (ii) all current reports that would be required to be filed with the Commission on Form 8-K if the Issuers were required to file such reports. In addition, whether or not required by the rules and regulations of the Commission, the Issuers shall file a copy of all such information and reports with the Commission for public availability (unless the Commission will not accept such a filing) and make such information available to securities analysts and prospective investors upon request. In addition, the Issuers have agreed that, for so long as any Notes remain outstanding, they shall furnish to the Holders and to securities analysts and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including each of the Issuers' compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely on Officers' Certificates).

SECTION 4.04. *COMPLIANCE CERTIFICATE.*

(a) Each Issuer shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officers' Certificate which need not comply with Section 13.05, stating that a review of the activities of such Issuer and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether such Issuer has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge such Issuer has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default shall have occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action such Issuer is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action such Issuer is taking or proposes to take with respect thereto.

(b) So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, the year-end financial statements delivered pursuant to Section 4.03(a) above shall be accompanied by a written statement of such Issuer's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that such Issuer has violated any provisions of Article Four or Article Five hereof, insofar as they relate to accounting matters, or, if any such violation has occurred, specifying the nature and period of

34

existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation.

(c)  Each Issuer shall, so long as any of the Notes are outstanding, deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default and what action such Issuer is taking or proposes to take with respect thereto.

SECTION 4.05.    TAXES.

The Issuers shall pay, and shall cause each of their respective Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

SECTION 4.06.    STAY, EXTENSION AND USURY LAWS.

The Issuers and the Subsidiary Guarantors covenant (to the extent that they may lawfully do so) that they shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuers and the Subsidiary Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenants that they shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

SECTION 4.07.    RESTRICTED PAYMENTS.

Each of the Issuers shall not, and shall not permit any of their respective Restricted Subsidiaries to, directly or indirectly: (i) declare or pay any dividend or make any other payment or distribution on account of the Issuers' or any of their respective Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Issuers (other than cash in lieu of fractional shares)) or to the direct or indirect holders of the Issuers' or any of their respective Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable (a) in additional Equity Interests (other than Disqualified Stock) of the Issuers or (in the case of a dividend, other payment or distribution on account of the Equity Interest of a Restricted Subsidiary) of such Restricted Subsidiary or (b) to the Issuers or their Restricted Subsidiaries); (ii) purchase, redeem or otherwise acquire or retire for value (including without limitation, in connection with any merger or consolidation involving the Issuers) any Equity Interests of the Issuers or any direct or indirect parent of the Issuers; (iii) make any Investment in any Unrestricted Subsidiary; (iv) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness (other than the Notes) that is *pari passu* with or subordinated to the Notes or the Note Guarantees, except a payment of interest or principal at Stated Maturity; or (v) make any Restricted Investment (all such payments and other actions set forth in clauses (i) through (v) above being collectively referred to as "Restricted Payments"), unless, at the time of and after giving effect to such Restricted Payment:

F041

(a) no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof; and

(b) Foamex would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of Section 4.09; and

(c) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuers and their respective Restricted Subsidiaries after the date of this Indenture (excluding Restricted Payments permitted by clauses (ii), (iii), (iv), (vi), (vii), (viii), (x), (xi), (xii), (xiii), (xiv), (xv), (xvi) and (xvii) of the next succeeding paragraph), is less than the sum of (i) 50% of the Consolidated Net Income of Foamex for the preceding four-quarter period, plus (ii) 100% of the aggregate net cash proceeds received by Foamex from the issue or sale since the date of this Indenture of Equity Interests of Foamex (other than Disqualified Stock) or of Disqualified Stock or debt securities of Foamex that have been converted into such Equity Interests (other than Equity Interests (or Disqualified Stock or convertible debt securities) sold to a Subsidiary of the Issuers and other than Disqualified Stock or convertible debt securities that have been converted into Disqualified Stock) or of capital contributions to the Issuers, plus (iii) to the extent that any Restricted Investment that was made after the date of this Indenture is sold for cash or otherwise liquidated or repaid for cash (less the cost of disposition, if any), or the cash return, including, without limitation, any cash dividends or distributions, with respect to such Restricted Investment or from any Unrestricted Subsidiary.

The foregoing provisions shall not prohibit (i) the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at said date of declaration such payment would have complied with the provisions of this Indenture; (ii) the redemption, repurchase, retirement, defeasance or other acquisition of any Pari Passu Debt, or subordinated Indebtedness or Equity Interests of the Issuers or any Restricted Subsidiary in exchange for, or out of the net cash proceeds of the substantially concurrent sale or issuance (other than to a Restricted Subsidiary of the Issuers) of, Equity Interests of the Issuers or any Restricted Subsidiary (other than any Disqualified Stock); provided that the amount of any such net cash proceeds that are utilized for any such redemption, repurchase, retirement, defeasance or other acquisition shall be excluded from clause (c) (ii) of the preceding paragraph; (iii) the defeasance, redemption, repurchase or other acquisition of Pari Passu Debt or subordinated Indebtedness with the net cash proceeds from an incurrence of Permitted Refinancing Indebtedness; (iv) the payment of any dividend or distribution by a Restricted Subsidiary of the Issuers to the holders of its Equity Interests on a pro rata basis; (v) the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Issuers, any Restricted Subsidiary of the Issuers, or any direct or indirect parent of the Issuers or their respective Restricted Subsidiaries held by any member of the Issuers' (or any of its Restricted Subsidiaries') management pursuant to any management equity subscription agreement or stock option agreement either (a) in effect as of the date of this Indenture; provided that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests shall not exceed $2.5 million in any twelve-month period and no Default or Event of Default shall have occurred and be continuing immediately after such transaction or (b) upon the termination of such person's employment; (vi) the advancement of payment or payment of distributions pursuant to the Tax Sharing Agreement and the making of up to $17.0 million of loans or advances pursuant to the Tax Advance Agreement dated as of December 11, 1996 between FJPS and Foamex, as amended to the date hereof; (vii) the payment by

Foamex of a management fee pursuant to the Management Services Agreement in an amount not to exceed $3.0 million per annum; (viii) distributions to Foamex International Inc. and its Subsidiaries which are utilized to pay the debt service and other expenses of Foamex Aviation Corp., the aggregate amount of which shall not exceed $2.0 million in any twelve-month period; (ix) additional payments in an aggregate amount not to exceed $25.0 million; (x) Contributions to a Restricted Subsidiary if such Subsidiary (a) executes and delivers to the Trustee a supplemental indenture in form reasonably satisfactory to the Trustee pursuant to which such Restricted Subsidiary shall guarantee all of the Obligations of the Issuers with respect to this Indenture and the Notes and (b) delivers to the Trustee an Opinion of Counsel reasonably satisfactory to the Trustee to the effect that such supplemental indenture, has been duly executed and delivered by such Restricted Subsidiary and is in compliance with the terms of this Indenture; (xi) distributions, loans or advances to the holders of the Equity Interests of the Issuers in an amount sufficient to pay all or a portion of the principal of, interest or premium, if any, on the Foamex-JPS Automotive L.P. Senior Secured Discount Debentures due 2004; (xii) distributions, loans or advances to holders of the Equity Interests of the Issuers in an amount sufficient to enable Foamex International Inc. to pay its reasonable, out of pocket operating and administrative expenses, including, without limitation, directors fees, legal and audit expenses, SEC compliance expenses and corporate franchise and other taxes; *provided* that no such expense payments shall be made to an Affiliate (other than a director or officer of the Issuers whose status as an Affiliate results solely from his position as a director or officer of the Issuers) of Foamex International Inc.; (xiii) Investments received by the Issuers or any of their Restricted Subsidiaries as non-cash consideration from Asset Sales to the extent permitted by Section 4.10; (xiv) the Closing Date Transactions; (xv) payments made pursuant to the Great Western Note; (xvi) payments made to purchase any Indebtedness subject to the Closing Date Transactions that is not purchased pursuant to such Transaction; and (xvii) the issuance or sale of Equity Interests of Foamex Latin America to key executives of Foamex Latin America not to exceed 5% of the outstanding Equity Interests of Foamex Latin America.

The Board of Directors may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if such designation would not cause a Default; *provided* that in no event shall the business currently operated by any Subsidiary Guarantor be transferred to or held by an Unrestricted Subsidiary. For purposes of making such determination, all outstanding Investments by either Issuer and their respective Restricted Subsidiaries (except to the extent repaid in cash) in the Subsidiary so designated shall be deemed to be Restricted Payments at the time of such designation and shall be included for purposes of calculating the aggregate amount of Restricted Payments under clause (c) of first paragraph of this covenant. All such outstanding Investments shall be deemed to constitute Investments in an amount equal to the fair market value of such Investments at the time of such designation. Such designation shall only be permitted if such Restricted Payment would be permitted at such time and if such Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Issuers or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The fair market value of any individual or series of related non-cash Restricted Payments (other than the Closing Date Transactions) shall be determined by the Board of Directors whose resolution with respect thereto shall be delivered to the Trustee, such determination to be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of national standing, as applicable, if such fair market value exceeds $1.0 million. In connection with each Restricted Payment, the Issuers shall deliver to the Trustee, prior to or within 60 days of the making of such Restricted Payment, an Officers'

37

F043

Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.07 were computed, together with a copy of any fairness opinion or appraisal required by this Indenture.

SECTION 4.08.    *DIVIDEND AND OTHER PAYMENT RESTRICTIONS AFFECTING SUBSIDIARIES.*

The Issuers shall not, and shall not permit any of their respective Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary which is not a Subsidiary Guarantor to (i)(a) pay dividends or make any other distributions to the Issuers or any of their respective Restricted Subsidiaries (1) on its Capital Stock or (2) with respect to any other interest or participation in, or measured by, its profits, or (b) pay any Indebtedness owed to the Issuers or any of their respective Restricted Subsidiaries, (ii) make loans or advances to the Issuers or any of their respective Restricted Subsidiaries or (iii) transfer any of its properties or assets to the Issuers or any of their respective Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (a) Existing Indebtedness as in effect on the date of this Indenture, (b) the New Credit Facility as in effect as of the date of this Indenture, and any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings thereof, *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacement or refinancings are no more restrictive with respect to such dividend and other payment restrictions than those contained in the New Credit Facility as in effect on the date of this Indenture, (c) this Indenture and the Notes, (d) applicable law, (e) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Issuers or any of their respective Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired, *provided* that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be incurred, (f) by reason of customary non-assignment provisions in leases entered into in the ordinary course of business and consistent with past practices, (g) purchase money obligations for property acquired that impose restrictions of the nature described in clause (iii) above on the property so acquired, (h) Permitted Refinancing Indebtedness, *provided* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are no more restrictive than those contained in the agreements governing the Indebtedness being refinanced, (i) any instrument or agreement governing Indebtedness permitted to be incurred under this Indenture, which is secured by a Lien permitted to be incurred under this Indenture, which encumbrance or restriction is not applicable to any property or assets other than the property or assets subject to such Lien, or (j) restrictions applicable to a Receivables Subsidiary arising from a Receivables Transaction.

SECTION 4.09.    *INCURRENCE OF INDEBTEDNESS AND ISSUANCE OF PREFERRED STOCK.*

The Issuers shall not, and shall not permit any of their respective Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness (including Acquired Debt) and; that the Issuers and the Subsidiary Guarantors shall not issue any Disqualified Stock and the Issuers shall not permit any of their respective Subsidiaries which are not Subsidiary Guarantors to issue any shares of preferred stock; *provided, however,* that the Issuers and their Subsidiaries may incur

38

Indebtedness (including Acquired Debt and Indebtedness under the New Credit Facility) or issue shares of Disqualified Stock or in the case of Subsidiaries which are not Subsidiary Guarantors, issue preferred stock if: the Fixed Charge Coverage Ratio for Foamex's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or preferred stock is issued would have been at least 2.25 to 1, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or preferred stock had been issued and such net proceeds had been applied, as the case may be, at the beginning of such four-quarter period.

The provisions of the first paragraph of this covenant will not apply to the incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(i) the incurrence by the Issuers or any of their respective Subsidiaries of term Indebtedness under the New Credit Facility; *provided* that all term Indebtedness outstanding under the New Credit Facility after giving effect to such incurrence, including all term Indebtedness incurred to refund, refinance or replace any other Indebtedness incurred pursuant to this clause (i), does not exceed an amount equal to $330.0 million *less* the aggregate amount of all Net Proceeds of Asset Sales that have been applied since the date of this Indenture to repay such term Indebtedness under the New Credit Facility and resulting in a permanent reduction of the related commitments pursuant to Section 4.10;

(ii) the incurrence by the Issuers or any of their respective Subsidiaries of revolving credit Indebtedness and letters of credit (with letters of credit being deemed to have a principal amount, without duplication, equal to the maximum potential liability of the Issuers and their Subsidiaries thereunder) under the New Credit Facility; *provided* that the aggregate principal amount of all revolving credit Indebtedness outstanding under the New Credit Facility after giving effect to such incurrence, including all revolving Indebtedness incurred to refund, refinance or replace any other revolving Indebtedness incurred pursuant to this clause (ii), does not exceed an amount equal to $150.0 million, less the aggregate amount of all Net Proceeds of Asset Sales applied to repay such revolving Indebtedness and resulting in a permanent reduction of the related commitments pursuant to Section 4.10; *provided, however*, that notwithstanding anything to the contrary contained in this Indenture, in no event shall the amount of Indebtedness which the Issuers and their Subsidiaries may incur in the aggregate pursuant to clause (i) and this clause (ii) be less than $150.0 million;

(iii) the incurrence by the Issuers and their respective Subsidiaries of the Existing Indebtedness;

(iv) the incurrence by the Issuers and the Subsidiary Guarantors of Indebtedness represented by the Senior Subordinated Notes;

(v) the incurrence by the Issuers or any of their respective Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property, plant or equipment used in the business of the Issuers or such Subsidiary, in an aggregate principal amount not to exceed $25.0 million at any time outstanding;

39

(vi) the incurrence by the Issuers or any of their respective Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace Indebtedness that was permitted by this Indenture to be incurred;

(vii) the incurrence by the Issuers or any of their respective Restricted Subsidiaries of intercompany Indebtedness between or among the Issuers and any of their respective Restricted Subsidiaries; *provided, however*, that (i) if an Issuer is the obligor on such Indebtedness and the payee is not a Subsidiary Guarantor, such Indebtedness is expressly subordinated to the prior payment in full in cash of all Obligations with respect to the Senior Subordinated Notes and (ii)(A) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than an Issuer or a Restricted Subsidiary and (B) any sale or other transfer of any such Indebtedness to a Person that is not either an Issuer or a Restricted Subsidiary shall be deemed, in each case, to constitute an incurrence of such Indebtedness by an Issuer or such Restricted Subsidiary, as the case may be;

(viii) the incurrence by the Issuers or any of their respective Subsidiaries of Hedging Obligations;

(ix) the Guarantee by the Issuers or any of their respective Subsidiaries of Indebtedness of the Issuers or a Restricted Subsidiary of the Issuers that was permitted to be incurred by another provision of this covenant;

(x) the incurrence by the Issuers' Unrestricted Subsidiaries of Non-Recourse Debt and preferred stock, *provided, however*, that if any such Indebtedness ceases to be Non-Recourse Debt of an Unrestricted Subsidiary, such event shall be deemed to constitute an incurrence of Indebtedness by a Restricted Subsidiary of the Issuers;

(xi) the incurrence by the Issuers or any of their respective Subsidiaries of additional Indebtedness including, without limitation, pursuant to the New Credit Facility, in an aggregate principal amount (or accreted value, as applicable) at any time outstanding, including all Permitted Refinancing Indebtedness incurred to refund, refinance or replace any other Indebtedness incurred pursuant to this clause (xi), not to exceed $45.0 million;

(xii) Acquired Debt of a Subsidiary in existence at the time of the acquisition of such Subsidiary, if such Acquired Debt was not incurred in contemplation of such acquisition and such Acquired Debt is Non-Recourse Debt (except with respect to such acquired Subsidiary and its Subsidiaries);

(xiii) Indebtedness of Foamex Canada, Inc. and its Subsidiaries (which is Non-Recourse Debt, except with respect to such entities) in an amount, at any time outstanding not to exceed CND$15.0 million;

(xiv) Indebtedness of Foamex Latin America (which is Non-Recourse Debt, except with respect to such entities) in an amount, at any time outstanding not to exceed $12.0 million;

(xv) Assets Sales in the form of Receivables Transactions; and

(xvi) Indebtedness of Foamex Asia Inc. and its Subsidiaries (which is Non-Recourse Debt, except with respect to such entities) in an amount, at any time outstanding not to exceed $5.0 million.

For purposes of determining compliance with this covenant, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (xvi) above or is entitled to be incurred pursuant to the first paragraph of this covenant, the Issuers shall, in their sole discretion, classify such item of Indebtedness in any manner that complies with this covenant and such item of Indebtedness will be treated as having been incurred pursuant to only one of such clauses or pursuant to the first paragraph hereof. Neither the accrual of interest, nor the accretion of accreted value will be deemed to be an incurrence of Indebtedness for purposes of this covenant.

SECTION 4.10.    ASSET SALES.

Each of the Issuers shall not, and shall not permit any of their respective Restricted Subsidiaries to, consummate an Asset Sale unless (i) such Issuer (or the Restricted Subsidiary, as the case may be) receives consideration at the time of such Asset Sale at least equal to the fair market value (evidenced by an Officers' Certificate delivered to the Trustee and a resolution of the Board of Directors) of the assets or Equity Interests issued or sold or otherwise disposed of and (ii) at least 80% of the consideration therefor received by such Issuer or such Restricted Subsidiary is in the form of (A) cash, (B) assets useful in a Permitted Business not to exceed $30.0 million in the aggregate over the life of the Notes, or (C) Equity Interests representing a controlling interest in a Permitted Business not to exceed $30.0 million in the aggregate over the life of the Notes (collectively, the "Permitted Consideration"); provided that the amount of (x) any liabilities (as shown on such Issuer's or such Restricted Subsidiary's most recent balance sheet), of such Issuer or any Restricted Subsidiary (other than contingent liabilities (except to the extent reflected (or reserved for) on a balance sheet of the Issuers or any Restricted Subsidiary as of the date prior to the date of consummation of such transaction) and liabilities that are by their terms subordinated to the Notes or the Note Guarantees) that are assumed by the transferee of any such assets and (y) any securities, notes or other obligations received by such Issuer or any such Restricted Subsidiary from such transferee that are converted within 90 days by such Issuer or such Restricted Subsidiary into Permitted Consideration (to the extent so received), shall be deemed to be Permitted Consideration for purposes of this provision; and provided further, that the 80% limitation referred to above shall not apply to any Asset Sale in which the Permitted Consideration portion of the consideration received therefor is equal to or greater than what the net after-tax proceeds would have been had such Asset Sale complied with the aforementioned 80% limitation.

Within 365 days after the receipt of any Net Proceeds from an Asset Sale, the Issuers may apply such Net Proceeds, at their option, (a) to repay Senior Debt, or (b) to the acquisition of assets to be used in a Permitted Business. Pending the final application of any such Net Proceeds, the Issuers may temporarily reduce the New Credit Facility or otherwise invest such Net Proceeds in any manner that is not prohibited by this Indenture. Any Net Proceeds from Asset Sales that are not applied or invested as provided in the first sentence of this paragraph will be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $15.0 million, the Issuers shall be required to make an offer to all Holders of Notes (an "Asset Sale Offer") to purchase the maximum principal amount of Notes that may be purchased out of the Excess Proceeds, at an offer price in cash in an amount equal to 100% of the principal amount thereof plus accrued and unpaid interest and Liquidated Damages, if any, thereon to the date of purchase, in accordance with the procedures set forth in Section 3.09. To the

41

extent that the aggregate amount of Notes tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuers may use any remaining Excess Proceeds for general corporate purposes. If the aggregate principal amount of Senior Subordinated Notes surrendered by Holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Senior Subordinated Notes to be purchased on a *pro rata* basis; *provided, however,* that the Issuers shall not be obligated to purchase Senior Subordinated Notes in denominations other than integral multiples of $1,000. Upon completion of such offer to purchase, the amount of Excess Proceeds shall be reset at zero.

SECTION 4.11.    *TRANSACTIONS WITH AFFILIATES.*

The Issuers shall not, and shall not permit any of their respective Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each of the foregoing, an "Affiliate Transaction"), unless (i) such Affiliate Transaction is on terms that are no less favorable to the Issuers or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Issuers or such Subsidiary with an unrelated Person and (ii) the Issuers deliver to the Trustee (a) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $1.0 million, a resolution of the Board of Directors set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (i) above and that such Affiliate Transaction has been approved by a majority of the members of the Board of Directors and (b) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $5.0 million, an opinion as to the fairness to the Holders of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing; *provided* that (m) prepaid expenses and loans or advances to employees and similar items in the ordinary course of business; (n) the advancement of payment or payment of distributions pursuant to the Tax Sharing Agreement and the making of loans or advances pursuant to the Tax Advance Agreement dated as of December 11, 1996 between EJPS and Foamex, as amended to the date hereof; (o) the payment by Foamex of a management fee pursuant to the Management Services Agreement in an amount not to exceed $3.0 million per annum; (p) distributions to Foamex International Inc. and its Subsidiaries which are utilized to pay the debt service and other expenses of Foamex Aviation Corp., the aggregate amount of which shall not exceed $2.0 million in any twelve-month period; (q) the issuance or sale of Equity Interests of Foamex Latin America to key executives of Foamex Latin America, not to exceed 5% of the outstanding Equity Interests of Foamex Latin America; (r) Investments in the Trace Note not to exceed $5.0 million; (s) Investments in the Trace Global Opportunity Fund not to exceed $5.0 million; (t) borrowings of up to $5.0 million by Trace International Holdings, Inc. from the Issuers and their respective Subsidiaries; (u) the Closing Date Transactions; (v) transactions pursuant to the Supply Agreement with Foamex International Inc., dated as of June 28, 1994; (w) purchases (and sales) of inventory and services in the ordinary course of business at a price not greater (less) than the price paid by (charged to) purchasers of a similar quantity of inventory and services which are not Affiliates of the Issuers; (x) any employment agreement entered into by the Issuers or any of their respective Restricted Subsidiaries in the ordinary course of business and consistent with the current market practice or the past practice of the Issuers or such Restricted Subsidiary; (y) transactions between or among the Issuers and/or its Restricted Subsidiaries; and (z) Restricted Payments that are permitted by the provisions of Section 4.07, in each case, shall not be deemed Affiliate Transactions.

F048

SECTION 4.12.    LIENS.

The Issuers shall not and shall not permit any of their respective Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien on any asset now owned or hereafter acquired, or any income or profits therefrom or assign or convey any right to receive income therefrom, except Permitted Liens.

SECTION 4.13.    LINE OF BUSINESS.

The Issuers shall not, and shall not permit any of their respective Restricted Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Issuers and their respective Restricted Subsidiaries taken as a whole.

SECTION 4.14.    CORPORATE EXISTENCE.

Subject to Article 5 and Article 12 hereof, the Issuers and the Subsidiary Guarantors shall do or cause to be done all things necessary to preserve and keep in full force and effect (i) their respective corporate existences, and the corporate, partnership or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Issuers or any such Subsidiary and (ii) the rights (charter and statutory), licenses and franchises of the Issuers and its Subsidiaries; provided, however, that the Issuers shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Issuers and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

SECTION 4.15.    OFFER TO REPURCHASE UPON CHANGE OF CONTROL.

Upon the occurrence of a Change of Control, each Holder of Notes shall have the right to require the Issuers to repurchase all or any part (equal to $1,000 or an integral multiple thereof) of such Holder's Notes pursuant to the offer described below (the "Change of Control Offer") at an offer price in cash equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest and Liquidated Damages, if any, thereon to the date of purchase (the "Change of Control Payment"). Within 30 days following any Change of Control, the Issuers shall mail a notice to each Holder describing the transaction or transactions that constituted the Change of Control and offering to repurchase Notes on the date specified in such notice, which date shall be no earlier than 30 days and no later than the fifth Business Day preceding the last day of the fiscal quarter of Foamex next following the Change of Control date (the "Change of Control Payment Date"), pursuant to the procedures required by this Indenture and described in such notice. The Issuers shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control.

On the Change of Control Payment Date, the Issuers shall, to the extent lawful, (1) accept for payment all Notes or portions thereof properly tendered pursuant to the Change of Control Offer, (2) deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions thereof so tendered and (3) deliver or cause to be delivered to the Trustee the Notes

43

so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Issuers. The Paying Agent shall promptly mail to each Holder of Notes so tendered the Change of Control Payment for such Notes, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any, *provided* that each such new Note will be in a principal amount of $1,000 or an integral multiple thereof. Prior to complying with the provisions of this covenant, but in any event prior to the Change of Control Payment Date, the Issuers shall either repay all outstanding Senior Debt or obtain the requisite consents, if any, under all agreements governing outstanding Senior Debt to permit the repurchase of Notes required by this covenant. The Issuers shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

The Issuers shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Indenture applicable to a Change of Control Offer made by the Issuers and purchases all Senior Subordinated Notes validly tendered and not withdrawn under such Change of Control Offer.

SECTION 4.16.    ANTI-LAYERING.

The Issuers shall not incur, create, issue, assume, guarantee or otherwise become liable for any Indebtedness that is both (a) subordinate or junior in right of payment to any Senior Debt and (b) senior in any respect in right of payment to the Senior Subordinated Notes. No Subsidiary Guarantor shall incur, create, issue, assume, guarantee or otherwise become liable for any Indebtedness that is both (a) subordinate or junior in right of payment to its Senior Debt and (b) senior in right of payment to its Note Guarantee.

SECTION 4.17.    SALE AND LEASEBACK TRANSACTIONS.

The Issuers shall not, and shall not permit any of their respective Restricted Subsidiaries to, enter into any sale and leaseback transaction; *provided* that the Issuers may enter into a sale and leaseback transaction if (i) the Issuers could have (a) incurred Indebtedness in an amount equal to the Attributable Debt relating to such sale and leaseback transaction pursuant to Section 4.09 and (b) incurred a Lien to secure such Indebtedness pursuant to Section 4.12 and (ii) the gross cash proceeds of such sale and leaseback transaction are at least equal to the fair market value (in the case of gross cash proceeds in excess of $5.0 million as determined in good faith by the Board of Directors and set forth in an Officers' Certificate delivered to the Trustee) of the property that is the subject of such sale and leaseback transaction.

SECTION 4.18    LIMITATION ON ISSUANCES AND SALES OF CAPITAL STOCK OF RESTRICTED SUBSIDIARIES.

The Issuers (i) shall not, and shall not permit any Restricted Subsidiary of the Issuers to, transfer, convey, sell, lease or otherwise dispose of any Capital Stock of any Restricted Subsidiary of the Issuers to any Person (other than the Issuers or a Restricted Subsidiary of the Issuers), unless (a) such transfer, conveyance, sale, lease or other disposition is of all the Capital Stock of such Restricted Subsidiary and (b) the cash Net Proceeds from such transfer, conveyance, sale, lease or other disposition are applied in accordance with Section 4.10, and (ii) shall not permit any Restricted Subsidiary of the

44

Issuers to issue any of its Equity Interests (other than, if necessary, shares of its Capital Stock constituting directors' qualifying shares) to any Person other than to the Issuers or a Restricted Subsidiary of the Issuers; *provided, however,* the foregoing restrictions shall not apply to (A) Investments in the entities described under clause (o) of the definition of Permitted Investments; (B) transfers, conveyances, sales, leases or other dispositions (collectively "dispositions") of any Capital Stock of any Restricted Subsidiary that have a fair market value at the time of such disposition of less than $1.0 million; or (C) a public offering of Equity Interests of Foamex Latin America which results in the net proceeds to Foamex Latin America of at least $15.0 million.

SECTION 4.19     PAYMENTS FOR CONSENT.

Neither the Issuers nor any of their respective Restricted Subsidiaries shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder of any Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid or is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

SECTION 4.20     ADDITIONAL GUARANTEES.

(i) If the Issuers or any of their respective Restricted Subsidiaries shall, after the date of this Indenture, transfer or cause to be transferred, including by way of any Investment, in one or a series of transactions (whether or not related), any assets, businesses, divisions, real property or equipment having an aggregate fair market value (as determined in good faith by the Board of Directors) in excess of $1.0 million to any Restricted Subsidiary that is not a Subsidiary Guarantor or a Foreign Subsidiary, (ii) if Foamex or any of its Restricted Subsidiaries shall acquire another Restricted Subsidiary other than a Foreign Subsidiary having total assets with a fair market value (as determined in good faith by the Board of Directors) in excess of $1.0 million, or (iii) if any Restricted Subsidiary other than a Foreign Subsidiary shall incur Acquired Debt in excess of $1.0 million, then the Issuers shall, at the time of such transfer, acquisition or incurrence, (i) cause such transferee, acquired Restricted Subsidiary or Restricted Subsidiary incurring Acquired Debt (if not then a Subsidiary Guarantor) to execute a Note Guarantee of the Obligations of the Issuers under the Senior Subordinated Notes in the form set forth in this Indenture and (ii) deliver to the Trustee an Opinion of Counsel, in form reasonably satisfactory to the Trustee, that such Note Guarantee is a valid, binding and enforceable obligation of such transferee, acquired Restricted Subsidiary or Restricted Subsidiary incurring Acquired Debt, subject to customary exceptions for bankruptcy, fraudulent conveyance and equitable principles. Notwithstanding the foregoing, the Issuers or any of their Restricted Subsidiaries may make a Restricted Investment in any Wholly Owned Restricted Subsidiary of the Issuers without compliance with this covenant provided that such Restricted Investment is permitted by Section 4.07.

45

# ARTICLE 5
## SUCCESSORS

SECTION 5.01.    MERGER, CONSOLIDATION, OR SALE OF ASSETS.

The Issuers may not consolidate or merge with or into (whether or not the Issuers are the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of their properties or assets in one or more related transactions, to another corporation, Person or entity unless (i) such Issuer is the surviving corporation or the entity or the Person formed by or surviving any such consolidation or merger (if other than such Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is organized and existing under the laws of the United States, any state thereof or the District of Columbia *provided* that FCC may not consolidate or merge with or into any entity other than a corporation satisfying such requirements for so long as Foamex remains a partnership; (ii) the entity or Person formed by or surviving any such consolidation or merger (if other than such Issuer) or the entity or Person to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made assumes all the obligations of such Issuer under the Notes and this Indenture pursuant to a supplemental indenture in a form reasonably satisfactory to the Trustee; (iii) immediately after such transaction no Default or Event of Default exists; and (iv) except in the case of a merger of an Issuer with or into one of its Wholly Owned Restricted Subsidiaries, the Issuer or the entity or Person formed by or surviving any such consolidation or merger (if other than the Issuer), or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made (A) shall have Consolidated Net Worth immediately after the transaction equal to or greater than the Consolidated Net Worth of such Issuer immediately preceding the transaction and (B) shall, at the time of such transaction and after giving pro forma effect thereto as if such transaction had occurred at the beginning of the applicable four-quarter period, be permitted to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of Section 4.09 hereof. In the case of a sale, assignment, lease, transfer, conveyance or other disposition of all or substantially all of the assets of an Issuer, upon the assumption provided for in clause (ii) above, such Issuer shall be discharged from all further liability and obligation under this Indenture.

SECTION 5.02.    SUCCESSOR CORPORATION SUBSTITUTED.

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Issuers in accordance with Section 5.01 hereof, the successor corporation formed by such consolidation or into or with which the Issuers is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Issuers" shall refer instead to the successor corporation and not to the Issuers), and may exercise every right and power of the Issuers under this Indenture with the same effect as if such successor Person had been named as the Issuers herein; *provided, however*, that the predecessor Issuers shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a sale of all or substantially all of the Issuers' assets as provided in the last sentence of Section 5.01 hereof.

46

F052

## ARTICLE 6
### DEFAULTS AND REMEDIES

SECTION 6.01.    *EVENTS OF DEFAULT.*

An "Event of Default" occurs if:

(a) the Issuers default for 30 days in the payment when due of interest on, or Liquidated Damages with respect to, the Notes (whether or not prohibited by the subordination provisions of this Indenture);

(b) the Issuers default in payment when due of the principal of, or premium, if any, on the Notes (whether or not prohibited by the subordination provisions of this Indenture);

(c) the Issuers fail to comply with Section 4.15, or to consummate a mandatory Asset Sale Offer pursuant to Section 4.10 or to comply with Article 5;

(d) the Issuers fail for 60 days after notice to comply with any of their other agreements in this Indenture or the Notes;

(e) the Issuers default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Issuers or any of their respective Restricted Subsidiaries (or the payment of which is Guaranteed by the Issuers or any of their respective Restricted Subsidiaries) whether such Indebtedness or Guarantee now exists, or is created after the date of this Indenture, which default (a) is caused by a failure to pay principal of, interest or premium, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a "Payment Default") or (b) results in the acceleration of such Indebtedness prior to its Stated Maturity and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the Stated Maturity of which has been so accelerated, aggregates $20.0 million or more;

(f) the Issuers or any of their respective Restricted Subsidiaries fail to pay final judgments aggregating in excess of $10.0 million, which judgments are not paid, discharged or stayed for a period of 60 days after entry thereof;

(g) the Issuers or any of their respective Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary pursuant to or within the meaning of Bankruptcy Law:

(i) commences a voluntary case,

(ii) consents to the entry of an order for relief against it in an involuntary case,

47

    (iii) consents to the appointment of a custodian of it or for all or substantially all of its property;

    (iv) makes a general assignment for the benefit of its creditors, or

    (v) generally is not paying its debts as they become due; or

(h) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

    (i) is for relief against the Issuers or any of its Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary in an involuntary case;

    (ii) appoints a custodian of the Issuers or any of their respective Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary or for all or substantially all of the property of the Issuers or any of their Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary; or

    (iii) orders the liquidation of the Issuers or any of their respective Significant Subsidiaries or any group of Subsidiaries that, taken as a whole, would constitute a Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days.

SECTION 6.02.    ACCELERATION.

If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediately *provided, however,* that if any Indebtedness or Obligation is outstanding pursuant to the New Credit Facility, upon a declaration of acceleration by the holders of the Notes or the Trustee, all principal and interest under this Indenture shall be due and payable upon the earlier of (x) the day which five Business Days after the provision to the Issuers, the Credit Agent and the Trustee of such written notice of acceleration or (y) the date of acceleration of any Indebtedness under the New Credit Facility; and *provided, further,* that in the event of an acceleration based upon an Event of Default set forth in clause (e) above, such declaration of acceleration shall be automatically annulled if the holders of Indebtedness which is the subject of such failure to pay at maturity or acceleration have rescinded their declaration of acceleration in respect of such Indebtedness or such failure to pay at maturity shall have been cured or waived within 30 days thereof and no other Event of Default has occurred during such 30-day period which has not been cured, paid or waived. Notwithstanding the foregoing, in the case of an Event of Default as described in (g) and, (h), of Section 6.01 hereof all outstanding Notes will become due and payable without further action or notice. Holders of the Notes may not enforce this Indenture or the Notes except as provided in this Indenture. Subject to certain limitations, Holders of a majority in principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default or Event

F054

of Default (except a Default or Event of Default relating to the payment of principal or interest) if it determines that withholding notice is in their interest.

If an Event of Default occurs on or after June 15, 2002 by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Issuers with the intention of avoiding payment of the premium that the Issuers would have had to pay if the Issuers then had elected to redeem the Notes pursuant to Section 3.07 hereof, then, upon acceleration of the Notes, an equivalent premium shall also become and be immediately due and payable, to the extent permitted by law, anything in this Indenture or in the Notes to the contrary notwithstanding. If an Event of Default occurs prior to June 15, 2002 by reason of any willful action (or inaction) taken (or not taken) by, or on behalf of the Issuers with the intention of avoiding the prohibition on redemption of the Notes prior to such date, then, upon acceleration of the Notes, an additional premium shall also become and be immediately due and payable, in an amount, for each of the years beginning on June 15 of the years set forth below, as set forth below (expressed as percentages of principal amount to the date of payment that would otherwise be due but for the provisions of this sentence):

| Year | Percentage |
|------|-----------|
| 1998 | 109.875% |
| 1999 | 108.641% |
| 2000 | 107.406% |
| 2001 | 106.172% |

SECTION 6.03.    OTHER REMEDIES.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

SECTION 6.04.    WAIVER OF PAST DEFAULTS.

Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes waive an existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of or premium or Liquidated Damages, if any, or interest on, the Notes (except a rescission of an acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted form such acceleration). Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

49

SECTION 6.05.     CONTROL BY MAJORITY.

Holders of a majority in principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights of other Holders of Notes or that may involve the Trustee in personal liability.

SECTION 6.06.     LIMITATION ON SUITS.

A Holder of a Note may pursue a remedy with respect to this Indenture or the Notes only if:

(a)   the Holder of a Note gives to the Trustee written notice of a continuing Event of Default;

(b)   the Holders of at least 25% in principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)   such Holder of a Note or Holders of Notes offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense;

(d)   the Trustee does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision of indemnity; and

(e)   during such 60-day period the Holders of a majority in principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with the request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

SECTION 6.07.     RIGHTS OF HOLDERS OF NOTES TO RECEIVE PAYMENT.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium and Liquidated Damages, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

SECTION 6.08.     COLLECTION SUIT BY TRUSTEE.

If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuers for the whole amount of principal of, premium and Liquidated Damages, if any, and interest remaining unpaid on the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

50

SECTION 6.09.    TRUSTEE MAY FILE PROOFS OF CLAIM.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and, the Holders of the Notes allowed in any judicial proceedings relative to the Issuers (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.10.    PRIORITIES.

If the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

First, to the Trustee, its agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expense and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection;

Second, to holders of Senior Debt to the extent required by Article 10 or Article 12 hereof;

Third, to Holders of Notes for amounts due and unpaid on the Notes for principal, premium and Liquidated Damages, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium and Liquidated Damages, if any and interest, respectively; and

Fourth, to the Issuers or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

51.

SECTION 6.11.    *UNDERTAKING FOR COSTS.*

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in principal amount of the then outstanding Notes.

## ARTICLE 7
## TRUSTEE

SECTION 7.01.    *DUTIES OF TRUSTEE.*

(a)  If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

(b)  Except during the continuance of an Event of Default:

(i)  the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)  in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)  The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)  this paragraph does not limit the effect of paragraph (b) of this Section;

(ii)  the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

F058

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d)    Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), and (c) of this Section.

(e)    No provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any liability. The Trustee shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holders, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f)    The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuers. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

SECTION 7.02.    RIGHTS OF TRUSTEE.

(a)    The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)    The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuers or the Subsidiary Guarantors shall be sufficient if signed by an Officer of any Issuer or any Subsidiary Guarantor, as applicable.

(f)    The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities that might be incurred by it in compliance with such request or direction.

(g)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or, unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

53

SECTION 7.03.    INDIVIDUAL RIGHTS OF TRUSTEE.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuers, the Subsidiary Guarantors or any Affiliate of the Issuers or the Subsidiary Guarantors with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee or resign. Any Agent may do the same with like rights and duties. The Trustee is also subject to Sections 7.10 and 7.11 hereof.

SECTION 7.04.    TRUSTEE'S DISCLAIMER.

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuers' use of the proceeds from the Notes or any money paid to the Issuers or, upon the Issuers' direction under any provision of this Indenture, it shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

SECTION 7.05.    NOTICE OF DEFAULTS.

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee shall mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, premium, if any, or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

SECTION 7.06.    REPORTS BY TRUSTEE TO HOLDERS OF THE NOTES.

Within 60 days after each May 15 beginning with the May 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee shall mail to the Holders of the Notes a brief report dated as of such reporting date that complies with TIA § 313(a) (but if no event described in TIA § 313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The Trustee also shall comply with TIA § 313(b)(2). The Trustee shall also transmit by mail all reports as required by TIA § 313(c).

A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to the Issuers and filed with the SEC and each stock exchange on which the Notes are listed in accordance with TIA § 313(d). The Issuers shall promptly notify the Trustee when the Notes are listed on any stock exchange.

SECTION 7.07.    COMPENSATION AND INDEMNITY.

The Issuers and the Subsidiary Guarantors shall pay to the Trustee from time to time such compensation as the Trustee and the Issuers and the Subsidiary Guarantors shall from time to time agree

54

F060

in writing for its acceptance of this Indenture and services hereunder. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuers shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

The Issuers and the Subsidiary Guarantors shall indemnify each of the Trustee and any predecessor Trustee against any and all losses, liabilities, damages, claims or expenses (including taxes (other than taxes based on the income of the Trustee) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Issuers and the Subsidiary Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Issuers, the Subsidiary Guarantors or any Holder or any other person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Trustee shall notify the Issuers and the Subsidiary Guarantors promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuers and the Subsidiary Guarantors shall not relieve the Issuers and the Subsidiary Guarantors of their respective obligations hereunder. The Issuers shall defend the claim and the Trustee shall cooperate in the defense. The Trustee may have separate counsel and the Issuers shall pay the reasonable fees and expenses of such counsel. The Issuers and the Subsidiary Guarantors need not pay for any settlement made without their consent, which consent shall not be unreasonably withheld.

The obligations of the Issuers under this Section 7.07 shall survive the satisfaction and discharge of this Indenture.

To secure the Issuers' and the Subsidiary Guarantors payment obligations in this Section, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(g) or (h) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

The Trustee shall comply with the provisions of TIA § 313(b)(2) to the extent applicable.

SECTION 7.08.    REPLACEMENT OF TRUSTEE.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuers. The Holders of Notes of a majority in principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuers in writing. The Issuers may remove the Trustee if:

F061

(a)  the Trustee fails to comply with Section 7.10 hereof;

(b)  the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(c)  a custodian or public officer takes charge of the Trustee or its property; or

(d)  the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuers shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuers.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuers, or the Holders of Notes of at least 10% in principal amount of the then outstanding Notes may petition, at the expense of the Issuers, any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder of a Note who has been a Holder of a Note for at least six months, fails to comply with Section 7.10, such Holder of a Note may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuers. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Holders of the Notes. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuers' obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

SECTION 7.09.    *SUCCESSOR TRUSTEE BY MERGER, ETC.*

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

SECTION 7.10.    *ELIGIBILITY; DISQUALIFICATION.*

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition.

F062

This Indenture shall always have a Trustee who satisfies the requirements of TIA § 310(a)(1), (2) and (5). The Trustee is subject to TIA § 310(b).

SECTION 7.11.    PREFERENTIAL COLLECTION OF CLAIMS AGAINST ISSUERS.

The Trustee is subject to TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b). A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated therein.

ARTICLE 8
DISCHARGE OF INDENTURE

SECTION 8.01.    TERMINATION OF ISSUERS' OBLIGATIONS.

This Indenture shall cease to be of further effect (except that the Issuers' and the Subsidiary Guarantors' obligations under Section 7.07 and 8.04 and the Issuers' Trustee's and Paying Agent's obligations under Section 8.03 shall survive) when all outstanding Notes theretofore authenticated and issued have been delivered (other than destroyed, lost or stolen Notes which have been replaced or paid) to the Trustee for cancellation and the Issuers have paid all sums payable by the Issuers hereunder. In addition, the Issuers may terminate all of their obligations under this Indenture if:

(1) the Issuers irrevocably deposit in trust with the Trustee or at the option of the Trustee, with a trustee reasonably satisfactory to the Trustee and the Issuers under the terms of an irrevocable trust agreement in form and substance satisfactory to the Trustee, money or United States Government Obligations sufficient (as certified by an independent public accountant designated by the Issuers) to pay principal and interest on the Notes to maturity or redemption, as the case may be, and to pay all other sums payable by them hereunder, provided that (i) the trustee of the irrevocable trust shall have been irrevocably instructed to pay such money or the proceeds of such United States Government Obligations to the Trustee and (ii) the Trustee shall have been irrevocably instructed to apply such money or the proceeds of such United States Government Obligations to the payment of said principal and interest with respect to the Notes;

(2) the Issuers and the Subsidiary Guarantors deliver to the Trustee an Officers' Certificate stating that all conditions precedent to satisfaction and discharge of this Indenture have been complied with, and an Opinion of Counsel to the same effect; and

(3) no Event of Default or event (including such deposit) which, with notice or lapse of time, or both, would become an Event of Default with respect to the Notes shall have occurred and be continuing on the date of such deposit.

Then, this Indenture shall cease to be of further effect (except as provided this paragraph), and the Trustee, on demand of the Issuers, shall execute proper instruments acknowledging confirmation of and discharge under this Indenture. The Issuers may make the deposit only if Article 10 hereof does not prohibit such payment. However, the Issuers' obligations in Section 2.03, 2.04, 2.05, 2.06, 2.07, 4.01, 7.07, 7.08, 8.03 and 8.04, and the Trustee's and Paying Agent's obligations in Section 8.03 shall survive until the Notes are no longer outstanding. Thereafter, only the Issuers', Trustee's and Paying Agents' obligations in Section 8.03 shall survive.

F063

After such irrevocable deposit made pursuant to this Section 8.01 and satisfaction of the other conditions set forth herein, the Trustee upon request shall acknowledge in writing the discharge of the Issuers' and the Subsidiary Guarantors' obligations under this Indenture except for those surviving obligations specified above.

In order to have money available on a payment date to pay principal or interest on the Notes, the United States Government Obligations shall be payable as to principal or interest at least one Business Day before such payment date in such amounts as will provide the necessary money. United States Government Obligations shall not be callable at the Issuer's options.

The Issuers shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the United States Government Obligations deposited pursuant to this Section 8.01 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of outstanding Notes.

SECTION 8.02.    APPLICATION OF TRUST MONEY.

The Trustee or a trustee satisfactory to the Trustee and the Issuers shall hold in trust money or United States Government Obligations deposited with it pursuant to Section 8.01. It shall apply the deposited money and the money from United States Government Obligations through the Paying Agent and in accordance with this Indenture to the payment of principal and interest on the Notes.

SECTION 8.03.    REPAYMENT TO ISSUERS.

The Trustee and the Paying Agent shall promptly pay to the Issuers upon written request any excess money or securities held by them at any time.

The Trustee and the Paying Agent shall pay to the Issuers upon written request any money held by them for the payment of principal or interest that remains unclaimed for 2 years after the date upon which such payment shall have become due; *provided, however,* that the Issuers shall have either caused notice of such payment to be mailed to each Holder of the Notes entitled thereto no less than 30 days prior to such repayment or within such period shall have published such notice in a financial newspaper of widespread circulation published in the City of New York including, without limitation, The Wall Street Journal. After payment to the Issuers, Holders of the Notes entitled to the money must look to the Issuers for payment as general creditors unless an applicable abandoned property law designates another person, and all liability of the Trustee and such Paying Agent with respect to such money shall cease.

SECTION 8.04.    REINSTATEMENT.

If the Trustee or Paying Agent is unable to apply any money or United States Government Obligations in accordance with Section 8.02 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuers' obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.01 until such time as the Trustee or Paying Agent is permitted to apply all such money or United States Government Obligations in accordance with Section 8.02; *provided, however,* that if the Issuers have made any payment of interest on or principal of any

58

F064

Notes because of the reinstatement of its obligations, the Issuers shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or United States Government Obligations held by the Trustee or Paying Agent.

## ARTICLE 9
## AMENDMENT, SUPPLEMENT AND WAIVER

SECTION 9.01.    *WITHOUT CONSENT OF HOLDERS OF NOTES.*

Notwithstanding Section 9.02 of this Indenture, the Issuers and the Trustee may amend or supplement this Indenture or the Notes without the consent of any Holder of a Note:

(a)  to cure any ambiguity, defect or inconsistency;

(b)  to provide for uncertificated Notes in addition to or in place of certificated Notes;

(c)  to provide for the assumption and discharge of the Issuers' and the Subsidiary Guarantors' obligations to Holders of Notes in the case of a merger, consolidation or sale of assets or Capital Stock pursuant to Article 5 or Article 11 hereof, as applicable;

(d)  to make any change that would provide any additional rights or benefits to the Holders of Notes or that does not adversely affect the legal rights under this Indenture of any such Holder;

(e)  to comply with requirements of the Commission in order to effect or maintain the qualification of this Indenture under the TIA; or

(f)  to allow any Subsidiary to Guarantee the Notes.

Upon the request of the Issuers accompanied by a resolution of their respective Boards of Directors authorizing the execution of any such amended or supplemental Indenture, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Issuers and the Subsidiary Guarantors in the execution of any amended or supplemental Indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental Indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

SECTION 9.02:    *WITH CONSENT OF HOLDERS OF NOTES.*

Except as provided below in this Section 9.02, the Issuers and the Trustee may amend or supplement this Indenture and the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture

F065

or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes (including consents obtained in connection with a tender offer or exchange offer for the Notes). Notwithstanding the foregoing, any amendment to the provisions of Article 10 or Article 12 of this Indenture (which relate to subordination) shall require the consent of the Holders of at least 75% in aggregate principal amount of the Notes then outstanding if such amendment would adversely affect the rights of Holders of Notes.

Upon the request of the Issuers accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental Indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Issuers and the Subsidiary Guarantors in the execution of such amended or supplemental Indenture unless such amended or supplemental Indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental Indenture.

It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section becomes effective, the Issuers shall mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuers to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental Indenture or waiver. Subject to Sections 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the Notes then outstanding may waive compliance in a particular instance by the Issuers or the Subsidiary Guarantors with any provision of this Indenture or the Notes. However, without the consent of each Holder affected, an amendment or waiver may not (with respect to any Notes held by a non-consenting Holder):

(a)   reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(b)   reduce the principal of or change the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes (other than provisions relating to Sections 4.10 and 4.15);

(c)   reduce the rate of or change the time for payment of interest on any Note;

(d)   waive a Default or Event of Default in the payment of principal of or premium or Liquidated Damages, if any, or interest on the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration);

(e)   make any Note payable in money other than that stated in the Notes;

F066

(f)  make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders of Notes to receive payments of principal of or premium, if any, or interest on the Notes;

(g)  waive a redemption payment with respect to any Note (other than a payment required by Section 4.10 or 4.15); or

(h)  make any change in the foregoing amendment and waiver provisions.

SECTION 9.03.    COMPLIANCE WITH TRUST INDENTURE ACT.

Every amendment or supplement to this Indenture or the Notes shall be set forth in a amended or supplemental Indenture that complies with the TIA as then in effect.

SECTION 9.04.    REVOCATION AND EFFECT OF CONSENTS.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

SECTION 9.05.    NOTATION ON OR EXCHANGE OF NOTES.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuers in exchange for all Notes may issue and the Trustee shall authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

SECTION 9.06.    TRUSTEE TO SIGN AMENDMENTS, ETC.

The Trustee shall sign any amended or supplemental Indenture authorized pursuant to this Article Nine if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Issuers and the Subsidiary Guarantors may not sign an amendment or supplemental Indenture until their respective Boards of Directors approve it. In executing any amended or supplemental indenture, the Trustee shall be entitled to receive and (subject to Section 7.01) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture, that it is not inconsistent herewith, and that it will be valid and binding upon the Issuers and the Subsidiary Guarantors in accordance with its terms.

## ARTICLE 10
## SUBORDINATION

SECTION 10.01.    AGREEMENT TO SUBORDINATE.

The Issuers agree, and each Holder of Notes by accepting a Note agrees, that the Indebtedness evidenced by the Note is subordinated in right of payment, to the extent and in the manner provided in this Article, to the prior payment in full of all Senior Debt (whether outstanding on the date hereof or hereafter created, incurred, assumed or guaranteed), and that the subordination is for the benefit of the holders of Senior Debt.

SECTION 10.02.    LIQUIDATION; DISSOLUTION; BANKRUPTCY.

Upon any payment or distribution of assets of the Issuers of any kind or character, whether in cash, property or securities, to creditors in any Insolvency or Liquidation Proceeding, with respect to either Issuer all amounts due or to become due under or with respect to all Senior Debt shall first be paid in full before any payment is made on account of the Notes, except that the Holders of Notes may receive Reorganization Securities. Upon any such Insolvency or Liquidation Proceeding, any payment or distribution of assets of Foamex or FCC of any kind or character, whether in cash, property or securities (other than Reorganization Securities), to which the Holders of the Notes or the Trustee would be entitled, shall be paid by Foamex or FCC or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, or by the Holders of the Notes or by the Trustee if received by them, directly to the holders of Senior Debt (pro rata to such holders on the basis of the amounts of Senior Debt held by such holders) or their Representative or Representatives, as their interests may appear, for application to the payment of the Senior Debt remaining unpaid until all such Senior Debt has been paid in full, after giving effect to any concurrent payment, distribution or provision therefor to or for the holders of Senior Debt.

SECTION 10.03.    DEFAULT ON DESIGNATED SENIOR DEBT.

(a) In the event of and during the continuation of any default in the payment of principal of, interest or premium, if any, on any Senior Debt, or any Obligation owing from time to time under or in respect of Senior Debt, or in the event that any event of default (other than a payment default) with respect to any Senior Debt shall have occurred and be continuing and shall have resulted in such Senior Debt becoming or being declared due and payable prior to the date on which it would otherwise have become due and payable, or (b) if any event of default other than as described in clause (a) above with respect to any Designated Senior Debt shall have occurred and be continuing permitting the holders of such Designated Senior Debt (or their Representative or Representatives) to declare such Designated Senior Debt due and payable prior to the date on which it would otherwise have become due and payable, then no payment shall be made by or on behalf of Foamex or FCC on account of the Notes (other than payments in the form of Reorganization Securities) (x) in case of any payment or nonpayment default specified in (a), unless and until such default shall have been cured or waived in writing in accordance with the instruments governing such Senior Debt or such acceleration shall have been rescinded or annulled, or (y) in case of any nonpayment event of default specified in (b), during the period (a "Payment Blockage Period") commencing on the date the Issuers or the Trustee receive written notice (a "Payment Notice") of such event of default (which notice shall be binding on the Trustee and the

62

F068

Holders of Notes as to the occurrence of such a payment default or nonpayment event of default) from the Credit Agent (or other holders of Designated Senior Debt or their Representative or Representatives) and ending on the earliest of (A) 179 days after such date, (B) the date, if any, on which such Designated Senior Debt to which such default relates is paid in full or such default is cured or waived in writing in accordance with the instruments governing such Designated Senior Debt by the holders of such Designated Senior Debt and (C) the date on which the Trustee receives written notice from the Credit Agent (or other holders of Designated Senior Debt or their Representative or Representatives), as the case may be, terminating the Payment Blockage Period. During any consecutive 360-day period, the aggregate of all Payment Blockage Periods shall not exceed 179 days and there shall be a period of at least 181 consecutive days in each consecutive 360-day period when no Payment Blockage Period is in effect. No event of default which existed or was continuing with respect to the Senior Debt to which notice commencing a Payment Blockage Period was given on the date such Payment Blockage Period commenced shall be or be made the basis for the commencement of any subsequent Payment Blockage Period unless such event of default is cured or waived for a period of not less than 90 consecutive days.

SECTION 10.04.    ACCELERATION OF NOTES.

If payment of the Notes is accelerated because of an Event of Default, the Issuers shall promptly notify holders of Senior Debt of the acceleration.

SECTION 10.05.    WHEN DISTRIBUTION MUST BE PAID OVER.

In the event that the Trustee or any Holder of a Note receives any payment of any Obligations with respect to the Notes at a time when such payment is prohibited by Section 10.03 hereof, such payment shall be held by the Trustee or such Holder, in trust for the benefit of, and shall be paid forthwith over and delivered, upon written request, to, the holders of Senior Debt as their interests may appear, or their Representative under the indenture or other agreement (if any) pursuant to which Senior Debt may have been issued, as their respective interests may appear, for application to the payment of all Obligations with respect to Senior Debt remaining unpaid to the extent necessary to pay such Obligations in full in accordance with their terms, after giving effect to any concurrent payment or distribution to or for the holders of Senior Debt.

With respect to the holders of Senior Debt, the Trustee undertakes to perform only such obligations on the part of the Trustee as are specifically set forth in this Article 10, and no implied covenants or obligations with respect to the holders of Senior Debt shall be read into this Indenture against the Trustee. The Trustee shall not be deemed to owe any fiduciary duty to the holders of Senior Debt, and shall not be liable to any such holders if the Trustee shall pay over or distribute to or on behalf of Holders of the Notes or the Issuers or any other Person money or assets to which any holders of Senior Debt shall be entitled by virtue of this Article 10, except if such payment is made as a result of the willful misconduct or gross negligence of the Trustee.

SECTION 10.06.    NOTICE BY THE ISSUERS.

The Issuers shall promptly notify the Trustee and the Paying Agent of any facts known to the Issuers that would cause a payment of any Obligations with respect to the Notes to violate this Article, but failure to give such notice shall not affect the subordination of the Notes to the Senior Debt as provided in this Article.

63

SECTION 10.07.    SUBROGATION.

After all Senior Debt is paid in full and until the Notes are paid in full, Holders of the Notes shall be subrogated (equally and ratably with all other Pari Passu Debt) to the rights of holders of Senior Debt to receive distributions applicable to Senior Debt to the extent that distributions otherwise payable to the Holders of the Notes have been applied to the payment of Senior Debt. A distribution made under this Article to holders of Senior Debt that otherwise would have been made to Holders of the Notes is not, as between the Issuers and Holders of the Notes, a payment by the Issuers on the Notes.

SECTION 10.08.    RELATIVE RIGHTS.

This Article defines the relative rights of Holders of the Notes and holders of Senior Debt. Nothing in this Indenture shall:

(1)  impair, as between the Issuers and Holders of the Notes, the obligations of the Issuers, which are absolute and unconditional, to pay principal of and interest on the Notes in accordance with their terms;

(2)  affect the relative rights of Holders of the Notes and creditors of the Issuers other than their rights in relation to holders of Senior Debt; or

(3)  prevent the Trustee or any Holder of the Notes from exercising its available remedies upon a Default or Event of Default, subject to the rights of holders and owners of Senior Debt to receive distributions and payments otherwise payable to Holders of the Notes.

If the Issuers fail, because of this Article to pay principal of or interest on a Note on the due date, the failure is still a Default or Event of Default.

SECTION 10.09.    SUBORDINATION MAY NOT BE IMPAIRED BY THE ISSUERS.

No right of any holder of Senior Debt to enforce the subordination of the Indebtedness evidenced by the Notes shall be impaired by any act or failure to act by the Issuers or any Holder or by the failure of the Issuers or any Holder to comply with this Indenture.

Without in any way limiting the generality of the foregoing paragraph, the holders of Senior Debt, or any of them, may, at any time and from time to time, without the consent of or notice to the Holders of the Notes, without incurring any liabilities to any Holder of any Notes and without impairing or releasing the subordination and other benefits provided in this Indenture or the obligations of the Holders of the Notes to the holders of the Senior Debt, even if any right of reimbursement or subrogation or other right or remedy of any Holder of Notes is affected, impaired or extinguished thereby, do any one or more of the following:

(1)  change the manner, place or terms of payment or change or extend the time of payment of, or renew, exchange, amend, increase or alter, the terms of any Senior Debt, any security therefor or guaranty thereof or any liability of any obligor thereon (including any guarantor) to such holder, or any liability incurred directly or indirectly in respect thereof or otherwise amend, renew, exchange, extend, modify, increase or supplement in any manner any Senior Debt or any instrument

64

evidencing or guaranteeing or securing the same or any agreement under which Senior Debt is outstanding;

(2) sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any property pledged, mortgaged or otherwise securing Senior Debt or any liability of any obligor thereon, to such holder, or any liability incurred directly or indirectly in respect thereof;

(3) settle or compromise any Senior Debt or any other liability of any obligor of the Senior Debt to such holder or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including, without limitation, Senior Debt) in any manner or order; and

(4) fail to take or to record or to otherwise perfect, for any reason or for no reason, any lien or security interest securing Senior Debt by whomsoever granted, exercise or delay in or refrain from exercising any right or remedy against any obligor or any guarantor or any other person, elect any remedy and otherwise deal freely with any obligor and any security for the Senior Debt or any liability of any obligor to such holder or any liability incurred directly or indirectly in respect thereof.

SECTION 10.10.    DISTRIBUTION OR NOTICE TO REPRESENTATIVE.

Whenever a distribution is to be made or a notice given to holders of Senior Debt, the distribution may be made and the notice given to their Representative.

Upon any distribution of assets of the Issuers referred to in this Article 10, the Trustee and the Holders of the Notes shall be entitled to rely upon any order or decree made by any court of competent jurisdiction or upon any certificate of such Representative or of the liquidating trustee or agent or other Person making any distribution to the Trustee or to the Holders of the Notes for the purpose of ascertaining the Persons entitled to participate in such distribution, the holders of the Senior Debt and other Indebtedness of the Issuers, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article 10.

SECTION 10.11.    RIGHTS OF TRUSTEE AND PAYING AGENT.

Notwithstanding the provisions of this Article 10 or any other provision of this Indenture, the Trustee shall not be charged with knowledge of the existence of any facts that would prohibit the making of any payment or distribution by the Trustee, and the Trustee and the Paying Agent may continue to make payments on the Notes, unless the Trustee shall have received at its Corporate Trust Office at least three Business Days prior to the date of such payment written notice of facts that would cause the payment of any Obligations with respect to the Notes to violate this Article. Only the Issuers or a Representative may give the notice. Nothing in this Article 10 shall impair the claims of, or payments to, the Trustee under or pursuant to Section 7.07 hereof.

The Trustee in its individual or any other capacity may hold Senior Debt with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights.

65

F071

SECTION 10.12.    *AUTHORIZATION TO EFFECT SUBORDINATION.*

Each Holder of a Note by the Holder's acceptance thereof authorizes and directs the Trustee on the Holder's behalf to take such action as may be necessary or appropriate to effectuate the subordination as provided in this Article 10, and appoints the Trustee to act as the Holder's attorney-in-fact for any and all such purposes, including without limitation the timely filing of a claim for the unpaid balance of the Notes held by such Holder in the form required in any Insolvency or Liquidation Proceeding and causing such claim to be approved. If the Trustee does not file a proper proof of claim or proof of debt in the form required in any proceeding referred to in Section 6.09 hereof at least 30 days before the expiration of the time of such claim, the Representatives of the Designated Senior Debt, including the Credit Agent, are hereby authorized to file an appropriate claim for and on behalf of the Holders of the Notes.

SECTION 10.13.    *AMENDMENTS.*

Any amendment to the provisions of this Article 10 shall require the consent of the Holders of at least 75% in aggregate amount of Notes then outstanding if such amendment would adversely affect the rights of the Holders of Notes.

## ARTICLE 11
## GUARANTEE OF NOTES

SECTION 11.01.    *NOTE GUARANTEE.*

Subject to Section 11.06 hereof, each of the Subsidiary Guarantors hereby, jointly and severally, unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes and the Obligations of the Issuers hereunder and thereunder, that: (a) the principal of, premium, if any, interest and Liquidated Damages, if any, on the Notes will be promptly paid in full when due, subject to any applicable grace period, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal, premium, if any, (to the extent permitted by law) interest on any interest, if any, and Liquidated Damages, if any, on the Notes, and all other payment Obligations of the Issuers to the Holders or the Trustee hereunder or thereunder will be promptly paid in full and performed, all in accordance with the terms hereof and thereof; and (b) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, subject to any applicable grace period, whether at stated maturity, by acceleration, redemption or otherwise. Failing payment when so due of any amount so guaranteed for whatever reason the Subsidiary Guarantors will be jointly and severally obligated to pay the same immediately. An Event of Default under this Indenture or the Notes shall constitute an event of default under the Note Guarantees, and shall entitle the Holders to accelerate the Obligations of the Subsidiary Guarantors hereunder in the same manner and to the same extent as the Obligations of the Issuers. The Subsidiary Guarantors hereby agree that their Obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuers, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable

66

discharge or defense of a Subsidiary Guarantor. Each Subsidiary Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuers, any right to require a proceeding first against the Issuers, protest, notice and all demands whatsoever and, covenants that this Note Guarantee will not be discharged except by complete performance of the Obligations contained in the Notes and this Indenture. If any Holder or the Trustee is required by any court or otherwise to return to the Issuers, the Subsidiary Guarantors, or any Note Custodian, Trustee, liquidator or other similar official acting in relation to either the Issuers or the Subsidiary Guarantors, any amount paid by either to the Trustee or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect. Each Subsidiary Guarantor agrees that it shall not be entitled to, and hereby waives, any right of subrogation in relation to the Holders in respect of any Obligations guaranteed hereby. Each Subsidiary Guarantor further agrees that, as between the Subsidiary Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Note Guarantee, notwithstanding any stay, injunction, or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such Obligations as provided in Article 6 hereof, such Obligations (whether or not due and payable) shall forthwith become due and payable by the Subsidiary Guarantors for the purpose of this Note Guarantee. The Subsidiary Guarantors shall have the right to seek contribution from any non-paying Subsidiary Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

SECTION 11.02.    EXECUTION AND DELIVERY OF NOTE GUARANTEE.

To evidence its Note Guarantee set forth in Section 11.01, each Subsidiary Guarantor hereby agrees that a notation of such Note Guarantee substantially in the form of Exhibit C shall be endorsed by an Officer of such Subsidiary Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture shall be executed on behalf of such Subsidiary Guarantor by manual or facsimile signature by an Officer of such Subsidiary Guarantor.

Each Subsidiary Guarantor hereby agrees that its Note Guarantee set forth in Section 11.01 shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Note Guarantee.

If an Officer whose signature is on this Indenture or on the Note Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Note Guarantee is endorsed, the Note Guarantee shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Subsidiary Guarantors.

SECTION 11.03.    SUBSIDIARY GUARANTORS MAY CONSOLIDATE, ETC., ON CERTAIN TERMS

(a) Except as set forth in Articles 4 and 5 hereof, nothing contained in this Indenture shall prohibit a merger between a Subsidiary Guarantor and another Subsidiary Guarantor or a merger between a Subsidiary Guarantor and the Issuers.

67

(b)  Except as provided in Section 11.03(a) hereof or in a transaction referred to in Section 11.04 hereof, no Subsidiary Guarantor may consolidate with or merge with or into (whether or not such Subsidiary Guarantor is the surviving Person), another corporation, Person or entity whether or not affiliated with such Subsidiary Guarantor unless, subject to the provisions of the following paragraph, (i) the Person formed by or surviving any such consolidation or merger (if other than such Subsidiary Guarantor) assumes all the obligations of such Subsidiary Guarantor pursuant to a supplemental indenture in form and substance reasonably satisfactory to the Trustee, under the Notes and the Indenture; (ii) immediately after giving effect to such transaction, no Default or Event of Default exists; (iii) such Subsidiary Guarantor, or any Person formed by or surviving any such consolidation or merger, would have Consolidated Net Worth (immediately after giving effect to such transaction), equal to or greater than the Consolidated Net Worth of such Guarantor immediately preceding the transaction; and (iv) Foamex would be permitted by virtue of Foamex's pro forma Fixed Charge Coverage Ratio, immediately after giving effect to such transaction, to incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of Section 4.09.  The requirements of clauses (iii) and (iv) of this paragraph will not apply in the case of a consolidation with or merger with or into any other Person if the acquisition of all of the Equity Interests in such Person would have complied with the provisions of Sections 4.07 and 4.09 hereof.

(c)  In the case of any such consolidation, merger, sale or conveyance and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and substantially in the form of Exhibit D hereto, of the Note Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Subsidiary Guarantor, such successor Person shall succeed to and be substituted for the Subsidiary Guarantor with the same effect as if it had been named herein as a Subsidiary Guarantor; provided that, solely for purposes of computing Consolidated Net Income for purposes of clause (b) of the first paragraph of Section 4.07 hereof, the Consolidated Net Income of any Person other than the Issuers and their respective Restricted Subsidiaries shall only be included for periods subsequent to the effective time of such merger, consolidation, combination or transfer of assets.  Such successor Person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Issuers and delivered to the Trustee.  All of the Note Guarantees so issued shall in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

SECTION 11.04.    RELEASES FOLLOWING SALE OF ASSETS, MERGER, SALE OF CAPITAL STOCK ETC..

In the event of (a) a sale or other disposition of all of the assets of any Subsidiary Guarantor, by way of merger, consolidation or otherwise, or a sale or other disposition of all of the capital stock of any Subsidiary Guarantor, or (b) that either of the Issuers designates a Subsidiary Guarantor to be an Unrestricted Subsidiary, or such Subsidiary Guarantor ceases to be a Subsidiary of the Issuers, then such Subsidiary Guarantor (in the event of a sale or other disposition, by way of such a merger, consolidation or otherwise, of all of the capital stock of such Subsidiary Guarantor or any such designation) or the entity acquiring the property (in the event of a sale or other disposition of all of the assets of such Subsidiary Guarantor) shall be released and relieved of any obligations under its Note Guarantee; provided that the Net Proceeds of such sale or other disposition are applied in accordance with the provisions of Sections 4.10 and 4.15 hereof.  In the case of a sale, assignment, lease, transfer, conveyance or other disposition of all or substantially all of the assets of a Subsidiary Guarantor, upon

F074

the assumption provided for in clause (i) of Section 11.03(b) hereof such Subsidiary Guarantor shall be discharged from all further liability and obligation under the Indenture. Upon delivery by the Issuers to the Trustee of an Officers' Certificate to the effect of the foregoing, the Trustee shall execute any documents reasonably required in order to evidence the release of any Subsidiary Guarantor from its Obligation under its Note Guarantee. Any Subsidiary Guarantor not released from its Obligations under its Note Guarantee shall remain liable for the full amount of principal of, premium, if any, interest and Liquidated Damages, if any, on the Notes and for the other Obligations of such Subsidiary Guarantor under the Indenture as provided in this Article 11.

SECTION 11.05.    ADDITIONAL SUBSIDIARY GUARANTORS.

Any Person that was not a Subsidiary Guarantor on the date of this Indenture may become a Subsidiary Guarantor by executing and delivering to the Trustee (a) a supplemental indenture in substantially the form of Exhibit D, and (b) an Opinion of Counsel to the effect that such supplemental indenture has been duly authorized and executed by such Person and constitutes the legal, valid, binding and enforceable obligation of such Person (subject to such customary exceptions concerning creditors' rights, fraudulent transfers, public policy and equitable principles as may be acceptable to the Trustee in its discretion).

SECTION 11.06.    LIMITATION ON SUBSIDIARY GUARANTOR LIABILITY.

For purposes hereof, each Subsidiary Guarantor's liability shall be limited to the lesser of (i) the aggregate amount of the Obligations of the Issuers under the Notes and this Indenture and (ii) the amount, if any, which would not have (A) rendered such Subsidiary Guarantor "insolvent" (as such term is defined in the United States Bankruptcy Code and in the Debtor and Creditor Law of the State of New York) or (B) left such Subsidiary Guarantor with unreasonably small capital at the time its Note Guarantee of the Notes was entered into; provided that, it will be a presumption in any lawsuit or other proceeding in which a Subsidiary Guarantor is a party that the amount guaranteed pursuant to the Note Guarantee is the amount set forth in clause (i) above unless any creditor, or representative of creditors of such Subsidiary Guarantor, or debtor in possession or trustee in bankruptcy of the Subsidiary Guarantor, otherwise proves in such a lawsuit that the aggregate liability of the Subsidiary Guarantor is the amount set forth in clause (ii) above. In making any determination as to solvency or sufficiency of capital of a Subsidiary Guarantor in accordance with the previous sentence, the right of such Subsidiary Guarantor to contribution from other Subsidiary Guarantors, and any other rights such Subsidiary Guarantor may have, contractual or otherwise, shall be taken into account.

SECTION 11.07.    "TRUSTEE" TO INCLUDE PAYING AGENT.

In case at any time any Paying Agent other than the Trustee shall have been appointed by the Issuers and be then acting hereunder, the term "Trustee" as used in this Article 11 shall in each case (unless the context shall otherwise require) be construed as extending to and including such Paying Agent within its meaning as fully and for all intents and purposes as if such Paying Agent were named in this Article 11 in place of the Trustee.

F075

ARTICLE 12
SUBORDINATION OF NOTE GUARANTEE

SECTION 12.01.    AGREEMENT TO SUBORDINATE.

The Subsidiary Guarantors agree, and each Holder by accepting a Note agrees, that all Guarantee Obligations, shall be subordinated in right of payment, to the extent and in the manner provided in this Article 12, to the prior payment in full of all Guarantor Senior Debt, whether outstanding on the date hereof or thereafter incurred and that the subordination is for the benefit of the holders of Senior Debt.

SECTION 12.02.    LIQUIDATION; DISSOLUTION; BANKRUPTCY.

Upon any payment or distribution of assets of the Subsidiary Guarantors of any kind or character, whether in cash, property or securities, to creditors in any Insolvency or Liquidation Proceeding with respect to any Subsidiary Guarantor all amounts due or to become due under or with respect to all Senior Debt shall first be paid in full before any payment is made on account of the Notes, except that the Holders of Notes may receive Reorganization Securities. Upon any such Insolvency or Liquidation Proceeding, any payment or distribution of assets of any Subsidiary Guarantor of any kind or character, whether in cash, property or securities (other than Reorganization Securities), to which the Holders of the Notes or the Trustee would be entitled shall be paid by the Subsidiary Guarantors or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution, or by the Holders of the Notes or by the Trustee if received by them, directly to the holders of Senior Debt (pro rata to such holders on the basis of the amounts of Senior Debt held by such holders) or their Representative or Representatives, as their interests may appear, for application to the payment of the Senior Debt remaining unpaid until all such Senior Debt has been paid in full, after giving effect to any concurrent payment, distribution or provision therefor to or for the holders of Senior Debt.

SECTION 12.03.    DEFAULT ON DESIGNATED SENIOR DEBT.

(a) In the event of and during the continuation of any default in the payment of principal of, interest or premium, if any, on any Senior Debt, or any Obligation owing from time to time under or in respect of Senior Debt, or in the event that any event of default (other than a payment default) with respect to any Senior Debt shall have occurred and be continuing and shall have resulted in such Senior Debt becoming or being declared due and payable prior to the date on which it would otherwise have become due and payable, or (b) if any event of default other than as described in clause (a) above with respect to any Designated Senior Debt shall have occurred and be continuing permitting the holders of such Designated Senior Debt (or their Representative or Representatives) to declare such Designated Senior Debt due and payable prior to the date on which it would otherwise have become due and payable, then no payment shall be made by or on behalf of any Subsidiary Guarantor on account of the Notes (other than payments in the form of Reorganization Securities) (x) in case of any payment or nonpayment default specified in (a), unless and until such default shall have been cured or waived in writing in accordance with the instruments governing such Senior Debt, or such acceleration shall have been rescinded or annulled, or (y) in case of any nonpayment event of default specified in (b), during the period (a "Payment Blockage Period") commencing on the date the Subsidiary Guarantors or the Trustee receive written notice (a "Payment Notice") of such event of default (which notice shall be binding on

the Trustee and the Holders of Notes as to the occurrence of such a payment default or nonpayment event of default) from the Credit Agent (or other holders of Designated Senior Debt or their Representative or Representatives) and ending on the earliest of (A) 179 days after such date, (B) the date, if any, on which such Designated Senior Debt to which such default relates is paid in full or such default is cured or waived in writing in accordance with the instruments governing such Designated Senior Debt by the holders of such Designated Senior Debt and (C) the date on which the Trustee receives written notice from the Credit Agent (or other holders of Designated Senior Debt or their Representative or Representatives), as the case may be, terminating the Payment Blockage Period. During any consecutive 360-day period, the aggregate of all Payment Blockage Periods shall not exceed 179 days and there shall be a period of at least 181 consecutive days in each consecutive 360-day period when no Payment Blockage Period is in effect. No event of default which existed or was continuing with respect to the Senior Debt to which notice commencing a Payment Blockage Period was given on the date such Payment Blockage Period commenced shall be or be made the basis for the commencement of any subsequent Payment Blockage Period unless such event of default is cured or waived for a period of not less than 90 consecutive days.

SECTION 12.04.    ACCELERATION OF NOTES.

If payment of the Notes is accelerated because of an Event of Default, the Subsidiary Guarantor shall promptly notify such Representatives of Guarantor Senior Debt of the acceleration.

SECTION 12.05.    WHEN DISTRIBUTION MUST BE PAID OVER.

In the event that the Trustee or any Holder of a Note receives any payment of any Obligations with respect to the Notes at a time when such payment is prohibited by Section 12.03 hereof, such payment shall be held by the Trustee or such Holder, in trust for the benefit of, and shall be paid forthwith over and delivered, upon written request, to, the holders of Senior Debt as their interests may appear or their Representative under the indenture or other agreement (if any) pursuant to which Senior Debt may have been issued, as their respective interests may appear, for application to the payment of all Obligations with respect to Senior Debt remaining unpaid to the extent necessary to pay such Obligations in full in accordance with their terms, after giving effect to any concurrent payment or distribution to or for the holders of Senior Debt.

With respect to the holders of Senior Debt, the Trustee undertakes to perform only such obligations on the part of the Trustee as are specifically set forth in this Article 12, and no implied covenants or obligations with respect to the holders of Senior Debt shall be read into this Indenture against the Trustee. The Trustee shall not be deemed to owe any fiduciary duty to the holders of Senior Debt, and shall not be liable to any such holders if the Trustee shall pay over or distribute to or on behalf of Holders of the Notes or the Issuers or any other Person money or assets to which any holders of Senior Debt shall be entitled by virtue of this Article 12, except if such payment is made as a result of the willful misconduct or gross negligence of the Trustee.

SECTION 12.06.    NOTICE BY SUBSIDIARY GUARANTOR.

The Subsidiary Guarantors shall promptly notify the Trustee and the Paying Agent of any facts known to the Subsidiary Guarantors that would cause a payment of any Obligations with respect to the

F077

Notes to violate this Article, but failure to give such notice shall not affect the subordination of the Notes to the Senior Debt as provided in this Article.

SECTION 12.07. SUBROGATION.

After all Senior Debt is paid in full and until the Notes are paid in full, Holders of the Notes shall be subrogated (equally and ratably with all Pari Passu Debt) to the rights of holders of Senior Debt to receive distributions applicable to Senior Debt to the extent that distributions otherwise payable to the Holders of the Notes have been applied to the payment of Senior Debt. A distribution made under this Article to holders of Senior Debt that otherwise would have been made to Holders of the Notes is not, as between the Subsidiary Guarantors and Holders of the Notes, a payment by the Subsidiary Guarantors on the Notes.

SECTION 12.08. RELATIVE RIGHTS.

This Article defines the relative rights of Holders of the Notes and holders of Senior Debt. Nothing in this Indenture shall:

(1) impair, as between the Issuers and Holders of the Notes, the obligations of the Issuers, which are absolute and unconditional, to pay principal of and interest on the Notes in accordance with their terms;

(2) affect the relative rights of Holders of the Notes and creditors of the Issuers other than their rights in relation to holders of Senior Debt; or

(3) prevent the Trustee or any Holder of the Notes from exercising its available remedies upon a Default or Event of Default, subject to the rights of holders and owners of Senior Debt to receive distributions and payments otherwise payable to Holders of the Notes.

If the Issuers fail because of this Article to pay principal of or interest on a Note on the due date, the failure is still a Default or Event of Default.

SECTION 12.09. SUBORDINATION MAY NOT BE IMPAIRED BY SUBSIDIARY GUARANTOR.

No right of any holder of Senior Debt to enforce the subordination of the Indebtedness evidenced by the Notes shall be impaired by any act or failure to act by the Issuers or any Holder or by the failure of the Issuers or any Holder to comply with this Indenture.

Without in any way limiting the generality of the foregoing paragraph, the holders of Senior Debt, or any of them, may, at any time and from time to time, without the consent of or notice to the Holders of the Notes, without incurring any liabilities to any Holder of any Notes and without impairing or releasing the subordination and other benefits provided in this Indenture or the obligations of the Holders of the Notes to the holders of the Senior Debt, even if any right of reimbursement or subrogation or other right or remedy of any Holder of Notes is affected, impaired or extinguished thereby, do any one or more of the following:

72

(1) change the manner, place or terms of payment or change or extend the time of payment of, or renew, exchange, amend, increase or alter, the terms of any Senior Debt, any security therefor or guaranty thereof or any liability of any obligor thereon (including any guarantor) to such holder, or any liability incurred directly or indirectly in respect thereof or otherwise amend, renew, exchange, extend, modify, increase or supplement in any manner any Senior Debt or any instrument evidencing or guaranteeing or securing the same or any agreement under which Senior Debt is outstanding;

(2) sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any property pledged, mortgaged or otherwise securing Senior Debt or any liability of any obligor thereon, to such holder, or any liability incurred directly or indirectly in respect thereof;

(3) settle or compromise any Senior Debt or any other liability of any obligor of the Senior Debt to such holder or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including, without limitation, Senior Debt) in any manner or order; and

(4) fail to take or to record or to otherwise perfect, for any reason or for no reason, any lien or security interest securing Senior Debt by whomsoever granted, exercise or delay in or refrain from exercising any right or remedy against any obligor or any guarantor or any other person, elect any remedy and otherwise deal freely with any obligor and any security for the Senior Debt or any liability of any obligor to such holder or any liability incurred directly or indirectly in respect thereof.

SECTION 12.10.    *DISTRIBUTION OR NOTICE TO REPRESENTATIVE.*

Whenever a distribution is to be made or a notice given to holders of Senior Debt, the distribution may be made and the notice given to their Representative.

Upon any payment or distribution of assets of the Issuers referred to in this Article 12, the Trustee and the Holders of the Notes shall be entitled to rely upon any order or decree made by any court of competent jurisdiction or upon any certificate of such Representative or the liquidating trustee or agent or other Person making any distribution to the Trustee or to the Holders of the Notes for the purpose of ascertaining the Persons entitled to participate in such distribution, the holders of the Senior Debt and other Indebtedness of the Issuers, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article 12.

SECTION 12.11.    *RIGHTS OF TRUSTEE AND PAYING AGENT.*

Notwithstanding the provisions of this Article 12 or any other provision of this Indenture, the Trustee shall not be charged with knowledge of the existence of any facts that would prohibit the making of any payment or distribution by the Trustee, and the Trustee and the Paying Agent may continue to make payments on the Notes, unless the Trustee shall have received at its Corporate Trust Office at least three Business Days prior to the date of such payment written notice of facts that would cause the payment of any Obligations with respect to the Notes to violate this Article.  Only the Issuers or a

F079

Representative may give the notice. Nothing in this Article 12 shall impair the claims of, or payments to, the Trustee under or pursuant to Section 7.07 hereof.

The Trustee in its individual or any other capacity may hold Senior Debt with the same rights it would have if it were not Trustee. Any Agent may do the same with like rights.

SECTION 12.12.    AUTHORIZATION TO EFFECT SUBORDINATION.

Each Holder of a Note by the Holder's acceptance thereof authorizes and directs the Trustee on the Holder's behalf to take such action as may be necessary or appropriate to effectuate the subordination as provided in this Article 12, and appoints the Trustee to act as the Holder's attorney-in-fact for any and all such purposes, including without limitation the timely filing of a claim for the unpaid balance of the Notes held by such Holder in the form required in any Insolvency or Liquidation Proceeding and causing such claim to be approved. If the Trustee does not file a proper proof of claim or proof of debt in the form required in any proceeding referred to in Section 6.09 hereof at least 30 days before the expiration of the time of such claim, the Representatives of the Designated Senior Debt, including the Credit Agent, are hereby authorized to file an appropriate claim for and on behalf of the Holders of the Notes.

SECTION 12.13.    AMENDMENTS.

Any amendment to the provisions of this Article 12 shall require the consent of the Holders of at least 75% in aggregate amount of Notes then outstanding if such amendment would adversely affect the rights of the Holders of Notes.

ARTICLE 13
MISCELLANEOUS

SECTION 13.01.    TRUST INDENTURE ACT CONTROLS.

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA §318(c), the imposed duties shall control.

SECTION 13.02.    NOTICES.

Any notice or communication by the Issuers, the Subsidiary Guarantors or the Trustee to the others is duly given if in writing and delivered in Person or mailed by first class mail (registered or certified, return receipt requested), telecopier or overnight air courier guaranteeing next day delivery, to the others' address:

74

If to the Issuers or the Subsidiary Guarantors:

    Foamex International Inc.
    375 Park Avenue
    11th Floor
    New York, New York 10152
    Telecopier No.: (212) 593-1363
    Attention: President & CEO

With a copy to:

    Willkie Farr & Gallagher
    One Citicorp Center
    153 East 53rd Street
    New York, New York 10022
    Telecopier No.: (212) 821-8111
    Attention: Jack H. Nusbaum

If to the Trustee:

    The Bank of New York
    101 Barclay Street, Floor 21 W
    New York, New York 10286
    Telecopier No.: (212) 815-5915
    Attention: Lucille Firrincieli

    The Issuers, the Subsidiary Guarantors or the Trustee, by notice to the others may designate additional or different addresses for subsequent notices or communications.

    All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; and the next Business Day after timely delivery to the courier, if sent by overnight air courier promising next Business Day delivery.

    Any notice or communication to a Holder shall be mailed by first class mail or by overnight air courier promising next Business Day delivery to its address shown on the register kept by the Registrar. Any notice or communication shall also be so mailed to any Person described in TIA § 313(c), to the extent required by the TIA. Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

    If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

    If the Issuers mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

F081

SECTION 13.03.    *COMMUNICATION BY HOLDERS OF NOTES WITH OTHER HOLDERS OF NOTES.*

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes. The Issuers, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

SECTION 13.04.    *CERTIFICATE AND OPINION AS TO CONDITIONS PRECEDENT.*

Upon any request or application by the Issuers or the Subsidiary Guarantors to the Trustee to take any action under this Indenture (other than the initial issuance of the Senior Subordinated Notes), such Issuer or Subsidiary Guarantor shall furnish to the Trustee upon request:

(a)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

SECTION 13.05.    *STATEMENTS REQUIRED IN CERTIFICATE OR OPINION.*

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA § 314(a)(4)) shall comply with the provisions of TIA § 314(e) and shall include:

(a)    a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)    a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

SECTION 13.06.    *RULES BY TRUSTEE AND AGENTS.*

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

F082

SECTION 13.07.    NO PERSONAL LIABILITY OF DIRECTORS, OFFICERS, EMPLOYEES AND STOCKHOLDERS.

No director, officer, employee, partner, incorporator or stockholder of the Issuers or any of their Restricted Subsidiaries, as such, shall have any liability for any obligations of the Issuers or any Subsidiary Guarantor under the Notes, this Indenture, the Note Guarantees, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.08.    GOVERNING LAW.

THE INTERNAL LAW OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE, THE NOTES AND THE NOTE GUARANTEES.

SECTION 13.09.    NO ADVERSE INTERPRETATION OF OTHER AGREEMENTS.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuers or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

SECTION 13.10.    SUCCESSORS.

All agreements of the Issuers and the Subsidiary Guarantors in this Indenture, the Notes and the Note Guarantees shall bind their respective successors and assigns. All agreements of the Trustee in this Indenture shall bind its successors and assigns.

SECTION 13.11.    SEVERABILITY.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 13.12.    COUNTERPART ORIGINALS.

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

SECTION 13.13.    TABLE OF CONTENTS, HEADINGS, ETC.

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

[Signatures on following page]

F083

## SIGNATURES

Dated as of June 12, 1997

FOAMEX L.P.
By its Managing General Partner FMXI, Inc.

By: _____
Name:  Philip N. Smith, Jr.
Title:  Vice President

FOAMEX CAPITAL CORPORATION

By: _____
Name:  Philip N. Smith, Jr.
Title:  Vice President

GENERAL FELT INDUSTRIES, INC.

By: _____
Name:  Philip N. Smith, Jr.
Title:  Vice President

FOAMEX FIBERS, INC.

By: _____
Name:  Philip N. Smith, Jr.
Title:  Vice President

THE BANK OF NEW YORK,
as Trustee

By: _____
Name:  LUCILLE FIRRINDIELI
Title:  ASSISTANT VICE PRESIDENT

F084

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
FOAMEX INTERNATIONAL INC., ET AL. CLAIMS PROCESSING
C/O BANKRUPTCY SERVICES, LLC
PO Box 5013, FDR STATION
NEW YORK, NY 10150-5013

## PROOF OF CLAIM

| In Re:<br>Foamex International Inc., et al.,<br>Debtors. | Chapter 11 Case Nos.<br>05-12685 through 05-12693<br>(Jointly Administered) |
| --- | --- |
| Name of Debtor Against Which Claim is Held<br>Foamex L.P. | Case No. of Debtor<br>05-12687 |

NOTE: This Form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

The Bank of New York
Default Administration Group
Corporate Trust
101 Barclay Street, 8W
New York, NY 10286
Attn: Stuart Kratter, Vice President, Corporate Trust

Telephone number: 212-815-5466

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - District of Delaware
Foamex International, Inc., Et Al.
05-12685 (PJW)          0000000816

Account or other number by which creditor identifies debtor:

Check here if this claim: ☐ replaces  ☐ amends a previously filed claim, dated:_____

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other  See attached _____ (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Last Four Digits of your SS#:  ___  ___  ___  ___

Unpaid compensation for services performed

from _____ to _____
      (date)            (date)

**2.** Date debt was incurred:  See attached

**3.** If court judgment, date obtained:

**4.** Total Amount of Claim at Time Case Filed: $_____ + _____ + _____ = Approximately $208 million
                                              (unsecured nonpriority)  (secured)  (unsecured priority)  (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $_____
Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6.** Unsecured Nonpriority Claim: $_____  See attached
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7.  Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries, or commissions (up to $10,000), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,225 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other- Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**8.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9.  Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
**DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10**  Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**FILED / RECEIVED**

DEC 0 7 2005

BANKRUPTCY SERVICES, LLC

| Date<br>12-1-2005 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>STUART KRATTER, VP |
| --- | --- |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

F085

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FOAMEX INTERNATIONAL INC., et al., | Jointly Administered |
| Debtors.[1] | Case No. 05-12685 (PJW) |

## ATTACHMENT TO PROOF OF CLAIM OF
## THE BANK OF NEW YORK AS INDENTURE TRUSTEE

1.    The undersigned, Stuart Kratter, Vice President, Default Administration Group, Corporate Trust, of The Bank of New York, a banking corporation organized under the laws of the State of New York and doing business at 101 Barclay Street, 8W, New York, NY 10286, is duly authorized to execute this proof of claim on behalf of The Bank of New York (the "Claimant"). Claimant is filing this proof of claim as indenture trustee under the following indentures: (i) an indenture dated as of December 23, 1997, (the "2005 Indenture"), by and between Foamex L.P ("Foamex") and Foamex Capital Corporation ("FCC"), each as Issuer, General Felt Industries, Inc., Foamex LLC, and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee, and (ii) an indenture dated as of June 12, 1997 (the "2007 Indenture," and together with the 2005 Indenture, the "Indentures"), by and between Foamex and FCC, each as Issuer, General Felt Industries, Inc. and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee.

2.    On or about December 23, 1997, under the 2005 Indenture, Foamex and FCC issued 13.5% Notes due 2005 in the aggregate principal amount of $98 million. The

---

[1]    The Debtors are the following entities: Foamex International Inc., FMXI, Inc., Foamex L.P., Foamex Capital Corporation, Foamex Carpet Cushion LLC, Foamex Asia, Inc., Foamex Latin America, Inc., Foamex Mexico, Inc., and Foamex Mexico II, Inc.

maturity date for the 13.5% Notes was August 15, 2005. Foamex and FCC failed to pay both principal due and payable upon maturity and the final interest payment, which constituted an "Event of Default" under the 2005 Indenture.

3. On or about November 26, 1997, under the 2007 Indenture, Foamex and FCC issued 9.875% Notes due 2007 in the aggregate principal amount of $150 million (the 9.875% Notes and the 13.5% Notes are collectively referred to as the "Securities").

4. The due and punctual payment of all amounts due under the Securities was guaranteed joint and severally by the subsidiary guarantors thereto in accordance with Section 11.01 of the Indentures.

5. Section 6.09 of the Indentures authorizes Claimant to file and prove this claim in order to have the claims of Claimant and all holders of the Securities allowed in Foamex's Chapter 11 case.

6. As of September 19, 2005, the date the petition was filed initiating this case (the "Petition Date"), Foamex was and still is indebted to Claimant for the amounts described in the following paragraphs, and for all other amounts which have accrued since the filing date, including without limitation post-petition interest, fees, and costs:

    a. $55,821,099.30 was owing as of the Petition Date to the holders of the issued 13.5% Notes due 2005 under the 2005 Indenture, which amount includes $51,585,000 in principal, $3,481,987.50 in interest, and $754,111.80 in defaulted interest in accordance with Section 2.12 of the 2005 Indenture.

    b. $152,329,031.25 was owing as of the Petition Date to the holders of the issued 9.875% Notes due 2007 under the 2007 Indenture, which amount includes $148,500,000 in principal, $3,829,031.25 in interest.

    c. Foamex is indebted to Claimant for all interest, trustee's fees, reimbursable costs, advances and expenses, and compensation for services performed (including, without limitation, reasonable compensation, disbursements and expenses of the Claimant's agents and counsel), in accordance with the terms and provisions of the Indentures (expressly

2

Section 7.7) and to the extent permitted under the Bankruptcy Code. Approximately $47,000 was owing to the Trustee for unpaid fees as described above, including fees owed to Trustee's counsel, as of October 31, 2005. Claimant's claim pursuant to this paragraph 3(c) is unliquidated as of the date hereof.

d.  The Claimant asserts that certain post-petition claims constitute an administrative expense of Foamex's estate and will include Foamex's claim for trustee's fees, reimbursable costs and expenses, and compensation for services performed (including, without limitation, legal fees and expenses) in accordance with the terms and provisions of the relevant agreements and to the extent permitted under the Bankruptcy Code. Claimant's claim pursuant to this paragraph 3(d) is unliquidated as of the date hereof.

e.  Claimant's claims in paragraphs 3(a) through 3(d) above are made without prejudice to any other claims arising after the Petition Date.

7.  The consideration for the debt described above is that Foamex entered into the Indentures which authorized the issuance of the Securities. Pursuant to the Indentures, the Securities were issued in the maximum aggregate principal amount of $248 million, of which an aggregate balance of $208,150,130.55 million is currently outstanding. The consideration for Foamex's obligation to repay the Securities and for the covenants of Foamex to pay the fees, costs, compensation, and expenses described in paragraph 3 hereof was the funding of the Securities and Claimant's agreement to serve as Indenture Trustee under the Indentures. A copy of the Indentures is annexed hereto as Exhibit A and B and the Indentures are incorporated herein by reference.

8.  This claim is not founded on an open account other than as set forth in paragraphs 3(a) through 3(d) above.

9.  No judgment has been rendered on the claim made hereby.

10.  The amount of all payments heretofore made on this claim have been credited and deducted for the purpose of making this proof of claim. Claimant holds no cash or securities as Indenture Trustee for the account of said trust.

3

F088

11.    To the extent the Claimant holds cash collateral of Foamex, Claimant's claim may be subject to any setoff or counterclaim.

12.    To the extent the Claimant holds cash collateral of Foamex, Claimant may hold a security interest for its claim except that such security interest does not have priority over money held in trust to pay principal and interest on particular Securities.

13.    This claim is a general unsecured claim, except that Section 7.7 of the Indentures provides that (1) Claimant shall have a claim prior to that of the holders of the Securities issued pursuant to the Indentures on all property and funds held in trust to pay for all amounts of compensation, expenses and indemnification due to Claimant under such section (except that such claim is not prior to funds held in trust to pay principal and interest on particular Securities), and (2) Claimant's claims for reimbursable costs and expenses, trustee's fees, and compensation for services performed (including, without limitation, legal fees and expenses) accruing after the Petition Date constitute expenses of administration under the Bankruptcy Code and are therefore entitled to priority under Section 507(a) of the Bankruptcy Code.

14.    Claimant reserves the right to amend or supplement this proof of claim in any respect, to fix or liquidate any claims stated herein, to specify and quantify expenses or other charges or claims incurred by Claimant, to assert any additional claim for priority, and to file additional proofs of claim for additional claims.

15.    The execution and filing of this proof of claim is not a waiver of any of Claimant's rights including, without limitation, the right to move to withdraw the reference with respect to the subject matter of this claim or otherwise, and any right to trial by jury that Claimant may have in any civil proceeding arising in or related to this case, nor is it a consent to

F089

jurisdiction of this or any court except with respect to the allowance of the claims asserted herein.

16.    The post office address of the Claimant and the address to which all notices to the Claimant should be addressed is:

> The Bank of New York
> Default Admin Group
> 101 Barclay Street, 8W
> New York, NY 10286
> Attn: Stuart Kratter, Vice President, Corporate Trust

with a copy to:

> Dechert LLP
> 30 Rockefeller Plaza
> New York, New York 10112-2200
> Attn: Glenn E. Siegel, Esq.

Dated: December 1, 2005

**THE BANK OF NEW YORK**, as Indenture Trustee

By: _____
    Stuart Kratter, Vice President,
    Default Administration Group
    Corporate Trust

Penalty for Presenting Fraudulent Claim. Fine of not more than $500,000.00 or imprisonment for not more than 5 years or both -- Title 18 U.S.C. §§ 152 and 3571.

5

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE<br>FOAMEX INTERNATIONAL INC., ET AL. CLAIMS PROCESSING<br>c/o BANKRUPTCY SERVICES, LLC<br>PO BOX 5013, FDR STATION<br>New York, NY 10150-5013 | **PROOF OF CLAIM** |
|---|---|

| In Re:<br>Foamex International Inc., et al.,<br>　　　　　　　　　　　　　　Debtors. | Chapter 11 Case Nos.<br>05-12685 through 05-12693<br>(Jointly Administered) | |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>Foamex Capital Corporation | Case No. of Debtor<br>05-12688 | |

NOTE: This Form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| **Name and address of Creditor :** (and name and address where notices should be sent if different from Creditor)<br><br>The Bank of New York<br>Default Administration Group<br>Corporate Trust<br>101 Barclay Street, 8W<br>New York, NY  10286<br>Attn:  Stuart Kratter, Vice President, Corporate Trust<br><br>Telephone number: 212-815-5466 | THIS SPACE IS FOR COURT USE ONLY<br><br>❏ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>❏ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>❏ Check box if the address differs from the address on the envelope sent to you by the court. | Filed: USBC - District of Delaware<br>Foamex International, Inc., Et AL<br>05-12685 (PJW)        0000000817 |
|---|---|---|

| Account or other number by which creditor identifies debtor: | **Check here if this claim:**<br>❏ replaces         ❏ amends a previously filed claim, dated:_____ |
|---|---|

| 1.  **Basis for Claim**<br>　❏ Goods sold<br>　❏ Services performed<br>　❏ Money loaned<br>　❏ Personal injury/wrongful death<br>　❏ Taxes<br>　☒ Other  _See attached_____ (explain) | ❏ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>❏ Wages, salaries, and compensation (fill out below)<br><br>Last Four Digits of your SS#:  ____ ____ ____ ____<br><br>Unpaid compensation for services performed<br><br>from _____to _____<br>　　　　　(date)　　　　　　　(date) |
|---|---|

| 2.  Date debt was incurred:  See attached | 3.　　If court judgment, date obtained: |
|---|---|

4.  **Total Amount of Claim at Time Case Filed:** $_____+_____+_____= Approximately $208 million
　　　　　　　　　　　(unsecured nonpriority)　　(secured)　　(unsecured priority)　　(Total)
　　If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 5.  **Secured Claim.**<br>❏ Check this box if your claim is secured by collateral (including a right of setoff).<br>　Brief Description of Collateral:<br>　❏ Real Estate     ❏ Motor Vehicle<br>　❏ Other_____<br>　Value of Collateral: $_____<br>　Amount of arrearage and other charges _at time case filed_ included in secured claim, if any: $_____<br><br>6.  **Unsecured Nonpriority Claim:** $_____  See attached_____<br>☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority. | 7.　　**Unsecured Priority Claim.**<br>❏ Check this box if you have an unsecured priority claim<br>　Amount entitled to priority $_____<br>　Specify the priority of the claim:<br>　❏ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).<br>　❏ Wages, salaries, or commissions (up to $10,000), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).<br>　❏ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).<br>　❏ Up to $2,225 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).<br>　❏ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).<br>　❏ Other- Specify applicable paragraph of 11 U.S.C. § 507(a)(____). |
|---|---|

| 8.  **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br><br>9.  **Supporting Documents:** _Attach copies of supporting documents,_ such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.<br>**DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.<br><br>10  Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY<br><br>**FILED / RECEIVED**<br><br>DEC 0 7 2005<br><br>BANKRUPTCY SERVICES, LLC |
|---|---|

| Date<br><br>12/01/2005 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>_STUART KRATTER, V.P._ |
|---|---|

_Penalty for presenting fraudulent claim:_ Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

F091

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FOAMEX INTERNATIONAL INC., et al., | ) | Jointly Administered |
| | ) | Case No. 05-12685 (PJW) |
| Debtors.[1] | ) | |
| | ) | |

## ATTACHMENT TO PROOF OF CLAIM OF
## THE BANK OF NEW YORK AS INDENTURE TRUSTEE

1.     The undersigned, Stuart Kratter, Vice President, Default Administration Group, Corporate Trust, of The Bank of New York, a banking corporation organized under the laws of the State of New York and doing business at 101 Barclay Street, 8W, New York, NY 10286, is duly authorized to execute this proof of claim on behalf of The Bank of New York (the "Claimant"). Claimant is filing this proof of claim as indenture trustee under the following indentures: (i) an indenture dated as of December 23, 1997, (the "2005 Indenture"), by and between Foamex L.P ("Foamex") and Foamex Capital Corporation ("FCC"), each as Issuer, General Felt Industries, Inc., Foamex LLC, and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee, and (ii) an indenture dated as of June 12, 1997 (the "2007 Indenture," and together with the 2005 Indenture, the "Indentures"), by and between Foamex and FCC, each as Issuer, General Felt Industries, Inc. and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee.

2.     On or about December 23, 1997, under the 2005 Indenture, Foamex and FCC issued 13.5% Notes due 2005 in the aggregate principal amount of $98 million. The

---

[1]     The Debtors are the following entities: Foamex International Inc., FMXI, Inc., Foamex L.P., Foamex Capital Corporation, Foamex Carpet Cushion LLC, Foamex Asia, Inc., Foamex Latin America, Inc., Foamex Mexico, Inc., and Foamex Mexico II, Inc.

maturity date for the 13.5% Notes was August 15, 2005. Foamex and FCC failed to pay both principal due and payable upon maturity and the final interest payment, which constituted an "Event of Default" under the 2005 Indenture.

3.    On or about November 26, 1997, under the 2007 Indenture, Foamex and FCC issued 9.875% Notes due 2007 in the aggregate principal amount of $150 million (the 9.875% Notes and the 13.5% Notes are collectively referred to as the "Securities").

4.    The due and punctual payment of all amounts due under the Securities was guaranteed joint and severally by the subsidiary guarantors thereto in accordance with Section 11.01 of the Indentures.

5.    Section 6.09 of the Indentures authorizes Claimant to file and prove this claim in order to have the claims of Claimant and all holders of the Securities allowed in Foamex's Chapter 11 case.

6.    As of September 19, 2005, the date the petition was filed initiating this case (the "Petition Date"), FCC was and still is indebted to Claimant for the amounts described in the following paragraphs, and for all other amounts which have accrued since the filing date, including without limitation post-petition interest, fees, and costs:

a.    $55,821,099.30 was owing as of the Petition Date to the holders of the issued 13.5% Notes due 2005 under the 2005 Indenture, which amount includes $51,585,000 in principal, $3,481,987.50 in interest, and $754,111.80 in defaulted interest in accordance with Section 2.12 of the 2005 Indenture.

b.    $152,329,031.25 was owing as of the Petition Date to the holders of the issued 9.875% Notes due 2007 under the 2007 Indenture, which amount includes $148,500,000 in principal, $3,829,031.25 in interest.

c.    FCC is indebted to Claimant for all interest, trustee's fees, reimbursable costs, advances and expenses, and compensation for services performed (including, without limitation, reasonable compensation, disbursements and expenses of the Claimant's agents and counsel), in accordance with the terms and provisions of the Indentures (expressly Section 7.7) and to

2

F093

the extent permitted under the Bankruptcy Code. Approximately $47,000 was owing to the Claimant for unpaid fees as described above, including fees owed to Claimant's counsel, as of October 30, 2005. Claimant's claim pursuant to this paragraph 3(c) is unliquidated as of the date hereof.

d.    The Claimant asserts that certain post-petition claims constitute an administrative expense of FCC's estate and will include Claimant's claim for trustee's fees, reimbursable costs and expenses, and compensation for services performed (including, without limitation, legal fees and expenses) in accordance with the terms and provisions of the relevant agreements and to the extent permitted under the Bankruptcy Code. Claimant's claim pursuant to this paragraph 3(d) is unliquidated as of the date hereof.

e.    Claimant's claims in paragraphs 3(a) through 3(d) above are made without prejudice to any other claims arising after the Petition Date.

7.    The consideration for the debt described above is that FCC entered into the Indentures which authorized the issuance of the Securities. Pursuant to the Indentures, the Securities were issued in the maximum aggregate principal amount of $248 million, of which an aggregate balance of $208,150,130.55 million is currently outstanding. The consideration for FCC's obligation to repay the Securities and for the covenants of FCC to pay the fees, costs, compensation, and expenses described in paragraph 3 hereof was the funding of the Securities and Claimant's agreement to serve as Indenture Trustee under the Indentures. A copy of the Indentures is annexed hereto as Exhibit A and B and the Indentures are incorporated herein by reference.

8.    This claim is not founded on an open account other than as set forth in paragraphs 3(a) through 3(d) above.

9.    No judgment has been rendered on the claim made hereby.

10.    The amount of all payments heretofore made on this claim have been credited and deducted for the purpose of making this proof of claim. Claimant holds no cash or securities as Indenture Trustee for the account of said trust.

3

11. To the extent the Claimant holds cash collateral of FCC, Claimant's claim may be subject to any setoff or counterclaim.

12. To the extent the Claimant holds cash collateral of FCC, Claimant may hold a security interest for its claim except that such security interest does not have priority over money held in trust to pay principal and interest on particular Securities.

13. This claim is a general unsecured claim, except that Section 7.7 of the Indentures provides that (1) Claimant shall have a claim prior to that of the holders of the Securities issued pursuant to the Indentures on all property and funds held in trust to pay for all amounts of compensation, expenses and indemnification due to Claimant under such section (except that such claim is not prior to funds held in trust to pay principal and interest on particular Securities), and (2) Claimant's claims for reimbursable costs and expenses, trustee's fees, and compensation for services performed (including, without limitation, legal fees and expenses) accruing after the Petition Date constitute expenses of administration under the Bankruptcy Code and are therefore entitled to priority under Section 507(a) of the Bankruptcy Code.

14. Claimant reserves the right to amend or supplement this proof of claim in any respect, to fix or liquidate any claims stated herein, to specify and quantify expenses or other charges or claims incurred by Claimant, to assert any additional claim for priority, and to file additional proofs of claim for additional claims.

15. The execution and filing of this proof of claim is not a waiver of any of Claimant's rights including, without limitation, the right to move to withdraw the reference with respect to the subject matter of this claim or otherwise, and any right to trial by jury that Claimant may have in any civil proceeding arising in or related to this case, nor is it a consent to

4

jurisdiction of this or any court except with respect to the allowance of the claims asserted herein.

16.    The post office address of the Claimant and the address to which all notices to the Claimant should be addressed is:

> The Bank of New York
> Default Admin Group
> 101 Barclay Street, 8W
> New York, NY 10286
> Attn: Stuart Kratter, Vice President, Corporate Trust

with a copy to:

> Dechert LLP
> 30 Rockefeller Plaza
> New York, New York 10112-2200
> Attn: Glenn E. Siegel, Esq.

Dated: December ____, 2005

**THE BANK OF NEW YORK,** as Indenture Trustee

By: _____
Stuart Kratter, Vice President,
Default Administration Group
Corporate Trust

Penalty for Presenting Fraudulent Claim. Fine of not more than $500,000.00 or imprisonment for not more than 5 years or both -- Title 18 U.S.C. §§ 152 and 3571.

5

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
FOAMEX INTERNATIONAL INC., ET AL. CLAIMS PROCESSING
C/O BANKRUPTCY SERVICES, LLC
PO BOX 5013, FDR STATION
NEW YORK, NY 10150-5013

## PROOF OF CLAIM

| In Re: Foamex International Inc., et al., Debtors. | Chapter 11 Case Nos. 05-12685 through 05-12693 (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held Foamex L.P. | Case No. of Debtor 05-12687 |

NOTE: This Form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

The Bank of New York
Default Administration Group
Corporate Trust
101 Barclay Street, 8W
New York, NY 10286
Attn: Stuart Kratter, Vice President, Corporate Trust
Telephone number: 212-815-5466

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - District of Delaware
Foamex International, Inc., Et Al.
05-12685 (PJW)          0000001308

| Account or other number by which creditor identifies debtor: | **Check here if this claim:** ☐ replaces  ☒ amends a previously filed claim, dated: <u>December 1, 2005</u> |
|---|---|

1. **Basis for Claim**
   ☐ Goods sold
   ☐ Services performed
   ☐ Money loaned
   ☐ Personal injury/wrongful death
   ☐ Taxes
   ☒ Other <u>See attached</u>_____ (explain)

   ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
   ☐ Wages, salaries, and compensation (fill out below)

   Last Four Digits of your SS#: ___ ___ ___ ___ — ___ ___ ___ ___
   Unpaid compensation for services performed
   from _____ to _____
   (date)                              (date)

2. **Date debt was incurred: See attached**

3. **If court judgment, date obtained:**

4. **Total Amount of Claim at Time Case Filed:** $_____+_____+_____=Approximately $208 million
   (unsecured nonpriority)  (secured)  (unsecured priority)  (Total)

   If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
   ☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. **Secured Claim.**
   ☐ Check this box if your claim is secured by collateral (including a right of setoff).
   Brief Description of Collateral:
   ☐ Real Estate  ☐ Motor Vehicle
   ☐ Other _____
   Value of Collateral: $_____
   Amount of arrearage and other charges <u>at time case filed</u> included in secured claim, if any: $_____

7. **Unsecured Priority Claim.**
   ☐ Check this box if you have an unsecured priority claim
   Amount entitled to priority $_____
   Specify the priority of the claim:
   ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
   ☐ Wages, salaries or commissions (up to $10,000), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
   ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
   ☐ Up to $2,225 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
   ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
   ☐ Other- Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

6. **Unsecured Nonpriority Claim:** $_____ <u>See attached</u>
   ☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

THIS SPACE IS FOR COURT USE ONLY

8. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

9. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
   **DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

10. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

**FILED / RECEIVED**

JUL 17 2006

BANKRUPTCY SERVICES, LLC

| Date 7/12/2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) *STUART KRATTER, VP* |
|---|---|

12734748.2.BUSINESS 7/13/2006 3:09 PM

F097

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| FOAMEX INTERNATIONAL INC., et al., ) | Jointly Administered |
| ) | Case No. 05-12685 (PJW) |
| Debtors.[1] ) | |
| ) | |

## ATTACHMENT TO AMENDED PROOF OF CLAIM OF
## THE BANK OF NEW YORK AS INDENTURE TRUSTEE

1.     The undersigned, Stuart Kratter, Vice President, Default Administration Group, Corporate Trust, of The Bank of New York, a banking corporation organized under the laws of the State of New York and doing business at 101 Barclay Street, 8W, New York, NY 10286, is duly authorized to execute this amended proof of claim on behalf of The Bank of New York (the "Claimant"). Claimant is filing this amended proof of claim as indenture trustee under the following indentures: (i) an indenture dated as of December 23, 1997, (the "2005 Indenture"), by and between Foamex L.P ("Foamex") and Foamex Capital Corporation ("FCC"), each as Issuer, General Felt Industries, Inc., Foamex LLC, and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee, and (ii) an indenture dated as of June 12, 1997 (the "2007 Indenture," and together with the 2005 Indenture, the "Indentures"), by and between Foamex and FCC, each as Issuer, General Felt Industries, Inc. and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee.

2.     On or about December 23, 1997, under the 2005 Indenture, Foamex and FCC issued 13.5% Notes due 2005 in the aggregate principal amount of $98 million. The

---

[1]     The Debtors are the following entities: Foamex International Inc., FMXI, Inc., Foamex L.P., Foamex Capital Corporation, Foamex Carpet Cushion LLC, Foamex Asia, Inc., Foamex Latin America, Inc., Foamex Mexico, Inc., and Foamex Mexico II, Inc.

maturity date for the 13.5% Notes was August 15, 2005. Foamex and FCC failed to pay both principal due and payable upon maturity and the final interest payment, which constituted an "Event of Default" under the 2005 Indenture.

3. On or about November 26, 1997, under the 2007 Indenture, Foamex and FCC issued 9.875% Notes due 2007 in the aggregate principal amount of $150 million (the 9.875% Notes and the 13.5% Notes are collectively referred to as the "Securities"). No payment has been made on the 9.875% Notes since June 15, 2005.

4. The due and punctual payment of all amounts due under the Securities was guaranteed joint and severally by the subsidiary guarantors thereto in accordance with Section 11.01 of the Indentures.

5. Section 6.09 of the Indentures authorizes Claimant to file and prove this claim in order to have the claims of Claimant and all holders of the Securities allowed in Foamex's Chapter 11 case.

6. As of September 19, 2005, the date the petition was filed initiating this case (the "Petition Date"), Foamex was and still is indebted to Claimant for the amounts described in the following paragraphs under the Indentures and applicable law, and for all other amounts which have accrued since the filing date, including without limitation post-petition interest, fees, and costs:

    a. $55,821,099.30 was owing as of the Petition Date to the holders of the issued 13.5% Notes due 2005 under the 2005 Indenture, which amount includes $51,585,000 in principal, $3,481,987.50 in interest, and $754,111.80 in defaulted interest in accordance with Section 2.12 of the 2005 Indenture. In addition, $6.5 million was owing as of July 1, 2006, in post-petition defaulted interest in accordance with Sections 2.2 and 4.1 of the 2005 Indenture.

    b. $152,329,031.25 was owing as of the Petition Date to the holders of the issued 9.875% Notes due 2007 under the 2007 Indenture, which amount includes $148,500,000 in principal, $3,829,031.25 in interest. In addition,

$13 million was owing as of July 1, 2006, in post-petition defaulted interest in accordance with Sections 2.2 and 4.1 of the 2007 Indenture.

c.    Foamex is indebted to Claimant for all interest, trustee's fees, reimbursable costs, advances and expenses, and compensation for services performed (including, without limitation, reasonable compensation, disbursements and expenses of the Claimant's agents and counsel), in accordance with the terms and provisions of the Indentures (expressly Section 7.7) and to the extent permitted under the Bankruptcy Code. Approximately $[267,000] was owing to the Trustee for unpaid fees as described above, including fees owed to Trustee's counsel, as of October 31, 2005. Claimant's claim pursuant to this paragraph 3(c) is unliquidated as of the date hereof.

d.    The Claimant asserts that certain post-petition claims constitute an administrative expense of Foamex's estate and will include Foamex's claim for trustee's fees, reimbursable costs and expenses, and compensation for services performed (including, without limitation, legal fees and expenses) in accordance with the terms and provisions of the relevant agreements and to the extent permitted under the Bankruptcy Code. Claimant's claim pursuant to this paragraph 3(d) is unliquidated as of the date hereof.

e.    Claimant's claims in paragraphs 3(a) through 3(d) above are made without prejudice to any other claims arising after the Petition Date.

7.    The consideration for the debt described above is that Foamex entered into the Indentures which authorized the issuance of the Securities. Pursuant to the Indentures, the Securities were issued in the maximum aggregate principal amount of $248 million, of which an aggregate principal balance of $208,150,130.55 million is currently outstanding. The consideration for Foamex's obligation to repay the Securities and for the covenants of Foamex to pay the fees, costs, compensation, and expenses described in paragraph 3 hereof was the funding of the Securities and Claimant's agreement to serve as Indenture Trustee under the Indentures. A copy of each of the Indentures is annexed to the proof of claim filed by the Indenture Trustee dated December 1, 2005 and the Indentures are incorporated herein by reference.

8.    This claim is not founded on an open account other than as set forth in paragraphs 3(a) through 3(d) above.

9.    No judgment has been rendered on the claim made hereby.

10.    The amount of all payments heretofore made on this claim have been credited and deducted for the purpose of making this proof of claim. Claimant holds no cash or securities as Indenture Trustee for the account of said trust.

11.    To the extent the Claimant holds cash collateral of Foamex, Claimant's claim may be subject to any setoff or counterclaim.

12.    To the extent the Claimant holds cash collateral of Foamex, Claimant may hold a security interest for its claim except that such security interest does not have priority over money held in trust to pay principal and interest on particular Securities.

13.    This claim is a general unsecured claim, except that Section 7.7 of the Indentures provides that (1) Claimant shall have a claim prior to that of the holders of the Securities issued pursuant to the Indentures on all property and funds held in trust to pay for all amounts of compensation, expenses and indemnification due to Claimant under such section (except that such claim is not prior to funds held in trust to pay principal and interest on particular Securities), and (2) Claimant's claims for reimbursable costs and expenses, trustee's fees, and compensation for services performed (including, without limitation, legal fees and expenses) accruing after the Petition Date constitute expenses of administration under the Bankruptcy Code and are therefore entitled to priority under Section 507(a) of the Bankruptcy Code.

14.    Claimant reserves the right to amend or supplement this proof of claim in any respect, to fix or liquidate any claims stated herein, to specify and quantify expenses or other charges or claims incurred by Claimant, to assert any additional claim for priority, and to file additional proofs of claim for additional claims.

15.    The execution and filing of this proof of claim is not a waiver of any of Claimant's rights including, without limitation, the right to move to withdraw the reference with respect to the subject matter of this claim or otherwise, and any right to trial by jury that Claimant may have in any civil proceeding arising in or related to this case, nor is it a consent to jurisdiction of this or any court except with respect to the allowance of the claims asserted herein.

16.    The post office address of the Claimant and the address to which all notices to the Claimant should be addressed is:

> The Bank of New York
> Default Admin Group
> 101 Barclay Street, 8W
> New York, NY 10286
> Attn: Stuart Kratter, Vice President, Corporate Trust

with a copy to:

> Dechert LLP
> 30 Rockefeller Plaza
> New York, New York 10112-2200
> Attn: Glenn E. Siegel, Esq.

Dated: July 1V, 2006

THE BANK OF NEW YORK, as Indenture Trustee

By: _____
Stuart Kratter, Vice President,
Default Administration Group
Corporate Trust

Penalty for Presenting Fraudulent Claim.  Fine of not more than $500,000.00 or imprisonment for not more than 5 years or both -- Title 18 U.S.C. §§ 152 and 3571.

fedex.com 1.800.GoFedEx 1.800.463.3339

**RECIPIENT: PEEL HERE**

# FedEx
Express **US Airbill**

1 **From** This portion can be removed for Recipient's records.
Date 7/14/06    FedEx Tracking Number

Sender's Name Anna Nienes

Company DECHERT LLP

Address 30 ROCKEFELLER PLZ FL 22

City NEW YORK    State NY    ZIP 10112-2299    Phone 212 698-3500

2 **Your Internal Billing Reference** 350929

3 **To**
Recipient's Name Fainex Internationel YK Wlack    Phone

Company C/o Bankruptcy Services, LLC

Address 757 Third Avenue    3rd Floor

City New York    State NY    ZIP 10017

8576 9848 7960

0336-3358-49

8576 9848 7960

© 2005 FedEx 154476/155475 REV 9/06 RT

---

3

**FedEx** PRIORITY OVERNIGHT MON
emp# 420229 14JUL06    Deliver By:
TRK# **8576 9848 7960** FORM 17JUL06
0215    A1

**10017** -NY-US    **Z2 OGSA** EWR

Recipient's Copy

4a **Express Package Service**
☐ FedEx Priority Overnight
☐ FedEx Standard Overnight
☐ FedEx First Overnight

4b FedEx 2Day
☐ FedEx Express Saver

**Express Freight Service**
☐ FedEx 1Day Freight
☐ FedEx 2Day Freight
☐ FedEx 3Day Freight

5 **Packaging**
☐ FedEx Envelope
☐ FedEx Pak
☐ FedEx Box
☐ FedEx Tube
☐ Other

6 **Special Handling**
☐ SATURDAY Delivery
☐ HOLD Weekday
☐ HOLD Saturday
☐ No ☐ Yes
☐ Cargo Aircraft Only

7 **Payment** Bill to:
☐ Sender
☐ Recipient
☐ Third Party
☐ Credit Card
☐ Cash/Check

8 **NEW Residential Delivery Signature Options**
☐ No Signature Required
☐ Direct Signature
☐ Indirect Signature

Total Packages    Total Weight    Total Declared Value    Total Charges

519

F104

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
FOAMEX INTERNATIONAL INC., ET AL: CLAIMS PROCESSING
C/O BANKRUPTCY SERVICES, LLC
P.O. BOX 5013, FDR STATION
NEW YORK, NY 10150-5013

| | |
|---|---|
| In Re: <br> Foamex International Inc., et al., <br> Debtors. | Chapter 11 Case Nos. <br> 05-12685 through 05-12693 <br> (Jointly Administered) |
| Name of Debtor Against Which Claim is Held <br> Foamex Capital Corporation | Case No. of Debtor <br> 05-12688 |

## PROOF OF CLAIM

NOTE: This Form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)**

The Bank of New York
Default Administration Group
Corporate Trust
101 Barclay Street, 8W
New York, NY 10286
Attn: Stuart Kratter, Vice President, Corporate Trust
Telephone number: 212-815-5466

**THIS SPACE IS FOR COURT USE ONLY**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - District of Delaware
Foamex International, Inc., Et Al.
05-12685 (PJW)        0000001309

| | |
|---|---|
| Account or other number by which creditor identifies debtor: | Check here if this claim: <br> ☐ replaces  ☒ amends a previously filed claim, dated: December 1, 2005 |

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other  See attached_____ (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Last Four Digits of your SS#:  ____  ____  ____  ____

Unpaid compensation for services performed

from _____ to _____
(date)                    (date)

**2.  Date debt was incurred: See attached**

**3.  If court judgment, date obtained:**

**4.  Total Amount of Claim at Time Case Filed:** $_____+_____+_____ = Approximately $208 million
(unsecured nonpriority)    (secured)    (unsecured priority)    (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.  Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $_____
Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6.  Unsecured Nonpriority Claim:** $_____ See attached _____
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7.    Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim.
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries or commissions (up to $10,000), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,225 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**8.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9.  Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10** Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**FILED / RECEIVED**

JUL 17 2006

**BANKRUPTCY SERVICES, LLC**

| Date <br> 7/12/2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): <br> STUART KRATTER , VP |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

F105

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FOAMEX INTERNATIONAL INC., et al., | ) | Jointly Administered |
| | ) | Case No. 05-12685 (PJW) |
| Debtors.[1] | ) | |
| | ) | |

## ATTACHMENT TO AMENDED PROOF OF CLAIM OF
## THE BANK OF NEW YORK AS INDENTURE TRUSTEE

1.      The undersigned, Stuart Kratter, Vice President, Default Administration Group, Corporate Trust, of The Bank of New York, a banking corporation organized under the laws of the State of New York and doing business at 101 Barclay Street, 8W, New York, NY 10286, is duly authorized to execute this amended proof of claim on behalf of The Bank of New York (the "Claimant"). Claimant is filing this amended proof of claim as indenture trustee under the following indentures: (i) an indenture dated as of December 23, 1997, (the "2005 Indenture"), by and between Foamex L.P ("Foamex") and Foamex Capital Corporation ("FCC"), each as Issuer, General Felt Industries, Inc., Foamex LLC, and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee, and (ii) an indenture dated as of June 12, 1997 (the "2007 Indenture," and together with the 2005 Indenture, the "Indentures"), by and between Foamex and FCC, each as Issuer, General Felt Industries, Inc. and Foamex Fibers, Inc. as subsidiary guarantors, and Claimant, as trustee.

2.      On or about December 23, 1997, under the 2005 Indenture, Foamex and FCC issued 13.5% Notes due 2005 in the aggregate principal amount of $98 million.  The

---

[1]      The Debtors are the following entities: Foamex International Inc., FMXI, Inc., Foamex L.P., Foamex Capital Corporation, Foamex Carpet Cushion LLC, Foamex Asia, Inc., Foamex Latin America, Inc., Foamex Mexico, Inc., and Foamex Mexico II, Inc.

maturity date for the 13.5% Notes was August 15, 2005. Foamex and FCC failed to pay both principal due and payable upon maturity and the final interest payment, which constituted an "Event of Default" under the 2005 Indenture.

3.      On or about November 26, 1997, under the 2007 Indenture, Foamex and FCC issued 9.875% Notes due 2007 in the aggregate principal amount of $150 million (the 9.875% Notes and the 13.5% Notes are collectively referred to as the "Securities"). No payment has been made on the 9.875% Notes since June 15, 2005.

4.      The due and punctual payment of all amounts due under the Securities was guaranteed joint and severally by the subsidiary guarantors thereto in accordance with Section 11.01 of the Indentures.

5.      Section 6.09 of the Indentures authorizes Claimant to file and prove this claim in order to have the claims of Claimant and all holders of the Securities allowed in Foamex's Chapter 11 case.

6.      As of September 19, 2005, the date the petition was filed initiating this case (the "Petition Date"), FCC was and still is indebted to Claimant for the amounts described in the following paragraphs under the Indentures and applicable law, and for all other amounts which have accrued since the filing date, including without limitation post-petition interest, fees, and costs:

   a.      $55,821,099.30 was owing as of the Petition Date to the holders of the issued 13.5% Notes due 2005 under the 2005 Indenture, which amount includes $51,585,000 in principal, $3,481,987.50 in interest, and $754,111.80 in defaulted interest in accordance with Sections 2.12 and 4.1 of the 2005 Indenture. In addition, $6.5 million was owing as of July 1, 2006, in post-petition defaulted interest in accordance with Sections 2.2 and 4.1 of the 2005 Indenture.

   b.      $152,329,031.25 was owing as of the Petition Date to the holders of the issued 9.875% Notes due 2007 under the 2007 Indenture, which amount includes $148,500,000 in principal, $3,829,031.25 in interest. In addition,

F107

$13 million was owing as of July 1, 2006, in post-petition defaulted interest in accordance with Sections 2.2 and 4.1 of the 2007 Indenture.

c.    FCC is indebted to Claimant for all interest, trustee's fees, reimbursable costs, advances and expenses, and compensation for services performed (including, without limitation, reasonable compensation, disbursements and expenses of the Claimant's agents and counsel), in accordance with the terms and provisions of the Indentures (expressly Section 7.7) and to the extent permitted under the Bankruptcy Code.    Approximately $[267,000] was owing to the Claimant for unpaid fees as described above, including fees owed to Claimant's counsel, as of July 1, 2006. Claimant's claim pursuant to this paragraph 3(c) is unliquidated as of the date hereof.

d.    The Claimant asserts that certain post-petition claims constitute an administrative expense of FCC's estate and will include Claimant's claim for trustee's fees, reimbursable costs and expenses, and compensation for services performed (including, without limitation, legal fees and expenses) in accordance with the terms and provisions of the relevant agreements and to the extent permitted under the Bankruptcy Code. Claimant's claim pursuant to this paragraph 3(d) is unliquidated as of the date hereof.

e.    Claimant's claims in paragraphs 3(a) through 3(d) above are made without prejudice to any other claims arising after the Petition Date.

7.    The consideration for the debt described above is that FCC entered into the Indentures which authorized the issuance of the Securities. Pursuant to the Indentures, the Securities were issued in the maximum aggregate principal amount of $248 million, of which an aggregate principal balance of $208,150,130.55 million is currently outstanding.    The consideration for FCC's obligation to repay the Securities and for the covenants of FCC to pay the fees, costs, compensation, and expenses described in paragraph 3 hereof was the funding of the Securities and Claimant's agreement to serve as Indenture Trustee under the Indentures. A copy of each of the Indentures is annexed to the proof of claim filed by the Indenture Trustee dated December 1, 2005 and the Indentures are incorporated herein by reference.

8.    This claim is not founded on an open account other than as set forth in paragraphs 3(a) through 3(d) above.

9.    No judgment has been rendered on the claim made hereby.

10.    The amount of all payments heretofore made on this claim have been credited and deducted for the purpose of making this proof of claim. Claimant holds no cash or securities as Indenture Trustee for the account of said trust.

11.    To the extent the Claimant holds cash collateral of FCC, Claimant's claim may be subject to any setoff or counterclaim.

12.    To the extent the Claimant holds cash collateral of FCC, Claimant may hold a security interest for its claim except that such security interest does not have priority over money held in trust to pay principal and interest on particular Securities.

13.    This claim is a general unsecured claim, except that Section 7.7 of the Indentures provides that (1) Claimant shall have a claim prior to that of the holders of the Securities issued pursuant to the Indentures on all property and funds held in trust to pay for all amounts of compensation, expenses and indemnification due to Claimant under such section (except that such claim is not prior to funds held in trust to pay principal and interest on particular Securities), and (2) Claimant's claims for reimbursable costs and expenses, trustee's fees, and compensation for services performed (including, without limitation, legal fees and expenses) accruing after the Petition Date constitute expenses of administration under the Bankruptcy Code and are therefore entitled to priority under Section 507(a) of the Bankruptcy Code.

14.    Claimant reserves the right to further amend or supplement this proof of claim in any respect, to fix or liquidate any claims stated herein, to specify and quantify expenses or other charges or claims incurred by Claimant, to assert any additional claim for priority, and to file additional proofs of claim for additional claims.

15.    The execution and filing of this proof of claim is not a waiver of any of Claimant's rights including, without limitation, the right to move to withdraw the reference with respect to the subject matter of this claim or otherwise, and any right to trial by jury that Claimant may have in any civil proceeding arising in or related to this case, nor is it a consent to jurisdiction of this or any court except with respect to the allowance of the claims asserted herein.

16.    The post office address of the Claimant and the address to which all notices to the Claimant should be addressed is:

> The Bank of New York
> Default Admin Group
> 101 Barclay Street, 8W
> New York, NY 10286
> Attn: Stuart Kratter, Vice President, Corporate Trust

with a copy to:

> Dechert LLP
> 30 Rockefeller Plaza
> New York, New York 10112-2200
> Attn: Glenn E. Siegel, Esq.

Dated: July 1️⃣, 2006

**THE BANK OF NEW YORK**, as Indenture Trustee

By: _____

Stuart Kratter, Vice President,
Default Administration Group
Corporate Trust

Penalty for Presenting Fraudulent Claim.  Fine of not more than $500,000.00 or imprisonment for not more than 5 years or both -- Title 18 U.S.C. §§ 152 and 3571.



30 Rockefeller Plaza
New York, NY 10112-2200
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com

**JULIA MIRSKY**

julia.mirsky@dechert.com
+1 212 698 3684  Direct
+1 212 698 3599  Fax

July 14, 2006

**VIA FEDEX OVERNIGHT DELIVERY**

Foamex International, Inc., et al.
Claims Processing
c/o Bankruptcy Services, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

Re:  Foamex International, Inc., et al.,    Chapter 11 Case Nos.: 05-12687 and 05-12688

To whom it may concern:

Enclosed please find an original and two copies of the amended proofs of claim of The Bank of New York in the above-referenced Chapter 11 cases.  At your convenience, please date- and time-stamp an enclosed copy and return in the Federal Express envelope provided.

Sincerely,

*Julia Mirsky*

Julia Mirsky

JM/JM

Enclosures

cc:   Anna P. Nemes
      Stuart Kratter

U.S. Austin  Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton
San Francisco  Washington DC   EUROPE  Brussels  Frankfurt  London  Luxembourg  Munich  Paris

F111

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) | Case No. 05-12685 (KG) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Related Docket No. 2268** |

**MEMORANDUM OF LAW OF THE BANK OF NEW YORK, AS
INDENTURE TRUSTEE, IN SUPPORT OF ENTRY OF ORDER COMPELLING
DEBTORS TO PAY POST-MATURITY COMPOUND INTEREST ON THEIR
2005 NOTES IN ACCORDANCE WITH THEIR CONFIRMED CHAPTER 11 PLAN**

Laurie Selber Silverstein (DE 2396)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, Sixth Floor
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, Delaware 19899
Tel: (302) 984-6000

- and -

Glenn E. Siegel
Davin J. Hall
DECHERT LLP
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 698-3500

*Attorneys for the Bank of New York,
as Indenture Trustee*

Dated: February 12, 2007

## **TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 6

CONCLUSION .................................................................................................................. 12

F113

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

In re Ace-Texas, Inc.,
217 B.R. 719 (Bankr. D. Del. 1998) ........................................................................10

In re American Solar King Corp.,
90 B.R. 808 (Bankr. W.D. Tex. 1988)........................................................................8

In re Combustion Engineering, Inc.,
391 F.3d 190 (3d Cir. 2004)...............................................................................6,7

In re Coram Healthcare Corp.,
315 B.R. 321 (Bankr. D. Del. 2004)………………………………………… ...............8

In re D.C. Sullivan & Co.,
929 F.2d 1 (1st Cir. 1991)..................................................................................8

Debentures Protective Comm. of Continental Investment Corp. v. Continental
Investment Corp.,
679 F.2d 264 (1st Cir. 1982)..............................................................................7,8

In re Dow Corning Corp.,
244 B.R. 678 (Bankr. E.D. Mich. 1999) .................................................................9

Elliott Assocs., L.P. v. The Republic of Peru
194 F.R.D. 116 (S.D.N.Y. 2000) .........................................................................9

Hughes Aircraft Co. v. United States,
31 Fed. Cl. 481 (Fed. Cl. 1994) ........................................................................11

In re New Valley Corp.,
168 B.R. 73 (Bankr. D.N.J. 1994) ......................................................................7,8

In re Realty Assocs. Sec. Corp.,
163 F.2d 387 (2d. Cir. 1947).............................................................................13

Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.),
324 F.3d 197 (3d Cir. 2003)..............................................................................7, 9

F114

In re Williams,
227 B.R. 83 (Bankr. E.D. Va. 1998)..................................................................11

## STATE CASES

Briscoe v. Goodmark Corp.,
130 S.W.3d 160 (Tex. 2003)...........................................................................10

Gutman v. Savas,
17 A.D.3d 278 (N.Y. 2005) ............................................................................9

William C. Dear & Associates, Inc. v. Plastronics, Inc.,
913 S.W.2d 251 (Tex. 1996)........................................................................10,11

## STATUTES

11 U.S.C. § 1124.................................................................................1, 7-8, 11-12

NY GBL § 5-527 .....................................................................................9

## LEGISLATIVE HISTORY

H.R. Rep. No. 103-835 (1994).............................................................................7

F115

## INTRODUCTION

The Bank of New York ("BNY"), as Indenture Trustee under an indenture dated as of December 23, 1997 (the "2005 Notes Indenture"),[1] by and between BNY, as trustee, Foamex L.P ("Foamex") and Foamex Capital Corporation ("FCC"), each as Issuer, and certain subsidiary guarantors thereto, by and through its undersigned counsel, submits this brief in support of the entry of an order, pursuant to Section 1124 of the Bankruptcy Code and the Debtors' confirmed Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"),[2] compelling the above-captioned debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") to pay certain post-maturity compound interest on the 2005 Notes as part of their treatment under the Plan, as more fully described below.

## PRELIMINARY STATEMENT

At issue before the Court is whether the Debtors' treatment, under their confirmed Plan, of the claims of the holders of the 2005 Senior Subordinated Notes (the "2005 Notes") which was intended to leave such claims unimpaired within the meaning of Section 1124 of the Bankruptcy Code, requires that the noteholders receive their principal plus interest at the default rate compounded twice yearly as provided for by the 2005 Notes Indenture or, as proposed under the Plan, allows for the Debtors to pay principal plus only simple interest on unpaid installments of interest at the default rate. The Debtors have asserted that, because the 2005 Notes matured

---

[1]  A copy of the 2005 Notes Indenture is attached hereto as Exhibit A and is incorporated herein by reference.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

pre-petition, there are no further unpaid "installments" of interest, and as a result, no compounding can occur post-maturity.

However, such a reading of the 2005 Notes Indenture disregards the continued accrual of post-maturity interest and renders meaningless the provision contained in the Notes that the terms of the Indenture (including for the payment of the Notes) survive until the notes are repaid. The rate of interest that the Debtors seek to apply to the Notes after the maturity date is not the effective rate of interest under the Notes, since it does not account for the compounding required by the provision in the 2005 Notes Indenture related to the calculation of interest. As such, the distribution that the Debtors propose to pay to the holders of the 2005 Notes would not leave the holders unimpaired, and this Court must direct that the Debtors pay the additional amounts required by compounding unpaid interest twice yearly.

The Debtors treatment of the 2005 Notes is particularly anomalous when compared with their treatment of the 2007 Senior Subordinated Notes (the "2007 Notes"), since the 2005 Notes rank *pari passu* with the 2007 Notes.[3]  The indentures for these notes, and in particular the portions dealing with payment of principal and interest, are virtually identical.  Nevertheless, under the Plan, the holders of the 2007 Notes are paid Post-Petition Interest compounded twice yearly in accordance with the terms of their indenture, while the holders of the 2005 Notes are not -- simply because their notes have matured.  This result, if allowed to stand, would necessarily mean that the holders of matured debt would be entitled to fewer rights under their

---

[3]     BNY is also the indenture trustee for the 2007 Notes, which were entered into by the Debtors on June 12, 1997. A copy of the 2007 Senior Subordinated Notes Indenture (the "2007 Notes Indenture" and, together with the 2005 Notes Indenture, the "Notes Indentures") is attached hereto as Exhibit B and is incorporated herein by reference.

agreements than the holders of identical un-matured debt that ranked *pari passu*, simply because the Debtors are in even further default of their obligations to those creditors. The proper result is to give the holders of the 2005 Notes the same treatment that the Debtors have granted to the holders of the 2007 Notes.

**BACKGROUND**

The Notes

1.      Pursuant to the 2005 Notes Indenture, Foamex and FCC issued 13.5% notes due 2005, which matured on August 15, 2005. Foamex and FCC failed to pay both principal due and payable upon maturity and the August 15, 2005 interest payment, which constituted an "Event of Default" under the 2005 Notes Indenture.

2.      Pursuant to the 2007 Indenture, Foamex and FCC issued 9.875% notes due 2007, which had not matured by the Petition Date.

3.      Section 8.1 of the 2005 Notes Indenture states that the obligations arising under the indenture, and in particular the requirements of Section 4.1 (Payment of Notes), survive until the 2005 Notes are no longer outstanding and that all applicable sums payable under the indenture have been made. Among other things, Section 2.8 of the indenture (Outstanding Notes) provides that if the principal amount of any note is paid under section 4.1, then at that point, it ceases to be outstanding and interest on it ceases to accrue.

4.      Each of the Notes Indentures provides that Foamex and FCC are obligated as follows:

SECTION 2.12. DEFAULTED INTEREST.

> If the Issuers or the Subsidiary Guarantors default in a payment of interest on the Notes, they shall pay the defaulted interest in any lawful manner

- 3 -

> plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.1 hereof. . . .

SECTION 4.1. PAYMENT OF NOTES.

> The Issuers shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes. . . .

> The Issuers shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest. . . at the same rate to the extent lawful.

Notes Indentures, §§ 2.12, 4.1.[4]

5.    Section 1 of the form of the 2005 Note, titled "Interest," incorporates Section 4.1 of the 2005 Notes Indenture and provides the terms of payment thereunder.  In particular, this section provides as follows:

> 1. INTEREST. Foamex L.P., a Delaware limited partnership and Foamex Capital Corporation, a Delaware corporation, or their respective successors (each an "Issuer" and together, the "Issuers"), promise to pay interest on the principal amount of this Note at the rate of 13 1/2% per annum. . . . The Issuers will pay interest and . . . semi-annually in arrears on February 15 and August 15, commencing on February 15, 1998, or if any such day is not a Business Day, on the next succeeding Business Day (each an "Interest Payment Date").  Interest on the Notes shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided that if there is no existing Default or Event of Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date, except in the case of the original

---

[4]    The 2005 Notes Indenture denotes section numbers by tenths (e.g., 4.1, 4.2), while the 2007 Notes Indenture denotes them by hundredths (e.g., 4.01, 4.02).

F119

> issuance of Notes, in which case interest shall accrue from the date of authentication. The Issuers shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest . . . at the same rate to the extent lawful.

Although the form of the 2005 Notes specifically states that the principal is due on August 15, 2005, it indicates that that the interest payment dates are February 15 and August 15 of each year, without reference to the year when such interest payment dates would end.

The Debtors' Cases

6.    On September 19, 2005, the Debtors filed separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and any action that BNY or the holders of the 2005 Notes could have taken to enforce their rights against the Debtors was automatically stayed.

7.    On December 6, 2005, as subsequently amended, BNY filed proofs of claim each against Foamex and FCC individually.

8.    On February 1, 2006, this Court entered an order confirming the Plan.

Treatment under the Plan

9.    As provided for in the Plan, the claims of the noteholders are classified as Class 4 claims and are treated as follows:

> The Note Claims shall be deemed Allowed in the aggregate amount of $208,150,130.55 which includes accrued and unpaid interest (at the applicable contract rate) on such Note Claims relating to the period up to but not including the Petition Date.
>
> On the Initial Distribution Date, in full and final satisfaction of such Claims, each holder of an Allowed Notes Claim shall receive Cash in an amount equal to such holders' Allowed Notes Claim plus Post-Petition Interest.

- 5 -

F120

Plan, Article IV, D.1.

10.    With respect to the 2005 Notes Claims, Post-Petition Interest is defined under the Plan as "accrued and unpaid interest pursuant to the 2005 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the default rate provided for in the 2005 Senior Subordinated Notes Indenture." Plan, Article I, A.

11.    However, with respect to the 2007 Notes Claims, Post-Petition Interest is defined under the Plan as "accrued and unpaid interest (including interest on interest that is due and owing and unpaid, *compounded semi-annually on the semi-annual interest payment dates*) pursuant to the 2007 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the default rate provided for in the 2007 Senior Subordinated Notes Indenture." Id. (emphasis added)

12.    Although Class 4 is characterized as unimpaired, see Plan, Article IV, D.2, the Debtors intend only to pay post-petition simple interest at the default interest rate to the holders of the 2005 Notes on the Initial Distribution Date. See Disclosure Statement at 59.

### ARGUMENT

13.    Bankruptcy Code § 1124 provides that a class of claims is impaired unless the plan leaves unaltered the legal, equitable, and contractual rights to which such claimholder is entitled or reinstates the claim or interest. See In re Combustion Engineering, Inc., 391 F.3d 190, 216 (3d Cir. 2004); Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.), 324 F.3d 197, 202 (3d Cir. 2003) ("If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely 'unaltered,' the creditors claim will be labeled as impaired . . . .").

14.    It is the Debtors' burden to demonstrate that a creditor's claim is unimpaired. PPI

- 6 -

F121

Enterprises, 324 F.3d at 203 (citations omitted). As set forth below, only the payment of post-petition interest, compounded semi-annually at the default rate, will leave unaltered the legal, equitable, and contractual rights of the holders of the 2005 Notes.

15. Indeed, this is indicated by the relevant legislative history to Bankruptcy Code § 1124 (and additional commentary regarding section 1129):

> The principal change in this section is set forth in subsection (d) and relates to the award of post petition interest. In a recent Bankruptcy Court decision in In re New Valley Corp., 168 B.R. 73 (Bankr. D.N.J. 1994), unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The New Valley decision applied section 1124(3) of the Bankruptcy Code literally by asserting, in a decision granting a declaratory judgment, that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under section 1124(3), therefore is not entitled to vote, and is not entitled to receive postpetition interest. The Court left open whether the good faith plan proposal requirement of section 1129(a)(3) would require the payment of or provision for postpetition interest. In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code.
>
> . . .
>
> Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery.

H.R. Rep. No. 103-835, at 47-48 (1994); accord PPI Enterprises, 324 F.3d at 205-06.

16. As Foamex and FCC are solvent entities and have provided recoveries for equity holders, pursuant to the Bankruptcy Code, they are required to pay post-petition interest on account of the 2005 Notes. See In re D.C. Sullivan & Co., 929 F.2d 1, 3 (1st Cir. 1991) ("There is a long line of cases holding that post-petition interest should be paid where the estate becomes solvent."); Debentures Protective Comm. of Continental Investment Corp. v. Continental

Investment Corp., 679 F.2d 264, 268-70 (1st Cir. 1982) (stating that a bankruptcy court must enforce a contractual provision for interest on unpaid installments of interest in the pre and post-petition periods in the case of a solvent debtor); In re Coram Healthcare Corp., 315 B.R. 321, 344 (Bankr. D. Del. 2004) (holding that, under Section 1129 of the Bankruptcy Code, the payment of post-petition interest is required before any distribution can be made to equityholders and that the contractual default rate interest should be applied if it is fair and equitable under the circumstances). However, BNY disputes the Debtors' assertion that they are only obligated to pay simple post-petition interest at the default rate.

17.     Moreover, given the mandate of Section 1124 of the Bankruptcy Code, which requires that when the debtor proposes to deprive a creditor of its vote under a Chapter 11 plan, the debtors must leave such creditor's rights unaltered, and the amendment that Congress made to Section 1124 in response to the New Valley decision to preclude unimpaired treatment in a solvent case where a debtor fails to pay post-petition interest at the contract rate, it is clear that impairment is found when even the slightest rights of a creditor to unpaid interest have been impacted -- including the right to compound interest.

18.     Here, a significant additional contractual right of the holders of the 2005 Notes has also been altered -- they were not paid their notes upon maturity. The Debtors cannot truly leave these creditors unimpaired, because they cannot retroactively pay them on the maturity date. They must find another way to provide such creditors with all of their legal, equitable and contractual rights.

19.     Given this difficulty, BNY submits that the only sensible way to compensate the holders of the 2005 Notes is to read the maturity date under the 2005 Notes Indenture as having

been forcibly extended by operation of the automatic stay to the Effective Date.

20.    The inherent unfairness of the Debtors' alternative reading provides the Debtors

and, derivatively, their shareholders, who entered into the 2005 Notes Indenture and agreed to be

bound by its terms, with a windfall that was never intended by the parties.  Adding insult to

injury, the Debtors have agreed to pay the holders of the 2007 Notes interest on unpaid interest

because their notes have not yet matured.  A more sensible result is to require the Debtors, who

chose to deprive the 2005 Holders of their right to vote, with the compounding that would have

accrued had their debt matured on the day it was actually satisfied.  See In re Dow Corning

Corp., 244 B.R. 678, 695 (Bankr. E.D. Mich. 1999) ("A debtor with the financial wherewithal to

honor its contractual commitments should be required to do so.").

21.    Under applicable state law, an agreement for the payment of compound interest

on outstanding principal and accrued interest is enforceable.  See NY GBL § 5-527; Gutman v.

Savas, 17 A.D.3d 278 (N.Y. 2005); 2005 Notes Indenture § 13.8.

22.    Specifically, compound interest on account of the 2005 Notes Indenture is

authorized under NY GBL § 5-527.  In Elliott Assocs., L.P. v. The Republic of Peru, plaintiffs

sought, among other things, to collect compound interest on the interest on matured principal

evidenced by certain letter agreements.   194 F.R.D. 116, 119 (S.D.N.Y. 2000).   These

agreements provided for "compound interest 'to the extent permitted by applicable law.'"  Id. at

122.  Applying Section 5-527, the Court ordered compound interest on the matured principal that

the plaintiffs sought to collect.  Id. at 19-20.  Similarly, the 2005 Notes Indenture provides for

compound interest "to the extent lawful."  See supra ¶¶ 4-5.

23.    After Foamex L.P. and FCC failed to pay both principal due and payable on

- 9 -

maturity and the final interest payment, Section 4.1 of the 2005 Notes Indenture required the payment of interest (including post-petition interest) at 1% per annum in excess of the rate on the notes (or 14.5%, i.e., the default rate) on overdue principal and interest. Section 1 of the form of the 2005 Notes provides that interest is due semi-annually in arrears on February 15 and August 15 of each year, and there is no reference in this section to this obligation ending prior to repayment.

24.    Indeed, pursuant to the express terms of the 2005 Notes Indenture, this obligation survives until the outstanding principal and accrued interest is paid. See supra §§ 3-5. Since the automatic stay prevented BNY from collecting upon this unpaid debt, despite the terms of the notes, "maturity" was when the notes were actually paid. Accordingly, when Foamex and FCC failed to make the principal payment and the August 15, 2005 interest payment, interest accrued at the default rate on those amounts at the default rate until February 15, 2006, when it was required to be compounded. See In re Ace-Texas, Inc., 217 B.R. 719 (Bankr. D. Del. 1998) (requiring the payment of post-petition compounded interest at the default rate to an oversecured creditor whose notes matured prior to the petition date); see also Briscoe v. Goodmark Corp., 130 S.W.3d 160, 168 (Tex. 2003) ("When a note specifies a rate of interest before maturity, but is silent about any rate after maturity, the pre-maturity rate is implied as the post-maturity rate as a matter of law.").

25.    The interest rate on the 2005 Notes is an "effective rate" that compounds a contract rate (or default rate, as applicable) on principal and interest. See generally William C. Dear & Associates, Inc. v. Plastronics, Inc., 913 S.W.2d 251 (Tex. 1996) (looking to the effective rate of interest, after taking into account compounding on the contract rate, rather than

simply the contract rate, in determining whether a particular interest rate violated state law); In re Williams, 227 B.R. 83 (Bankr. E.D. Va. 1998); Hughes Aircraft Co. v. United States, 31 Fed. Cl. 481 (Fed. Cl. 1994).   Section 1124 of the Bankruptcy Code requires that the Debtors pay the same rate of interest on matured debt that they would have otherwise had to pay had the notes not matured, and "interest" means the effective rate, taking into account compounding.[5]

26.     The concept that the holders of the 2005 Notes must be entitled to the same effective rate of interest (whether as an implicit or explicit obligation under the indenture) before and after the maturity date is in accord with Section 1124's requirement that solvent debtors must pay an appropriate amount of post-petition interest such that the rights of the holders are left unaltered.  As a result of the automatic stay, the holders of the 2005 Notes could not seek to enforce their rights against the Debtors thereunder.  As the Debtors are not able to turn back the clock, the question becomes what amount of post-maturity interest is appropriate in order to compensate for this alteration of the holders' rights while still leaving these creditors unimpaired. Essentially, the cases cited above, which collectively stand for the principle that a court should require compound interest post-maturity if the debt instrument otherwise provides for compound interest pre-maturity, have the most weight in the impairment context, because the proper way to leave the rights of the holder of matured debt unaltered is to afford it the same rights in the post-maturity period as it had in the pre-maturity period.

---

[5]     It is indeed strange for the Debtors to argue that their failure to pay the debt when it matured means that they did not continue to accrue unpaid interest on the default interest that they have admitted that they are obligated to pay.

## CONCLUSION

For the reasons stated herein, BNY respectfully requests that the Court enter an order, pursuant to Bankruptcy Code § 1124, the Plan, and the 2005 Notes Indenture, requiring the Debtors to pay post-petition interest in the form of accrued and unpaid interest (including interest upon interest that is due and owing and unpaid, compounded semi-annually on the semi-annual payment dates) from the Petition Date through the Effective Date at the default rate provided for in the 2005 Notes Indenture to the holders of the 2005 Notes.

Dated:  February 12, 2007
    Wilmington, Delaware

POTTER ANDERSON & CORROON LLP

_Laurie Selber Silverstein_

Laurie Selber Silverstein (DE 2396)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

-and-

DECHERT LLP

Glenn E. Siegel
Davin J. Hall
30 Rockefeller Plaza
New York, New York  10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

Counsel for The Bank of New York, as
Indenture Trustee

F127

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) | Case No. 05-12685 (KG) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Ref. Docket Nos. 2298, 2379** |

**REPLY MEMORANDUM OF LAW
OF THE BANK OF NEW YORK, AS INDENTURE TRUSTEE, TO
REORGANIZED DEBTORS' MEMORANDUM OF LAW IN OPPOSITION
TO THE REQUEST OF THE BANK OF NEW YORK, AS INDENTURE
TRUSTEE, FOR ENTRY OF AN ORDER COMPELLING THE DEBTORS TO PAY
POST-MATURITY COMPOUND INTEREST ON THE 2005 SUBORDINATED NOTES**

Laurie Selber Silverstein (2396)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

-and-

Glenn E. Siegel
Davin J. Hall
DECHERT LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for The Bank of New York, as
Indenture Trustee*

Dated: March 16, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. i

INTRODUCTION ........................................................................................................... 1

RESPONSE.................................................................................................................... 2

    Unimpairment of Matured Debt......................................................................... 2

    The 2005 Notes Indenture Expressly Provides for Compounding Post-Maturity ............. 4

    Reliance on Proofs of Claims is Not Justified ................................................. 7

CONCLUSION.............................................................................................................. 9

F129

# TABLE OF AUTHORITIES

Pages

## FEDERAL CASES

In re American Solar King Corp.,
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ...................................................................8

In re Chateaugay Corp.,
    170 B.R. 551 (S.D.N.Y. 1994) ...........................................................................6

In re Chicago, M. S. P. & P. R. Co.,
    791 F.2d 524 (7th Cir. 1986) ...........................................................................3

Debentures Protective Comm. of Continental Investment Corp. v. Continental
    Investment Corp.,
    679 F.2d 264 (1st Cir. 1982) ......................................................................3, 4

In re Dow Corning Corp.,
    244 B.R. 678 (E.D. Mich. 1999) ..................................................................3, 7

Elliott Assocs., L.P. v. The Republic of Peru,
    194 F.R.D. 116 (S.D.N.Y. 2000) .......................................................................7

In re L & J Anaheim Assocs.,
    995 F.2d 940 (9th Cir. 1993) ...........................................................................8

In re Realty Assocs. Securities Corp.,
    163 F.2d 387 (2d Cir. 1947) .........................................................................4, 7

Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.),
    324 F.3d 197 (3d Cir. 2003) ...........................................................................8

## STATE CASES

Aceta v. Robinson,
    2000 Mass. App. Div. 155 (2000) ......................................................................6

Allendorph v. Ogden,
    44 N.W. 220 (Neb. 1889) ...............................................................................6

Astoria Fed. Sav. and Loan Ass'n v. Rambalakos,
    372 N.Y.S.2d 689 (1975) ................................................................................6

Briscoe v. Goodmark Corp.,
    130 S.W.3d 160 (Tex. 2003) ...........................................................................6

F130

## TABLE OF AUTHORITIES
(continued)

Pages

First Nat. Bank of Hastings v. McNamara,
    357 N.W.2d 171 (Minn. 1984)...........................................................................................6

Kellogg v. Lavender,
    18 N.W. 38 (Neb. 1883)....................................................................................................6

Martin v. Star Publishing Co.,
    107 A.2d 795 (Del. Super. Ct. 1954) ...............................................................................7

Ohio Loan Co. v. Porychuk,
    34 N.E.2d 1021 (Ohio 1935)............................................................................................6

Petroscience Corp v. Diamond Geophysical, Inc.,
    684 S.W.2d 668 (Tex. 1984)............................................................................................6

Roberts v. Grise,
    442 N.E.2d 30 (Mass. 1982) ............................................................................................6

Stull v. Joseph Feld., Inc.,
    309 N.Y.S.2d 985 (1970)..................................................................................................6

F131

## INTRODUCTION

The Bank of New York ("BNY"), as Indenture Trustee, by and through its undersigned counsel, submits this reply brief (the "Reply Brief") to the *Reorganized Debtors' Memorandum of Law in Opposition to the Request of the Bank of New York, as indenture trustee, for Entry of an Order Compelling the Debtors to Pay Post-Maturity Compound Interest on the 2005 Subordinated Notes* (the "Answering Brief") and in support of its opening brief, filed on February 12, 2007 (the "BNY Opening Brief")[1].

The Debtors proposed a Plan in these cases in which they asserted that their proposed treatment of the holders of the 2005 Subordinated Notes left those holders unimpaired within the meaning of section 1124 of the Bankruptcy Code. In order to avoid litigation at the disclosure statement hearing and the confirmation hearing, the Debtors agreed that they would pay to the holders of the 2005 Notes whatever amount this Court determined was necessary to leave such holders unimpaired. Since the effect of this approach was to deny the holders of the 2005 Notes the right to vote on the Plan and, if they voted against the plan, the right to invoke the protections afforded by section 1129(b) of the Bankruptcy Code, i.e., the absolute priority rule and the fair and equitable standard, this Court must closely scrutinize any attempt by the Debtors to obtain any benefit from avoiding these statutory protections. This concern is particularly acute when a debtor proposes a plan that treats holders of fully matured debt worse than holders of virtually identical instruments that have not yet matured. Moreover, the Debtors should not be able to achieve under unimpairment what they otherwise would not able to do had they attempted to

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the BNY Opening Brief.

cram down the Plan (i.e., giving equity holders any type of recovery before meeting the fair and equitable test).

The Debtors' explanation for this disparity in treatment is a strained, formalistic reading of the interest compounding provisions of the 2005 Notes Indenture, where the Debtors suggest that interest cannot be compounded for fully matured debt since there are no further unpaid installments of interest. This approach rewards the Debtors for failing to pay their debt at maturity without any plausible reason for depriving the holders of the 2005 Notes of compounding of interest and ignores the specific language contained in the Indenture and the Notes making the interest provisions applicable until the obligations under the Notes are satisfied.

## RESPONSE

### Unimpairment of Matured Debt

Instead of classifying the claims of the holders of the 2005 Notes as impaired and giving the holders thereof the right to vote, the Debtors elected to unimpair such claims. Thus, the fundamental issue before this Court is how a solvent debtor can unimpair fully matured but unpaid debt. BNY submits that the payment of post-maturity compound interest is the only way to unimpair the claims of the holders of the 2005 Notes, as it is in accordance with 2005 Notes Indenture, section 1124 of the Bankruptcy Code, and applicable state law. Moreover, the Debtors' narrow interpretation of the documents is wholly inequitable, given the facts and circumstances of these cases.

"A debtor with the financial wherewithal to honor its contractual commitments should be required to do so . . . [and w]here the debtor is solvent, the bankruptcy rule is that where there is

- 2 -

a contractual provision, valid under state law, providing for interest on unpaid installments of interest, the bankruptcy court will enforce the contractual provision with respect to both installments due before and . . . after the petition was filed. . . . This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor." In re Dow Corning Corp., 244 B.R. 678, 695 (E.D. Mich. 1999) (quoting in part Debentures Protective Comm. of Continental Investment Corp. v. Continental Investment Corp., 679 F.2d 264, 269 (1st Cir. 1982)). As discussed below, because the 2005 Notes Indenture contemplates the payment of post-maturity compound interest, the holders of the 2005 Notes should get the benefit of their bargain.

Due to the automatic stay, the holders of the 2005 Notes were unable to enforce their contractual remedies against the Debtor, and this Court ought not to interpret section 1124 of the Bankruptcy Code in such a way as to leave the holders of matured but unpaid debt with fewer rights in the post-maturity period as they had in the pre-maturity period. Indeed, "[t]he only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." In re Chicago, M. S. P. & P. R. Co., 791 F.2d 524, 527 (7th Cir. 1986). Accordingly, because the Debtors have the ability to pay the full amount of interest required under the 2005 Notes, this Court should hold that a solvent debtor should be required to pay post-maturity compound interest.

- 3 -

F134

## The 2005 Notes Indenture Expressly Provides for Compounding Post-Maturity

Contrary to the Debtors' assertion, the 2005 Notes Indenture provides for post-maturity compounding at the default rate, meaning that the Debtors still owe the holders of the 2005 Notes approximately $800,000 in order to leave them unimpaired pursuant to section 1124 of the Bankruptcy Code.  See Continental Investment Corp., 679 F.2d at 268-70 (stating that a bankruptcy court should enforce a contractual provision for interest on unpaid installments of interest in the pre and post-petition periods in the case of a solvent debtor); In re Realty Assocs. Securities Corp., 163 F.2d 387 (2d Cir. 1947) (holding that a solvent debtor was required to pay the contract rate of interest to unsecured bondholders on its matured but unpaid bonds, because the bond indenture stated that an event of default would lead to an interest rate of 5% per year on overdue principal).

Under section 6.1 of the 2005 Notes Indenture, an event of default occurs if the Debtors default in the payment of interest or principal on the 2005 Notes.  Therefore, when the Debtors failed to pay both principal due and payable on maturity and the August 15, 2005 interest payment,[2] they put themselves in default.

As described in detail in the BNY Opening Brief, pursuant to sections 2.12 and 4.1 of the 2005 Notes Indenture, interest accrues on principal and missed interest payment at the default rate of 14.5% per year.  Moreover, the 2005 Notes Indenture contains an express provision regarding the payment of post-maturity compound interest after maturity.

---

[2]    As discussed below, the Debtors' argument that BNY's use of the word "final" in its papers as being dispositive is specious.

- 4 -

Curiously, although the Debtors cite certain portions of the 2005 Notes Indenture in their Answering Brief, they fail to address section 8.1 (Termination of the Issuers' Obligations) and section 2.8 (Outstanding Notes) of the 2005 Notes Indenture. Instead, they merely make conclusory statements that the 2005 Notes Indenture does not require post-maturity compounding.

Section 8.1 states that the "Indenture shall cease to be of further effect . . . when all outstanding Notes theretofore authenticated and issued have been delivered . . . to the Trustee for cancellation and the Issuers have paid all sums payable by the Issuers [t]hereunder." Among other things, section 8.1 states that "the Issuers' obligations in Section 4.1 . . . shall survive until the Notes are no longer outstanding."

Section 2.8 (Outstanding Notes) states that "[i]f the principal amount of any Note is considered paid under Section 4.1 . . , it ceases to be outstanding and interest on it ceases to accrue." Since principal was not paid until the Effective Date, interest continued to accrue on the 2005 Notes after the stated maturity date.

Pursuant to the 2005 Notes, interest accrues from last date interest was paid to the next succeeding Interest Payment Date (i.e., February 15 and August 15 of each year),[3] and default interest accrues on overdue installments of interest. Therefore, under the express terms of the 2005 Notes Indenture, default interest only ceased to accrue and compound on February 12, 2007, the date on which the Debtors paid the principal amount of the 2005 Notes.

---

[3]     Although the 2005 Notes provide that interest is due on February 15 and August 15 of each year, the Debtors are asking the Court to read in a provision that the last Interest Payment Date was August 15, 2005, a provision that is not contained in the 2005 Notes.

F136

In addition, the cases upon which the Debtors rely in their Answering Brief are readily distinguishable. Indeed, as the Debtors acknowledge, these cases stand for the proposition that "the contract rate no longer applies unless expressly agreed to in the loan documents." Answering Brief, p.8. In four cases upon which the Debtors rely -- Wolf v. Aero Factors Corp., In re Dilts, Sindelar v. Fritzsch, and Rosenbaum v. Rose -- the underlying debt instrument at issue lacked a provision for post-maturity interest. However, because the 2005 Notes Indenture clearly provides for a default interest rate of 14.5%, compounded semi-annually, when the Debtors failed to pay the principal amount on the stated maturity date, the Debtors' reliance on these cases is misguided. See 2005 Notes Indenture §§ 2.12, 4.1; 2005 Notes § 1. In any event, under the Plan, the Debtors have already conceded that they are required to pay post-petition interest at the contractually-required default rate.[4]

---

[4] Even assuming, arguendo, that this Court finds that no such express provision exists, case law suggests that such a term can be implied from the documents. See, e.g., Roberts v. Grise, 442 N.E.2d 30, 30 (Mass. 1982) (finding "an implied contract between the parties that the same interest rate shall continue after maturity as before" and suggesting that the payment of compound interest would have been ordered if that issue had been brought on appeal). In addition, the following courts have implied a pre-maturity interest rate to the post-maturity period when the debt instrument provided for simple interest, which logically suggests that these courts would also imply a pre-maturity *effective* rate of interest to matured but unpaid debt. See, e.g., Astoria Fed. Sav. and Loan Ass'n v. Rambalakos, 372 N.Y.S.2d 689 (1975); Stull v. Joseph Feld., Inc., 309 N.Y.S.2d 985 (1970); Briscoe v. Goodmark Corp., 130 S.W.3d 160, 168 (Tex. 2003) ("When a note specifies a rate of interest before maturity, but is silent about any rate after maturity, the pre-maturity rate is implied as the post-maturity rate as a matter of law."); Aceta v. Robinson, 2000 Mass. App. Div. 155, 158 (2000) (implying that compounding would apply in the post-maturity period had the underlying document called for compounding pre-maturity period); First Nat. Bank of Hastings v. McNamara, 357 N.W.2d 171 (Minn. 1984) (applying state law); Petroscience Corp v. Diamond Geophysical, Inc., 684 S.W.2d 668 (Tex. 1984); Ohio Loan Co. v. Porychuk, 34 N.E.2d 1021 (Ohio 1935); Allendorph v. Ogden, 44 N.W. 220 (Neb. 1889); Kellogg v. Lavender, 18 N.W. 38 (Neb. 1883). See generally In re Chateauguay Corp., 170 B.R. 551 (S.D.N.Y. 1994) (post-petition

F137

In addition, In re Grayboyes involved a mortgage that provided for simple, rather than compound, interest during the pre-maturity period, whereas the 2005 Notes Indenture clearly provides for the compounding of interest. Likewise, the Debtors have misapplied Martin v. Star Publishing Co., 107 A.2d 795 (Del. Super. Ct. 1954). The Court in Martin discussed a general rule that, if the agreement of the parties (as to interest) extends no further than the maturity date, then there is no agreement regarding post-maturity interest. Id. at 796. However, as discussed above, because the 2005 Notes Indenture provides for post-maturity interest and the Debtors failed to pay principal due and payable on the stated maturity date, interest continued to accrue and compound until the Effective Date. See generally Dow Corning, 244 B.R. at 692.

**Reliance on Proofs of Claims is Not Justified**

The observation that "BNY has consistently stated that the interest installment due on the Maturity Date was the final interest payment,"[5] based on its proofs of claim (or recitation of similar language in its opening brief) is irrelevant and should not detract this Court from the unambiguous language in the 2005 Notes Indenture. A claim is filed against a debtor's estate in order to determine the *allowable* amount thereof for distribution purposes, not as an admission

---

compound interest pursuant to an indenture is allowable for such indentures entered into after 1989); Realty Assocs., 163 F.2d at 392 (solvent debtor corporation was required to pay the contract rate of interest to unsecured bondholders for its matured but unpaid bonds; no compound interest was paid because contract itself lacked compounding generally); Elliott Assocs., L.P. v. The Republic of Peru, 194 F.R.D. 116, 119 (S.D.N.Y. 2000) (allowing compound interest under New York law when indenture provided for "compound interest to the extent permitted by applicable law.")

[5]    BNY submits that by "final," it meant the interest payment that otherwise would have been the final interest payment, had the Debtors paid principal due and payable on the maturity date.

F138

that the claim face amount represents the totality of the creditor's legal, equitable, and contractual rights. Since claims for post-petition interest by unsecured creditors are not allowed in bankruptcy, whether the claims of the holders of the 2005 Notes are unimpaired has nothing to do with the amount asserted by BNY as its allowable claim, and everything to do with whether the Debtors have the left unaltered the rights of the holders of the 2005 Notes.   Because the Debtors have deprived the holders of their right to vote on the Plan, it is the Debtors' burden to prove that the claims of the holders of the 2005 Notes are unimpaired, rather than BNY's burden to prove that it claims were not paid in full.  See Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.), 324 F.3d 197, 203 (3d Cir. 2003); In re L & J Anaheim Assocs., 995 F.2d 940, 942 (9th Cir. 1993); In re American Solar King Corp., 90 B.R. 808, 819-20 (Bankr. W.D. Tex. 1988).

## CONCLUSION

For the reasons stated BNY Opening Brief and herein, BNY respectfully requests that the Court enter an order, pursuant to section 1124 of the Bankruptcy Code, the Plan, and the 2005 Notes Indenture, requiring the Debtors to pay post-petition interest in the form of accrued and unpaid interest (including interest upon interest that is due and owing and unpaid, compounded semi-annually on the semi-annual payment dates) from the Petition Date through the Effective Date at the default rate provided for in the 2005 Notes Indenture to the holders of the 2005 Notes.

Dated:  March 16, 2007
        Wilmington, Delaware

POTTER ANDERSON & CORROON LLP

*Laurie Selber Silverstein*

Laurie Selber Silverstein (2396)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

-and-

DECHERT LLP

Glenn E. Siegel
Davin J. Hall
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

Counsel for The Bank of New York, as
Indenture Trustee

F140

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| FOAMEX INTERNATIONAL INC. ) | Bankr. Case No. 05-12685 (KG) |
| ) | |
| Reorganized Debtor. ) | |

-----------------------------------------------------------x

| | |
|---|---|
| ) | |
| THE BANK OF NEW YORK, AS INDENTURE ) | Civil Action No. 07-00212 (JJF) |
| TRUSTEE, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| FOAMEX INTERNATIONAL INC. ) | |
| ) | |
| Appellee. ) | |
| ) | |

-----------------------------------------------------------x

## OPENING BRIEF OF APPELLANT
## THE BANK OF NEW YORK, AS INDENTURE TRUSTEE

**POTTER ANDERSON & CORROON LLP**
Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConaill (No. 4734)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

**DECHERT LLP**
Glenn E. Siegel
Ross L. Hirsch
Davin J. Hall
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel for The Bank of New York, as Indenture Trustee*

Dated:  June 25, 2007
        Wilmington, Delaware

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ................................................................. 1

ISSUE PRESENTED ON APPEAL.............................................................3

STANDARD OF REVIEW.........................................................................3

STATEMENT OF THE CASE.....................................................................3

SUMMARY OF ARGUMENT ................................................................... 5

STATEMENT OF THE FACTS ................................................................. 6

I.     THE 2005 NOTES INDENTURE ..................................................... 6

       A.     Compounding Under the 2005 Notes Indenture ......................... 6

       B.     Post-Maturity Obligations.......................................................... 7

III.   TREATMENT OF THE 2005 NOTES UNDER THE PLAN.............................. 8

ARGUMENT ........................................................................................... 9

I.     NEW YORK LAW GOVERNS THE NOTEHOLDERS' RIGHTS
       UNDER THE INDENTURE ............................................................. 9

II.    UNDER NEW YORK LAW, THE 2005 NOTES INDENTURE
       PROVIDES FOR POST-MATURITY COMPOUND INTEREST. ................... 10

       A.     Under New York, Interest Accrues After the Maturity Date in the
              Manner Provided for in the Debt Instrument if the Document
              States that such Interest Shall Accrue until the Debt "Is Paid" ............... 10

       B.     The 2005 Notes Indenture Provides that Interest Shall Accrue on
              the Dates and in the Manner Provided for in the 2005 Notes Until
              Principal Is Paid ................................................................. 12

       C.     The Bankruptcy Court Erred................................................ 14

              1. Reliance on Non-New York Law was Erroneous............................... 14

              2. "Express" Does Not Mean Contained in One Provision ................... 15

III.   BECAUSE THE 2005 NOTES INDENTURE EXPRESSLY PROVIDES
       FOR POST-MATURITY COMPOUND INTEREST AND THE
       HOLDERS OF THE 2005 NOTES WERE TO BE LEFT UNIMPAIRED
       UNDER THE SOLVENT DEBTORS' PLAN, THE BANKRUPTCY
       CODE REQUIRES THE PAYMENT OF POST-MATURITY INTEREST...... 17

CONCLUSION........................................................................................ 19

i

## TABLE OF AUTHORITIES

### STATUTES

11 U.S.C. § 1124 .................................................................................................. 4, 8-9

NY GBL § 5-527 ....................................................................................................... 12

### CASES

Astoria Fed. Sav. and Loan Ass'n v. Rambalakos,
      372 N.Y.S.2d 689 (1975) ........................................................... 10, 14

Bank Leumi Trust Co. of New York v. Sanford Ross Management, Ltd.,
      101 A.D.2d 759 (N.Y. 1984)…………………………………………….............. 10, 14

Berkery v. C.I.R.,
      192 B.R. 835 (E.D. Pa. 1996) ............................................................. 3

Citibank, N.A. v. Liebowitz, 110 A.D.2d 615 (N.Y. 1985)…………………………....10, 14

First Business Credit Co. v. Grayboyes (In re Grayboyes), 2006 U.S. Dist. LEXIS
      6671 (E.D. Pa. 2006).............................................................................. 15

In re Best Payphones, Inc.,
      2003 Bankr. LEXIS 180 (Bankr. S.D.N.Y. 2003) ........................... 10, 15

In re Brannon,
      476 F.3d 170 (3d Cir. 2007)................................................................ 9

In re Combustion Engineering, Inc.,
      391 F.3d 190 (3d Cir. 2004)................................................................ 18

In re Continental Airlines, Inc.,
      149 B.R. 76 (D. Del. 1993)................................................................. 3

Debentures Protective Comm. of Continental Investment Corp. v. Continental
      Investment Corp.,
      679 F.2d 264 (1st Cir. 1982) .............................................................. 17

In re Dilts, 143 B.R. 644 (Bankr. W.D. Pa. 1992) ........................................... 14

In re Dow Corning Corp.,
      244 B.R. 678 (E.D. Mich. 1999)........................................................ 17

F143

In re Dow Corning Corp.,
    456 F.3d 668 (6th Cir. 2006) ........................................................................17

In re Dunes Casino Hotel,
    63 B.R. 939 (D. N.J. 1986) ...........................................................................3

Elliott Assocs., L.P. v. The Republic of Peru,
    194 F.R.D. 116 (S.D.N.Y. 2000) ..................................................................12

Empire Trust Co. v. Equitable Office Bldg. Corp.,
    167 F.2d 346 (2d Cir. 1948)...................................................................11, 12

European American Bank v. Peddlers Pond Holding Corp.,
    185 A.D.2d 805 (N.Y. 1992) ..................................................................10, 14

In re Four Three Oh, Inc.,
    256 F.3d 107 (3d Cir. 2001).........................................................................3

Interface Group-Nevada v. Trans World Airlines, Inc. (In re Trans World
    Airlines, Inc.),
    145 F.3d 124 (3d Cir. 1998).........................................................................9

Leverso v. South Trust Bank,
    18 F.3d 1527 (11th Cir. 1994) .....................................................................9

Nobleman v. American Sav. Bank,
    508 U.S. 324 (1993)....................................................................................9

O'Brien v. Young,
    95 N.Y. 428 (1884) ...........................................................................10, 11, 14

Photopaint Techs., LLC v. Smartlens Corp.,
    335 F.3d 152 (2d Cir. 2003).........................................................................3

In re Realty Assocs. Securities Corp.,163 F.2d 387 (2d Cir. 1947)..........................11, 16

Slutsky v. Blooming Grove Inn, Inc.,
    147 A.D.2d 208 (N.Y. 1989) ..................................................................10, 14

Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.),
    324 F.3d 197 (3d Cir. 2003)........................................................................18

Stull v. Joseph Feld, Inc.,
    309 N.Y.S.2d 985 (1970) ......................................................................10, 14

iii

Weiss v. Northwest Broadcasting Inc.,
    140 F.Supp.2d 336 (D. Del. 2001).........................................................................................9

## OTHER

N.Y. Jur. 2d. Interest and Usury § 23 .............................................................................................10

F145

## PRELIMINARY STATEMENT

In this appeal, The Bank of New York ("BNY"), as indenture trustee under a certain indenture, dated as of December 23, 1997 (the "2005 Notes Indenture")[1] asks this Court to reverse the March 23, 2007 order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), because that decision is wrong as a matter of law. The single issue upon which the Bankruptcy Court ruled was whether the 2005 Notes Indenture required the Debtors to pay post-maturity interest on overdue installments of interest (or "compound interest") to BNY because of the Debtors' payment default. This issue is determined by the 2005 Notes Indenture, which is governed by New York law. There are no factual issues in dispute.

The Debtors were required to pay post-maturity compound interest because the holders of the 2005 Notes were left unimpaired under the Debtors' confirmed Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan")[2]. Since their claims were unimpaired, the Debtors were required to leave unaltered the legal, equitable, and contractual rights of the holders. Because the terms of the 2005 Notes Indenture require the payment of post-maturity compound interest, the Debtors should have paid such compound interest. Under the Plan, however, the Debtors only paid post-maturity simple interest.

---

[1]   Pursuant to the 2005 Notes Indenture, Foamex L.P. and Foamex Capital Corporation, two of the above-captioned reorganized debtors (collectively, the "Debtors"), issued 13-1/2% senior subordinated notes due 2005 (the "2005 Notes").

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Prior to the hearing to consider the confirmation of the Plan, BNY advised the Debtors that it would object to the confirmation since the holders of the 2005 Notes would be impaired if they did not receive compound interest. In order to avoid litigation over this objection at the confirmation hearing, the Debtors and BNY agreed that the Debtors would pay what was finally determined to be the appropriate amount owed to the holders under the 2005 Notes.

Following briefing and oral argument, the Bankruptcy Court ruled from the bench. Notably, in rendering its decision, the Bankruptcy Court did not disagree with BNY's reading of the Indenture to require payment of compound interest upon default, nor did the Bankruptcy Court suggest an alternative reading of the various provisions of the Indenture cited by BNY. Rather, the Bankruptcy Court indicated that the Indenture did not "expressly" provide for post-maturity compound interest, because it was required to read various provisions of the Indenture together to arrive at the position advocated by BNY.

A correct ruling would be in accordance with the Bankruptcy Code and the Debtors' Plan. The Debtors are solvent, and the Plan required payment in full, including all applicable interest on all allowed pre-petition general unsecured claims. Payment to BNY of post-maturity interest is thus mandated by the Plan and merely permits BNY to receive the treatment it should have received with respect to its claim – to simply be made whole, as were all other pre-petition creditors.

2

### ISSUE PRESENTED ON APPEAL

Whether the Bankruptcy Court erred in concluding that the claims of the holders of the 2005 Notes were unimpaired even though the holders did not receive the post-maturity compound interest provided for in the 2005 Notes Indenture and as required by New York law.

### STANDARD OF REVIEW

For cases originating in bankruptcy court, this Court occupies the first level of appellate review. Thus, "it is settled law" that the district court's "role is to apply a clearly erroneous standard to findings of fact, while applying a de novo standard of review to questions of law." Berkery v. C.I.R., 192 B.R. 835, 837 (E.D. Pa. 1996); see also In re Four Three Oh, Inc., 256 F.3d 107, 112 (3d Cir. 2001); In re Continental Airlines, Inc., 149 B.R. 76, 84 (D. Del. 1993). Matters of contract construction are questions of law and subject to plenary review. See Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 160 (2d Cir. 2003); In re Dunes Casino Hotel, 63 B.R. 939, 944 (D. N.J. 1986).

### STATEMENT OF THE CASE

On September 19, 2005, the Debtors filed voluntary petitions for relief in the Bankruptcy Court, pursuant to Chapter 11 of the United States Bankruptcy Code. (Disclosure Statement, App. at A32.)[3] BNY participated in the Debtors' cases on behalf of the holders of the 2005 Notes.

On November 27, 2006, the Debtors filed their Plan. (Disclosure Statement, App. at A33.) The Plan provided that the claims of the holders of the 2005 Notes would be left

---

[3]     Citations to the Appendix to the Opening Brief of The Bank of New York, as Indentured Trustee, filed herewith are abbreviated "App. A__".

3

unimpaired. (Plan Art. IV.D.2, App. at A44.) Accordingly, pursuant to section 1124(1)

of the Bankruptcy Code, the Debtors were required to leave unaltered the legal, equitable,

and contractual rights of the holders and of BNY.

Notwithstanding that requirement, in the Plan, the Debtors provided that the

holders would be paid principal and simple interest at the default rate on the Plan's

Effective Date. The Plan failed to account for the payment of interest on missed interest

payments that came due after the maturity date, as required by the plain terms of the 2005

Notes Indenture.

Because this issue was discrete and did not need to delay confirmation of the

Plan, and in order to avoid litigation over this objection at the confirmation hearing, the

Debtors and BNY agreed that BNY's objection could be resolved post-confirmation.

With the express reservation of BNY's rights on this issue, the Bankruptcy Court

confirmed the Plan. Thereafter, the Debtors paid BNY (i) the full amount of principal

due, (ii) a certain missed August 2005 interest payment, and (iii) simple interest on both.

The Debtors did not pay interest on their missed interest payments which came due in

2006, as promised by the 2005 Notes Indenture.

Following briefing and oral argument, the Bankruptcy Court (in a bench ruling)

concluded that the 2005 Notes Indenture did not "expressly" provide for post-maturity

interest. (Transcript of Omnibus Hearing (the "Transcript"), Case No. 05-12685 (KG)

(Bankr. D. Del. Mar. 21, 2007), App. at A73). The Bankruptcy Court entered its order

denying BNY's request on March 23, 2007. On April 2, 2007, BNY timely filed its

notice of appeal. This is BNY's opening brief in support thereof.

4

## SUMMARY OF ARGUMENT

1.     The Bankruptcy Court erred when it concluded that there was no express provision in the 2005 Notes Indenture for post-maturity compound interest.  Under New York law, which governs the 2005 Notes Indenture,[4] if a debt instrument provides for interest to accrue on the "unpaid" balance, or until principal is no longer "outstanding" or has been paid, then interest continues to accrue in the manner set forth in the debt instrument after the stated maturity date and until the outstanding principal is in fact paid.

2.     Pursuant to the 2005 Notes Indenture, the failure to pay principal on the stated maturity date triggered application of a default rate.  More importantly, the 2005 Notes Indenture expressly provides that this default interest continues to "accrue" until the notes are no longer outstanding and the principal has been paid.  Indeed, under the 2005 Notes Indenture, interest accrues semi-annually and is payable on stated interest payment dates.  When interest payments are not made, default interest accrues on the overdue installments of interest.  Because the principal amount of the 2005 Notes was not paid until February 12, 2007 (the date the Plan was substantially consummated), rather than the stated maturity date of August 15, 2005, the Debtors are required to make additional payments of installment interest after the maturity date, as well as pay interest on such overdue installments of interest.  However, the Debtors have only paid default interest on principal and the August 15, 2005 missed interest payment and, as such, have not paid the claims of the holders in full.  Accordingly, because the Plan was to leave the claims of the holders unimpaired, and the Debtors have a valid contractual obligation to

---

[4]     See 2005 Notes Indenture § 13.8, App. at A15 ("The internal laws of the State of New York, without regard to conflicts of laws principles thereof, shall govern and be used to construe th[e] Indenture, the Notes and the Note Guarantees.").

5

pay post-maturity compound interest, this Court should order payment of such interest to the holders of the 2005 Notes.

## STATEMENT OF THE FACTS

**I.    The 2005 Notes Indenture**

    *A.    Compounding Under the 2005 Notes Indenture*

Under the 2005 Notes Indenture, the Debtors were required to pay principal and interest on the dates and in the manner provided in the 2005 Notes. (2005 Notes Indenture § 4.1, App. at A09.) The 2005 Notes required that principal be paid on August 15, 2005. (2005 Notes, App. at A16.) In addition, the Debtors were to pay interest "semi-annually in arrears on February 15 and August 15 . . . (each an "Interest Payment Date")." (2005 Notes, App. at A22.) The Debtors did not make the required principal or interest payment due on August 15, 2005, and therefore, the Debtors were in default of the 2005 Notes Indenture prior to the Petition Date. (Disclosure Statement, App. at A36.)

This failure to pay both principal due and payable upon maturity and the August 15, 2005 interest payment constituted an "Event of Default" under the 2005 Notes Indenture,[5] which triggered a default rate of interest (of 14.5%) on outstanding principal and missed interest payments.[6]

---

[5]    2005 Notes Indenture § 6.1(a), (b), App. at A10 ("An event of default occurs if . . . (a) the Issuers default for 30 days in the payment when due of interest . . . [or] the Issuers default in payment when due of the principal . . . on the Notes.").

[6]    2005 Notes Indenture § 4.1, App. at A09 ("The Issuers shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest . . . at the same rate to the extent lawful"); see also id. § 2.12, App. at A08 ("If the Issuers or the Subsidiary Guarantors default in a payment of interest on the Notes, they shall pay the defaulted interest in any

In addition to default interest, the 2005 Notes Indenture provides for the payment of compound interest. Specifically, the 2005 Notes require the Debtors to:

> pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest at the [default] rate.

(2005 Notes § 1, App. at A22); see also (2005 Notes Indenture § 4.1, App. at A09 (same)). Thus, the 2005 Notes Indenture expressly stipulates that compound interest (i.e., interest-on-interest) accrues on the 2005 Notes.

### B.    Post-Maturity Obligations

The obligation to pay installments of interest (and default interest on those missed installments) on account of the 2005 Notes continues after the stated maturity date. This obligation is expressly stated in a number of provisions of the 2005 Notes Indenture. For example, section 8.1 of the 2005 Notes Indenture unequivocally provides that "*the Issuers' [payment] obligations in section 4.1 . . . shall survive until the Notes are no longer outstanding.*" (2005 Notes Indenture § 8.1, App. at A13-A14) (emphasis added). In addition, section 2.8 of the 2005 Notes Indenture (entitled "Outstanding Notes") makes it clear that a note ceases to be outstanding and accrue interest only when the principal is paid under section 4.1:

> If the principal amount of any Note is considered paid under Section 4.1 hereof, it ceases to be outstanding and interest on it ceases to accrue.

(2005 Notes Indenture § 2.8 ¶ 3, App. at A07); see also (id., ¶ 4) ("*[i]f the Paying Agent . . . holds, on a redemption date or maturity date, money sufficient to pay Notes payable on*

---

lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.1").

F152

*that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.*") (emphasis added).[7]  Because the Debtors did not pay the principal amount on the stated maturity date, the 2005 Notes were outstanding on that date.  Therefore, the 2005 Notes required continued semi-annual interest payments, and continued to accrue default interest, and interest on interest (or compound interest).

## II.    Treatment of the 2005 Notes under the Plan

On February 1, 2007, the Bankruptcy Court entered an order confirming the Plan. Under the Plan, the claims of the holders of the 2005 Notes were to be left *unimpaired* within the meaning of section 1124 of the Bankruptcy Code.  See (Plan, Art. IV.D.2, App. at A44.)  These claims were classified as Class 4 Claims under the Plan and were deemed Allowed (as defined in the Plan) in the aggregate amount of (i) the outstanding principal, (ii) the August 15, 2005 interest payment, and (iii) accrued default rate simple interest on principal and the August 15, 2005 interest payment from the stated maturity date through the Petition Date.  (Plan, Art. IV.D.1, App. at A43.)  On February 12, 2007, the holders were paid this Allowed claim, plus certain "Post-Petition Interest."  See (Plan, Article IV.D.1, App. at A43.)

"Post-Petition Interest" was defined as "accrued and unpaid interest pursuant to the 2005 Senior Subordinated Notes Indenture from the Petition Date through the Effective Date at the default rate provided for in the 2005 Senior Subordinated Notes Indenture." (Plan, App. at A40-A41.)  As such, the Debtors paid only post-maturity

---

[7]    It should also be noted that the 2005 Notes provide a date certain for the commencement of interest payments (February 15, 1998), but no certain termination date. (2005 Notes § 1, App. at A22.)

8

*simple* interest at the default rate on the Plan's Effective Date (ignoring the Interest

Payment Dates), even though the holders of the 2005 Notes were to be left unimpaired.

The Bankruptcy Court subsequently upheld this payment as all that the Debtors were

required to make pursuant to section 1124 of the Bankruptcy Code.

## ARGUMENT

The Plan provides that the rights of the holders of the 2005 Notes are to be

unimpaired. Since they were to be left unimpaired, and the 2005 Notes Indenture and the

2005 Notes require compounding of unpaid interest until the 2005 Notes are paid, the

Debtors are required to pay compound interest to the holders of the 2005 Notes.

## I.    New York Law Governs the Noteholders' Rights Under the Indenture

The 2005 Notes Indenture and the 2005 Notes provide that New York law

governs the rights of the parties to the 2005 Notes Indenture and the holders of the 2005

Notes. 2005 Notes Indenture § 13.8.

This provision is enforceable in bankruptcy, Leverso v. South Trust Bank, 18 F.3d

1527, 1531 (11th Cir. 1994) ("[b]ondholders' rights are a matter of contract, governed by

the trust indenture and general principles of contract law."), and courts within the Third

Circuit will enforce a contract's choice of law provision. See, e.g., Interface Group-

Nevada v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124,

134 (3d Cir. 1998); Weiss v. Northwest Broadcasting Inc., 140 F.Supp.2d 336, 342 (D.

Del. 2001). See generally Nobleman v. American Sav. Bank, 508 U.S. 324, 329 (1993)

("Congress has 'left the determination of property rights in the assets of a bankrupt's

estate to state law,' since such '[p]roperty interests are created and defined by state

law.'") (quoting in part Butner v. United States, 440 U.S. 48, 54 (1979)); accord In re

Brannon, 476 F.3d 170, 176 (3d Cir. 2007) (stating that Courts within the Third Circuit

9

will "turn to state law for the 'determination of property rights in the assets of a

bankrupt's estate.'").

**II.    Under New York Law, the 2005 Notes Indenture Expressly Provides for Post-Maturity Compound Interest.** [8]

    A.    Under New York Law, Interest Accrues After the Maturity Date in the Manner Provided for in the Debt Instrument if the Document States that such Interest Shall Accrue until the Debt "Is Paid"

Under New York law, if a debt instrument provides for interest to accrue in a

particular manner until the principal amount of the debt is paid, such interest will accrue

in the same manner regardless of the instrument's stated maturity date. See, e.g., O'Brien

v. Young, 95 N.Y. 428, 430 (1884) (use of the phrase "until the principal shall be paid"

was dispositive); accord European American Bank v. Peddlers Pond Holding Corp., 185

A.D.2d 805, 805 (N.Y. 1992) (noting that the foregoing principle is "well established");

Slutsky v. Blooming Grove Inn, Inc., 147 A.D.2d 208 (N.Y. 1989) (same); Citibank,

N.A. v. Liebowitz, 110 A.D.2d 615 (N.Y. 1985); Bank Leumi Trust Co. of New York v.

Sanford Ross Management, Ltd., 101 A.D.2d 759 (N.Y. 1984); Astoria Fed. Sav. and

Loan Ass'n v. Rambalakos, 372 N.Y.S.2d 689 (1975); Stull v. Joseph Feld, Inc., 309

N.Y.S.2d 985 (1970); see also 72 N.Y. Jur. 2d. Interest and Usury § 23 (noting that the

use of similar language means that the maturity date will be disregarded); In re Best

Payphones, Inc., 2003 Bankr. Lexis 180, at *19, Case No. 01-15472 (SMB) (Bankr.

S.D.N.Y. Mar. 10, 2003) (attached as Exhibit A) (concluding that the only reasonable

---

[8]    It should be noted that the Debtors agree that they were obligated to pay compound interest pre-maturity and indeed did so for their 9-7/8% notes due 2007 (which are virtually identical to, and rank *pari passu* with, the 2005 Notes) under the Plan.  This created the odd result that claims of the holders of notes which had not yet matured were treated better than the claims of holders of notes which had matured, even though the interest provisions of the matured instrument were to apply post-maturity. See Plan, Article I.A.

interpretation of a document was that certain interest provisions continued to govern until the payment of principal) (citing O'Brien, 95 N.Y. at 428).

Accordingly, under New York law, if an indenture provides for the accrual of interest until the principal "is paid," such language is sufficient to constitute a stipulation between the contracting parties that interest accrues in the manner provided for in the indenture after the stated maturity date. For example, in In re Realty Assocs. Securities Corp., the Court of Appeals for the Second Circuit considered an appeal by a *debtor* who argued that the contract rate of interest (rather than the statutory rate of interest) should have been paid on its matured but unpaid bonds upon its exit from bankruptcy. 163 F.2d 387, 389-90 (2d Cir. 1947). After (i) cross-referencing a number of sections in the indenture (particularly, that the default rate of interest applied after an event of default, and nonpayment at maturity being one such event) and (ii) considering that "it is common ground that under the New York decisions interest continues [in the manner provided for in the specific contract] . . . if the contract provides for payment of interest 'until the principal shall be paid,'" the Court held that the bondholders were entitled to post-maturity interest in accordance with the terms of their indenture. Id. at 390-92 (citing O'Brien, 95 N.Y. at 430).

Similarly, in Empire Trust Co. v. Equitable Office Bldg. Corp., 167 F.2d 346 (2d Cir. 1948), the debtor's plan of reorganization provided for the payment of certain debentures in full with interest to the date of consummation of the plan. Id. at 347. The issue in the case was whether the debenture holders were entitled to interest at the contract rate or the statutory rate for interest that accrued after an accelerated maturity date. Id. The court held that, because the debenture contained a provision to pay interest

11

on principal "until such principal shall be paid," contractual interest continued to accrue. Moreover, the Court also "construed" a clause in the debenture to be an equivalent of a covenant to pay interest on matured coupons of interest,[9] but because such a compounding provision was void under New York law at the time Empire Trust was decided, the Court could not enforce it. Id. at 348-49. Payment of compound interest, however, is now clearly authorized under current New York law and the 2005 Notes Indenture expressly provides for compounding in section 4.1 of the indenture, section 1 of the Note, and as set forth below. See NY GBL § 5-527 ("A loan or other agreement providing for compound interest shall be enforceable notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed). See generally Elliott Assocs., L.P. v. The Republic of Peru, 194 F.R.D. 116, 119 (S.D.N.Y. 2000) (ordering the payment of post-maturity compound interest pursuant to New York law).

B.    The 2005 Notes Indenture Provides that Interest Shall Accrue on the Dates and in the Manner Provided for in the 2005 Notes Until Principal Is Paid

The 2005 Notes Indenture provides for interest to accrue in the manner provided for in the 2005 Notes after the maturity date and until principal is paid, and the obligation to pay installments of interest (and default interest on those missed installments) on account of the 2005 Notes continues after the stated maturity date.

---

[9]    The court looked to the terms of the indenture for this obligation, because the interest coupon itself was silent about post-maturity interest. Id. at 348-49 ("[W]e think the . . . clause should be construed as equivalent to a covenant to pay interest at 5% per annum on overdue coupons."). This suggests that an obligation to pay post-maturity compound interest need not be contained in one provision in order for a court to conclude that it exists.

This obligation is stated in a number of provisions in the 2005 Notes Indenture. Specifically, section 8.1 of the 2005 Notes Indenture provides that *"the Issuers' [payment] obligations in section 4.1 . . . shall survive until the Notes are no longer outstanding."* (2005 Notes Indenture, App. at A14) (emphasis added). Notably, there is no mention of the "maturity" date.

In addition, section 2.8 of the 2005 Notes Indenture (entitled "Outstanding Notes") states that interest continues to accrue in the manner provided for in the 2005 Notes until principal is paid. (2005 Notes Indenture § 2.8, ¶ 3, App. at A07) (*"If the principal amount of any Note is considered paid under Section 4.1 hereof, it ceases to be outstanding and interest on it ceases to accrue."* (emphasis added)); see also (id., ¶ 4) (*"[i]f the Paying Agent . . . holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest."* (emphasis added)). Again, there is no mention of the "maturity" date being the termination date.

Thus, the 2005 Notes Indenture provides that interest continues to accrue on the 2005 Notes, on the dates and in the manner provided for in the notes, *until principal is paid*. See (2005 Notes Indenture §§ 2.8, 4.1, 8.1, App. at A07, A09, A13-14.) Pursuant to the 2005 Notes, interest accrues semi-annually, and if it is not paid on the applicable Interest Payment Date, default interest accrues on the missed interest payments. Sections 2.8 and 8.1 mandate that interest accrues in this manner until principal is paid, and the Debtors were obligated to make interest payments on February 15, 2006, and August 15, 2006 (at the default rate). They did not, thereby causing default interest to accrue on these overdue installments of interest.

13

Since the 2005 Notes Indenture states that interest shall cease to accrue only if the principal is paid, and interest accrues at a default rate compounded semi-annually, <u>see</u> discussion <u>supra</u> pp. 10-12, under New York law, the Debtors are required to pay post-maturity compound interest at the default interest rate, rather than just simple interest.

      C.    <u>The Bankruptcy Court Erred</u>

          *1.    Reliance on Non-New York Law was Erroneous*

The Bankruptcy Court was apparently persuaded by the Debtors' argument that it was not "enough to state . . . that the indenture survives until the notes are no longer outstanding." (Transcript, App. at A58, A62, A71.) As indicated above, however, the Bankruptcy Court erred in relying on a body of case law that contradicts the law of New York or was otherwise patently inapplicable. For example, in <u>In re Dilts</u>, the bankruptcy court based a denial of payment of post-maturity contractual interest on the observation that, "[u]nder Pennsylvania law, 'until paid' relates only to the maturity date." 143 B.R. 644, 647 (Bankr. W.D. Pa. 1992). As indicated above, the New York courts do not follow that principle of law, and the use of the phrase "until paid" does in fact constitute an express stipulation between the parties that interest shall continue to accrue in the manner provided for in the debt instrument after the maturity date or until the debtor's obligations are no longer outstanding. <u>See, e.g.</u>, <u>O'Brien v. Young</u>, 95 N.Y. 428, 430 (1884) <u>European American Bank v. Peddlers Pond Holding Corp.</u>, 185 A.D.2d 805, 805 (N.Y. 1992); <u>Slutsky v. Blooming Grove Inn, Inc.</u>, 147 A.D.2d. 208 (N.Y. 1989); <u>Citibank, N.A. v. Liebowitz</u>, 110 A.D.2d 615 (N.Y. 1985); <u>Bank Leumi Trust Co. of New York v. Sanford Ross Management, Ltd.</u>, 101 A.D.2d 759 (N.Y. 1984); <u>Astoria Fed. Sav. and Loan Ass'n v. Rambalakos</u>, 372 N.Y.S.2d 689 (1975); <u>Stull v. Joseph Feld, Inc.</u>, 309

14

N.Y.S.2d 985 (1970); In re Best Payphones, Inc., 2003 Bankr. Lexis 180, at *19, Case

No. 01-15472 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2003).

      Likewise, in First Business Credit Co. v. Grayboyes (In re Grayboyes), a decision

that was also based on Pennsylvania law, the district court affirmed the bankruptcy

court's determination that only simple interest was to accrue on a debt instrument

because the "loan documents fail[ed] to specify that interest should be calculated

according to a compound interest formula." 2006 U.S. Dist. LEXIS 6671, at *34 (E.D.

Pa. 2006) (attached as Exhibit B). Even if this case was binding precedent (which it is

not, since it is based on Pennsylvania law), it is readily distinguishable, because the 2005

Notes Indenture clearly requires the payment of compound interest. See (2005 Notes

Indenture §§ 2.12, 4.1, 8.1, App. at A08, A09, A13-14); see also (2005 Notes § 1, App. at

A22).

      2.    *"Express" Does Not Mean Contained in One Provision*

      Although the Bankruptcy Court noted that it understood BNY's argument, found

it to be "skillful" and "well made," and did not challenge its interpretation of the

indenture provisions, it was ultimately not persuaded by it, because (in its opinion) there

was no "express" provision for compound interest. See (Transcript, App. at A73.) The

Court seemed to imply that such a provision needed to be made in one sentence or

perhaps required a separate single paragraph on post-maturity interest. See (Transcript at

A71 ("[T]he Court emphasi[zes] the word express.").) Although under New York law a

debt instrument just needs to provide that interest shall accrue until principal is paid (in

order for contractual interest to continue on past the maturity date), sections 2.8 and 8.1

of the 2005 Notes Indenture do in fact contain express statements that the interest provisions of the 2005 Notes extend beyond their maturity.

Moreover, simply because a handful of sections of the 2005 Notes Indenture need to be cross-referenced in order to fully state the Debtors' obligation to pay post-maturity compound interest does not render the obligation "implied."[10] For something to be "express," it just has to be clearly stated; "express" is not synonymous with "succinct" or "terse." Certainly, it cannot be suggested that courts interpreting New York law would not cross reference particular provisions in an indenture to determine whether a debtor would be contractually obligated to provide post-maturity interest. See, e.g., Realty Assocs., 163 at 390 ("[A]fter an 'event of default' (nonpayment at maturity being specified as one such event) [certain interest] shall be applied to the payment of principal and interest then owing."). In any event, the key point under New York law is that because the 2005 Notes were not considered to be "paid" until the Effective Date, interest continued to accrue in the manner and on the dates provided for in the notes. See (2005 Notes Indenture §§ 2.8, 2.12, 4.1, 8.1, App. at A07-A08, A09, A13-A14.)

Additionally, although the obligation to pay post-maturity compound interest does arise from a number of sections, that does not mean the obligation is implied or inferred -- sections 2.8 and 8.1 clearly state that interest continues to accrue until the notes are paid, section 4.1 states that interest accrues in the manner and on the dates provided for in

---

[10]    In fact, this is exactly how the Debtors themselves reasoned that they needed to pay post-maturity *simple* interest under the Plan, since section 6.1 of the 2005 Notes Indenture identifies what constitutes an event of default, and section 2.12 and 4.1 tell the Debtors what rate of default interest they had to pay. Indeed, at no point have the Debtors pointed to a provision in the 2005 Notes Indenture that supports their argument that their obligation to pay interest on the Interest Payment Dates ceases to exist after the maturity date, especially when principal was still outstanding.

the notes, and section 1 of the notes states that interest is due twice a year and that default interest accrues on the missed interest payments. Thus, it is quite clear that the Debtors are required to pay post-maturity compound interest.

**III.    Because the 2005 Notes Indenture Expressly Provides for Post-Maturity Compound Interest and the Holders of the 2005 Notes were to be Left Unimpaired under the Solvent Debtors' Plan, the Bankruptcy Code Requires the Payment of Post-Maturity Interest.**

Because (i) the 2005 Notes Indenture provides for post-maturity compound interest, (ii) the holders of the 2005 Notes were to be left unimpaired under the Plan, and (iii) the Debtors are solvent, this Court must reverse the Bankruptcy Court and order that the Debtors pay post-maturity compound interest at the default rate. When dealing with issues similar to those presented to this Court, the United States Court of Appeals for the Sixth Circuit held that "[w]here the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law, providing for interest on unpaid installments of interest, the bankruptcy court will enforce the contractual provision with respect to both instalments [sic] due before and . . . after the petition was filed. . . . This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor, and, correspondingly, the creditor will have been deprived of the opportunity to use the money to his advantage." In re Dow Corning Corp., 456 F.3d 668 (6th Cir. 2006) (quoting In re Dow Corning Corp., 244 B.R. 678, 695 (E.D. Mich. 1999)); accord Debentures Protective Comm. of Continental Investment Corp. v. Continental Investment Corp., 679 F.2d 264, 269 (1st Cir. 1982) (stating that a bankruptcy court should enforce a contractual provision for interest on unpaid installments of interest in the pre and post-petition periods in the case of a solvent debtor). Because there is indeed

17

a valid contractual provision for post-maturity and post-petition interest, the Debtors (and, by implication, their equityholders) should not be able to reap a windfall by not paying due and outstanding default interest-on-interest.

Furthermore, because the Plan was to leave the holders of the 2005 Notes unimpaired, they must be paid in full. See In re Combustion Engineering, Inc., 391 F.3d 190, 216 (3d Cir. 2004); Solow v. PPI Enterprises (U.S.), Inc. (In re PPI Enterprises (U.S.), Inc.), 324 F.3d 197, 202 (3d Cir. 2003). In order to be paid in full, they must be given everything that is owed to them under their indenture (i.e., post-maturity compound interest). Since the 2005 Notes Indenture contains an express provision for post-maturity compound interest, which is valid under New York state law, and the Debtors are solvent and have obligated themselves to pay the 2005 Notes in full (under the Plan), this Court must therefore require the Debtors to give the holders of the 2005 Notes the benefit of their bargain by ordering the payment of such interest.

## CONCLUSION

WHEREFORE, BNY respectfully requests that the Court enter an order (i) reversing the Order from which BNY appealed, (ii) concluding that the 2005 Notes Indenture requires the payment of post-maturity compound interest at the default interest rate provided therein, (iii) requiring that the Debtors pay such interest to the holders of the 2005 Notes, and (iv) granting such further relief as the Court may deem just and proper.

Dated: June 25, 2007

**POTTER ANDERSON & CORROON LLP**

Laurie Selber Silverstein (No. 2396)
Gabriel R. MacConaill (No. 4734)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

-and-

**DECHERT LLP**
Glenn E. Siegel
Ross L. Hirsch
Davin J. Hall
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

Counsel for The Bank of New York, as
Indenture Trustee

Pac#803724

19

F164